**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANK HALL, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> JOHNSON & JOHNSON, ALEX GORSKY, and DOMINIC J. CARUSO, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Frank Hall ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Johnson & Johnson ("J&J" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the

Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of J&J between February 22, 2013 and February 7, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      J&J has known for decades that its talc products, such as its Baby Powder, include asbestos fibers and that the exposure to those fibers can cause ovarian cancer and mesothelioma. Accordingly, Defendants misrepresented and failed to disclose the danger that J&J's talc products posed to consumers, J&J's significant contingent liability related to its talc products, and that J&J's revenues from sales of these products were unsustainable due to the dangerous and harmful nature of its talc products.

3.      In the 1990s, J&J outlined a plan to hike flagging sales of its powder "by targeting" black and Hispanic women, according to a company memorandum made public in recent lawsuits against J&J.

4.      On September 21, 2017, *Bloomberg* published an article titled, "Johnson & Johnson alerted to risk of asbestos in talc in '70s, files show," stating that "documents indicate that J&J has known for decades that its talc products include asbestos fibers and that the exposure to those fibers can cause ovarian cancer."

5.      On this news, shares of J&J fell $2.28 per share over five consecutive trading days to close at $129.47 per share on September 28, 2017, damaging investors.

6.      On February 5, 2018, *CNBC* published an article titled, "Johnson & Johnson falls on report that lawsuits could expose potentially damaging documents."

7.      On this news, shares of J&J fell $7.29 per share or over 5% from its previous closing price to close at $130.39 per share on February 5, 2018, damaging investors.

8.      Then, on February 7, 2018, during aftermarket hours, the Beasley Allen Law Firm issued a press release stating that "[l]awsuits filed by ovarian cancer and mesothelioma victims are revealing never-before-seen documents from Johnson & Johnson and talc supplier, Imerys, that shed light on just how prevalent asbestos and heavy metals are in the talc used in Baby Powder." The release stated that "[i]nternal Johnson & Johnson documents from 1972 note that asbestos was found in 100 percent of talc samples tested at the time, but this information was never released publicly." It further stated that J&J stopped funding a project designed to test talc samples for asbestos contamination once a majority of the sample batches were found to be positive for asbestos.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.    Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and are headquartered within this District.

12.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.    Plaintiff, as set forth in the accompanying Certification, purchased J&J securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.    Defendant J&J, together with its subsidiaries, researches and develops, manufactures, and sells various products in the health care field worldwide. The Company is incorporated in New Jersey and its principal executive offices are located at One Johnson & Johnson Plaza, New Brunswick, New Jersey, 08933. J&J's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "JNJ."

15.    Defendant Alex Gorsky ("Gorsky") has been the Chairman and Chief Executive Officer of J&J since December 28, 2012 and April 26, 2012 respectively.

16.    Defendant Dominic J. Caruso ("Caruso") has been the Chief Financial Officer at J&J since January 1, 2007 and has been its Executive Vice President since May 2, 2016.

17.    Defendants Gorsky and Caruso are sometimes referred to herein as the "Individual Defendants."

18.    Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

19.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

20.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

21.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

22.     On February 22, 2013, the Company filed a Form 10-K for the fiscal year ended December 30, 2012 (the "2012 10-K") with the SEC, which provided the Company's year-end

financial results and position and stated that the Company's disclosure controls and procedures was effective as of December 30, 2012. The 2012 10-K stated that Management's Report on Internal Control Over Financial Reporting "is incorporated herein by reference to the material under the caption 'Management's Report on Internal Control Over Financial Reporting' of the Annual Report, filed as Exhibit 13 to this Report on Form 10-K." Exhibit 13 to the 2012 10-K stated that the Company's internal control over financial reporting was effective as of December 30, 2012. The 2012 10-K was signed by Defendants Gorsky and Caruso. The 2012 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

23.     The 2012 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, skin care, oral care, wound care and women's health care fields, as well as nutritional and over-the-counter pharmaceutical products, and wellness and prevention platforms. The Baby Care franchise includes the JOHNSON'S® Baby line of products.

