CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)

Local Counsel

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANK HALL, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>JOHNSON & JOHNSON, et al., )<br><br>Defendants. ) | No. 3:18-cv-01833-FLW-TJB<br><br>CLASS ACTION<br><br>LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

**Page**

I.     Introduction ................................................................................................1

II.    Statement of Facts ......................................................................................4

    A.     J&J Becomes the "Baby Company" and Internally Recognizes
        that Its Baby Powder Contains Asbestos ..............................................4

    B.     J&J Conducts a Widespread, Decades-Long Fraudulent Scheme
        While Carefully Cultivating Its Defenses ............................................6

        1.     J&J Successfully Conceals Asbestos Contamination and
            Undermines Regulators in the 1970s ..........................................6

        2.     As Concerns Are Raised About Talc and Ovarian Cancer,
            J&J Continues Its Fraudulent Scheme .......................................7

    C.     During the Class Period, Defendants Continue the Fraudulent
        Scheme by Making False and Misleading Statements ........................10

        1.     Defendants Promise that J&J's Talc and Talcum Powders
            Have "*Always*" Been Safe and Asbestos-Free ..........................11

        2.     Defendants Assert the Misleading Defenses that J&J Had
            Been Cultivating for Decades ...................................................11

        3.     Defendants Misrepresent the Company's Safety Policies
            and Asbestos Testing, Both Past and Present ...........................12

        4.     Defendants Misrepresent J&J's Exposure and Conceal
            the Facts Regarding the Company's Talc and Powders ...........14

    D.     The Truth Leaks Out .........................................................................14

III.   Argument: The Complaint Sufficiently Pleads Violations of §10(b) ...........15

    A.     The Complaint Adequately Alleges Material Misrepresentations
        and Omissions ...................................................................................16

**Page**

1.  Defendants' Statements About the Historical Safety of J&J's Talc and Powders Were False and Misleading..............17

2.  Defendants' Statements About J&J's Currently-Sold Talc and Powders Were False and Misleading.................................21

3.  Defendants' Assertions of J&J's Carefully Cultivated Defenses Were False and Misleading.......................................25

4.  Defendants' Statements About Asbestos Testing and Safety Policies Were False and Misleading.............................27

5.  Defendants' Statements About Product Warnings and the Talc Litigation Were False and Misleading.............................30

B.   Defendants' False and Misleading Statements and Omissions Were Material......................................................................31

C.   The Totality of Allegations Support a Strong Inference of Scienter........................................................................36

1.  Defendants' Statements, Like Their Consistent Claims that J&J's Talc Had "Always" Been Asbestos-Free, Make Their Deliberate Concealment of the Scheme Even More Compelling..................................................................37

2.  Internal Documents Demonstrate that Casalvieri and Goodrich Made Their Statements with Scienter.......................40

3.  That J&J's Fraudulent Scheme Concerned "the Baby Company's" "Institution," Baby Powder, Made It a Central Focus of Defendants' Attention...................................43

4.  The Magnitude of J&J's Scheme to Mislead Regulators and the Public About the Safety of Baby Powder Contributes to a Strong Inference of Scienter...........................47

Cases\4843-2033-4490.v1-6/28/19

**Page**

5.   Ongoing Investigations – Including by the FDA, SEC, DOJ, and U.S. Senate – into the Alleged Fraudulent Scheme Add to an Already Strong Inference of Scienter........49

D.   The Complaint Adequately Alleges Loss Causation ..........................51

1.   Plaintiff Plausibly Alleges that the Market Understood that New Information Was Disclosed.......................................52

2.   The Form of the Alleged Disclosures Satisfies *Dura*...............61

3.   Plaintiff's Losses Are Attributable to the Misrepresentations ...................................................................62

E.   The Class Period Is Plausibly Alleged ...............................................63

F.   The Complaint Also Amply Pleads Control Person Liability ............65

IV.   Conclusion ......................................................................................................65

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009) ..........................................................................*passim*

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)........................................................................................33

*Aquila v. Nationwide Mut. Ins. Co.*,
2008 WL 4899359 (E.D. Pa. Nov. 13, 2008) ......................................................60

*Archdiocese of Milwaukee Supporting Fund, Inc. v.
Halliburton Co.*,
597 F.3d 330 (5th Cir. 2010) ...............................................................................62

*Axar Master Fund, Ltd. v. Bedford*,
308 F. Supp. 3d 743 (S.D.N.Y. 2018) .........................................................19, 31

*Bauer v. Eagle Pharms., Inc.*,
2017 WL 2213147 (D.N.J. May 19, 2017)..........................................................29

*Benak ex rel. All. Premier Growth Fund v.
All. Capital Mgmt. L.P.*,
435 F.3d 396 (3d Cir. 2006) .............................................................................56

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .............................................................................60

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012)........................................................................57

*Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*,
68 F. Supp. 2d 480 (D.N.J. 1999)......................................................................23

*Christian v. BT Grp. PLC*,
2018 WL 3647213 (D.N.J. Aug. 1, 2018) ....................................................47, 49

*City of Edinburgh v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014) .............................................................................20

**Page**

*Commw. of Pa. Dep't of Pub. Welfare v.*
  *U.S. Dep't of Health and Human Servs.*,
    101 F.3d 939 (3d Cir. 1996) ................................................................17

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).............................................................51, 52, 61

*EP Medsystems, Inc. v. EchoCath, Inc.*,
    235 F.3d 865 (3d Cir. 2000) ...............................................51, 55, 58

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015) .......................................................62

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).............................................................................62

*Foman v. Davis*,
    371 U.S. 178 (1962)............................................................................65

*Freeland v. Iridium World Commc'ns, Ltd.*,
    545 F. Supp. 2d 59 (D.D.C. 2008).....................................................55

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ...............................................34, 56, 58

*Gelfer v. Pegasystems, Inc.*,
    96 F. Supp. 2d 10 (D. Mass. 2000)....................................................51

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ............................................................41

*Hering v. Rite-Aid Corp.*,
    331 F. Supp. 3d 412 (M.D. Pa. 2018).................................................37

*Hirtenstein v. Cempra, Inc.*,
    348 F. Supp. 3d 530 (M.D.N.C. 2018) ...............................................43

*Hoey v. Insmed Inc.*,
    2018 WL 902266 (D.N.J. Feb. 15, 2018) ........................16, 20, 33, 45

**Page**

*Hull v. Glob. Dig. Sols., Inc.*,
  2017 WL 6493148 (D.N.J. Dec. 19, 2017)..................................................*passim*

*In re Amarin Corp. PLC*,
  2015 WL 3954190 (D.N.J. June 29, 2015).......................................................48

*In re Anadigics, Inc., Sec. Litig.*,
  2011 WL 4594845 (D.N.J. Sept. 30, 2011), *aff'd*,
  484 F. App'x 742 (3d Cir. 2012) ........................................................................29

*In re Apollo Grp., Inc. Sec. Litig.*,
  2010 WL 5927988 (9th Cir. June 23, 2010)......................................................61

*In re AstraZeneca Sec. Litig.*,
  559 F. Supp. 2d 453 (S.D.N.Y. 2008) ................................................................43

*In re Banc of Cal. Sec. Litig.*,
  2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) .....................................................57

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*,
  566 F. App'x 93 (2d Cir. 2014) ..........................................................................59

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ...............................................................62

*In re BP p.l.c. Sec. Litig.*
  843 F. Supp. 2d 712 (S.D. Tex. 2012)................................................................29

*In re Bradley Pharm., Inc. Sec. Litig.*,
  421 F. Supp. 2d 822 (D.N.J. 2006).....................................................................53

*In re China Organic Sec. Litig.*,
  2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013) ...................................................59

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018) ..............................................47, 48, 49

**Page**

*In re CommVault Sys., Inc. Sec. Litig.*,
   2016 WL 5745100 (D.N.J. Sept. 30, 2016) .......................................................37

*In re Corel Corp. Sec. Litig.*,
   206 F.R.D. 533 (E.D. Pa. 2002) ..........................................................................64

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................29, 61

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*,
   2019 WL 1299673 (D.N.J. Mar. 21, 2019) ........................................................45

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ................................................................51

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) .............................................................53, 55

*In re Genta, Inc. Sec. Litig.*,
   2005 WL 2416970 (D.N.J. Sept. 30, 2005) ........................................................45

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ............................................................................58

*In re KLX, Inc. Sec. Litig.*,
   232 F. Supp. 3d 1269 (S.D. Fla. 2017) ...............................................................24

*In re Lucent Techs., Inc. Sec. Litig.*,
   217 F. Supp. 2d 529 (D.N.J. 2002) .....................................................................28

*In re Massey Energy Co. Sec. Litig.*,
   883 F. Supp. 2d 597 (S.D. W. Va. 2012) ............................................................28

*In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*,
   2011 WL 3444199 (D.N.J. Aug. 8, 2011) ....................................16, 23, 33, 35

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
   2015 WL 2250472 (D.N.J. May 13, 2015) ...................................................18, 43

**Page**

*In re Merck & Co. Inc. Vytorin/Zetia Sec. Litig.*,
    2012 WL 4482041 (D.N.J. Sept. 25, 2012) ........................................ 64

*In re Merck Co., Inc. Sec., Deriv. & ERISA Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013) ........................................... 49

*In re Miller Energy Res. Sec. Litig.*,
    2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) ..................................... 61

*In re Novatel Wireless Sec. Litig.*,
    830 F. Supp. 2d 996 (S.D. Cal. 2011) ................................... 55, 60, 61

*In re PTC Therapeutics, Inc. Sec. Litig.*,
    2017 WL 3705801 (D.N.J. Aug. 28, 2017) ....................................... 18

*In re RAIT Fin. Tr. Sec. Litig.*,
    2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ..................................... 45

*In re Rent-Way Sec. Litig.*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002) ............................................... 48

*In re Res. Am. Sec. Litig.*,
    202 F.R.D. 177 (E.D. Pa. 2001) ........................................ 57, 63, 64, 65

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    184 F.3d 280 (3d Cir. 1999) ............................................................ 36

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom.*,
    *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) ............................... 20

*In re Sanofi-Aventis Sec. Litig.*,
    2009 WL 3094957 (S.D.N.Y. Sept. 25, 2009) .................................. 29

*In re Tellium Inc., Sec. Litig.*,
    2005 WL 1677467 (D.N.J. June 30, 2005) ....................................... 45

*In re Tellium, Inc. Sec. Litig.*,
    2005 WL 2090254 (D.N.J. Aug. 26, 2005) ....................................... 63

**Page**

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2017 WL 1658822 (D.N.J. Apr. 28, 2017)........................................................52

*In re Velti PLC Sec. Litig.*,
2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) .........................................19, 23, 24

*In re Vertex Pharms. Inc. Sec. Litig.*,
357 F. Supp. 2d 343 (D. Mass. 2005)..............................................................43

*In re Vivendi Universal, S.A., Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009) ...............................................................57

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ....................................................................*passim*

*Key Equity Inv'rs, Inc. v. Sel-Leb Mktg. Inc.*
246 F. App'x 780 (3d Cir. 2007) ......................................................................30

*Laborers' Int'l Union of N. Am., AFL-CIO v.*
*Foster Wheeler Energy Corp.*,
26 F.3d 375 (3d Cir. 1994) .............................................................16, 53, 54, 55

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) ..............................................................33

*Lorenzo v. Sec. & Exch. Comm'n*,
___ U.S. ___, 139 S. Ct. 1094 (2019)..............................................................16

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ................................................................52, 56, 62

*Martin v. GNC Holdings, Inc.*,
2017 WL 3974002 (W.D. Pa. Sept. 8, 2017), *aff'd*,
757 F. App'x 151 (3d Cir. 2018) ......................................................................54

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)...............................................................................31, 35, 50

**Page**

*Messler v. Cotz*,
2017 WL 1458196 (D.N.J. Apr. 24, 2017) ........................................................56

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ........................................................59

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*,
720 F. Supp. 2d 517 (D.N.J. 2010) ........................................................52, 54, 63

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys. Inc.*,
877 F.3d 687 (6th Cir. 2017) ........................................................57

*Omanoff v. Patrizio & Zhao LLC*,
2015 WL 1472566 (D.N.J. Mar. 31, 2015) ........................................................55, 62

*Omnicare, Inc. v. Laborers Dist. Council Constr.*
*Indus.Pension Fund*,
___ U.S. ___, 135 S. Ct. 1318 (2015) ........................................................17, 19, 31

*Ong v. Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018) ........................................................30

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000) ........................................................35, 62

*Phillips v. Cty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ........................................................16

*Plumbers and Pipefitters Local Union v. Zimmer*,
673 F. Supp. 2d 718 (S.D. Ind. 2009) ........................................................43

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ........................................................54, 56, 57

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013) ........................................................47

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ........................................................39, 40, 47

Cases\4843-2033-4490.v1-6/28/19

**Page**

*Ret. Sys. v. Horizon Lines, LLC*,
　442 F. App'x 672 (3d Cir. 2011) ........................................................................49

*Sapssov v. Health Mgmt. Assocs., Inc.*,
　608 F. App'x 855 (11th Cir. 2015) ....................................................................59

*Schwab v. E\*Trade Fin. Corp.*,
　285 F. Supp. 3d 745 (S.D.N.Y. 2018), *aff'd*,
　752 F. App'x 56 (2d Cir. 2018) ..........................................................................51

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
　351 F. Supp. 3d 874 (E.D. Pa. 2018)..........................................................*passim*

*SEC v. Wash. Inv. Network*,
　475 F.3d 392 (D.C. Cir. 2007)............................................................................57

*Semerenko v. Cendent Corp.*,
　223 F.3d 165 (3d Cir. 2000) ..................................................................55, 62, 63

*Shapiro v. UJB Fin. Corp.*,
　964 F.2d 272 (3d Cir. 1992) ...............................................................................28

*Silverman v. Motorola, Inc.*,
　798 F. Supp. 2d 954 (N.D. Ill. 2011)............................................................53, 55

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
　775 F. Supp. 2d 227 (D. Mass. 2011).................................................................62

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007)...............................................................................15, 36, 51

*Utesch v. Lannett Co., Inc.*,
　2019 WL 2136467 (E.D. Pa. May 15, 2019)..............................................*passim*

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
　57 F. Supp. 3d 950 (D. Minn. 2014)...................................................................55

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
　845 F.3d 384 (8th Cir. 2016) ..............................................................................42

- xi -

**Page**

*Weiner v. Quaker Oats Co.*,
   129 F.3d 310 (3d Cir. 1997) ............................................................31

*Winer Family Tr. v. Queen*,
   503 F.3d 319 (3d Cir. 2007) ............................................................49

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78j(b)...........................................................................................15, 19
   §78t(a)...................................................................................................65

Federal Rules of Civil Procedure
   Rule 8....................................................................................................52
   Rule 9(b) .........................................................................................51, 52
   Rule 15(a)..............................................................................................65

17 C.F.R.
   §240.10b-5(a).......................................................................................16
   §240.10b-5(c).......................................................................................16

## I.      Introduction

Johnson & Johnson ("J&J" or the "Company"), known worldwide as "the Baby Company," achieved that reputation through its "flagship" product, Johnson's Baby Powder ("Baby Powder").   J&J admitted that Baby Powder was critical to the Company's overall reputation and financial success.  Financial analysts agreed.