24.     The 2012 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products**…

6

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

*      *      *

**Management's Objectives**
The Company manages within a strategic framework aimed at achieving sustainable growth. To accomplish this, the Company's management operates the business consistent with certain strategic principles that have proven successful over time. To this end, the Company participates in growth areas in human health care and is committed to attaining leadership positions in these growth areas through the development of high quality, innovative products and services.

[Emphasis added].

25.     The 2012 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

Most of the Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation. In the United States, the drug, device, diagnostics and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

26.     Exhibit 13 to the 2012 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

27.     Exhibit 13 to the 2012 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries are confident of the adequacy of the warnings and instructions for use that accompany the products at issue," stating in pertinent part:

Certain subsidiaries of Johnson & Johnson are involved in numerous product liability cases. The damages claimed are substantial, and while **these subsidiaries**

**are confident of the adequacy of the warnings and instructions for use that accompany the products at issue**, it is not feasible to predict the ultimate outcome of litigation. The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. Changes to the accruals may be required in the future as additional information becomes available.

[Emphasis added].

28.     On February 21, 2014, the Company filed a Form 10-K for the fiscal year ended December 29, 2013 (the "2013 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's disclosure controls and procedures was effective as of December 29, 2013. The 2013 10-K stated that Management's Report on Internal Control Over Financial Reporting "is incorporated herein by reference to the material under the caption 'Management's Report on Internal Control Over Financial Reporting' of the Annual Report, filed as Exhibit 13 to this Report on Form 10-K." Exhibit 13 to the 2013 10-K stated that the Company's internal control over financial reporting was effective as of December 29, 2013. The 2013 10-K was signed by Defendants Gorsky and Caruso. The 2013 10-K also contained signed SOX certifications by Defendants Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

29.     The 2013 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, skin care, oral care, wound care and women's health fields, as well as nutritionals, over-the-counter pharmaceutical products and wellness and prevention platforms. The Baby Care franchise includes the JOHNSON'S® Baby line of products.

30.     The 2013 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

\*       \*       \*

The Company engages in areas of human health care where there is an opportunity to make a meaningful difference, and is committed to creating value by developing broadly accessible, high quality, innovative products and services.

[Emphasis added].

31.     The 2013 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

Most of the Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation. In the United States, the drug, device, diagnostics and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

32.     Exhibit 13 to the 2013 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

33.     Exhibit 13 to the 2013 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries believe they have substantial defenses," stating in pertinent part:

> Certain subsidiaries of Johnson & Johnson are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages. While **these subsidiaries believe they have substantial defenses**, it is not feasible to predict the ultimate outcome of litigation. The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. Changes to the accruals may be required in the future as additional information becomes available.

> [Emphasis added].

34.     On May 12, 2014, J&J issued the following statement in an article published by *Fox 32*, titled "Popular Baby Powder Allegedly Caused Cancer in Pro-Figure Skater":

> "We have no higher responsibility than the health and safety of consumers who rely on our products. It is important for consumers to know that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies."

35.     On February 24, 2015, the Company filed a Form 10-K for the fiscal year ended December 28, 2014 (the "2014 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's disclosure controls and procedures was effective as of December 28, 2014. The 2014 10-K stated that Management's Report on Internal Control Over Financial Reporting "is incorporated herein by reference to the material under the caption 'Management's Report on Internal Control Over Financial Reporting' of the Annual Report, filed as Exhibit 13 to this Report on Form 10-K." Exhibit 13 to the 2014

10-K stated that the Company's internal control over financial reporting was effective as of December 28, 2014. The 2014 10-K was signed by Defendants Gorsky and Caruso. The 2014 10-K also contained signed SOX certifications by Defendants Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

36.     The 2014 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, oral care, skin care, over-the-counter pharmaceutical, women's health and wound care markets. Baby Care includes the JOHNSON'S® Baby line of products.

37.     The 2014 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

*     *     *

The Company engages in areas of human health care where there is an opportunity to make a meaningful difference, and is committed to creating value by developing broadly accessible, high quality, innovative products and services.

[Emphasis added].