During the Class Period, J&J was facing lawsuits that alleged a link between ovarian cancer and Baby Powder, and later, that Baby Powder contained asbestos and caused cancer (collectively the "Talc Litigation").[1]  Knowing the importance of Baby Powder to J&J's business – and stock price – defendants made frequent statements assuring the market the Talc Litigation claims were baseless.  For example, defendants stated that J&J's talc products had "a long history of safe use" and promised that the products have "always" been free of asbestos.  Defendants also claimed that J&J had always taken specific and adequate measures to make absolutely certain of it, including through sophisticated testing and meetings with regulators.  And, defendants

---

[1]   "The U.S. federal government has made clear that there is no safe level of asbestos exposure. Even trace amounts are considered dangerous."  ¶1.  All "¶_" and "¶¶_" references are to the First Amended Complaint for Violations of the Federal Securities Laws (ECF No. 33) ("Complaint" or "FAC").  "Class Period," refers to the period from February 22, 2013 through December 13, 2018.  ¶2.  "Motion" or "Mtn." refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss First Amended Class Action Complaint (ECF No. 44-1).  J&J, Alex Gorsky ("Gorsky"), Dominic Caruso ("Caruso"), Sandra Peterson ("Peterson"), Carol Goodrich ("Goodrich"), Joan Casalvieri ("Casalvieri"), Michael Sneed ("Sneed") and Tara Glasgow ("Glasgow") are referenced herein as ("defendants") (¶¶20-27) and Lead Plaintiff San Diego County Employees Retirement Association as ("plaintiff").

claimed that decades of science and regulation confirmed that J&J's talc has "always" been safe and asbestos-free.  The market credited J&J's assurances.

But, hidden from investors and known by defendants was the fact that J&J executives recognized internally that its talc and powders contained asbestos, purposely *never* adopted the testing method that J&J insiders knew was necessary to detect asbestos, manipulated and misled regulators and scientists about the asbestos contamination and had tried (but failed) to remove the asbestos from J&J's talc.  J&J concealed these facts through a highly-organized, decades-long fraudulent scheme.

Inside the Company, executives celebrated their successful manipulation of regulators.  "We did it!" they exclaimed, when they duped one agency using the bogus and intentionally misleading "fatal flaw" strategy.  J&J executives who dared to mention "*[t]he reality that talc is not actually safe for use around babies*" were privately reprimanded.  As defendants' Motion emphasizes, this abhorrent conduct has been going on inside J&J for decades.  But it also continued throughout the Class Period.  For example, J&J admitted – internally – on October 7, 2013, "*we cannot say 'always' asbestos free*."  But they did, repeatedly.  On February 25, 2016, the Food and Drug Administration ("FDA") requested "all" information about talc.  J&J responded by lying to the FDA and falsely claimed that no asbestos had "ever been found during any testing."

Defendants' Motion primarily asserts a "truth-on-the-market" defense, but ignores their consistent (false) denials of that same truth.  In a September 21, 2017 *Bloomberg* article and a January 2018 *Fair Warning* article, J&J promised that its talcs had never contained asbestos.  To stem a stock drop, J&J also issued a public intra-day denial on February 5, 2018 and again stated that J&J's talc has "***always***" been asbestos-free and "***all***" tests confirmed this.  And, immediately after a $4.69 billion jury verdict, J&J published similar false denials.[2]  Analysts credited J&J's non-stop unhedged assurances.

Through a series of partial disclosures the truth began to leak out and cause the stock price to decline.  But it wasn't until publication of a December 14, 2018 *Reuters* report (the "*Reuters* report") that the market finally understood the true scope of J&J's lies and fraudulent scheme.   In addition to revealing J&J executives' explicit knowledge of asbestos contamination, the *Reuters* report disclosed J&J's intentional avoidance – to this day – of "essential" testing methods that it knew had found asbestos in J&J's talc and that J&J successfully manipulated and lied to regulators (including the FDA).  In response, J&J's stock dropped 10% – its worst trading day in 15 years.  Analysts immediately recognized that *Reuters* disclosed "new information" that had a significant negative impact on J&J's overall business and reputation.  This "new information" led to four separate governmental investigations of J&J – including

---

[2]  *E.g.,* ¶¶127, 180, 183, 191, 200, 203-208, 210, 219-222, 379-380, 382, 390.

by the U.S. Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ").

Instead of squarely confronting the Complaint, defendants' Motion ignores many of the alleged facts and misstatements.  Where they do address the allegations, they raise factual disputes that can't be resolved at this stage.  This is not surprising given that the Complaint pleads facts establishing each element of plaintiff's action.  Defendants' Motion should be denied.

## II.   Statement of Facts

### A.   J&J Becomes the "Baby Company" and Internally Recognizes that Its Baby Powder Contains Asbestos

J&J's "baby products business was born" when the Company began selling Johnson's Baby Powder in 1894.  ¶44.  Before long, Baby Powder and the Company's other baby products "became trusted components of the way families across the world cared for their children" (¶45), with Baby Powder serving as "the cornerstone" of the Company's "baby products franchise."   ¶46.   J&J "has enjoyed a longstanding reputation as 'the Baby Company'" "despite the depth and breadth of its product lines," with consumers' trust in the Company inextricably intertwined with Baby Powder.  ¶46.  J&J executives have referred to Baby Powder as "an institution" (¶47), "sacred cow" (¶87), "flagship product" (¶43 n.3), and "a primary link to the positive J&J name in the public mind" (¶93).

- 4 -

Talc is the main ingredient in Baby Powder.  ¶49.  In 1969, J&J recognized internally that its talc contained "unavoidable trace amounts" of tremolite (asbestos) that could penetrate deep inside the lungs of babies and mothers, and that J&J could face a "furor" and litigation if this was revealed.  ¶¶52-53.  Throughout the 1970s, J&J internally acknowledged the asbestos in its talc and powder and received numerous non-public reports of the same.  ¶¶55, 57, 59, 61, 64, 72.  J&J attempted to find a way to remove it and even considered seeking a patent on such a procedure, but eventually decided to not "let the whole world know."  ¶¶58, 60.

J&J also purposely avoided using "concentration" testing methods that it knew were capable of detecting asbestos in J&J's talc and powder.  ¶¶63-67, 230.  As J&J knew, looking for trace amounts of asbestos was like looking for a "'needle in a haystack,'" requiring that more talc be tested, and J&J's own consultant "considered [it] essential" to concentrate the asbestos before the talc was examined.  ¶63.  But J&J also knew that "tremolite-type" asbestos was found in its talc this way and decided the method "may be too sensitive" (¶64), *i.e*., it would detect asbestos.

In 1975, J&J admitted internally that it "want[ed] to avoid promotion of this [testing] approach," and that it "really want[ed] to exclude concentration techniques in any proposed analytical procedure."  ¶65.  J&J's "major problem" with concentration methods was that they allowed trace amounts of asbestos to be found while J&J felt that allowing some asbestos was "reasonable."  ¶65.  By 1976, J&J acknowledged

- 5 -

internally that concentration methods were "disturbing," as their use would make "many talcs on all markets . . . hard pressed in supporting purity claims." ¶66. J&J has *never* adopted a concentration method for testing its talc. ¶67.

> **B.      J&J Conducts a Widespread, Decades-Long Fraudulent Scheme While Carefully Cultivating Its Defenses**

Rather than withdraw its talcum powders from the market or notify the public or regulators that the products contained asbestos, J&J concealed the truth through a highly organized campaign of deceit and regulatory manipulation.[3]

> **1.      J&J Successfully Conceals Asbestos Contamination and Undermines Regulators in the 1970s**

In the 1970s, J&J sponsored "talc safety studies" to "neutralize or hold in check data already generated by investigators who question the safety of talc" (¶68) and set out to obtain "maximal leverage for defending the product" by contradicting "generated negative data." ¶70. J&J went to extreme lengths to defend its flagship product, concealing negative data from the FDA, including three different independent labs' findings of asbestos in J&J's talc. ¶227.

By August 1977, J&J recognized internally that its "talc safety defense program" had been a success, noting that talc no longer suffered from "disruptive influences" and had been deemed "free of hazard," which J&J attributed in part to

---

[3]    Plaintiff has attached Exhibit 1 to this Memorandum, which contains a list of J&J executives alleged to have participated in the scheme, and which is provided as a reference for the Court in reviewing the FAC and the briefing.

"the various J&J sponsored studies . . . disseminated effectively to the scientific and medical communities." ¶71.  Shortly thereafter, J&J again learned of asbestos in its talc and Baby Powder and continued executing on its objectives: to "defend against consumerist, scientific and regulatory attitudes/trends which could impact adversely on the safety image and marketability of cosmetic talcs"; and to "generate or provide necessary data to support and reinforce the safety of our baby powder."  ¶¶72-73.

### 2. As Concerns Are Raised About Talc and Ovarian Cancer, J&J Continues Its Fraudulent Scheme

In the 1980s, scientific research suggesting a link between ovarian cancer and talc began to mount and J&J faced increasing regulatory and scientific scrutiny from the 1990s to early 2000s.  ¶¶74, 77, 82, 86.  J&J worked to cover its tracks by destroying most of the records from its Vermont talc mine in 1989 and selling the mine shortly thereafter.  ¶75.  The mine had served as the primary source of talc for Baby Powder for over 30 years, and an internal memorandum shows that mine staff knew that asbestos was present.  ¶¶75-76.  By 1993, J&J had developed "a strategy" to "insure that [it] ha[d] worldwide oversight on talc issues" (¶78), which included participating in representations that its own consultant had internally acknowledged were "inept," "inaccurate" and "*outright false*."  ¶80.  And, in 1998, J&J was again (privately) told that its "*talc contains trace amounts of asbestos*."  ¶81.

In 2000, J&J and its industry allies used the "Fatal-Flaw Strategy" to prevent the National Toxicology Program ("NTP") from listing talc as a carcinogen in the

Report on Carcinogens ("RoC").   J&J succeeded as the NTP deferred a decision.
¶¶37, 82-84.  The purported "fatal flaw" with the research linking ovarian cancer and
talc was that most of the studies involved the use of talc products produced before
1976, the year after which talc was supposedly required to be "asbestos-free."  ¶83.
But J&J knew its "fatal flaw" was itself fatally flawed because of continued asbestos
contamination and inadequate testing.  ¶¶63-67, 85, 230.  J&J also recognized the self-
contradicting nature of pushing the "fatal flaw" to the NTP while claiming that J&J's
talc "never" contained asbestos.  ¶87.  J&J's Lorena Telofski ("Telofski") admitted in
2002: "I still don't have a terrific suggestion regarding the asbestos."  ¶87.

In 2004, J&J learned that an independent lab had found "above normal levels"
of asbestos in Baby Powder.  ¶88.  In response, J&J called its talc supplier
"frantically," asking "where all the data was."  ¶90.  But J&J's talc supplier had gone
three years ***without doing the asbestos testing***.  ¶90.[4]  That same year, with threat of
the NTP's possible decision to label talc a carcinogen, Mann raised the level of risk to
J&J "from Moderate to High."  ¶93.  Just months after Mann had been informed of
asbestos in Baby Powder, he wrote that J&J could "be at the point where [it] need[ed]
to call upon major corporate resources and utilize all [its] power to defend against" the

---

[4]   J&J executives involved in this incident included Marc Monseau, Steve Mann
("Mann"), Bill Ashton and Sarah Colamarino ("Colamarino").  ¶¶28-29, 88-89.

NTP, as a bad ruling "would have a major ripple effect as J&J Baby Powder is a primary link to the positive J&J name in the public mind." ¶93.

With "the NTP talc issue" presenting a "high" risk to the Company, J&J's fraudulent scheme to "assure a good outcome" was conducted "on several fronts." ¶¶93-95. Under the direction of Casalvieri, this "project" included close monitoring of the NTP and "proactively providing NTP all the scientific data available in support of talc." ¶¶94-95. J&J worked with its talc supplier and outside "experts" "to develop documents" that undermined any link between talc and ovarian cancer, which were to be submitted "to NTP and for publication." ¶95. For example, J&J secretly funded a meta-study that sided with the Company on the safety of talc. ¶¶97-99. In conducting its NTP-related activities, the "critical question" for J&J was not whether talc was a carcinogen but whether the Company could prevent such a classification. ¶96.

In October 2005, the NTP withdrew talc from consideration as a carcinogen. ¶¶37, 103. J&J knew this was "a direct result" of its fraudulent scheme and J&J executives celebrated the "major accomplishment for J&J," proclaiming: "We did it!" ¶¶94-95, 104. Casalvieri was specifically congratulated. ¶104.

J&J also sought to influence the World Health Organization's International Agency for Research on Cancer ("IARC") in its review of talc as a possible carcinogen. ¶¶35, 86, 100-102. To manipulate the IARC, despite rules making "industry input difficult and suspect," J&J sought to get industry-allies nominated as

- 9 -

"talc expert[s]," including the two authors of the secretly-funded study.  ¶¶97-102.
The IARC ultimately "concluded that perineal use of talc-based body powder is
possibly carcinogenic to humans" (¶105), but a J&J e-mail shows that at least 16 J&J
insiders were aware of J&J's efforts to manipulate the IARC, including Casalvieri.
¶¶100-102.

In 2008, internally, J&J's Todd True ("True") wanted to develop a strategy "to
eliminate the use of talc under Johnson's Baby," admitting the "disturbing" "reality"
"that *talc is unsafe for use on/around babies*."  ¶¶106-107.  J&J responded by
chastising True.  ¶109.  And just before the Class Period, J&J knew of numerous
quality concerns with its outside asbestos testing facility, including "deficiencies in
the document control process," "no formal quality agreement" and that J&J's test
method "*was not an optimal method for asbestos testing*."  ¶¶110-111.