38.    The 2014 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

> Most of the Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation. In the U.S., the drug, device, diagnostics and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

39.    Exhibit 13 to the 2014 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

40.    Exhibit 13 to the 2014 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries believe they have substantial defenses," stating in pertinent part:

> Certain subsidiaries of Johnson & Johnson are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages. While **these subsidiaries believe they have substantial defenses**, it is not feasible to predict the ultimate outcome of litigation. The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. In addition, product liability accruals can represent projected product liability for thousands of claims around the world, each in different litigation environments and with different fact patterns. Changes to the accruals may be required in the future as additional information becomes available.

> [Emphasis added].

41.    On April 8, 2015, J&J stated on its website that:

> "Various agencies and governmental bodies have examined whether talc is a carcinogen, and none have concluded that it is. These include the U.S. Food and Drug Administration and National Toxicology Program, part of the U.S. Department of Health and Human services."

42.     On February 24, 2016, the Company filed a Form 10-K for the fiscal year ended January 3, 2016 (the "2015 10-K") with the SEC, with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of January 3, 2016. The 2015 10-K was signed by Defendants Gorsky and Caruso. The 2015 10-K also contained signed SOX certifications by Defendants Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

43.     The 2015 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, oral care, skin care, over-the-counter pharmaceutical, women's health and wound care markets. Baby Care includes the JOHNSON'S® line of products.

44.     The 2015 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

*     *     *

The Company is broadly based in human health care, and is committed to creating value by developing accessible, high quality, innovative products and services.

[Emphasis added].

45.     The 2015 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

The Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation. In the U.S., the drug, device and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

46.     The 2015 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

47.     The 2015 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries believe they have substantial defenses," stating in pertinent part:

Certain subsidiaries of Johnson & Johnson are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages. While **these subsidiaries believe they have substantial defenses**, it is not feasible to predict the ultimate outcome of litigation. The Company has established accruals for product liability claims and lawsuits in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. The Company accrues an estimate of the legal defense costs needed to defend each matter. For certain of these matters, the Company has accrued additional amounts such as estimated costs associated with settlements, damage and other losses. Product liability accruals can represent projected product liability for thousands of claims around the world, each in different litigation environments and with different fact patterns. Changes to the accruals may be required in the future as additional information becomes available.

14

[Emphasis added].

48.      On December 30, 2016, J&J touted the safety and effectiveness of talc in its products on its website at https://www.safetyandcarecommitment.com/Ingredients/Talc, stating in pertinent part:

**In our products**

We continue to use talc in our products because decades of science have reaffirmed its safety. Because of its safety and effectiveness, we confidently include pharmaceutical grade talc in our products. Your trust in our products and your confidence using them every day is a huge responsibility—that's why we only use ingredients in our products deemed safe by the latest science.

Science, research, clinical evidence and 30 years of studies by medical experts around the world continue to support the safety of cosmetic talc.

49.      On February 27, 2017, the Company filed a Form 10-K for the fiscal year ended January 1, 2017 (the "2016 10-K") with the SEC, with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of January 1, 2017. The 2016 10-K was signed by Defendants Gorsky and Caruso. The 2016 10-K also contained signed SOX certifications by Defendants Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

50.      The 2016 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, oral care, beauty (previously referred to as skin care), over-the-counter pharmaceutical, women's health and wound care markets. Baby Care includes the JOHNSON'S® line of products.

51. The 2016 10-K discussed the pending lawsuits against J&J and its subsidiaries based on nondisclosure of alleged health risks associated with talc contained in J&J's baby products, stating in pertinent part:

> Claims for personal injury have been made against Johnson & Johnson Consumer Inc. and Johnson & Johnson arising out of the use of JOHNSON'S® Baby Powder. The number of pending product liability lawsuits continues to increase, and the Company continues to receive information with respect to potential costs and the anticipated number of cases. Lawsuits have been primarily filed in state courts in Missouri, New Jersey and California. In addition, a federal multi-district litigation proceeding has been created for this litigation in the District Court of New Jersey. The Company has established an accrual for defense costs in connection with product liability litigation associated with JOHNSON'S® Baby Powder. Changes to this accrual may be required in the future as additional information becomes available.

> *       *       *

> In June 2014, the Mississippi Attorney General filed a complaint in Chancery Court of The First Judicial District of Hinds County, Mississippi against Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. (now Johnson & Johnson Consumer Inc.) (JJCI). The complaint alleges that defendants failed to disclose alleged health risks associated with female consumers' use of talc contained in JOHNSON'S® Baby Powder and JOHNSON'S® Shower to Shower (a product no longer sold by JJCI) and seeks injunctive and monetary relief. This matter is currently scheduled for trial in September 2017.