### C.    During the Class Period, Defendants Continue the Fraudulent Scheme by Making False and Misleading Statements

Soon after Gorsky became Chief Executive Officer ("CEO"), J&J began facing
lawsuits alleging a connection between ovarian cancer and J&J's talc.  ¶120.  During
the Class Period, J&J also faced cases alleging that asbestos in its powders caused

cancer.  ¶¶179-186, 192-201, 204, 213-222.  Defendants made numerous false and misleading statements to continue the Company's decades-long fraudulent scheme.[5]

### 1. Defendants Promise that J&J's Talc and Talcum Powders Have "*Always*" Been Safe and Asbestos-Free

Defendants falsely stated that J&J's talc products "***are, and always have been, free of asbestos***" (¶¶338-339), and J&J has provided "a safe choice for cosmetic powder" for "over 100 years."  ¶¶302-304.  According to Gorsky, "more than a 100 years of experience" "clearly demonstrate[d] the safety of talc."  ¶335.  And defendants repeatedly emphasized these false statements.  ¶¶266, 288, 299.  But, after "carefully assess[ing] all available data on talc" (¶288), defendants knew their statements were false.  During the Class Period, J&J and Goodrich even admitted internally that "***we cannot say 'always' asbestos free.***"  ¶¶128, 267.

### 2. Defendants Assert the Misleading Defenses that J&J Had Been Cultivating for Decades

Defendants falsely represented that decades of research, including by the FDA and the NTP, supported the safety of talc.[6]  While J&J claimed that experts and regulators had "reviewed and analyzed all available data" (¶303), the undisclosed truth was that J&J had knowingly concealed asbestos contamination from these entities,

---

[5]   ¶¶120, 253-391.  Plaintiff has attached Appendix A in order to assist the Court. For each alleged misstatement, it provides a citation, date, the defendant(s) responsible, the text of the misstatement and the reasons why it is false and misleading.  *See* Appendix A.

[6]   *See* ¶¶266, 288, 292, 294, 299, 302-303, 311, 318, 321, 331, 335, 339.

including two months prior when J&J had told the FDA that "[n]o asbestos-form structures have ever been found during any testing" of J&J's talc. ¶¶150-152. Meanwhile, Glasgow misrepresented that based on "decades of conclusive . . . findings," "the science is clear," that "cosmetic talc is, and has been, safe." ¶321. Glasgow knew but did not disclose that this was false, since she and others at J&J had "assembled all of the available data," and assessed "decades of scientific work" on the safety of their products (¶321), which by definition included J&J's private admissions of asbestos contamination.

Casalvieri made similar false statements (¶292), but as the person directing the project "to defend talc" in 2005, she knew but concealed that J&J had manipulated the science and regulators. ¶¶145-146. And, Goodrich worked on the website falsely representing that the "research papers and epidemiology studies" "published since the early 1990s" had "found talc to be safe," but admitted internally that scientific sources "could be interpreted as suggesting a causal effect" between talc and ovarian cancer, and that studies cited by J&J "send mixed messages." ¶¶266-268.

### 3. Defendants Misrepresent the Company's Safety Policies and Asbestos Testing, Both Past and Present

Defendants falsely represented that testing conducted "since the 1970s" through today confirmed that J&J's talc was and is "asbestos free" (¶¶266, 288, 292, 299, 311, 339), and that J&J was ensuring the safety of its Baby Powder. ¶¶269, 278, 284, 311, 321. According to defendants, J&J had "always taken questions about the safety of

- 12 -

[its] products extremely seriously" and J&J "always put patient and consumer safety first in everything" that it did.  ¶¶158, 256, 302, 303, 335.  Defendants also falsely stated that J&J had taken "concerns about . . . talc and ovarian cancer" "very seriously" when they were raised.  ¶¶303, 311.

In truth, unbeknownst to investors, J&J had destroyed mine records (¶75), illicitly funded and ghost-written studies (¶¶97-99, 232), manipulated the NTP through a "project" to "defend talc" (¶¶37, 82-85, 93-96, 103-104) and improperly attempted to influence the IARC (¶¶35, 86, 100-102).  J&J's conduct prior to the 1980s further belies defendants' representations that J&J had always taken safety "extremely seriously," as the Company had falsely assured the public that there was no asbestos present (¶¶54-55), intentionally hid positive asbestos results from the FDA (¶227), purposely avoided testing methods it knew had found asbestos (¶¶63-67, 230) and fought against regulatory and scientific scrutiny through subterfuge and false information (¶¶59, 61-62, 68-72).  J&J's fraudulent scheme continued throughout the Class Period, as J&J knowingly refused to adopt testing methods that could actually find the asbestos contamination (¶¶63-67, 230), while continuing to conceal the asbestos contamination acknowledged internally.

### 4. Defendants Misrepresent J&J's Exposure and Conceal the Facts Regarding the Company's Talc and Powders

Defendants misrepresented J&J's actual expected liability and reputational exposure from asbestos contamination of its products. While defendants warned of possible general risks like product safety concerns, litigation and reputational damage, they omitted that J&J long knew of asbestos contamination and had conducted a decades-long scheme to hide it. ¶¶324-325, 328. Indeed, Gorsky falsely told investors that J&J "remain[ed], based upon the data, confident of the position" it was taking in the Talc Litigation. ¶335. Instead of disclosing the truth, defendants repeatedly represented that J&J's subsidiaries had provided adequate warnings.[7]

### D. The Truth Leaks Out

The truth was gradually revealed through a series of partial disclosures of the facts defendants had concealed from investors for decades. ¶¶184-243. But defendants continued to flood the market with J&J's vehement (and false) denials.[8]

For example, J&J falsely stated that its talc is and "*always*" has "been, free of asbestos." ¶350. J&J insisted that its baby product ingredients "have . . . *always* been safe" (¶369), and that J&J had "been through this extensively" and was "*100% sure*"

---

[7]   ¶¶254, 259, 264, 272, 274, 282, 286, 297, 307, 315-316, 326, 329, 333.

[8]   ¶¶191, 200, 203-210, 340-341, 346-347, 350, 359, 367, 369-370, 375-376.

and "***absolutely certain***" that its "talc product is safe." ¶¶370, 375.  Defendants also continued to conceal J&J's manipulation of scientists and regulators.[9]

On July 12, 2018, J&J suffered a $4.69 billion verdict in the first trial in which plaintiffs alleged their ovarian cancer was caused by asbestos in J&J's talc.  ¶¶213-218.  Still, defendants denied any asbestos contamination and asserted that the "evidence" was overwhelmed by "prejudice" towards J&J.  ¶¶379-380, 388-391. Gorsky claimed that the FDA had "fully reviewed the full body of scientific evidence on multiple occasions" (¶382), when J&J had withheld numerous test results from the FDA that showed J&J's talcs were contaminated with asbestos.  ¶¶150-154, 227.

Finally, on December 14, 2018, *Reuters* published a detailed report revealing J&J executives' actual knowledge of J&J talc's asbestos contamination, the Company's unsuccessful efforts to remove asbestos from its talc, its failure (to this day) to use "essential" testing methods, its longstanding illicit manipulation of scientists and regulators and lies to the FDA.  ¶¶223-243.  In response, J&J's stock dropped 10%.  ¶233.  Analysts immediately reported that *Reuters* disclosed "new information" and caused "significant damage" to J&J's overall business.  ¶¶233-343.

## III.   Argument: The Complaint Sufficiently Pleads Violations of §10(b)

The Court must consider the Complaint in its entirety, accept all well-pleaded allegations as true and draw all reasonable inferences in favor of plaintiff.  *Tellabs,*

---

[9]   ¶¶344-345, 350, 353-355, 356, 358, 360-361, 365, 367, 374, 376, 382.

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  Here, plaintiff has adequately pleaded each element.[10]

### A.    The Complaint Adequately Alleges Material Misrepresentations and Omissions

The FAC sets forth each alleged misrepresentation and omission, which of the defendants made each statement, the date of each statement and the reasons each statement was false and misleading.  *See* ¶¶253-391.  Nothing more is required. *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).  Notably, defendants fail to challenge many of the misstatements, conceding their falsity. *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("[a]n issue is waived unless a party raises it in its opening brief").[11]  The few misstatements addressed by defendants are adequately pleaded.[12]

---

[10]  Defendants' Motion contains a number of inaccuracies and misleading citations. Plaintiff has summarized these in Appendix B attached hereto.

[11]  This is consistent with defendants' cases.  *See Hoey v. Insmed Inc.*, 2018 WL 902266, at *19 n.17 (D.N.J. Feb. 15, 2018) ("the Court's analysis is confined" to the statements specifically addressed); *In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*, 2011 WL 3444199, at *9 n.5 (D.N.J. Aug. 8, 2011) ("*Merck I*") (same).

[12]  Defendants also do not challenge plaintiff's allegations of a fraudulent scheme. *E.g.*, ¶¶2, 392.  "[D]issemination of false or misleading statements with intent to defraud can fall within the scope of" Rule 10b-5(a) and (c), *Lorenzo v. Sec. & Exch. Comm'n*, ___ U.S. ___, 139 S. Ct. 1094, 1100 (2019), and defendants committed

### 1. Defendants' Statements About the Historical Safety of J&J's Talc and Powders Were False and Misleading

Defendants consistently stated that "*all*" "historical testing" had "confirmed the absence of asbestos" in J&J's talcs and they "are, and *always* have been, free of asbestos." *See infra* n.14, *supra* at 11.  The facts alleged demonstrate that these statements were false and misleading. *See, e.g.*, ¶¶52, 55-61, 61 n.8, 64, 76, 81, 87-89, 92, 128, 223-224, 226-228, 230, 417.

Defendants fail to challenge the falsity of the vast majority of these statements, thus waiving such argument. *Commw. of Pa. Dep't of Pub. Welfare v. U.S. Dep't of Health and Human Servs.*, 101 F.3d 939, 945 (3d Cir. 1996).  Instead, defendants claim (in their "Preliminary Statement"), that "[s]tatements about the "historic safety of J&J's Talc Products" are inactionable opinions.  Defendants cite generally to ¶¶266 and 288 as purported "[i]nterpretations" of scientific data (Mtn. at 24), but fail to identify specific statements being challenged.[13]

Even if not waived, this "opinions" argument fails.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, ___ U.S. ___, 135 S. Ct. 1318,

---

additional fraudulent acts as well, including misleading the FDA in 2016 (¶¶150-154), and continuing to purposefully use inadequate asbestos testing methods so that they would have negative results to rely upon (*see* ¶¶63-67).

[13] Defendants, without explanation, also erroneously cite ¶¶258 and 261 as "interpretations of complex scientific data" regarding the "asbestos-free" nature of J&J's talc.  They also cite ¶¶176 and 302-303, but only to assert that the paragraphs somehow support their argument against ¶¶266 and 288.

1325 (2015) ("[A] statement of fact ('the coffee is hot') expresses certainty . . . whereas a statement of opinion ('I think the coffee is hot') does not."). Defendants' statements were clear and certain representations of fact.[14] They were not "subjective interpretation[s] or expression[s] of belief," and they "painted a favorable picture without including the details that would have presented a complete and less favorable one." *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 900 (E.D. Pa. 2018); *see also In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *14 (D.N.J. Aug. 28, 2017) (defendant "was not merely highlighting favorable data while downplaying disappointing data," but rather was "affirmatively telling investors that it had proven" the drug was effective). And *SEB* did not hold that "[c]haracterizations of clinical data" are categorically non-actionable opinions (Mtn. at 24), but rather that the statements at issue "were much more" than "puffery," and were "clearly misleading." *SEB*, 351 F. Supp. 3d at 899-900.

Even if deemed opinions, defendants' statements are still false and misleading. "[A]n opinion statement can be materially misleading . . . if it either does not express the actual belief of the speaker . . . or lacks a reasonable basis." *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472, at *24 (D.N.J. May 13,

---

[14] *See, e.g.*, ¶311 ("We also carefully select and process the talc used in *all* our global production to be asbestos-free, and *have confirmed this* with regular testing since the 1970s."); ¶350 ("historical testing" has "*all*" "confirmed the absence of asbestos"); ¶359 ("Baby Powder has been used *for more than 120 years* and it does not contain asbestos"); ¶370 ("we are *100% sure* that our talc product is safe").

- 18 -

2015) ("*Merck III*"); *see also Omnicare*, 135 S. Ct. at 1326, 1333 (opinion can be "untrue statement of fact" if speaker holds different belief, or misleading if lacking "the basis…a reasonable investor would expect").[15]

First, defendants did not honestly believe their statements, ***as they admit*** (and the FAC alleges), that defendants' own private understanding was far different than what they stated. ¶223.[16]   Thus, defendants' attempt to rely on J&J's public falsehoods, and their assertion that plaintiff's allegations are based on "debunked" and "cherry-picked" results, should be rejected.  Mtn. at 25.  Second, even if defendants' statements were opinions, they lacked a reasonable basis.  *See SEB*, 351 F. Supp. 3d at 897 ("opinion about data cannot be considered reasonably held if it is not supported

---

[15] Defendants' cases apply *Omnicare* to §10(b) claims, as have "several courts." *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *33, *38 (N.D. Cal. Oct. 1, 2015); *see also Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 753-55, 757 (S.D.N.Y. 2018).  Defendants ignore *Omnicare*, waiving any argument to its applicability.

[16] *See, e.g.*, ¶¶128, 267 (Goodrich's admission that "***we cannot 'say' always***," and "I don't think we can link cosmetic talc to 100 years of use" at all, let alone 100 years of safe use); ¶131 (some studies "could be interpreted as suggesting a causal effect," and "[e]ven some of the studies we cite send mixed messages," with one acknowledging a possible risk of ovarian cancer); ¶¶171, 213 (Gorsky and the Company's Board of Directors (the "Board") informed about Talc Litigation and "reputational risk"); ¶87 ("I still don't have a terrific suggestion regarding the asbestos"); ¶55 (J&J's acknowledgement that its talc contained "trace amounts" of asbestos); ¶57 (admission that tremolite (asbestos) fibers could be in the talc); ¶58 (J&J's attempts to remove tremolite and consideration of patents "re asbestos in talc" removal, and decision to not "let the whole world know"); ¶¶62-67 (J&J's avoidance of "essential" testing methods); ¶106 (internal recognition that talc "is not actually safe for use around babies").

by the evidence or ignores contradictory results in the same data"). The allegations here go further than alleging mere data or results, as J&J itself recognized the asbestos contamination internally and ***purposely*** avoided "essential" testing methods. ¶¶223-243, *see supra* §II.A. Defendants reference purported "countervailing results" and question the asbestos findings' validity. But these tactics are inappropriate at this stage and ignore the many other allegations illustrating that defendants did not have a reasonable basis for their statements.[17]

Defendants also raise two red herrings. Defendants argue, with an unexplained string-cite, that plaintiff conflates asbestiform and non-asbestiform minerals. Mtn. at 26. But this is belied by plaintiff's allegations – including those based on J&J's ***own documents and internal admissions of "asbestos"*** – which make clear there is no

---

[17] Defendants misread *Pfizer*, as the alleged misstatements there stayed silent on the product's efficacy and even specifically cautioned that "'[n]o conclusion'" about the study could "'be drawn'" yet. *City of Edinburgh v. Pfizer, Inc.*, 754 F.3d 159, 164 (3d Cir. 2014). The court repeatedly referred to the lack of any statement about the character or strength of the results, or efficacy or safety, recognizing that a "failure to accurately disclose clinical trial data may be actionable" where, as here, "plausible allegations of affirmative false statements about . . . efficacy and safety" are involved. *Id.* at 168-72, 174-75. In addition, plaintiff pleads defendants' own admissions and conduct, not "[i]nterpretations of clinical trial data" or "isolated test results." Defendants' other cases are inapposite. *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 544, 546 (S.D.N.Y. 2015) (no inference that defendants' private and public opinions differed), *aff'd sub nom.*, *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *Hoey*, 2018 WL 902266, at *15-*17 (no allegations of the company being "informed about any concerns" with the trial, no allegations that defendant doubted or contradicted one of the statements, and statements included "'[w]e are encouraged,'" and "'in my judgment'").

confusion about asbestiform and non-asbestiform minerals, including in the paragraphs cited by defendants.[18]  Defendants ignore (and thus waive) any challenge to the allegation that asbestos is present if any kind of tremolite is present.  ¶50 n.6. Defendants also dispute whether talc causes ovarian cancer, but their promises that there was *never any* asbestos were false and misleading because, *inter alia*, there *was* asbestos (*see, e.g.*, ¶¶289, 300, 312), not because of a "link between talc and ovarian cancer."  Mtn. at 27-28.  The Court should reject defendants' materials from outside the FAC that attempt to dispute well-pleaded facts.  *See* Plaintiff's Opposition to Defendants' Request for Judicial Notice in Support of Their Motion to Dismiss the First Amended Complaint ("RJN Opp.").