> *       *       *

> In May 2014, two purported class actions were filed in federal court, one in the United States District Court for the Central District of California and one in the United States District Court for the Southern District of Illinois, against Johnson & Johnson (J&J) and Johnson & Johnson Consumer Companies, Inc. (now Johnson & Johnson Consumer Inc.) (JJCI), alleging violations of state consumer fraud statutes based on nondisclosure of alleged health risks associated with talc contained in JOHNSON'S® Baby Powder and JOHNSON'S® Shower to Shower (a product no longer sold by JJCI). Both cases seek injunctive relief and monetary damages; neither includes a claim for personal injuries. In October 2016, both cases were transferred to the United States District Court for the District Court of New Jersey as part of a newly created federal multi-district litigation. In December 2016, J&J and JJCI filed a motion to dismiss one of the cases.

52.   The 2016 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

\*      \*      \*

The Company is broadly based in human health care, and is **committed to creating value by developing accessible, high quality, innovative products and services.**

[Emphasis added].

53.   The 2016 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

The Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation. In the U.S., the drug, device and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

54.   The 2016 10-K discussed that the risks and uncertainties facing the Company are, among others, "[p]roduct efficacy or safety concerns, whether or not based on scientific

evidence, potentially resulting in product withdrawals, recalls, regulatory action on the part of the U.S. Food and Drug Administration (or international counterparts), declining sales and reputational damage."

55.     The 2016 10-K discussed the product liability cases against J&J and it's subsidiaries, while stating that "the Company believes it has substantial defenses," stating in pertinent part:

> Johnson & Johnson and certain of its subsidiaries are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages. While **the Company believes it has substantial defenses**, it is not feasible to predict the ultimate outcome of litigation. The Company has established accruals for product liability claims and lawsuits in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. The Company accrues an estimate of the legal defense costs needed to defend each matter when those costs are probable and can be reasonably estimated. For certain of these matters, the Company has accrued additional amounts such as estimated costs associated with settlements, damages and other losses. To the extent adverse verdicts have been rendered against the Company, the Company does not record an accrual until a loss is determined to be probable and can be reasonably estimated. Product liability accruals can represent projected product liability for thousands of claims around the world, each in different litigation environments and with different fact patterns. Changes to the accruals may be required in the future as additional information becomes available.

> The most significant of these cases include the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System, the PINNACLE® Acetabular Cup System, pelvic meshes, RISPERDAL®, XARELTO® and JOHNSON'S® Baby Powder. As of January 1, 2017, in the U.S. there were approximately 2,000 plaintiffs with direct claims in pending lawsuits regarding injuries allegedly due to the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System, 9,400 with respect to the PINNACLE® Acetabular Cup System, 54,800 with respect to pelvic meshes, 18,500 with respect to RISPERDAL®, 16,900 with respect to XARELTO® and 3,100 with respect to JOHNSON'S® Baby Powder.

> [Emphasis added].

56.     On July 1, 2017, J&J touted the safety and effectiveness of talc in its products on its website at https://www.johnsonsbaby.com.ph/baby-products/johnsons-baby-powder, stating in pertinent part:

> **Is talc safe for my baby's skin?**
>
> JOHNSON'S® Baby talc products are made using U.S. Pharmacopeial (USP) grade talc to ensure it meets the highest-quality, purity and compliance standards. **Our talc is carefully selected, processed and tested to ensure that is asbestos free, as confirmed by regular testing conducted since the 1970s.**
>
> Our confidence in using talc is based on a long history of safe use and more than 30 years of research by independent researchers, scientific review boards and global regulatory authorities.
>
> Read more about our Safety & Care Commitment here: http://www.safetyandcarecommitment.com/ingredient-info/other/talc
>
> [Emphasis added].

57.     On September 21, 2017, Ernie Knewitz, a spokesman for J&J, said in an emailed statement to *Bloomberg* that:

> "We are confident that our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation," Knewitz said. "Historical testing of samples by the FDA, numerous independent laboratories, and numerous independent scientists have all confirmed the absence of asbestos in our talc products."