### 2. Defendants' Statements About J&J's Currently-Sold Talc and Powders Were False and Misleading

Defendants also made misstatements and omissions regarding J&J's present-day talc and powders.  *See supra* §II.C.1.  These are not the main type of representations "at issue," and they were not "undisputedly true."  Mtn. at 20.

---

[18]  *See* ¶57 (J&J memorandum states that "*asbestos* fibers could be detected"); ¶58 (J&J memorandum regarding patents on removing "*asbestos* in talc"); ¶61 (allegation that Dr. Langer "had told J&J of his finding of *asbestos* in J&J's 'baby talc'"); ¶64 (J&J report states that tremolite-type (asbestos) found when using "Proposed Specs for Analyzing Talc for *Asbestos*"); ¶76 (J&J's talc supplier's memorandum discussing "*asbestiform* minerals," including "past tremolite" from J&J's primary mine for over 30 years); ¶52 (J&J memorandum about concerns over "unavoidable trace amounts" of tremolite that could "*enter the pulmonary alveoli*" and have "*adverse effects on the lungs of babies*"); ¶53 (J&J memorandum further recognizing possible litigation over the realities admitted in ¶52).

- 21 -

Defendants challenge two statements purportedly in this category, regarding J&J's talc being carefully processed and tested to be asbestos-free, Mtn. at 20 n.15 (citing ¶¶266, 288).[19] These statements, along with defendants' affirmative representations that J&J's talc and powders are safe and asbestos-free, are adequately pleaded as false.

Plaintiff alleges that J&J purposely avoided "essential" testing methods that found asbestos in talc (¶¶63-67, 230), which shows the falsity of the statements in ¶¶266 and 288.  Falsity is also pleaded by allegations that Baby Powder sold in the U.S. has contained talc from China supplied by Imerys from 2003 to today, and that *asbestos was found in Baby Powder in 2004*.  FAC, Ex. 3 at 271; ¶¶49 n.5, 87-88. Defendants cast aspersions on the independent laboratory that found asbestos in J&J's Baby Powder in 2004, but inappropriately dispute facts alleged in the FAC.  Mtn. at 22.  More telling than defendants' denials now, however, are the "frantic[]" reactions of J&J insiders at the time, which show that *J&J had gone three years without getting asbestos testing results* (¶90) and that J&J had sought advice on how to undermine the laboratory's work.  *See* ¶91.  These facts lead to the reasonable

---

[19]  Defendants also cite these same paragraphs in their "opinions" argument, but without identifying which statements they are challenging, waiving that argument. Mtn. at 24.  Defendants also cite ¶¶300, 302, and 305, without identifying any statements.  Mtn. at 21 n. 16; 25 n.19.

inference that J&J's current talc products also contain asbestos, belying defendants' purported certainty of the opposite.[20]

Defendants also ignore what their cases recognize – that a statement can be misleading even if "literally" accurate. *Velti*, 2015 WL 5736589, at *25 ("'[s]ome statements, although literally accurate, can become, through their context and . . . presentation, devices which mislead'"); *Merck I*, 2011 WL 3444199, at *9 (same). Defendants misleadingly cite *Merck I*, which actually stated that "present statements of fact that were accurate at the time they were made *or which did not require further disclosure* to render them accurate are not actionable." *Id.* at *9 n.5. Defendants' statements about J&J's current talc and powders were misleading when made, as defendants omitted numerous material facts. *See, e.g.*, ¶417. Indeed, the statements are alleged to be misleading not only because of asbestos contamination, but also because they omitted J&J's intentional avoidance of "essential" testing methods that they knew had revealed asbestos contamination, J&J's attempts to remove tremolite (asbestos) from its talc and its widespread fraudulent scheme to conceal the internally acknowledged asbestos contamination. *See supra* §§II.B-C, III.C.

---

[20] And *Castlerock* does not say that citing "contemporaneous testing data" is necessary or "ordinary," Mtn. at 22, but merely that explaining the falsity of statements "'can be done . . . by pointing to'" contemporaneous information. *Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480, 485 n.8 (D.N.J. 1999).

Defendants admittedly fail to "respond to each of these" allegations, claiming they are "entirely derivative of" asbestos contamination.  Mtn. at 21 n.16.  But defendants ignore that these allegations independently show the falsity of their statements.  In addition, defendants provide no authority condoning their failure to respond to plaintiff's allegations.  In *KLX*, the court did not "decline[] to separately consider theories," Mtn. at 21 n.16, but addressed them and even took "a closer look" at one of them.  *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1277 (S.D. Fla. 2017).  And in *Velti*, the court merely found that the statements of some defendants were not actionable for the same reasons it had discussed regarding another defendant's statements.  2015 WL 5736589, at *24.  At any rate, defendants' statements that J&J's testing confirmed the talc was asbestos-free were false because J&J has ***never*** adopted essential testing methods that it knew found asbestos.  And the statements were independently misleading in that they omitted J&J's manipulation of regulators and unsuccessful efforts to remove asbestos from its talc.

Defendants' argument that their false and misleading statements regarding J&J's current talc products were mere opinions should be rejected for the reasons outlined above.  Not only is the argument waived as to the majority of misstatements, as defendants fail to address them, but a reasonable investor would have heard defendants' statements for what they were – representations of fact.  Indeed, defendants repeatedly boasted of conclusive evidence and findings and denied any

- 24 -

suggestion to the contrary.  Defendants' claim that it is all just too complicated to reach a determination should be rejected.

### 3.   Defendants' Assertions of J&J's Carefully Cultivated Defenses Were False and Misleading

During the Class Period, defendants represented that historical science and regulation proved the safety of J&J's talc and products, while omitting J&J's longstanding, successful scheme to manipulate those same scientists and regulators. *See supra* §II.B.  Defendants fail to challenge the majority of these statements, waiving any such argument.[21]  This is unsurprising, as the false and misleading nature of the statements are readily apparent.  For example, the representations that the FDA and other agencies and "expert panels" had "reviewed and analyzed ***all*** available data" (¶¶303, 382), were untrue because defendants omitted that J&J had withheld J&J's own admissions and positive asbestos findings from regulators, including from the FDA in March 2016.  ¶¶150-154.

While defendants publicly stated that "[t]he facts are clear," "the science is clear," and "decades" of "***conclusive***" findings confirmed the past and present safety of talc (¶¶311, 321; *see also* ¶¶335, 375), the opposite was true, as J&J recognized

---

[21]  As discussed above, they cite ¶¶266 and 288 without addressing specific statements.  *See* Mtn. at 24.  Defendants do not even refer to ¶376 anywhere in their Motion.  And the only references to ¶¶294, 299, 302-303, 311, 318, 321, 331, 335, 339, 350 or 382 is where defendants claim that these paragraphs only concern J&J's current talc and products or litigation (Mtn. at 10-11), or cite their own false statements.  *See* Mtn. at 7 n.6, 25 n.19, 28 n.22.

internally. ¶¶400-401. These statements were also materially misleading. Defendants' reliance on the FDA and the NTP (¶¶266, 288), concealed J&J's successful manipulation of those regulators for over 30 years. ¶¶268, 290. Indeed, defendants relied on cosmetic talc's absence from the RoC, hiding that this was a "direct result" of J&J's fraudulent scheme. ¶¶288, 291. And while J&J had "ask[ed] outside experts" for help (¶288), this was to *defend* J&J's talc, not to determine its safety. *See, e.g.*, ¶¶95, 97-99. Glasgow even boasted that studies reporting "an association between talc and ovarian cancer" were discounted by "many in the scientific community" (¶¶306, 311), omitting that this was a "direct result" of J&J's fraudulent scheme.[22]

Even if certain statements in this category were opinions, they did not have a reasonable basis because of J&J's admittedly successful scheme to manipulate scientists and regulators, and the statements also contained false statements of defendants' actual opinions. For example, Goodrich promised that "[m]any research papers and epidemiology studies" "found talc to be safe," but admitted internally that some were "not as definitive or supportive and could be interpreted as suggesting a

---

[22] ¶¶103-104. Defendants argue that Glasgow's reference to studies reporting an *association* somehow absolves Goodrich of failing to disclose the internal admission at J&J that studies "could be interpreted as suggesting a *causal* effect." *See, e.g.*, ¶131. But Glasgow dismissed these studies publicly, consistent with the representation that talc's safety was a fact, not an opinion. And, as Glasgow admitted, "terms and words matter when it comes to studies, and an 'association' does not mean something causes a specific result." ¶311.

causal effect," with "[e]ven some of the studies" she and J&J cited "send[ing] mixed messages," and one admitting "perineal talc use may modestly increase the risk of invasive serous ovarian cancers."  ¶¶131, 225, 266, 268, 288.

### 4. Defendants' Statements About Asbestos Testing and Safety Policies Were False and Misleading

Defendants made specific material misstatements regarding historical asbestos testing and policies.  *See supra* II.C.3.  For example, they promised that in the universe of "[h]istorical testing of samples by the FDA" and "numerous independent laboratories" and scientists, they "have *all* confirmed the absence of asbestos in our talc products."  ¶350.   In truth, Sperry Rand, the Dutch Consumer Organization, Forensic Analytical, J&J's "independent consulting laboratories," J&J Consultant Fred Pooley, University of Minnesota Professor Thomas E. Hutchinson, Dr. Alice Blount and Dr. Arthur Langer *had all separately found asbestos in J&J's talc and/or powders*."  ¶¶55-57, 59, 64, 81, 88; 228 FAC, Ex. 3 at 281.  At best, defendants only challenge one of the statements in this category.  Mtn. at 24 (citing ¶266).[23]  But the statement in ¶266 was an affirmative statement of fact – that testing "since the 1970s" confirmed the absence of asbestos – which is adequately alleged to be false.

---

[23]  Defendants don't refer to ¶256.  For the majority of the remainder of the statements, defendants refer to the paragraphs containing these statements as solely concerning J&J's current talc and products or litigation (Mtn. at 10-11), or cite their own false statements.  *See* Mtn. at 25 n.19, 28 n.22.  Defendants also mischaracterize the statements in ¶¶358 and 360 as merely discussing J&J's present-day commitment to safety and quality rather than its historical conduct.  *See* Mtn. at 31 n. 24.

Defendants also falsely stated that: J&J's current testing confirmed that its talc and powders were asbestos-free, J&J had successfully reformed its safety and quality control issues, J&J had in place a policy of transparency that it was following and J&J was doing all it could to ensure safety.[24]  For those statements defendants do address, they don't challenge falsity other than to say that "J&J stands by its statements."  Mtn. at 31.  Instead, they argue the statements are non-actionable puffery.

Statements considered puffery in one context may be material in other contexts. *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 558-59 (D.N.J. 2002). "[W]here," as here, "a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play,'" and "[b]y addressing the quality of a particular management practice, a defendant declares the subject . . . to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).  None of defendants' statements were puffery, especially considering that they were about J&J's current and past practices, rather than the future.  *See id.*; *In re Massey Energy*

---

[24]  ¶¶256, 261, 269, 277, 284, 288, 299, 303, 311, 318, 321, 368, 374.  Defendants don't refer to ¶¶256 or 374 and merely cite generally to ¶¶299, 303, 311, 318 and 321 in their Statement of Facts and/or simply cite to their own false statements.  *See* Mtn. at 10-11, 28 n.22 (citing ¶311); *id.* at 25 n.19 (citing ¶303).  Nor do defendants address their representation that J&J was committed to "improving existing products." ¶¶253, 258, 263, 271, 273, 281, 296, 327, 356.  Defendants cite to some paragraphs containing statements in this category, including ¶¶261, 269, 277, 284 and 367-369, but they fail to challenge a number of misstatements therein.  *Compare* Mtn. at 31 n. 24 with Appendix A.

- 28 -

*Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617-18 (S.D. W. Va. 2012) (representations that safety was "the first priority every day" were actionable where context was "the company's past achievements and current goals" rather than "future prediction").[25]

The materiality of these statements is especially bolstered when considering the juxtaposition of defendants' representations with the reality that J&J: (i) knowingly exposed generations to asbestos and covered it up; (ii) purposely avoided testing methods that it knew were "essential" and had found asbestos; and (iii) lied to the FDA regarding asbestos testing and safety. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008) (representations like "'high quality,'" were not puffery as a matter of law where the company's "practices so departed from its public statements" that "'high quality' became materially false or misleading"). And analysts confirmed the materiality of the statements. *E.g.*, ¶240 (*Reuters* report revealed "counter-credo J&J decisions").[26]

---

[25]  *In re BP p.l.c. Sec. Litig.*, provides additional support, as the court there held that the alleged facts sufficiently "call[ed] into question whether" the company and its agents "were in fact implementing the process safety reforms" where defendants "inundated the market" with the "frequent, repeated, and unequivocal" "image that [the company] was making significant progress on process safety." *See* 843 F. Supp. 2d 712, 758-59 (S.D. Tex. 2012).