58.     On November 16, 2017, *Reuters* published an article titled, "Johnson & Johnson wins California lawsuit claiming asbestos in talc caused cancer," wherein J&J was quoted stating that "Johnson's Baby Powder has been around since 1894 and it does not contain asbestos or cause mesothelioma or ovarian cancer."

59.     The statements referenced in ¶¶ 22 - 58 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to

Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) J&J has known for decades that its talc products include asbestos fibers and that the exposure to those fibers can cause ovarian cancer and mesothelioma; and (2) as a result, Defendants' public statements were materially false and misleading at all relevant times.

## The Truth Emerges

60.     On June 2, 2016, *Reuters* published an article titled, "Talc linked to ovarian cancer risk in African-American women," stating that J&J targeted its powder products to minorities, stating in pertinent part:

> In the 1990s, Johnson and Johnson outlined a plan to hike flagging sales of its powder "by targeting" black and Hispanic women, according to a company memorandum made public in recent lawsuits leading to multimillion-dollar verdicts against the powder manufacturer.

61.     On September 21, 2017, *Bloomberg* published an article titled, "Johnson & Johnson alerted to risk of asbestos in talc in '70s, files show," stating that "documents indicate that J&J has known for decades that its talc products include asbestos fibers and that the exposure to those fibers can cause ovarian cancer," stating in pertinent part:

### J&J Was Alerted to Risk of Asbestos in Talc in '70s, Files Show

By Jef Feeley, Margaret Cronin Fisk, and Jared S Hopkins

September 21, 2017, 10:49 PM EDT Updated on September 22, 2017, 11:50 AM EDT

**Documents unsealed in suit show traces of carcinogen in mine**

**J&J's tests going back to 1972 find no traces of asbestos**

Johnson & Johnson trained its employees to reassure anyone concerned about whether the company's talcum powder contained asbestos that the cancer-causing

substance "has never been found and it never will'' in its iconic baby powder, according to an undated <u>memo</u> unsealed in a lawsuit against the drugmaker.

**But plaintiffs say other unsealed documents indicate that J&J has known for decades that its talc products include asbestos fibers and that the exposure to those fibers can cause ovarian cancer. The talc used by J&J to make its products "is not now, nor has it ever been, free from asbestos and asbestiform fibers,'' according to the lawsuit filed on behalf of more than 50 women in St. Louis.**

The unsealed <u>documents</u> add another dimension to the claims against J&J as it defends itself from more than 5,000 suits across the U.S. blaming its baby powder products for causing women to develop ovarian cancer. While five juries have ruled against J&J, the company has won one case and had some other claims thrown out.

One of the documents unsealed Sept. 6 indicates that in May 1974, an official at J&J's Windsor mine in Vermont recommended "the use of citric acid in the depression of chrysotile asbestos'' from talc extracted from the site.

"The use of these systems is strongly urged by this writer to provide protection against what are currently considered to be materials presenting a severe health hazard and are potentially present in all talc ores in use at this time,'' the mine's director of research and development wrote then.

*      *      *

The unsealed files were used as part of an April pre-trial deposition given by <u>Joanne Waldstreicher</u>, J&J's chief medical officer since 2013. Under questioning by plaintiffs' lawyer Mark Lanier, Waldstreicher maintained that J&J's baby powder products are asbestos free. We have experts that assure there's no asbestos in our talc," she told the lawyer.

**Consumer Safety**

According to the undated training memo, J&J representatives continued to reiterate at medical conferences that there wasn't any asbestos in the company's talc-based products.

"Though there will never be a problem with Johnson & Johnson talc, we also endeavor vigorously to keep an eye on all the sources of talc worldwide, which might be used by other powder manufacturers and sold here,'' officials said.

In 1973, a company report about J&J's Windsor Materials talc mine in Vermont noted that officials were working with federal officials to check for fibers that could indicate the presence of asbestos at the site.

A J&J official said in that report that the company's baby powder "contains talc fragments classifiable as fiber. Occasionally sub-trace quantities of" two types of asbestos "are identifiable and these might be classified as asbestos fiber.''

Concerned that asbestos may have tainted talc used in the company's products, a J&J official suggested the company move toward using corn starch in its consumer products rather than talc, according to the report.