[26]  Defendants' case law is inapposite. *See In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *23 (D.N.J. Sept. 30, 2011) ("'we believe we are one of the best'"), *aff'd*, 484 F. App'x 742 (3d Cir. 2012); *In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *4 (S.D.N.Y. Sept. 25, 2009) (characterization of drug safety data as "'very good'"); *Bauer v. Eagle Pharms., Inc.*, 2017 WL 2213147, at *12 (D.N.J. May 19, 2017) (the product was "'unique,' 'far superior,' . . . should do 'very well' and will be

### 5.    Defendants' Statements About Product Warnings and the Talc Litigation Were False and Misleading

Defendants made false and misleading statements regarding the Talc Litigation and J&J's product warnings.  *See supra* II.C.4.  Defendants fail to challenge the misstatements in ¶¶254, 259, 264 or 335, and thus waived any argument.  And while some of the statements use the word "believe," even those are false.  Defendants understood that J&J faced massive litigation exposure, as evidenced by J&J's fraudulent scheme and the defendants' continuation of it.  *See supra* II.B-C.  Defendants' statements put the safety and purported asbestos-free nature of the products at issue, but withheld existing material information on those same subjects.  After the *Reuters* report revelations, analysts recognized: "***J&J's messages in its recent campaign to combat the talc issue actually omit key details regarding findings on talc.***"  ¶240.  If these statements are deemed opinions, they are still adequately pleaded as misleading, as these same facts show defendants did not believe

---

'well received'"); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 218-19, 232-33 (S.D.N.Y. 2018) (representations were in a single paragraph of one public filing and "did not amount to a guarantee" regarding the practices' efficacy).  Defendants mis-cite *Key Equity Inv'rs, Inc. v. Sel-Leb Mktg. Inc.*, as the court was merely referring to "projections about the company's financial growth, or expressions of general optimism about its financial health," stating that "[s]uch positive portrayals of the company" are not actionable.  246 F. App'x 780, 785 (3d Cir. 2007).  Defendants' statements are much more and are not "vague" or "general."  Mtn. at 31.

- 30 -

their statements and "'"call into question the issuer's basis for offering the opinion."'"

*Axar*, 308 F. Supp. 3d at 753-54.[27]

Defendants also raise a premature factual dispute by incorrectly claiming that their statements "have been borne out" in litigation.  Mtn. at 30.  But the Talc Litigation cases are not deciding the falsity of the alleged misstatements.  The falsity of defendants' statements is adequately pleaded.

### B.     Defendants' False and Misleading Statements and Omissions Were Material

A misrepresentation is material if there is "'"a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).  This is "a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact."  *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997).

The material facts concealed by defendants include: (i) the repeated internal admissions and findings of asbestos in J&J's talc; (ii) J&J's internal acknowledgement

---

[27]  These alleged facts are far stronger than the allegations in *Axar*.  *See* 308 F. Supp. 3d at 757.  And, contrary to defendants' assertion (Mtn. at 30), following *Omnicare*, *Axar* recognized that opinion statements can be actionable if the belief is not actually held, *or* misleading where the basis of the opinion is called into question.  *See* 308 F. Supp. 3d at 753-54.

during the Class Period that "we cannot say 'always' asbestos free" and talc's long history of use was not safe; (iii) J&J's purposeful and continual avoidance of "essential" testing methods that revealed asbestos in its talc; (iv) J&J's successful (covert) efforts to manipulate scientists and regulators; and (v) J&J's unsuccessful (covert) efforts to remove tremolite (asbestos) from its talc and consideration of seeking a patent. *See, e.g.*, ¶¶266-68; *see also* ¶383.[28]

The Complaint alleges that defendants' misrepresentations were material to J&J's investors. *E.g.*, ¶¶1, 3. Financial analysts agreed. *E.g.*, ¶235 ("the brand name and accompanying consumer trust are critical" for J&J's success); ¶241 ("highlight[ing] the importance of Baby Powder to J&J's overall reputation"). J&J's stock price's reaction following the alleged disclosures also demonstrates the materiality of defendants' misrepresentations. *See, e.g.*, *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) (materiality "self-evident when we look at the market's negative reaction" when the truth was disclosed). Notwithstanding that any reasonable investor would have wanted to know about J&J's

---

[28]  Many of defendants' statements were false and misleading because they concealed that J&J made misrepresentations to the FDA in 2016. *See* ¶¶306, 314, 319, 332, 337, 352, 362, 371, 383-384, 387. Additional concealed material facts include that: (i) J&J falsely assured the FDA that its talc and powders were free of asbestos (¶291); (ii) J&J withheld the numerous findings of asbestos from scientific and regulatory bodies (¶387); (iii) the absence of talc in the RoC was a "direct result" of the Company's efforts (¶291); (iv) J&J was not keeping investors "well-informed" (¶300); and (v) defendants were continuing J&J's longstanding scheme (*e.g.*, ¶257).

- 32 -

fraudulent scheme, defendants ignore both the analysts and the stock drops following the disclosures, which further show materiality.  *See infra* at §III.D.1.

Instead, defendants assert a truth-on-the-market defense, arguing that the concealed facts were already public.  Mtn. at 14-18.  But this defense "requires a fact intensive analysis not suitable for consideration on a motion to dismiss."  *Hoey*, 2018 WL 902266, at \*15 n.12; *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (2013).

Moreover, even when the issue becomes ripe, defendants' "proof" will fail. First, defendants have consistently and falsely claimed that J&J's talc is "and ***always*** [has] been" asbestos-free and that any claims to the contrary were not credible and have "repeatedly been disproven."  *E.g.,* ¶¶5, 9-10; Mtn. at 15.  These denials eviscerate defendants' truth-on-the-market argument. *E.g.*, ¶9 ("defendants' vigorous denials" "prevented investors from learning the truth").[29]  *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (rejecting truth-on-the-market defense where public information "was counteracted by contemporaneous statements").[30]  Second, defendants' purported disclosures do not even come close to

---

[29]  *See also* ¶¶10, 11, 127, 180, 183, 191, 200, 203, 204, 208, 210, 219, 222.

[30]  Defendants' argument that their statements were merely a "reiterat[ion]" of J&J's "long-held" position is unsupported and meritless.  The relevant question "is whether the information [J&J] failed to disclose was material," not how long J&J denied the material facts' existence. *See Merck I*, 2011 WL 3444199, at \*10.

- 33 -

revealing the concealed facts, let alone to showing that the purported truth was "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

In order to argue that "the underpinnings" of plaintiff's case "were all" publicly known "from as early as the 1970s," defendants ignore the facts alleged.  Defendants point to a few isolated incidents in the FAC where there were ***not*** allegations of asbestos contamination and where "J&J was able to avoid" producing test results. Mtn. at 15-16; FAC, Ex. 3 at 269.  Defendants also refer to a 1971 press conference about "two unidentified brands of cosmetic talc."  Mtn. at 16.  But these allegations in no way disclose the many material facts detailed above that were concealed by defendants.  Defendants then resort to re-writing the FAC, making the generic claim that there were "publicly available" studies about whether J&J's powders contained asbestos, and citing ***their own misstatements*** as if these false statements were accurate.  *See* Mtn. at 16; Appendix B at 4-6.  They also cite generally to the *Reuters* report, which does not support their claims, but in fact demonstrates the material falsity of their statements.  *See* Appendix B at 4-5.

Defendants also appear to argue that the facts they concealed were immaterial because, according to defendants, (i) those facts are actually not true at all, and (ii) J&J has always denied their truth.  *See* Mtn. at 15-18, *id.* at 25 (similar argument

- 34 -

about purported "opinions").  Thus, defendants improperly dispute the facts alleged.
They also point to a number of facts that illustrate that the asbestos contamination
continued to be concealed.  Mtn. at 16-17; FAC, Ex. 3 at 282, 274-276.  For example,
defendants' argument that "[b]y 1977, 'independent authorities had deemed cosmetic
talc to be "free of hazard'''" (Mtn. at 16), omits that this quote is from J&J's **own**
"Defense of Talc Safety" report, which "attributed 'this growing opinion' to the
dissemination . . . of 'favorable data from the various J&J sponsored studies.'"  FAC,
Ex. 3 at 279.  And in asserting that the FDA "confirmed the purity of [J&J's] talc,"
defendants again cite to their own misstatement (Mtn. at 17 citing ¶288), which
omitted that J&J lied to the FDA.  ¶291.

Defendants' argument that plaintiff must establish a "definitive link between
J&J's talc products" and cancer is similarly unavailing.  *See* Mtn. at 18.  Defendants'
position "is belied by the Supreme Court's recent discussion of materiality in
*Matrixx*."  *Merck I*, 2011 WL 3444199, at *10 (rejecting reliance on *Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000), and the argument that "the lack of data supporting a
conclusive link" between the product and heart attacks precluded materiality);
*Matrixx*, 563 U.S. at 39-40 (rejecting defendants' argument).

Even if defendants' "definitive link" argument were viable, it would fail here,
as plaintiff does not plead studies linking a product to a negative health outcome (like
in *Oran*).  As detailed above, plaintiff's allegations include internal Company

- 35 -

admissions about actual asbestos contamination in J&J's talc and Baby Powder, illicit manipulation of regulators, lying to the FDA, failing – to this day – to ever adopt proper testing that J&J knew had found asbestos, and their secret efforts to remove the asbestos. *See, e.g.*, ¶¶415-417. To argue otherwise, defendants re-write the FAC as alleging "'isolated reports' of adverse effects." Mtn. at 18. But the Court must accept the allegations as true. *Tellabs*, 551 U.S. at 322-23.[31] Materiality is pleaded.

## C. The Totality of Allegations Support a Strong Inference of Scienter

The parties agree that pleading scienter "requires plaintiffs to allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Avaya*, 564 F.3d at 267; Mtn. at 32-33. Correct scienter analysis is a "comparative assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true." *Tellabs*, 551 U.S. at 326-27. Here, a strong and cogent inference of scienter is "at least as compelling as any opposing inference one could draw from the facts alleged," based on defendants' fraudulent scheme and lies about their "flagship" product, Baby Powder. *Id.* at 324. In weighing that inference, the Court must review "all the allegations holistically." *Id.* at 326.

---

[31] Ignoring *Tellabs*, defendants argue that "wholly disputed" facts cannot be material. Mtn. at 19. But defendants' summary judgment case, *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 290 (3d Cir. 1999), does not support this purported rule. If defendants' "rule" were real, perpetrators of securities fraud could avoid liability by simply denying the allegations.

1.  **Defendants' Statements, Like Their Consistent Claims that J&J's Talc Had "Always" Been Asbestos-Free, Make Their Deliberate Concealment of the Scheme Even More Compelling**

Here, "the most powerful evidence of scienter is the content and context of [defendants'] statements themselves." *Avaya*, 564 F.3d at 269.  In response to analysts' questions, news articles and Talc Litigation verdicts, defendants repeatedly stated that there had ***never*** been asbestos in J&J talc, that there were no safety risks to use of talc and that J&J's talc was thoroughly tested for asbestos.  ¶¶253-391.  Given the pleaded facts, these statements were ***deliberately*** false; at a minimum, they support an inference of recklessness.  *See Avaya*, 564 F.3d at 269-71 ("consistent" and "unhedged denials" of discounting where complaint alleged "unusual discounting," established recklessness).[32]

J&J published consistent and unhedged denials claiming, for example, that its talc had "always" been asbestos free, and that the FDA "require[d] specific testing to ensure" this.[33]  These statements were made while J&J's scheme hid from the market that its talc repeatedly tested positive for asbestos, J&J purposely never adopted

---

[32]  *See also In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *8 (D.N.J. Sept. 30, 2016) ("emphatic and repeated denial" significant evidence of scienter); *Utesch v. Lannett Co., Inc.*, 2019 WL 2136467, at *8 (E.D. Pa. May 15, 2019) ("particularly where the underlying substance is being publicly questioned"); *SEB*, 351 F. Supp. 3d at 906 (same); *Hering v. Rite-Aid Corp.*, 331 F. Supp. 3d 412, 428 (M.D. Pa. 2018) (same).

[33]  *E.g.,* ¶¶10, 11, 127, 180, 183, 191, 192, 200, 203-204, 208, 210, 219, 222.

proper asbestos testing and manipulated and lied to regulators.[34]  For example, Gorsky made specific statements about the Talc Litigation, the "safety of talc," the "clinical data" relating to talc's safety and whether J&J's products contained asbestos.  ¶¶394-398.  Many were in response to analyst questions.  *E.g.*, ¶¶335, 367, 382.  On February 5, 2018, to halt a stock drop caused by news about the Talc Litigation, J&J even issued an intra-day denial stating its talc had "always" been asbestos free.  ¶200.  After *Reuters*' revelations, analysts caught on: "J&J's messages in its recent campaign to combat the talc issue *actually omit key details regarding findings on talc*."  ¶240; ¶236 (J&J "*concealed this information from the FDA*").  *See also* ¶¶234-243.  *Avaya*, 564 F.3d at 270 (analysts focus on issue adds to scienter inference).  At a minimum, these allegations show recklessness.  *Id.* at 269-71.

Casalvieri's statements that perineal use of talc was safe and implying that no ingredient in J&J's talc posed a risk also support an inference of scienter.  ¶¶144-146, 292-293, 402-403.  She even boasted of being a toxicologist, whose job was to assess whether any ingredient "poses a risk."  ¶¶292, 402-403.  Her emphatic denials that

---

[34]  That J&J has – to this day and under defendants' leadership – continued avoiding testing methods that found asbestos in J&J's talc is supportive of a strong inference of scienter, as it shows that the defendants knew the talc contained asbestos and were attempting to conceal that fact.  ¶415.  Defendants, citing J&J's lawyer's statement in FAC, Ex. 3, claim J&J deemed the methods "too sensitive" because of a fear of false positives.  Mtn. at 47 n.35; FAC, Ex. 3 at 278.  But J&J admitted internally that its "major problem" with more-sensitive testing was *not* "false positives" but rather that it would be "hard pressed in supporting purity claims."  *Id.* ¶¶64-66.

there was no safety issue or risk associated with Baby Powder, when she had led the team charged with manipulating regulators, are strong evidence of scienter.  *See Reese v. Malone*, 747 F.3d 557, 570-72 (9th Cir. 2014) (scienter pleaded because defendant "referenc[ed] the data directly").

Additionally, Glasgow, Vice President ("VP") of Research and Development ("R&D") for J&J's baby franchise, told the market that "[a]s a scientist and, equally important, as a parent myself, I can tell you the science is clear: Cosmetic talc is, and has been, safe for use in consumer products."  ¶¶278, 280, 407-408.  Glasgow also emphasized that she sought out "the guidance of experts" and "monitor[ed] the latest science" and looked at "all the science" when it came to talc.  *Id.*  She insisted that "[w]hen concerns about an association between talc use and ovarian cancer were raised, we started doing the things you expect from a company you trust."  ¶311.