According to the unsealed documents, J&J also pushed to stop the distribution of a booklet revealing the discovery of trace amounts of asbestos in the talc the company bought from an Italian mine. Owners of the <u>Val Chisone</u> mine near Turin produced the booklet in 1974 to market the site's talc.

"The business threat" with the Italian publication, according to a J&J research scientist, "is that it can raise doubts on the validity of the documentation of purity and safety of talc.''

The scientist persuaded the mine's owners to stop distributing English-language versions of the booklet until J&J officials could rewrite it, according to the unsealed documents.

**Trace Amounts**

J&J contends that testing at the Val Chisone mine two years before the marketing pamphlet was written showed no evidence of asbestos at the site.  Dr. F.D. Pooley of University College, Cardiff, Wales, said in a 1972 report that "no chrysotile was found at the mine or in the samples taken."

"Some tremolite was located, but was not asbestiform in character and has not been detected in talc imported into Great Britain for the past year," Pooley said, according to documents provided by J&J, "nor in shipments dating back to 1949.''

Even trace amounts of asbestos in talc products pose a cancer risk, said Dr. Barry Castleman, a consultant hired by government agencies and health groups to gauge the health effects of the once-commonly used insulation material. He has testified for plaintiffs in asbestos cases, not in talc cases.

"It is a problem even if it's found in small amounts in talc, especially because it's used by children and women," Castleman said in an interview. He added that he wrote J&J in 1972 pointing out that asbestos in talc consumer products could cause serious health problems. "They responded that there was no asbestos in their talc," Castleman said.

Lanier, the plaintiffs' lawyer, asked Waldstreicher during her deposition if she'd seen the rewritten version of the mine booklet in which all references to asbestos were stricken. "I don't see that here," she said.

Lanier also pointed to some studies of J&J's talc products that he said found asbestos, and questioned whether the company should have warned consumers about those findings. He asked her specifically about the Windsor mine testing, and she said "40 years ago, there could have been different types of testing that may not be as accurate as the testing we have today."

"Would you agree that if asbestos is in the product, you all ought to be warning people?'' Lanier asked. At first, Waldstreicher responded that it was a "hypothetical question." Eventually, she conceded.

"I would like to be warned before I were around any cancer-causing substance,'' she said.

62.   On this news, shares of J&J fell $2.28 per share over five consecutive trading days to close at $129.47 per share on September 28, 2017, damaging investors.

63.   On February 5, 2018, *CNBC* published an article titled, "Johnson & Johnson falls on report that lawsuits could expose potentially damaging documents," stating in pertinent part:

**Johnson & Johnson falls on report that lawsuits could expose potentially damaging documents**

- Johnson & Johnson's stock fell on a report that court proceedings could expose potentially damaging documents.

- J&J is facing numerous lawsuits claiming its talc products such as Johnson's Baby Powder caused cancer.

- Johnson & Johnson has said baby powder does not contain asbestos and does not cause ovarian cancer or mesothelioma.

Angelica LaVito | @angelicalavito
Published 1:01 PM ET Mon, 5 Feb 2018 Updated 4:46 PM ET Mon, 5 Feb 2018

Shares of Johnson & Johnson fell Monday on a report that court proceedings could expose potentially damaging documents.

J&J is facing numerous lawsuits claiming its talc products such as Johnson's Baby Powder caused cancer. The company has insisted its baby powder does not contain asbestos and causes neither mesothelioma nor ovarian cancer.

In a statement, a J&J spokesman pointed to a California judge ruling in favor of J&J in November in a lawsuit by a woman who said she developed mesothelioma after using the company's talc-based products. He said the company would continue to defend its position in future cases.

"We are confident that our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation dating back to the 1970s," he said. "Historical testing of samples by the FDA, numerous independent laboratories, and numerous independent scientists have all confirmed the absence of asbestos in our talc products."

64.   On this news, shares of J&J fell $7.29 per share or over 5% from its previous closing price to close at $130.39 per share on February 5, 2018, damaging investors.