But taking Glasgow at her word that she monitored "***all***" available evidence, she would have been aware of J&J's internal evidence that their talc was ***not*** "always" asbestos-free, and indeed, that their asbestos-testing facilities were years behind in their talc sample testing and purposely avoided "essential" testing methods.[35]  She also would have known that J&J had a team dedicated to manipulating regulators.  ¶¶103-104.  Indeed, as the head of R&D, she would also have known that another executive at J&J Consumer Inc. ("JJCI") had recently misled the FDA by stating that no

---

[35]  *See also* ¶¶55-57, 59, 63-67, 73, 76, 81, 87-92, 223, 227-228, 312.

asbestos had "ever been found during any testing." ¶¶151-154.  Her statements, made in the face of substantial contrary evidence, are strong evidence of scienter.  *See Reese*, 747 F.3d at 570-72.

Peterson also presented herself to investors as an authoritative figure on J&J's suppliers and quality control in representing that J&J had "the right quality and compliance," and had "early warning systems in place to understand if we think there may be something going on with a product."  ¶¶209, 261, 374.  As the person responsible for turning around J&J's quality control problems beginning in 2012, it is reasonable to infer Peterson knew of or recklessly disregarded the 2012 Audit Report from testing facility RJ Lee informing J&J that its test "*was not an optimal method for asbestos testing*," in addition to other quality issues.  ¶110.  The content and context of these statements support a strong inference of scienter.[36]

### 2.    Internal Documents Demonstrate that Casalvieri and Goodrich Made Their Statements with Scienter

#### a.    Goodrich Made Statements with Scienter

The FAC cites to "Goodrich's edits to a draft corporate website" (Mtn. at 45), which show actual knowledge that her statements were false and misleading.  *See, e.g.*, ¶¶400-401.  Her admissions, even under defendants' spin, show scienter:

---

[36]  ¶¶55-57, 59, 63-67, 73, 76, 81, 87-92, 223, 227-228, 230.  And Peterson was not "simply an experienced businessperson" brought in to "fix" issues like "shipping delays" (Mtn. at 42 n.31), she was specifically tasked with knowing about and fixing the problems with J&J's products.  ¶118.

| Goodrich said publicly: | Goodrich knew/wrote internally: |
|---|---|
| J&J "has provided consumers with a **safe** choice for cosmetic powder products" "[f]or over 100 years." ¶302. | "Talc has over 100 years of ~~**safe**~~ use in personal care products." ¶128; FAC, Ex. 2 at 262.<br><br>"J&J should not say its cosmetic talc was safe or asbestos free 'for over 100 years.'" Mtn. at 45 n. 34. |
| "Johnson's Baby Powder has been used for more than 120 years" and "has been around since 1894" and "**does not contain asbestos** or cause mesothelioma or ovarian cancer." ¶¶340, 359. | "*[W]e cannot say 'always' asbestos free*." ¶128; FAC, Ex. 2 at 262.<br><br>"J&J should not say its cosmetic talc was safe or asbestos free 'for over 100 years.'" Mtn. at 45 n.34. |
| The studies "since the early 1990s" "have found talc to be safe." ¶¶266, 288.<br><br>We "**firmly believe** the safety of cosmetic talc is supported by decades of scientific evidence." ¶294. | "[T]here are other links to consider, but they are not as definitive or supportive and *could be interpreted as suggesting a causal effect*, such as the American Cancer Society and the IARC. Even *some of the studies we cite send mixed messages*." ¶131.<br><br>"[A]t best, scientific testing has not reached a definitive conclusion with respect to the safety of talc generally." Mtn. at 45. |

Because Goodrich made statements contradicted by her internal admissions (¶¶130-132, 148-149, 156, 204, 220, 380), plaintiff alleges conscious or reckless behavior. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) ("divergence between internal reports and external statements" shows scienter). These allegations also show "a bad faith misrepresentation of scientific data" so necessarily they "give rise to a strong inference of scienter." *Pharmacia*, 554 F.3d at 352.

- 41 -

### b.    Casalvieri Made Statements with Scienter

Internal documents show that Casalvieri knew that statements she made were false and misleading.  ¶¶402-403.  E-mails confirm that she was the director of J&J's project "to defend talc," which included "***develop[ing]*** documents that scientifically support" the safety of talc and leading J&J's efforts to ensure that the IARC and the NTP did not list talc as a carcinogen.  ¶¶94-95, 97-99, 100-102, 402-403.  Casalvieri was congratulated for doing a "[g]reat job," on J&J's successful efforts to "manipulate" the NTP, "a major accomplishment for J&J." ¶¶103-104.  And she was involved in J&J's illicit secret-funding of at least one meta-study designed to manipulate regulators.  ¶¶97-99, 402-403. *See W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc*., 845 F.3d 384, 390-93 (8th Cir. 2016) (secretly paying physicians to induce their complicity in shaping the content of medical journals demonstrates scienter and a fraudulent scheme).

Casalvieri also directed Mann on that project, who had recently been informed that a third-party – using the "EPA Test Method" – had found that ***Baby Powder "tested at above normal levels for asbestos.***"  ¶¶88-94.  Not coincidentally, after being told about asbestos in Baby Powder, Mann wrote that "[t]here is a significant chance that NTP could make an unfavorable ruling" and J&J needed to "utilize all our power to defend against this." ¶93.  These facts, viewed holistically, along with the facts that Casalvieri led the "Talc Task Force," and that J&J purposely avoided

essential testing (¶415), confirm that Casalvieri understood that the science as to the existence of asbestos in J&J's talc and its safety was not as clear-cut as she assured the public. ¶¶87-104. *See Avaya*, 564 F.3d at 273 (courts "'need not close their eyes to circumstances that are probative of scienter . . .'").[37]

### 3. That J&J's Fraudulent Scheme Concerned "the Baby Company's" "Institution," Baby Powder, Made It a Central Focus of Defendants' Attention

The alleged scheme concerns Johnson's Baby Powder, "one of the most familiar and trusted products in the world." ¶¶1, 411-414. Baby Powder, which made

---

[37] Defendants mischaracterize plaintiff's scienter allegations as based on J&J's nondisclosure of "disproved test results." Mtn. at 44. Defendants ignore that *Reuters* revealed that J&J has never adopted a concentration method for its asbestos testing, even after being informed that it was "[t]he best way to detect asbestos in talc" and its own consultant used the method to identify asbestos in talc. ¶¶58, 64, 230. And defendants' cases (Mtn. at 44 n.33) are inapposite. *Merck III*, 2015 WL 2250472, at *12-*14, makes this clear. In *Merck III*, the court found that unlike in cases where recklessness was supported because defendants knew of a potential problem with a drug but did not disclose it – like J&J trying to remove the asbestos from its talc, manipulating regulators and lying to the FDA – the plaintiff only alleged that Merck should have, but did not, study a possible side effect. *See* Mtn. at 44 n.33 (citing *In re Vertex Pharms. Inc. Sec. Litig.*, 357 F. Supp. 2d 343, 355 (D. Mass. 2005) (allegations of internal debate over drug's viability, without "details about the substance of the debate," cannot by itself show scienter); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 471 (S.D.N.Y. 2008) (allegation that company was "too optimistic" in interpreting FDA report, but no allegation that there had been any "red flags" to indicate they knew statements were false); *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 568 (M.D.N.C. 2018) (mere allegation that defendants failed to disclose clinical results in response to an oral request for a comparison of two trial drugs didn't show scienter); *Plumbers and Pipefitters Local Union v. Zimmer*, 673 F. Supp. 2d 718, 743 (S.D. Ind. 2009) (where defendants disclosed the existence of claims that device had problems, fact that the efficacy was disputed was immaterial).

J&J "the Baby Company," is referred to internally as a "sacred cow" and "flagship." ¶¶1, 43-46, 87, 411-414.  J&J has conceded the critical importance of Baby Powder to its overall reputation and financial success.  *Id.*, ¶129; ¶43 n.3 (Baby Powder is "a cornerstone of [J&J's] business").  Analysts agreed.  ¶¶235-243.  Following *Reuters*, CFRA slashed J&J's price target citing the "significant damage" the new information caused to J&J's "valuable brand name in consumer products and medical devices." ¶235; ¶414 ("reputation is critically important").  Here, "[t]he perceived importance of [Baby Powder] supports an inference that [defendants were] paying close attention to [it]."  *Avaya*, 564 F.3d at 271.

As senior J&J executives – CEO (Gorsky), Chief Financial Officer ("CFO") (Caruso), Group Worldwide Chair (Peterson), Director of Corporate Media Relations (Goodrich), Director of Toxicology and Skincare at JJCI (Casalvieri), Executive VP of Global Corporate Affairs & Chief Communications Officer (Sneed) and VP of R&D for the baby franchise (Glasgow) – defendants had access to J&J's internal documents and control over its operations.  ¶¶21-27, 393, 399, 402, 407.  Because the scheme involved Baby Powder, the "primary link to the positive J&J name in the public mind," (¶1) and key to "J&J's overall reputation" (¶241), defendants' senior positions in the Company support an inference of scienter.  *Avaya*, 564 F.3d at 271 ("'[T]here can be a number of special circumstances which, taken together with an officer's position, may support a strong inference of scienter.'").  Like in *Avaya*,

courts regularly hold that it is implausible that executives, with high-level access to corporate records and information, would be unaware of material facts relating to a "flagship" product of central importance to the company.[38]

And the fraudulent scheme continued through defendants' tenure. Numerous concealed facts surfaced inside J&J *after* some or all of defendants' start dates: Sneed (1983), Gorsky (1988), Glasgow (1994), Caruso (1999), Casalvieri (by 2005), Peterson (2012), Goodrich (by 2013). ¶¶21-23, 26-27, 94; *e.g.*, ¶75 (1989 and 1993-destruction of mine records); ¶81 (1998 letter confirming asbestos in J&J's talc); ¶¶82-87 (2000-2003 manipulation of the NTP); ¶92 (asbestos found in 2002 and 2003 in Baby Powder); ¶¶88-91 (2004 asbestos in Baby Powder); ¶¶93-104 (manipulation of the NTP in 2004-2005, under Casalvieri's direction); ¶¶110-111 (2012 Audit Report confirming J&J's test was "not an optimal" one); ¶¶150-154 (lies to the FDA

---

[38] *See In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164, at *12-*13 (E.D. Pa. Dec. 22, 2008) (allegations of senior positions and access to contradictory information, combined with fact that misstatements concerned core operations, supported scienter); *SEB*, 351 F. Supp. 3d at 906 (same); *In re Genta, Inc. Sec. Litig.*, 2005 WL 2416970, at *7 (D.N.J. Sept. 30, 2005) (same); *In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, 2019 WL 1299673, at *16 (D.N.J. Mar. 21, 2019) (where "as a pharmaceutical company, a core aspect of [the] business 'is ensuring compliance with safety and manufacturing quality standards,'" court could infer executives knew of threat to operations posed by quality control problems). Defendants' cases do not hold otherwise. *See* Mtn. at 37 (*In re Tellium Inc., Sec. Litig.*, 2005 WL 1677467, at *25 (D.N.J. June 30, 2005) (scienter alleged where defendant would "certainly have had access to these [allegedly arbitrary financial] guidances by virtue of his position"); *Hoey*, 2018 WL 902266, at *17 (no allegation that defendant had access to information demonstrating falsity before he made the statement)).

- 45 -

in 2016). Defendants' roles during the Class Period required them to either review the scientific evidence and quality control records J&J possessed, or the evidence from the Talc Litigation they were publicly commenting on. *E.g.*, ¶¶335, 367, 382.

Unable to challenge the importance of Baby Powder, defendants' seniority or the allegations of access to contradictory information, defendants instead point to overall sales. Mtn. at 36. But defendants' narrow focus on dollar amounts ignores the reputational and financial importance of Baby Powder to J&J's Consumer and Medical Devices segments – each multi-billion-dollar enterprises. ¶¶1, 43-44, 87, 235-243, 411-414.[39] Gorsky admitted that J&J's iconic brands (*i.e.*, Baby Powder) "have been, and continue to be, perhaps ***the greatest connection that we have with people***." ¶140. J&J's baby line was so critical that during the Class Period, J&J "relaunch[ed]" it, with Gorsky's direct involvement. ¶¶206, 367.

The cost of the Talc Litigation was also important to J&J (and the market). ¶¶171, 186, 198, 215. Defendants admit that investors were "focus[ed] on the financial consequences from resulting jury verdicts." Mtn. at 59; *see also* ¶¶147, 155, 172, 204, 213. E-mails confirm that Gorsky – and the entire Board – were "[u]pdate[d] on Talc Litigation," including the "***reputational risk***" to J&J. ¶171. And Gorsky held himself out as knowing about: (i) the "significant amount of clinical

---

[39] Defendants' straw-man argument regarding corporate motives (Mtn. at 34-37), also ignores that Baby Powder was "critical" to J&J's "overall business." ¶¶411-414.

information [and] control data" regarding talc, including NCI and FDA; (ii) the safety

of talc; (iii) J&J's defense in the Talc Litigation; (iv) specific ovarian cancer cases; (v)

the ingredients in J&J's baby products and whether they were "concerning"; (vi) the

"clinical data and safety information" on talc; (vii) whether J&J's baby products were

"science-based"; and (viii) whether regulators had "fully reviewed the full body of

scientific evidence" on talc.  ¶¶170-178, 206, 221, 224, 394.[40]

Thus, because the scheme involved asbestos in Baby Powder, it is implausible

that defendants, in senior roles with access to contradictory information, wouldn't

have known the myriad facts that made their public statements false and misleading.

> ### 4.    The Magnitude of J&J's Scheme to Mislead Regulators and the Public About the Safety of Baby Powder Contributes to a Strong Inference of Scienter

Defendants' scienter is bolstered by J&J's internal knowledge and the "highly-

organized, decades-long campaign of deceit."  ¶¶1, 415-417; *In re Cognizant Tech.*

*Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *33 (D.N.J. Aug. 8, 2018) (corporate

scienter pleaded where scheme was "widespread . . . and involved multiple

---

[40]  *See Reese*, 747 F.3d at 570-72.  *Rahman v. Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013), is inapposite.  There, core-operations didn't apply because the company's violations only generated $10 million in liabilities, while sales were in the hundreds of millions.  Here, while sales might be 0.3% of total sales (Mtn. at 36), Baby Powder is admittedly "critical" to J&J's "overall success," and potential liabilities are massive (*i.e.*, $4.69 billion verdict).  *Christian v. BT Grp. PLC*, is likewise unapt.  2018 WL 3647213 (D.N.J. Aug. 1, 2018) (alleged fraud did not implicate core operations or product of company, and there was no cover-up of the fraud).