65.   On February 7, 2018, during aftermarket hours, the Beasley Allen Law Firm issued a press release stating that "[l]awsuits filed by ovarian cancer and mesothelioma victims are revealing never-before-seen documents from Johnson & Johnson and talc supplier, Imerys, that shed light on just how prevalent asbestos and heavy metals are in the talc used in Baby Powder," stating in pertinent part:

**New Johnson & Johnson, Imerys Documents Reveal More Cancer Links to Talc, Asbestos, Heavy Metals**

Published: Feb 7, 2018 5:01 p.m. ET

***Ovarian cancer victims demand answers amid growing findings from J&J trials***

ST. LOUIS, Feb. 7, 2018 /PRNewswire/ -- New information highlighting the links between talc, asbestos, heavy metals and cancer continue to surface as ovarian cancer victims use the legal system to press Johnson & Johnson for answers about the health risks of its popular talcum powder products, including Johnson's Baby Powder and Shower To Shower.

Lawsuits filed by ovarian cancer and mesothelioma victims are revealing never-before-seen documents from Johnson & Johnson and talc supplier, Imerys, that shed light on just how prevalent asbestos and heavy metals are in the talc used in Baby Powder. The documents also show the corporations' response to growing concerns about cancer risks.

"Over the last 90 days, we've seen a dramatic increase in document production from Johnson & Johnson and Imerys,"  said attorney Ted Meadows, principal at

the Beasley Allen law firm and co-lead counsel in litigation on behalf of thousands of women diagnosed with ovarian cancer. "These documents are highly relevant to our claims that Johnson & Johnson and Imerys have known about these risks for a long, long time."

Cancer victims suing J&J and Imerys argue that the corporations failed to provide warning labels on talc products despite knowing for decades about talc's link to cancer. Although numerous cases have already been tried, the corporate giants continue to reveal more hidden information, adding to a growing body of knowledge about the safety of talc products and their response.

"Even though we've already gone to trial against these companies on numerous occasions, they are just now getting around to turning over documents that are proving to be very significant in these cases," Mr. Meadows said.

Earlier litigation uncovered these important elements:

- In a May 2017 trial on behalf of a woman whose ovarian tissue was found to contain talc, asbestos and heavy metals, an Israeli researcher testified that J&J had hired his lab to test talc samples for asbestos contamination. When a majority of the sample batches were found to be positive for asbestos, J&J stopped funding the project. A St. Louis jury returned a $110 million verdict against J&J and Imerys in that case.

- Internal Johnson & Johnson documents from 1972 note that asbestos was found in 100 percent of talc samples tested at the time, but this information was never released publicly.

- In a 1997 letter, a toxicology expert hired by J&J told the company that at least nine studies had shown a statistically significant ovarian cancer risk for women who apply talc products in their genital areas. The expert warned J&J at the time that its response to the cancer threat could cause a public opinion backlash similar to that faced by the tobacco industry when they denied cigarettes caused lung cancer.

"Thanks to our courageous clients, all of us are finally getting a fuller picture of what these companies knew about the safety of their iconic talc products," Mr. Meadows said. "We're hopeful that these companies will once and for all acknowledge the concerns they have expressed in private for more than a generation."

66.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired J&J securities publicly traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, J&J securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of J&J securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

27

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- J&J securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold J&J securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

74.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against All Defendants**

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

78.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of J&J securities during the Class Period.

80.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company

29

were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

81.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

82.     As a result of the foregoing, the market price of J&J securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of J&J securities during the Class Period in purchasing J&J securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

83.     Had Plaintiff and the other members of the Class been aware that the market price of J&J securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the

Company's and the Individual Defendants did not disclose, they would not have purchased J&J securities at the artificially inflated prices that they did, or at all.

84.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

85.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of J&J securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

86.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

88.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

89.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class

Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of J&J securities.

90.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

91.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: February 8, 2018                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           By: /s/ Laurence Rosen
                                           Laurence M. Rosen, Esq.
                                           609 W. South Orange Avenue, Suite 2P
                                           South Orange, NJ 07079
                                           Tel: (973) 313-1887
                                           Fax: (973) 833-0399
                                           Email: lrosen@rosenlegal.com

                                           Ben Crump, Esq.
                                           Ben Crump Law PLLC
                                           122 S. Calhoun Street
                                           Tallahassee, FL 32301

                                           Counsel for Plaintiff