- 47 -

personnel"); *see also In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 506 (W.D. Pa. 2002) (magnitude and duration of an alleged fraud "is probative of" scienter). Like in *Cognizant*, plaintiff alleges "a pervasive operation extending from senior management itself." 2018 WL 3772675, at *33; ¶¶415-417; ¶4 ("from at least 1971 to the 2000s," "Company executives, mine managers, scientists, doctors and lawyers" failed to disclose the asbestos contamination to regulators or the public); *see also* Ex. 1.  As one judge put it, J&J "knew of the presence of asbestos in products that they knowingly targeted for sale to mothers and babies . . . and misrepresented the safety of these products *for decades*."  ¶247.[41]

Along with defendants, J&J's scheme involved myriad participants who were at J&J during the Class Period, such as Colamarino and Telofski.  ¶¶29, 39, 87-88, 104. Still leading today, Colamarino was involved in "crisis communication" and "reputation-building strategies" in the early 2000s when *she learned of "above normal levels [of] asbestos" in Baby Powder*.  ¶88, 88 n.9.  Her silence was rewarded with repeated promotions.  ¶29.  Plaintiff similarly pleads the knowledge and conduct

---

[41]   *In re Amarin Corp. PLC*, 2015 WL 3954190 (D.N.J. June 29, 2015), is dissimilar. There, the alleged fraud lasted just five years, and plaintiffs did not allege that the executives had any reason to know of a meeting that preceded their tenure.  J&J's Baby Powder scheme continued through the Class Period and the Talc Litigation – which defendants spoke publicly about – required that they either knew what they were telling the market or were reckless in not knowing.

of numerous other long-time J&J senior executives.  *See* Ex. 1.  These allegations –

reaching into J&J's executive suites – further support a strong inference of scienter.[42]

> **5.    Ongoing Investigations – Including by the FDA, SEC, DOJ, and U.S. Senate – into the Alleged Fraudulent Scheme Add to an Already Strong Inference of Scienter**

Ongoing government investigations into whether J&J's talc products contained

asbestos also represent a "'piece of the puzzle when taking a "holistic" view of the

purported facts as they relate to scienter.'"  *Utesch*, 2019 WL 2136467, at *9.  In

addition to regulators' examination of whether talc should be classified as a

carcinogen (a process defendants manipulated) (*e.g.*, ¶¶93-105), J&J faced additional

inquiries throughout the Class Period.  By 2014, the Attorney General of Mississippi

---

[42]  The Third Circuit has noted that corporate scienter could apply to "an instance of pervasive corporate misconduct," *i.e.*, "a corporate cover-up," or "blatantly false statements." *Cognizant*, 2018 WL 3772675, at *32.  As defendants' case recognized, "the Third Circuit [has] suggested" that the corporate-scienter doctrine may be viable in a situation like *Bridgestone*, involving a tire maker that knew its tires were defective but "engaged in a variety of tactics . . . to keep news of the scope of the problem from reaching safety regulators and investors." *BT Grp.*, 2018 WL 3647213, at *7 (citing *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, LLC*, 442 F. App'x 672, 676-77 (3d Cir. 2011)).  Plaintiff pleads even stronger facts here – and much more than a conspiracy of "rogue employees," like in *Roseville*. *Cognizant*, 2018 WL 3772675, at *34.  Defendants wrongly contend that plaintiff relies on "group pleading" and thus it cannot contribute to an inference of scienter.  Mtn. at 47.  As an initial matter, defendants misinterpret *Winer Family Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007), by conflating group pleading and corporate scienter. *See In re Merck Co., Inc. Sec., Deriv. & ERISA Litig.*, 2013 WL 396117 (D.N.J. Jan. 30, 2013) ("*Merck II*").  Regardless, the Complaint's "additional scienter" allegations are relevant to each defendant's conduct and scienter.  ¶¶393-417.

- 49 -

had launched an investigation into whether J&J had failed to warn of health risks associated with its talc products. ¶136.  On February 25, 2016, the FDA requested "*all* safety literature and data regarding talc." ¶¶150-154.  J&J responded by lying to the FDA: "No asbestos-form structures have *ever* been found during *any* testing" – then doubled-down by boasting about the NTP's decision but omitting that was "a direct result" of J&J's manipulation.  *Id.*  These allegations "give rise to a 'cogent and compelling' inference that [J&J] elected not to disclose the reports of [asbestos contamination to the FDA] not because it believed they were meaningless but because it understood their likely effect on the market." *Matrixx*, 563 U.S. at 50.

After the *Reuters* report revelations, at least four different investigations were announced.   U.S. Senator Ed Markey requested that the FDA "immediately investigate" to determine whether J&J's "actions have placed at risk the public's health and safety." ¶245.  U.S. Senator Patty Murray requested documents related to the "'alleged decades-long effort by J&J to potentially mislead regulators and consumers about the safety'" of Baby Powder.  ¶248.  And the DOJ and SEC sent J&J "preliminary inquiries and *subpoenas*" about Baby Powder and the December 14, 2018  stock  drop.    ¶¶250-252.    "[S]o  many  different  governmental  entities

- 50 -

investigating" the alleged misconduct "provides support – at this stage of the litigation – for an inference of scienter." *Utesch*, 2019 WL 2136467, at *9.[43]

### D.    The Complaint Adequately Alleges Loss Causation

To plead loss causation, a plaintiff need only provide a "'short and plain statement'" giving defendants "some indication of the loss and the causal connection that [they have] in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). "Importantly, alleging loss causation or economic loss does not require a plaintiff to satisfy the heightened pleading standard under Rule 9(b)." *Hull v. Glob. Dig. Sols., Inc.*, 2017 WL 6493148, at *11 (D.N.J. Dec. 19, 2017). "Whether the plaintiff has proven causation is usually reserved for the trier of fact." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000). Pleading loss causation "should not prove burdensome for a plaintiff." *Dura*, 544 U.S. at 347.

The Complaint easily satisfies these pleading requirements.[44] Plaintiff alleges that defendants' misstatements and omissions maintained inflation in J&J's stock. *Id.*

---

[43]  Viewed "holistically," *Tellabs*, 551 U.S. at 326, Gorsky's prior misconduct adds to his scienter. ¶¶21, 113-115, 397-398. *See In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 689 (S.D. Tex. 2002) (evidence of prior misconduct suggestive of scienter); *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 15 (D. Mass. 2000) (similar prior misconduct "strongly probative of scienter"). Unlike *Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745 (S.D.N.Y. 2018), *aff'd*, 752 F. App'x 56 (2d Cir. 2018) (*see* Mtn. at 41 n.30), plaintiff has alleged that Gorsky was directly involved in or had significant knowledge of the misleading and unethical conduct in his prior jobs. ¶¶113-115.

[44]  *See* ¶¶184-186, 192-202, 213-218, 223-243, 418-422.

- 51 -

The inflation was dissipated from J&J's stock through six partial disclosures that leaked the truth regarding J&J's talcum powders and fraudulent scheme, along with the Company's internal policies, testing and true legal and reputational exposure. *Id.* Each disclosure is alleged to have revealed "new information" and caused a "statistically significant" price decline. *Id.*

Unable to credibly challenge these allegations, defendants dispute (and ignore) the facts alleged, claim that the disclosures did not reveal "anything new," quibble about the form of some of the disclosures and speculate as to "alternative causes" of plaintiff's losses. Mtn. at 51. Defendants' arguments fail.[45]

### 1. Plaintiff Plausibly Alleges that the Market Understood that New Information Was Disclosed

***The Complaint pleads that the market understood new information was disclosed***. Plaintiff alleges that an event study has determined that each disclosure caused a "statistically significant" price decline.[46] Plaintiff further alleges that, where a stock price decline is deemed statistically significant, it indicates that it "was caused

---

[45] Defendants urge the Court to apply Fed. R. Civ. P. Rule 9(b). Mtn. at 50 n.37. But under *Dura*, the court (and others in the circuit) have repeatedly applied Rule 8. *See Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at \*12 (D.N.J. Apr. 28, 2017); *Utesch*, 2019 WL 2136467, at \*10. The Fifth Circuit agrees. *E.g.*, *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 266 (5th Cir. 2009). Under any applicable standard, the Complaint adequately alleges loss causation.

[46] *See* ¶¶185, 193, 195, 202, 214, 233, 421.

by ***new company-specific information***." ¶185 n.21.  Thus, plaintiff plausibly alleges that the market understood that new information was disclosed.  *Cf. Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 983 (N.D. Ill. 2011) (a statistically significant decline "is evidence of new information"); *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006) ("significance of the market reaction" following alleged disclosure supports loss causation allegations); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1190 (D. Or. 2015) (same).  Tellingly, defendants ignore these allegations – and so have waived further argument on the point.  *See Laborers' Int'l Union*, 26 F.3d at 398.

The Complaint pleads additional facts plausibly alleging that the market understood that new information was disclosed by the corrective disclosures.  ¶¶184-243, 418-422.  The disclosures include news about J&J's exposure to the Talc Litigation, and a $4.69 billion verdict in the first trial in which plaintiffs alleged their ovarian cancer was caused by asbestos in J&J's talc.  *Id*.  Each disclosure revealed new information in both content and degree as reflected by the market reaction.  *Id*.

***The Reuters report disclosed new information***.  By way of example, plaintiff alleges that "[t]he *Reuters* report disclosed new information and new analysis, including internal J&J documents 'reported to the public for the first time.'"  ¶¶12; 223-232.  The "new information" included: (i) that J&J had never adopted a concentration method for its asbestos testing that J&J executives knew had found

asbestos in J&J's talc; (ii) "from at least 1971 to the early 2000s, the company's raw talc and finished powders" had tested positive for asbestos, "and that company executives, mine managers, scientists, doctors and lawyers fretted over the problem and how to address it while failing to disclose it to regulators or the public"; (iii) "demonstrated defendants' knowledge that the science on talc and ovarian cancer was not clearly in J&J's favor"; and (v) that J&J had misled and manipulated scientists and regulators, including by telling "the researchers the results it wanted." *Id.*[47]

Financial analysts following J&J confirmed that the *Reuters* report revealed new information. ¶¶234-243. *See Pharmacia*, 554 F.3d at 350-52 (noting analysts are a proxy for what "the market" understood); *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (that "analysts have characterized the WSJ Article as 'new news,'" "counters the argument that the sources used in the article have previously been made public"). For example, based "on the new information" "disclosed by the *Reuters* report," CFRA dropped their price target by $30 per share. ¶235. Wells Fargo, UBS and CFRA highlighted the new information that ***J&J "did not disclose to the FDA that asbestos had sometimes been found in its baby powder***

---

[47] Defendants ignore these facts. *See Laborers' Int'l Union*, 26 F.3d at 398. Instead they generically assert that the entirety of the *Reuters* report is "necessarily a recharacterization," of unspecified prior disclosures. Mtn. at 56. At best they raise a dispute of fact. *Infra* at 55-61. And unlike the "vague and speculative" reports noted in *Nat'l Junior*, 720 F. Supp. 2d at 561 n.34 and *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *19 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018), *Reuters* disclosed specific and material new information. ¶¶223-243.

*ingredients*."   ¶¶235-236 (J&J "concealed this information from the FDA").  And

Credit Suisse and Leerink recognized that *Reuters* disclosed information "reported to

the public *for the first time*."  ¶237.  Defendants simply ignore these allegations.[48]

      ***Defendants' truth-on-the-market challenge to loss causation fails***.  Whether

"the disclosures revealed information already known to the market, and thus could not

have negatively affected the market" is a question of fact.  *Freeland v. Iridium World*

*Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 80 (D.D.C. 2008) (citing *EP Medsystems*, 235

F.3d at 884); *Cf. Semerenko v. Cendent Corp.*, 223 F.3d 165, 183-87 (3d Cir. 2000)

(rejecting argument that "several intervening events, and not the alleged

misrepresentations, led first to the artificial inflation and then to the decline in the

market price of [the company's] common stock").[49]  Thus, defendants' argument

"cannot be adjudicated at this early stage."  *Omanoff v. Patrizio & Zhao LLC*, 2015

WL 1472566, at *6 (D.N.J. Mar. 31, 2015).

      Defendants argue that the public "had access" to information from certain

lawsuits, improperly requesting that the Court take notice of the matters asserted in

---

[48]  Other analyst commentary plausibly alleges that the analyst perceived the disclosure as new information that caused the stock drops.  ¶¶186, 196-199, 214-218. Defendants ignore these allegations.  *See Laborers' Int'l Union*, 26 F.3d at 398.

[49]  Other courts agree.  *See, e.g.*, *Galena Biopharma*, 117 F. Supp. 3d at 1189-91; *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 983 (D. Minn. 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1021 (S.D. Cal. 2011); *Silverman*, 798 F. Supp. 2d at 983.

their contents and factually determine – as a matter of law – that the market understood that they disclosed all aspects of J&J's fraudulent scheme.  Mtn. at 52. For example, defendants point generically to "a large volume" of exhibits to motions in other cases.  *Id*.[50]  Similarly, defendants claim that other trials were shown "on live television," or the internet and therefore the market understood every part of the fraudulent scheme.  Mtn. at 53-56.  But no such facts are pleaded.  Moreover, defendants ignore their repeated denials, like the claims that J&J's talc is and "always" has been asbestos free and the FDA was on its side.[51]  *See Pharmacia*, 554 F.3d at 351-52 ("repeated" denials prevented investors from learning truth); *Ganino*, 228 F.3d at 167.[52]  And J&J's reassuring statements were credited by market professionals.  *E.g.*, ¶186 (October 11, 2017 analyst: J&J has "several large studies, as well as the FDA . . . on its side regarding the safety of talc."); ¶198 (February 5, 2018

---

[50]  In addition to improperly attempting to insert facts from outside the Complaint, defendants' citation to an entire court docket of a separate case – and request that the Court rummage through it – lacks meaning.  *Cf. Messler v. Cotz*, 2017 WL 1458196, at*5 (D.N.J. Apr. 24, 2017) ("'Judges are not like pigs, hunting for truffles buried "in the record."'").  *See also* RJN Opp. at 13-14.

[51]  *E.g.*, ¶¶127, 180, 183, 191, 200, 203-208, 210, 219-222, 379-380, 382, 390.

[52]  *See also Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 402 n.16 (3d Cir. 2006) (finding that reassurances can dissipate investor's fears of malfeasance); *Hull*, 2017 WL 6493148, at *9 (false statements "may have had the effect of reassuring investors – despite the news articles"); *Amedisys*, 769 F.3d at 324 (misstatements can prevent the full truth from being revealed); *Lormand*, 565 F.3d at 266, 267 n.34 (same).

- 56 -

analyst: J&J talc "products have been free of asbestos, based on decades of monitoring, testing and regulation dating back to the 1970s.").

And a disclosure of information that may have technically been in the public sphere – but was not something that the ordinary reasonable investor would have necessarily processed or understood – can support loss causation allegations.  *See Amedisys*, 769 F.3d at 323 (an alleged disclosure should not be "pushed aside simply because the data it was based upon may have been technically available to the public"); *In re Res. Am. Sec. Litig.*, 202 F.R.D. 177, 190 (E.D. Pa. 2001) (when public information is "presented in such a way as to hide its true meaning," a later disclosure that allowed the market "to determine the existence of potential wrongdoing on the part of the defendants, and react to it" constitutes "new information"); *In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *5-*10 (C.D. Cal. Sept. 6, 2017) (article based on "publicly filed" court documents pled loss causation).[53]  Particularly where, as

---

[53]  *See also Norfolk Cty. Ret. Sys. v. Cmty. Health Sys. Inc.*, 877 F.3d 687, 694-98 (6th Cir. 2017) (a civil complaint that disclosed analyses of "publicly available" information "revealed new information"); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ("The results . . . were not 'publicly available' simply because they were posted in an obscure location on the internet."); *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009); *SEC v. Wash. Inv. Network*, 475 F.3d 392, 405 (D.C. Cir. 2007).  Contrary to defendants' claim (Mtn. at 52), *Hull* held that, at the pleading stage, plaintiffs' allegation that a court filing was "a public disclosure that reveal[ed] a previously concealed truth," sufficiently pled loss causation.  *Hull*, 2017 WL 6493148, at *12 n.20.  And, recognizing the factual nature of the issue, the Court held that at summary judgment or trial defendants can "submit evidence" to contest whether the market understood that new information was disclosed.  *Id*. at *12.

here, consistent unhedged denials were credited by the market. *Pharmacia*, 554 F.3d at 351-52; *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (published FDA letter describing fraud "would not necessarily trigger a market reaction because it did not contain enough information to significantly undermine" the company's positive statements). At best, defendants raise a premature dispute of fact. *See* EP *Medsystems*, 235 F.3d at 884.

Likewise, defendants' references to the September 2017 *Bloomberg* article and January 2018 *Fair Warning* article fail. Mtn. at 52-54. Defendants ignore that both are alleged to contain false statements. ¶¶339, 346-347. Indeed, J&J issued false denials ***within each article***; claiming, for example, that "our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation." ¶¶183, 189, 191. The market believed J&J's false assurances. ¶186 (October 11, 2017 analyst: "Scientific evidence appears to support JNJ on talc litigation."); ¶¶196, 200 (February 5, 2018 CNBC: historical tests "by the FDA" and others "have ***all*** confirmed the absence of asbestos."). *See Pharmacia*, 554 F.3d at 351-52; *Ganino,* 228 F.3d at 167. Analysts even explained "how J&J was able to hide the truth from investors ***until*** the *Reuters* report revelations." ¶242. As one wrote,

until the *Reuters* report, "[t]he happy-go-lucky attitude of JNJ longs regarding the ongoing talcum powder/asbestos lawsuits was an understandable phenomenon." *Id*.[54]

In addition to ignoring their denials and the analysts, the *Bloomberg* and *Fair Warning* articles did not disclose what defendants claim.  Mtn. at 52-54.  *Bloomberg's* article was titled, "J&J Was Alerted to ***Risk*** of Asbestos in Talc in '70s, Files Show." ¶181.  And defendants admit that "***none*** of the 'unsealed documents'" referenced by the article "revealed asbestos contamination in J&J's Talc Products."  Mtn. at 8 n.8. *Fair Warning's* article was titled, "Baby Powder Battles: Johnson & Johnson Internal Documents Reveal Asbestos ***Worries***."  ¶188 ("'***might*** be classified as asbestos'").  As *Fair Warning* put it, the documents "***don't settle the safety issue***."  ¶189.  And, both articles stated that asbestos had ***never*** been found in Baby Powder.  ¶¶183, 191. Learning that J&J was alerted to what "might" be asbestos "'is quite different from knowing they were in fact'" aware that Baby Powder contained asbestos, purposely

---

[54] Defendants' cases are inapposite.  Mtn. at 51-55.  In *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863-64 (11th Cir. 2015), there weren't denials and the court, following *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013), held loss causation requires "proof of fraud."  A "concurring" opinion explained that *Meyer* was "contrary to Supreme Court precedent."  *Sapssov*, 608 F. App'x  at 864-68.  And, *Meyer*, 710 F.3d at 1199 n.10, acknowledged that where the "Company obfuscated," "or actively concealed" information even a "short-seller's opinion" could qualify as new information.  In *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *8 (S.D.N.Y. Sept. 30, 2013) and *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014), in contrast to J&J's constant obfuscation, the companies "made publicly available the exact information that investors needed to evaluate" the alleged fraud or said their financials can't be "relied upon."

avoided the testing method that could detect asbestos, manipulated regulators and lied to the FDA.  *Novatel*, 830 F. Supp. 2d at 1021 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)).[55]

But even if the Court were to ignore J&J's denials and credit the claim that the market understood that *Bloomberg* and *Fair Warning* disclosed J&J's internal knowledge that its talc contained asbestos, it should still deny the motion.  Defendants don't even argue that the market understood that *Bloomberg* or *Fair Warning* fully revealed **all** aspects of the alleged fraud.  Defendants ignore plaintiff's allegations that the *Reuters* report additionally revealed, among other things, J&J's lies to the FDA, that J&J never adopted tests that could detect the asbestos present in its talc, J&J's attempts to remove asbestos and its decision to not seek a patent so as to not "let the whole world know," J&J's failure to tell regulators or the public about asbestos findings from 1971 to the early 2000s, and J&J's successful manipulation of regulators and scientists, "led by physician and scientist executives."  *Compare* Mtn.

---

[55]  "One indicates a risk, the other a certainty.  It goes without saying that investors would treat the two differently."  *Berson*, 527 F.3d at 987.  For example, *Fair Warning's* vague reference to "an asbestos problem" and theoretical contamination is a far cry from J&J's own admissions and the numerous positive tests, including "**incontrovertible asbestos**."  *Compare* Mtn. at 53 *with* ¶¶223-228.  And *Fair Warning's* gloss on J&J's talks with the FDA is not the same as J&J misleading the FDA, its avoidance of effective testing methods to this day and its decades-long scheme.  Thus, defendants' reliance on the initial complaint is misplaced.  *Infra* at 63-65; *Aquila v. Nationwide Mut. Ins. Co.*, 2008 WL 4899359, at *2 n.5 (E.D. Pa. Nov. 13, 2008) ("amended pleading supercedes and renders moot the initial complaint").

at 52-54 *with* ¶¶223-243 and FAC, Ex. 3 at 277, 282.  And savvy analysts recognized that *Reuters* revealed more than "just" asbestos in Baby Powder.  ¶¶234-243.

In *Pharmacia*, 554 F.3d at 344-51, the Third Circuit rejected a similar argument.  There, FDA reports disagreed with the company's use of "truncated data," received "substantial media attention," were commented on by "analysts," and led to a 9% stock drop.  *Id.* at 345.  But this did not prevent a subsequent disclosure of the fact that the company had also withheld the data from "JAMA" from serving as an additional corrective disclosure in light of "repeated" denials.  *Id.* at 344.[56]  Plaintiff plausibly alleges that the market understood that new information was disclosed.

## 2.    The Form of the Alleged Disclosures Satisfies *Dura*

Defendants argue that some of the disclosures cannot, "as a matter of law," constitute corrective disclosures.  Mtn. at 57-58 (arguing that a verdict can't disclose a "truth," and other disclosures lack "veracity").  But corrective disclosures aren't required to "take any particular format."  *Hull*, 2017 WL 6493148, at *15.  For example, an SEC complaint or "'informal'" investigation – neither a verified "truth" –

---

[56] *See also In re Miller Energy Res. Sec. Litig.*, 2014 WL 415730, at *22 (E.D. Tenn. Feb. 4, 2014) ("report did include information previously disclosed publicly, [but] the report also included some 'new' information"); *Novatel*, 830 F. Supp. 2d at 1021 ("partial disclosures at an earlier date do not negate loss causation upon fuller disclosure of the relevant truth"); *Countrywide*, 588 F. Supp. 2d at 1172 (same); *In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010) (same).

can serve as a disclosure.  *Id.*  Here, each alleged disclosure satisfies *Dura's* "flexible approach" to pleading loss causation.  *Id.*[57]

### 3.    Plaintiff's Losses Are Attributable to the Misrepresentations

Defendants claim that alternate causes led to the stock-price declines.  Mtn. at 58-61.  But "[s]o long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery."  *Semerenko*, 223 F.3d at 186-87 (rejecting defendants' argument); *see also Oran*, 226 F.3d at 285 n.5 (error to point to "alternative explanation" for drop "rather than accepting the theory put forward by plaintiffs").[58]

Here, both "alternate causes" raise a dispute of fact.  Moreover, defendants' first alternate cause (increased litigation risk) is specifically alleged as

---

[57]   Defendants cite to *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 340-41 (5th Cir. 2010) (Mtn. at 57), but that decision was vacated. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011).  On remand, the court rejected defendants' argument and held that a stock price decline following a jury verdict "show[s] price impact."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 276-80 (N.D. Tex. 2015); *see also Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 244-45 (D. Mass. 2011) (jury verdict a corrective disclosure).

[58]   *See also Omanoff*, 2015 WL 1472566, at *6 (defendants proposed alternate cause "is a factual dispute that cannot be adjudicated at this early stage"); *Lormand*, 565 F.3d at 266-67 (same); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 506-07 (S.D.N.Y. 2011) (same).

- 62 -

misrepresentation-related.  ¶¶418-422.  Defendants ignore these allegations.  And, as

noted, the analyst commentary cited by defendants supports plaintiff's theory.  Mtn. at

59-60.  Defendants' second alternate cause (that "at least two losses" coincide with

market-wide declines) is equally flawed.  Mtn. at 60-61.  Defendants ignore that

plaintiff pleads an event study and that the declines "cannot be attributed to market

and sector factors."  ¶¶185 n.21, 193, 195, 202, 214, 233, 421.  Thus, defendants'

alternate cause arguments should be rejected.[59]

### E.    The Class Period Is Plausibly Alleged

Defendants argue that the February 7, 2018 disclosure "fully" revealed the fraud

such that investors could no longer have reasonably relied on the misrepresentations.

Mtn. at 12, 61-62.[60]  But "[i]t is well established that not every intervening event is

sufficient to break the chain of causation."  *Semerenko*, 223 F.3d at 185.  Courts will

only shorten a class period when "a defendant makes a curative disclosure," or,

"publication of curative information makes it unreasonable for the market to continue

to rely on the alleged misrepresentations."  *Res. Am.*, 202 F.R.D. at 183-85.

---

[59]  Unlike *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *4 (D.N.J. Aug. 26,
2005), where plaintiff "failed to allege the effect on the market of the disclosure," the
Complaint alleges the declines were independent of any market decline.  ¶¶185, 193,
195, 202, 214, 233, 421.  And *Nat'l Junior*, 720 F. Supp. 2d at 559-63, addressed a
different issue, holding that a disclosure of poor financial results alone doesn't plead
loss causation.

[60]  This is precisely the opposite of their loss causation argument which claims that
this disclosure (and the earlier disclosures) did not constitute corrective disclosures.

Importantly, "continued denials of wrongdoing" prevent a disclosure from being "curative." *Id*. at 185; *Pharmacia*, 554 F.3d at 351-52 (error to shorten class period "in light of defendants' repeated" reassuring statements). This "is a fact sensitive inquiry." *In re Merck & Co. Inc. Vytorin/Zetia Sec. Litig.*, 2012 WL 4482041, at *9 (D.N.J. Sept. 25, 2012).

Here, defendants have ***never*** made ***any*** curative disclosure, and throughout the Class Period issued false denials. *E.g.*, ¶9 ("defendants' vigorous denials" "prevented investors from learning the truth").[61]   In addition to ignoring their denials, defendants rely on the non-operative complaint. Mtn. at 61-62. But "the theory of the currently operative complaint has changed significantly from the" moot initial complaint. *Utesch*, 2019 WL 2136467, at *10.[62]   Moreover, defendants misstate the allegations pleading a complex scheme that included, J&J never adopting tests that could detect the asbestos present in its talc, J&J's failure to tell regulators or the public about asbestos findings from 1971 to the early 2000s and J&J's successful manipulation of regulators and scientists, "led by physician and scientist executives."  ¶¶2, 223-243; FAC, Ex. 3 at 282.  And plaintiff alleges that these facts (and others) were revealed

---

[61]  *See also* ¶¶180, 183, 191, 200, 203-208, 210, 219-222, 379-380, 382, 390.

[62]  *See also In re Corel Corp. Sec. Litig.*, 206 F.R.D. 533, 542 (E.D. Pa. 2002) (Though original complaint indicated that fraud was uncovered earlier, "subsequent investigation and events revealed a more sustained pattern of concealment, and it is under this theory that all plaintiffs now proceed."); *Res. Am.*, 202 F.R.D. at 186 (class period properly ended months "after the filing of the first complaint").

for the first time by *Reuters*.  ¶12, 223-243.  Thus, considering all of the information

provided to the market after February 7, 2018, "[p]articularly in light of defendants'

repeated" reassuring statements, "it was reasonable for plaintiffs to rely upon

defendants' statements until the publication of the" *Reuters* report.  *Pharmacia*, 554

F.3d at 351-52; *Res. Am.*, 202 F.R.D. at 185.

### F.    The Complaint Also Amply Pleads Control Person Liability

Defendants do not dispute that they are control persons of J&J as relevant to 15

U.S.C. §78t(a).  Mtn. at 62-63.  Because a primary violation has indeed been pled, the

individuals who controlled those frauds are also liable as control persons.

## IV.    Conclusion

For these reasons, defendants' motion should be denied.  Plaintiff maintains the

sufficiency of the Complaint; but if the Court finds otherwise, plaintiff requests leave

to amend.  Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

DATED:  June 28, 2019          CARELLA, BYRNE, CECCHI, OLSTEIN,
                                 BRODY & AGNELLO, P.C.
                               JAMES E. CECCHI
                               DONALD A. ECKLUND


                                    /s/ JAMES E. CECCHI
                               _____
                                    JAMES E. CECCHI

5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
ARTHUR C. LEAHY
ROBERT R. HENSSLER JR.
NATHAN R. LINDELL
HILLARY B. STAKEM
MATTHEW J. BALOTTA
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
artl@rgrdlaw.com
bhenssler@rgrdlaw.com
nlindell@rgrdlaw.com
hstakem@rgrdlaw.com
mbalotta@rgrdlaw.com

Lead Counsel for San Diego County
Employees Retirement Association and Lead
Counsel for the Class

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 28, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ JAMES E. CECCHI
JAMES E. CECCHI

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
E-mail:  jcecchi@carellabyrne.com