**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

————————————————————  :
                                                         :
FRANK HALL, individually and on behalf  :
of all others similarly situated,                   :
                                                         :          Civil Action No.: 18-1833 (FLW)
                            Plaintiff,               :
                                                         :                    **OPINION**
        vs.                                           :
                                                         :
JOHNSON & JOHNSON, *et al.*,              :
                                                         :
                            Defendants.            :
————————————————————:

## WOLFSON, Chief Judge:

Presently before the Court is a motion by Defendants Johnson & Johnson ("J&J" or the "Company"), Alex Gorsky ("Gorsky"), Dominic Caruso ("Caurso"), Sandra Peterson ("Peterson"), Carol Goodrich ("Goodrich"), Joan Casalvieri ("Casalvieri"), Michael Sneed ("Sneed"), and Tara Glasgow ("Glasgow") (collectively, "Defendants"), to dismiss Lead Plaintiff San Diego County Employees Retirement Association's ("Plaintiff") Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  In this putative class action securities litigation, Plaintiff alleges that it, and other similarly situated investors, purchased J&J stock between February 2013 and October 2018  (the "Class Period"), and that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.  Furthermore, Plaintiff avers that Defendants Gorsky, Caruso, Peterson, Goodrich, Sneed, Glasgow, and Casalvieri (collectively, "Individual Defendants") violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Plaintiff alleges that Defendants fraudulently inflated the value of J&J's stock by issuing

false and misleading statements as part of a long-running scheme to conceal the truth from investors that the Company's talc products were contaminated with asbestos, and that Plaintiff and other investors relied on these material misrepresentations and omissions to their detriment. In the instant matter, Defendants move to dismiss the Amended Complaint on the basis that the alleged misstatements and omissions were not material, that Plaintiff has failed to plead with particularity that Defendants acted with scienter, and that Plaintiff has not sufficiently alleged loss causation.

For the reasons set forth below, Defendant's motion is **granted in part and denied in part**. Plaintiff's Section 10(b) and Rule 10b–5 claims are limited to those stemming from Defendants' statements regarding the safety of its talc products, the "asbestos-free" nature of its talc, and the Company's commitment to product safety, quality assurance, and research, and Plaintiff's claims based upon Defendants' alleged misstatements about the viability of the Product Liability lawsuits are dismissed. Furthermore, because Plaintiff has not adequately alleged facts suggesting a strong inference of scienter as to defendants Caruso, Peterson, and Sneed, those defendants are dismissed from the lawsuit.

## I. <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

The following allegations are taken from the Amended Complaint ("AC") and are assumed to be true for purposes of this motion to dismiss.[1]

### A. <u>Defendants</u>

J&J is a multinational company engaged in research and development, manufacturing, and sale of a broad range of healthcare products. AC ¶20. J&J has three business segments: pharmaceutical, medical device, and consumer. *Id*. The products produced by the consumer

---

[1] The Amended Complaint spans approximately 250 pages, plus exhibits, and includes numerous detailed factual allegations describing J&J's alleged thirty-year long fraudulent scheme. The following factual background does not purport to be an exhaustive summary of all of those facts, but rather recounts the most salient allegations.

segment include Baby Powder ("Baby Powder") and "Shower-to-Shower"[2] ("Shower-to-Shower") (collectively, the "Talc Products"), which are both made from cosmetic talc. [3] *Id.* at ¶¶48, 49.

Each of the Individual defendants is, or was, a senior J&J executive and, along with other personnel, allegedly helped perpetuate the Company's fraudulent scheme over its investors.[4]

Alex Gorsky is the Chairman of the Board and Chief Executive Officer ("CEO") of J&J. *Id.* at ¶21. He has served as CEO since April 26, 2012, and has been the Chairman since December 28, 2012. *Id.* Gorsky began his career at J&J in 1988, and has served in various leadership roles in the Company prior to being selected as CEO. *Id.*

Dominic Caruso was the Chief Financial Officer ("CFO") of the Company from 2007 until his retirement in September 2018, and also served as the Executive Vice President from April 2016 until his retirement. *Id.* at ¶22.

Sandra Peterson was Group Worldwide Chair at J&J from 2012 to October 2018. Peterson, the first outsider to ever join the Company's Executive Committee, is allegedly a "corporate fixer" who was hired to fix quality and supply chain issues, which the Company was facing leading up to the Class Period. *Id.* at ¶23. However, on June 22, 2018, just over two months after the first

---

[2] J&J produced Shower-to Shower until 2012, after which the brand was sold to Valeant Pharmaceuticals International, Inc. AC ¶49 n.5

[3] The consumer segment is housed within a subsidiary of J&J, Johnson & Johnson Consumer, Inc. ("JJCI"). JJCI is the entity primarily responsible for the formulation, manufacture, testing, marketing, and sale of the Talc Products. In order to avoid confusion, for the purposes of this Opinion, the Court will refer to both JJCI and J&J as J&J.

[4] In addition to Individual Defendants, Plaintiff's Complaint and Exhibit 1 to Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss ("Pl. Br.") identify numerous other J&J employees who purportedly played a role in the Company's alleged scheme. AC ¶¶28-41; ECF No. 45-3 Ex. 1, "J&J Personnel Involved in J&J's Longstanding Fraudulent Scheme."

jury verdict against J&J in a case alleging harm from asbestos in the Company's Talc Products, the Company announced Peterson's retirement, effective October 1, 2018. *Id*. at ¶211.

Carol Goodrich is the Director of Corporate Media Relations at J&J. *Id*. at ¶24. In 2013, Goodrich allegedly drafted the text of J&J's "Our Safety & Care Commitment" website, which addressed the safety of the Talc Products, and made public statements on behalf of J&J from 2016 through 2018. *Id*.

Joan Casalvieri, Ph.D. was the Director of Toxicology and Skincare at JJCI. *Id*. at ¶25. She allegedly spearheaded the Company's efforts to defend talc from both scientific and regulatory scrutiny in 2005. *Id*.

Michael Sneed has worked at the Company since 1983, and has been J&J's Executive VP of Global Corporate Affairs & Chief Communication Officer since 2012. *Id*. at ¶26. He is also a member of J&J's Executive Committee. *Id*.

Tara Glasgow was VP of Research and Development ("R&D") for the baby product unit of J&J's consumer division. *Id*. at ¶27. Glasgow allegedly made public statements on behalf of J&J from 2015 through 2017. *Id*.

### B. The Talc Products and the Alleged Fraudulent Scheme

Defendants allegedly concealed the truth about the asbestos in its Talc Products through a highly organized campaign of deceit and regulatory manipulation. According to Plaintiff, Baby Powder "stands out as a symbol of J&J's history and legacy" and has been described by the Company's executives as "an institution," "flagship product," and "sacred cow." AC ¶¶43,47. Plaintiff contends that the Talc Products "are contaminated with cancer-causing asbestos." *Id*. at ¶1. Cosmetic talc is a naturally occurring mineral that is mined from rock and then ground into powder form. *Id*. at ¶49. Talc can be naturally contaminated with different types of asbestos, such as chrysotile, tremolite, actinolite, anthophyllite, amosite, and crocidolite minerals, that develop

as bundles of long, thin fibers that are flexible and easily separable, rather than as solid rock. *Id.* at ¶50 Tremolite, actinolite, and anthophyllite minerals can also develop naturally as larger rocks, *i.e.*, "non-asbestiform." *Id.* at ¶50 n.6. The parties dispute the health risks, if any, posed by those minerals in their non-asebstos form, however, they agree that asbestos fibers can cause fatal cancers. *Id.* at ¶50, 50 n.6; *see* ECF No. 44-1, Memorandum of Law in Support of Defendants' Motion to Dismiss First Amended Class Action Complaint ("Def. Br."), at 5.

According to Plaintiff, in the 1970's, concerns about the safety of talc-based products and the potential for asbestos contamination began to surface, and as a result, J&J allegedly initiated a concerted effort to convince the public that talc was safe. *Id.* at ¶51. Similarly, after public health researchers in the 1980's started to consider a potential association between talc powder usage and ovarian cancer, the Company's alleged scheme turned to quelling those concerns. *Id.* at ¶74. To that end, the Company allegedly "lied to the public, influenced regulators, and purposely avoided testing methods that could detect the trace amounts of asbestos that the Company knew were present," *id.* at 51, and sought to preclude health organizations such as the National Toxicology Program ("NTP") and the World Health Organization ("WHO") from listing talc as a carcinogen, *id.* at ¶¶82-84, 100-102.

Plaintiff alleges that the Company was aware, as early as 1969, that J&J's talc contained "unavoidable trace amounts of tremolite," and Plaintiff cites to internal documents wherein pediatricians and the Company's own employees had expressed concern about potential adverse effects of talcum powder on the lungs of babies or mothers. *Id.* at ¶52. Throughout the 1970's, the Company allegedly received testing results from outside laboratories, and following those results, internally acknowledged the existence of asbestos in its Talc Products, but endeavored to keep the issue hidden from regulators and the public. *Id.* at ¶¶55, 57, 59. For example, Plaintiff

alleges that in 1971, an internal Company memorandum, drafted by Dr. T. M. Thompson, the son of the Company's co-founder, noted that that "[t]he talc used in JOHNSON'S Baby Powder came from a Vermont mine containing 'trace amounts of fibrous minerals (tremolite/actinolite).' While the talc went through a 'washing process,' 'three independent consulting laboratories' showed that the resulting talc still had 'traces of fibrous minerals.'" *Id*. at ¶¶55. Further, the memo acknowledged that "if it became known that [the Company's] formulations contained any significant amount of Tremolite" the [C]ompany could face a "furor" and "become involved in litigation." *Id*. at ¶53. In 1972, two other outside laboratories allegedly tested talcum powder samples and found the presence of tremolite asbestos fibers. *Id*. at ¶¶56-57.

J&J allegedly avoided testing methods which might reveal the presence of asbestos in its talc. *Id*. at ¶¶63-67, 230. Plaintiff alleges that in 1973, J&J hired a consultant who concluded that detecting trace amounts of asbestos was like looking for a "needle in a haystack" and requires testing large amounts of talc. *Id*. at ¶63. Accordingly, the consultant "considered [it] essential" to concentrate the asbestos before the talc was examined. *Id*. at ¶63. Knowing that the concentration method might lead to the detection of asbestos, the Company allegedly agreed internally that it "want[ed] to avoid promotion of this [testing] approach," and that it "really want[ed] to exclude concentration techniques in any proposed analytical procedure." *Id*. at ¶65. Plaintiff also alleges that in addition to the historical issues regarding J&J's testing methods, more recently, a 2016 internal audit report found that the Company's methods for testing its talc were "questionable at best." *Id*. at ¶110. Furthermore, RJ Lee, the outside lab utilized by J&J indicated that the test method required by J&J was "not an optimal method for asbestos testing." *Id*. In addition to avoiding testing methods which might find asbestos in its Talc Products, in 1974, J&J allegedly

authorized a clandestine "asbestos-destruction experiment," through which the Company hoped to identify methods to destroy the tremolite and chrysotile in its talc. *Id*. at ¶60.

Unable to remove the asbestos fibers from its talc, J&J also allegedly made efforts to control the scientific community's research regarding the safety of talc and purportedly sponsored "talc safety studies" to "neutralize or hold in check data already generated by investigators who question the safety of talc." *Id*. at ¶68. Simultaneously, J&J set out to obtain "maximal leverage for defending the product" by contradicting "negative data," *id* at ¶70; *see also id.* at *¶¶* 68-73. To that end, J&J allegedly led efforts to preclude the National Toxicology Program ("NTP) from considering whether talc was a potential carcinogen and including talc in its biennial Report on Carcinogens ("RoC"). *Id*. at ¶¶37, 82-84. The RoC is published every two years and lists substances "either known or reasonably anticipated to be human carcinogens." *Id*. at ¶37. In 2000, the NTP was considering whether to include talc in its next RoC, and J&J and its talc supplier allegedly worked hand in hand to undermine those efforts. *Id*. at ¶¶82-85. They succeeded in convincing the NTP to defer its decision on talc, by pointing out an "alleged fatal flaw" in the then-existing research linking ovarian cancer and talc: most of the studies involved the use of talc products produced before 1976, the year after which talc was supposedly required to be "asbestos-free." *Id*. at ¶¶82-83.

Later, when the NTP, again, decided to review whether talc was a potential carcinogen, the Company allegedly assigned Casalvieri the task of directing the project to "defend talc." *Id*. at ¶94. J&J worked with its talc supplier and outside experts "to develop documents" that undermined any link between talc and ovarian cancer, for potential submission to the NTP and for publication. *Id*. at ¶¶95,97. For example, J&J and its talc supplier allegedly secretly funded a study that sided with the Company on the safety of talc. *Id*. at ¶¶97-99. In order to conceal their

involvement, J&J purportedly retained a law firm which hired the researchers and through which payments to the researchers were funneled. *Id.*

In October 2005, the NTP withdrew talc from consideration as a carcinogen. *Id.* at ¶¶37, 103. An internal company email sent to 30 individuals, including Casalvieri, celebrated the NTP's decision, proclaiming, "We did it!" and acknowledging that the decision was "a direct result" of J&J's efforts, along with those of its talc supplier. *Id.* at ¶104.

Plaintiff alleges that J&J went to extreme lengths to defend its products, including updating the Company's website to address the safety of the Talc Products, and seeking to conceal negative data from the FDA. *Id.* at ¶¶227, 288, 299. Plaintiff alleges that while the Company was engaged in its offensive tactics to conceal negative data regarding its talc from the public, J&J was repeatedly informed, and internally discussed, the asbestos contamination in its Talc Products. For example, a March 1992 internal memorandum at J&J's talc supplier allegedly illustrates that it was "common knowledge" that asbestiform minerals such as tremolite and actinolite were present in the Vermont talc mines utilized by the Company. *Id.* at ¶76. In 2004, a news channel allegedly tested J&J Baby Powder and found that it "tested at above normal levels for asbestos." *Id.* at ¶88. Upon receiving the information, the Company allegedly "frantically called its talc supplier," and discovered that during the prior three years, the supplier had not been performing quarterly asbestos testing on the talc it was supplying to J&J. *Id.* at ¶90. In a series of 2008 emails, the Company's Global Creative Director repeatedly expressed concern that talc was not safe for use around babies, and was ultimately, reprimanded. *Id.* at ¶¶107-108.

### C. Alleged Misrepresentations and Omissions during the Class Period

In 2013, J&J began facing lawsuits alleging a connection between ovarian cancer and talc, and that asbestos in its talc powder caused cancer. ¶¶120, 179-186, 192-201, 204, 213-222. Plaintiff alleges that, shortly thereafter, the Company began issuing numerous false and misleading

statements – a continuation of its decade's long scheme– which form the basis of Plaintiff's instant claims. Plaintiff further alleges that the various misstatements made during the Class Period were aimed at preserving the public trust and precluding the discovery of the Company's longstanding misinformation campaign.

For example, in October 2013, following a jury verdict against the Company in a case where the plaintiff alleged that there was a link between asbestos and talc, the Company's "Safety & Care Commitment" webpage was updated to state that "[f]ew ingredients have demonstrated the same performance, mildness and safety profile as cosmetic talc, which has been used for over 100 years" and has "a long history of safe use." *Id*. at ¶¶126-127. The webpage stated that the Company's "talc is carefully selected, processed and tested to ensure that [it] is asbestos free" and that this has been "confirmed by regular testing conducted since the 1970s." *Id*. at ¶127. Plaintiff alleges that these statements were false, as indicated by a draft version of the website contained in the Company's internal documents. *Id*. at ¶¶128-129, 142. Plaintiff alleges that the draft of the webpage, modified by Goodrich and held in her files, contained the following edit: "Talc has over 100 years of ~~safe~~ use in personal care products." *Id*. at ¶128. Additionally, Plaintiff further alleges that commentary in the draft document, purportedly added by Goodrich, acknowledged, "I don't think we can link cosmetic talc to 100 years of use," and that J&J "cannot say [the Talc Products have] 'always' been asbestos free." *Id*. at ¶128

In February 2016, a Missouri state jury returned a verdict against J&J for failure to warn, negligence, and conspiracy, and awarded $72 million in damages to a long-time user of J&J's talcum powders who suffered from ovarian cancer. *Id*. at ¶147. This verdict was reportedly the first to award damages to a plaintiff linking ovarian cancer to J&J's talc products, and it included an award of $62 million in punitive damages. *Id*.

On February 25, 2016, following the $72 million verdict, the FDA requested, in writing, that J&J "provide all safety literature and data regarding talc, including data in support of the safety of this active ingredient and data that shows potential harmful effects." *Id*. at ¶150. In the company's letter-response, J&J allegedly represented that "[n]o asbestos-form structures have been found during any testing" of its body powders. *Id*. at ¶151. The Company did not reveal that over the years at least three independent laboratories had found asbestos in the Company's talc. The statements to the FDA were not the Company's only commentary on the safety of talc during that time period. Following articles about that jury verdict, Plaintiff alleges that the Company's website was updated to include various "materially false and misleading" statements including the following:

- "JOHNSON's talc products do not contain asbestos."
- It is a "misperception . . . that JOHNSON's Baby Powder contains talc made with asbestos."
- "Since the 1970s, talc used in consumer products has been required to be asbestos-free."
- "The grade of talc used in cosmetics is of high purity . . . and is free from asbestos and asbestiform fibers."
- "Cosmetic grade talc is only mined from select deposits from certified locations .."
- "Cosmetic grade talc is . . . milled to relatively large, non-respirable particles size."
- "Our sources for talc undergo comprehensive qualification."
- "The incoming talc is routinely evaluated . . . ."
- "The incoming talc is . . . evaluated using a sophisticated battery of tests designed to ensure quality, safety, and compliance with all global standards."
- "The safety of talc is based on a long history of safe use and decades of research by independent researchers and scientific review boards."

*Id*. at ¶148. Defendant Glasgow allegedly made similar representations in a June 2016 Houston Chronical editorial. *Id*. at ¶163. There, she claimed that 30 years of scientific studies and regulatory reviews have shown that "cosmetic talc is safe" and that "I can tell you the science is clear – cosmetic talc is, and has been, safe for use and that is the most important guiding principle

for every product Johnson & Johnson Consumer Inc. offers to consumers and patients." *Id*. at ¶¶163-164.

Despite the Company's efforts, throughout 2017 and 2018, it is alleged that the truth regarding asbestos in the Talc Products was slowly disclosed, and the Company's stock price began to decline. *Id*. at ¶¶184-237. On September 21, 2017, a law firm issued a press release (the "Bernstein Liebhard Press Release"), entitled "Talcum Powder Lawsuit Plaintiffs Claim Unsealed Documents Show Johnson & Johnson Knew of Talc-Asbestos Danger in 1970s, Bernstein Liebhard LLP Reports." *Id*. at ¶184. The press release indicated that plaintiffs in the ovarian cancer lawsuits were looking to add asbestos allegations to their ovarian cancer claims. *Id*. In response to the news, J&J's stock price declined from a close of $130.94 on September 26, 2017 to a close of $129.75 on September 27, 2017, and an event study allegedly "determined that [the decline] was statistically significant" and "cannot be attributed to market and sector factors, or to random volatility, but rather was caused by new company-specific information." *Id*. at ¶185, 185 n.21.

On January 30, 2018, testimony began in a New Jersey state court case (the "*Lanzo* Case") where the plaintiff, Stephen Lanzo, alleged that he developed mesothelioma as a result of exposure to J&J Baby Powder containing asbestos. That same day, after the markets closed, Law360 published an article regarding the Plaintiff's allegations and summarizing some of the testimony, including the allegation that J&J had been aware that its talc contained asbestos since the 1970s. *Id*. at ¶192. In response to that disclosure, J&J's stock dropped 3% from a close of $142.43 on January 30, 2018 to a close of $138.19 on January 31, 2018. *Id*. ¶193. An event study allegedly determined that the decline was statistically significant. *Id*.

On February 5, 2018, *Mesothelioma.net* published an article anticipating use of "damaging internal company documents" during the *Lanzo* trial. *Id.* at ¶194. The article explained that the anticipated documents would

> show that as long ago as the early 1970s, company officials were questioning each other about the impact of asbestos, and specifically about how much asbestos an infant might inhale if the company's baby powder contained a 1% concentration of the carcinogen. This type of documentation is likely to weigh heavily against the consumer products giant as they assert in court that their product has always been completely asbestos free.

*Id.* Plaintiff alleges that following the publication of that article, the Company's stock declined over 5%, from a close of $137.68 on February 2, 2018, to a close of $130.39 on February 5, 2018, the following trading day, which an event study determined to be statistically significant. *Id.* at ¶195. Contemporaneous publications from financial news outlets and analysts also attributed the stock drop to the article's pronouncements. *Id.* at ¶196-199.

On February 7, 2018, the Beasley Allen Law Firm, co-lead counsel on behalf of thousands of women in ovarian cancer related product liability lawsuits, issued a press release emphasizing the significance of recently disclosed J&J internal documents, which had been produced to it in discovery. *Id.* ¶201. Among other things, the press release alleged that the documents "shed light on just how prevalent asbestos and heavy metals are in the talc used in Baby Powder. The documents also show the corporations' response to growing concerns about cancer risks." *Id.* Following the press release, J&J's stock declined nearly 4%, from a close of $131.42 on February 7, 2018 to a close of $126.36 on February 8, 2018, which was determined to be statistically significant. *Id.* at ¶202.

Shortly thereafter, in April 2018, the jury in the *Lanzo* case found J&J and its talc supplier liable for the plaintiff's mesothelioma. *Id.* at ¶204. Following the verdict, Goodrich was quoted

in a New York Daily News article as stating that "Johnson's Baby Powder has been used for more than 120 years and it does not contain asbestos or cause mesothelioma," and "[w]e believe that once the full evidence is reviewed, this decision will be reversed." *Id*. at ¶205. Other spokespeople for the Company made similar statements to investors during various conferences throughout May 2018. For example, during the Consumer and Medical Devices Business Review, Global Chief Technology Officer Josh Ghaim claimed that, "our ingredients have . . . always been safe" and Jorge Mesquita, Executive VP of the J&J subsidiary which produces the Baby Powder product, promised that "we've been through this extensively, and we are 100% sure that our talc product is safe." *Id* at ¶208. During another conference on May 21, 2018, Mesquita similarly promised on May 21, 2018, that "[w]e are absolutely certain that science shows that our talcum product is safe." *Id*. During that same conference, Peterson represented that the Company's global supply chain had been largely fixed, and that she had ensured "we've got the right quality and compliance in all of our manufacturing sites around the world, both internal and external." *Id*. at ¶210.

On July 12, 2018, a jury in a Missouri product liability lawsuit (the *Ingham* case), the first trial where plaintiffs alleged that their ovarian cancer was caused by asbestos in the Talc Products, rather than talc itself, issued a $4.69 billion verdict in favor of the plaintiffs. *Id.* at ¶213. Following the jury verdict, the Company's stock price declined 1% which an event study determined to be statistically significant. *Id*. at ¶214. Market commenters and financial analysists also contributed the decline to the jury verdict. *Id*. at ¶¶215-218.

Much like after the *Lanzo* verdict, the Company went on the defensive, and made public statements decrying the verdict in the *Ingham* case. *Id*. at ¶¶219-222. In a July 2018 corporate statement, J&J promised that "the evidence in the case was simply overwhelmed by the prejudice" J&J had suffered during the proceeding, and J&J "remains confident that its products do not

contain asbestos and do not cause ovarian cancer." *Id*. at ¶219. In fact, the Company allegedly commented that the "the multiple errors in this trial were worse than those in the prior trials which have been reversed." *Id*. Similarly, Bloomberg reported on July 12, 2018, that Goodrich had stated in an email that the verdict "'was the product of a fundamentally unfair process,'" and that "'the evidence in the case was simply overwhelmed by the prejudice'" of the proceeding. *Id*. at ¶220. Goodrich also blamed "'multiple errors'" in the proceeding for the verdict and again promised that J&J's products were asbestos-free and did not cause ovarian cancer. *Id*. During an earnings call on July 17, 2018, Gorsky specifically referenced the *Ingham* case and avowed that "we remain confident that our products do not contain asbestos and do not cause ovarian cancer," and that "preeminent scientific and regulatory bodies . . . have fully reviewed the full body of scientific evidence on multiple occasions and found that it does not support the allegation that talc causes ovarian cancer." *Id*. at ¶222.

On December 14, 2018, Reuters published a highly detailed investigative report (the "Reuters report") entitled, "Powder Keg: Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder." *Id*. at ¶223. The article purportedly provided new information regarding the Company's knowledge of asbestos contamination in the Talc Products, the Company's alleged offensive campaign to convince regulators that talc was not a carcinogen, the Company's unsuccessful efforts to remove asbestos from its talc, and its failure to use "essential" testing methods. *Id*. at ¶¶223-243. Furthermore, the article allegedly included never-before-seen internal J&J documents that detailed the Company's knowledge of asbestos in the Talc Products and documented J&J's longstanding fraudulent cover-up scheme. *Id*. at ¶223.

Following the publication of the Reuters article, J&J's stock price plummeted 10% from a closing price of $147.78 the prior day to a closing price of $133. *Id*. at ¶233. An event study

allegedly determined that the decline "was statistically significant." *Id.* Financial analysts and market commenters from entities such as Forbes, Wells Fargo, and Credit Suisse also attributed the decline to the new information revealed in the Reuters article. *Id*. at ¶¶234-237.

Following the Reuters report's revelations, several government entities announced investigations into its allegations. A U.S. senator from the Environment and Public Works Committee requested that the FDA "immediately investigate" to determine whether J&J's "actions have placed at risk the public's health and safety." *Id*. at ¶245. Another senator, from the Committee on Health, Education, Labor and Pensions, requested documents related to the "'alleged decades-long effort by J&J to potentially mislead regulators and consumers about the safety'" of Baby Powder. *Id*. at ¶248. The Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") sent J&J "preliminary inquiries and subpoenas" regarding the instant securities class action lawsuit, a shareholder derivative suit, two Employee Retirement Income Security Act of 1974 class action lawsuits, and the product liability multidistrict litigation. ¶¶250-252.

### D. <u>This Putative Class Action</u>

On February 8, 2019 plaintiff Frank Hall filed a putative class action complaint, on behalf of all investors that purchased J&J securities between February 22, 2013 and February 7, 2018, alleging violations of Section 10(b) of the Securities Act of 1934 and Rule 10(b)(5) (Count 1) by all Defendants, and violations of Section 20(a) of the 1934 Act by defendants J&J, Gorsky, and Caruso (Count 2). *See* ECF. No. 1. On February 28, 2019, the Court appointed San Diego County Employees Retirement Association as Lead Plaintiff. *See* ECF No. 20. An Amended Complaint was filed on February 28, 2019. *See* ECF No. 33. The new pleadings added Sandra Peterson,

Carol Goodrich, Joan Casalvieri, Michael Sneed, and Tara Glasgow as defendants, and also extended the Class Period through December 2018. *Id.*

Subsequently, Defendants filed the instant motion to dismiss, arguing that Plaintiff has failed to state a claim under the applicable securities laws because: (1) the allegedly "new" information about the existence of asbestos in J&J's talc is immaterial; (2) alleged misrepresentations and omissions are either true or a non-actionable opinion; (3) Plaintiff has failed to allege a strong inference of scienter; 4) Plaintiff has not sufficiently alleged loss causation; and (5) Plaintiff's claims based on events occurring after February 7, 2018 (the end of the class period proposed in the initial Complaint) are not viable. Plaintiff opposes the motion.

## II. <u>LEGAL STANDARD</u>

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

"Independent of the standard applicable to Rule 12(b)(6) motions," Fed. R. Civ. P. 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of its alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum*, 361 F.3d at 224). Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 216).

In addition to Rule 9(b)'s heightened pleading requirements, Congress enacted the PSLRA, 15 U.S.C § 78u, *et seq.*, to require an even higher pleading standard for plaintiffs bringing private securities fraud actions. *In re Suprema, 438 F.3d at 276*. This heightened pleading standard is targeted at preventing abusive securities litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (identifying "ways in which the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent . . .") (quotes and citations omitted).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Both provisions of the PSLRA require facts to be pled with "particularity." *Avaya*, 564 F.3d at 253. This particularity language "echoes precisely Fed. R. Civ. P. 9(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999); *see* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Indeed, although the PSLRA complements Rule 9(b) as the pleading standard governing private securities class actions, the rule's particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." *Avaya*, 564 F.3d at 253 (citations omitted).

## III. <u>ANALYSIS</u>

### A. Judicial Notice

Defendants request that this Court take judicial notice of seventeen documents pursuant to Federal Rule of Civil Procedure 201. *See* ECF No. 44, Defendants' Request for Judicial Notice in Support of Their Motion to Dismiss ("Def. Judicial Notice Br."), Ex. 1-17. Plaintiff objects to

judicial notice of eleven of the proffered exhibits.[5]  *See* ECF No. 45-4, Lead Plaintiff's Brief in Opposition to Defendants' Request for Judicial Notice ("Pl. Judicial Notice Br.").

On a motion to dismiss, courts may consider "document[s] integral to or explicitly relied upon in the complaint" or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiffs' claims are based on the document."  *In re Asbestos Product Liability Litig. (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016).  Courts may also consider facts and documents which are subject to judicial notice under Federal Rule of Evidence 201.  A fact is appropriate for judicial notice if it "is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Plaintiff does not oppose limited judicial notice of Exhibit 1, an SEC form 10-K filed by J&J, for the fact that the form was filed with the SEC and that the statements included in the filing were made.  Pl. Judicial Notice Br. at 5.  However, Plaintiff objects to judicial notice of the document to the extent J&J seeks to admit the exhibit "for the truth of contested matters it discusses – such as J&J's defensive position that there is an 'absence of any credible scientific evidence suggesting that the Talc Products contain dangerous levels of tremolite asbestos or any other type of asbestos." *Id.*   Similarly, Plaintiff does not object to judicial notice of the existence of the contents of Exhibits 2, 5, and 9, each of which is a document issued by a government entity or public agency, but objects to the Court assuming the truth of the matters asserted in those documents.  *Id.*  Because these documents are publicly available authentic records, or documents

---

[5]  Plaintiff does not oppose Defendants' request for judicial notice of Exhibits 6-8,11,13,15, each of which was either expressly relied upon in the Amended Complaint or consists of historical stock price data.  *See* Pl. Judicial Notice Br. at 3-5.  Accordingly, the Court takes judicial notice of those exhibits.

issued by government and public agencies, the Court will take judicial notice of Exhibits, 1, 2, 5, and 9, however, to the extent Defendants attempt to rely on those documents to create a defense to the Complaint's otherwise well-pled allegations, and suggest that this Court should assume the factual assertions in those documents to be true, the Court finds it inappropriate to do so, at this juncture.

Finally, Plaintiff objects to judicial notice of the remaining exhibits: Ex 3., March 5, 2019 Statement from U.S. Food and Drug Administration Commissioner Scott Gottlieb, M.D. and Susan Mayne, Ph.D., director of the Center for Food Safety and Applied Nutrition; Ex. 4, The U.S. Food and Drug Administration webpage regarding a 2009-2010 talc study; Ex. 10, a 2016 scientific study from the Journal of the National Cancer Institute, entitled "Douching, Talc Use, and Risk of Ovarian Cancer"; Ex. 12, "Prospective Study of Talc Use and Ovarian Cancer"; Ex. 14, February 13, 1975 letter from G. Lee regarding "CTFA Talc Subcommittee Meeting with Food and Drug Administration, Washington, D.C., February 7, 1975,"; Ex. 16-17., CNN articles by Matt Egan from February 5 and February 8, 2019.

Exhibits 3 and 4 are both excerpts from the Food and Drug Administration's (FDA) website. Although statements from government entities are typically appropriate for judicial notice, Exhibit 3 was issued on March 5, 2019, three months after the close of the Class Period. Thus, it arguably has minimal relevance to the claims at issue, here. Exhibit 4, although it does not contain a publication date, notes the release of a March 12, 2019 safety alert regarding cosmetic talc, and thus, also appears to post-date the Class Period. Accordingly, the Court declines to take judicial notice of either document. *See In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *3 n.5 (D.N.J. Aug. 28, 2017) (declining to take judicial notice of post-class period public

documents because "their relevance to the issues here – e.g., what was known to PTC at the time it made the alleged misstatements – is quite low").

Exhibit 10 is a scientific study sponsored U.S. National Institutes of Health (NIH) and published in the National Cancer Institute journal. Defendants contend that the study is appropriate for judicial notice because it was sponsored by the NIH and courts may take notice of information reported by government administrative agencies. Def. Judicial Notice Br. at 5. Although Defendants are correct that courts may generally take judicial notice of a document issued by a governmental agency, the Court declines to take judicial notice of Exhibit 10. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (finding it appropriate to take judicial notice of documents that are the records of government agencies). Defendant primarily seeks to introduce Exhibit 10 to contest the allegation that there is a link between talc and ovarian cancer. *See* Def. Br. at 27 (citing Exhibit 10 for the proposition that "a large prospective study" "did not observe an association between recent talc use and ovarian cancer.") Because Exhibit 10 addresses the merits of Plaintiff's claims, is not relied upon or integral to the Complaint, and would require the court to delve into the scientific evidence that forms the crux of the parties' dispute, the Court declines to take judicial notice of the study.

Defendants contend that Exhibits 12 and 14 are documents linked directly from the Reuters article, which is Exhibit 3 to the Amended Complaint. Def. Judicial Notice Br. at 5-6. Similarly, Exhibit 12 is a study referenced in the draft of the J&J Safety Care and Commitment Website, and quoted in Paragraph 131 and Exhibit 2 of the Amended Complaint. *Id.* Although these documents are referenced in exhibits to the Complaint, they are not, themselves, "integral to" or "expressly relied upon" in the Complaint. *In re Asbestos Product Liability Litig.*, 822 F.3d at 134 n.7. The mere fact that the documents are referenced or quoted in an Exhibit to the Amended Complaint

does not render the exhibits themselves appropriate for consideration on a motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) ("[T]he critical [issue] is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited."). Furthermore, the inferences that Defendants wish to draw from these documents are inappropriate at this juncture. Like Exhibit 10, Defendants largely point to these documents to establish substantive merits-based defenses regarding the science underlying the Complaint's allegations. Accordingly, the Court declines to take judicial notice of Exhibits 12 and 14.

Exhibit 16-17 are both CNN news articles, which are not referenced in the Complaint, but provide analysis of the Dow Jones' historical average price data. Because the documents convey historical stock data, the Court will take judicial notice of Exhibits 16 and 17. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 272-74 (D.N.J. 2007) (taking judicial notice of "stock price data compiled by a reliable financial news service."). However, to the extent Defendants seeks to create factual disputes regarding the cause for the decline in J&J stock, the Court will grant Plaintiff the benefit of all reasonable inferences from the facts as alleged, as required at this phase of the litigation.

### B. The Section 10(b) and Rule 10b–5 Claims

The private right of action under Section 10(b) and Rule 10b–5 "creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 141. In relevant part, Rule 10b–5 makes it unlawful for an individual "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any

security." 17 C.F.R. § 240.10b–5(b). To state a claim under Section 10(b) and Rule 10b–5, the plaintiff must allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *Gold v. Ford Motor Co*., 577 F. App'x 120, 122 (3d Cir. 2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

Under Section 10(b) and Rule 10b–5, a misrepresentation or omission of fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision, and there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. v. Northway*, 426 U.S. 438, 440, 449 (1976)); *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). Importantly, to be actionable, a statement or omission must have been materially misleading at the time it was made; liability cannot be imposed on the basis of subsequent events. *In re NAHC, Inc. Sec. Litig*., 306 F.3d 1314, 1330 (3d Cir. 2002).

Additionally, because materiality is a mixed question of law and fact, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro v. UJB Financial Corp*., 964 F.2d 272, 280 n. 11 (3d Cir. 1992) (citation omitted). The Third Circuit has warned that the task of determining materiality can be especially difficult when the statement at issue contains "soft" information, i.e., statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts. *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 642 (3d Cir. 1989).

However, regardless of whether a piece of information is material, Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Indeed, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *City of Edinburgh Council v. Pfizer, Inc.,* 754 F.3d 159, 174 (3d Cir. 2014) (quoting *Basic*, 485 U.S. at 239 n. 17). Rather, "[d]isclosure is required ... only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)); *see also City of Edinburgh*, 754 F.3d at 174; *Burlington*, 114 F.3d at 1432 ("[P]ossession of material nonpublic information alone does not create a duty to disclose it.").

Additionally, according to the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, when the alleged misleading statement at issue is an opinion or a belief, whether that statement is 'misleading' "depends on the perspective of a reasonable investor: The inquiry (like the one into materiality) is objective." 575 U.S. 175, 185 (2015). Although *Omnicare* examined claims under Section 11 of the Securities Act of 1933, these principles are "not unique to § 11." *Id*. at 191. Rather, "[t]hey inhere, too, in much common law respecting the tort of misrepresentation," *id*., and are therefore arguably applicable to claims under Section 10(b) as well. *See In re Merck & Co*., No. 05-1151, 2015 WL 2250472, at *21 (D.N.J. May 13, 2015) (finding *Omnicare*'s analysis of misleading opinions, instructive, to some extent, on the viability of claims regarding misleading opinions under Section 10(b)).

As the Supreme Court observed:

> The Restatement of Torts, for example, recognizes that '[a] statement of opinion as to facts not disclosed and not otherwise known to the recipient may' in some circumstances reasonably 'be interpreted by him as an implied statement' that the speaker 'knows facts sufficient to justify him in forming' the opinion, or that he at least knows no facts 'incompatible with [the] opinion.' When that is

so, the Restatement explains, liability may result from omission of facts—for example, the fact that the speaker failed to conduct any investigation—that rebut the recipient's predictable inference.

*Omnicare*, 575 U.S. at 191 (quoting Restatement (Second) of Torts § 539 at 85, Comment a at 86, Comment b at 87 (1976) (citations omitted)).  These principles are consistent with the Third Circuit's admonition that when evaluating Section 10(b) claims, courts must examine allegedly misleading statements in context, to determine whether they were indeed misleading.  *See City of Edinburgh,* 754 F.3d at 167.  Furthermore, the Third Circuit has deemed determinative that "[o]pinions are only actionable under securities laws [including Section 10(b),] if they are not honestly believed and lack a reasonable basis."  *Id*. at 170.

In addition to opinions and beliefs, a defendant may not be held liable for an alleged misrepresentation that consists of nothing more than vague and nonspecific expressions of corporate optimism.  *Advanta*, 180 F.3d at 538.  Such statements "constitute no more than 'puffery' and are understood by reasonable investors as such."  *Id*.  (quoting *Burlington*, 114 F.3d at 1428 n. 14).  Thus, if a false or misleading statement is "too vague to ascertain anything on which a reasonable investor might rely," it is inactionable as corporate puffery.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010)

### i.  The Alleged Material Misstatements and Omissions

As an initial matter, the Court makes clear that, at this pleading phase of the litigation, the Court has not, and will not, assess the substantive merits, or truthfulness, of the alleged misstatements and omissions identified by Plaintiff.  Critically, in this case, many of the identified misstatements involve interpretations of complex scientific evidence, which are the appropriate fodder for expert testimony.  The Court assumes, as it must on a motion to dismiss, the truth of Plaintiff's well-pled allegations; to the extent Plaintiff has sufficiently alleged facts suggesting that

the identified statements were false or misleading, the Court grants Plaintiff all reasonable inferences from those facts, without expressing an opinion as to the underlying substance of Plaintiff's allegations.

The basis of Plaintiff's claims in the instant case are hundreds of allegedly false or misleading misstatements issued by Defendants between February 2013 – and October 2018 in furtherance of J&J's purported scheme to conceal the truth about the safety of its Talc Products from investors and the public. *See* AC ¶¶253-391. Here, Defendants argue that Plaintiff has failed to adequately allege that Defendants' statements are materially false or misleading. In that regard, Defendants do not specifically point to particular misleading statements in the Amended Complaint; instead, they identify categories of statements, and provide examples within those categories, which they contend are insufficient to sustain a securities fraud claim. Def. Br. at 10-1. Specifically, Defendants argue that each of the alleged misstatements falls into one of several broad categories 1) "[g]eneral statements regarding J&J's commitment to quality, research and development, and product safety," *see, e.g.*, AC ¶¶ 253, 258, 261, 263, 269, 271, 273, 275, 277, 278, 281, 284, 296, 309, 327, 356, 358, 360, 361, 367-69.; 2) "[s]pecific statements that J&J's talc and consumer talc products are 'carefully tested,' 'safe,' and 'asbestos free,'" *see, e.g.*, *id*. at ¶¶ 292, 294, 299, 302-03, 311, 318, 321, 331, 335, 338-41, 346-47, 350, 359, 370, 375, 379, 382, and 3) "[s]tatements about J&J subsidiaries involvement in product liability lawsuits . . . and [c]ertain Defendants . . . assessment of jury verdicts rendered against the Company in the PL Lawsuits," *see, e.g.*, *id*. at ¶¶ 272, 274, 282, 286, 297, 302, 307, 315-16, 324-26, 329, 333, 344, 353-55, 365, 379-80, 388, 390. The Amended Complaint spans over 240 pages and contains numerous, detailed, allegations of false or misleading statements which were issued in, among other things, J&J's SEC filings, website, earnings calls, press releases, and media reports. *See*

*generally id.* at ¶¶ 253-391.  In that connection, Plaintiff has provided the Court with a chart, totaling over 100 pages, summarizing each misstatement or omission identified in the complaint, the speaker, and the reason why the statement is allegedly false or misleading.  *See* ECF No. 45-1, Appendix 1.  However, the Court will not examine each statement individually, but rather, consistent with the parties' briefing, the Court will assess each category of allegedly false and misleading statements, and identify specific statements as examples, where necessary.

### 1.  General Statements Regarding the Company's Commitment to Product Safety and Quality

Defendants contend that Plaintiff has not adequately alleged that any of the statements regarding the quality and safety of the Talc Products are inaccurate.  Def. Br. at 31.  Furthermore, Defendants contend that even if false, the statements are "vague" and "general," and constitute non-actionable "puffery."  Def. Br. at 31.

Plaintiff contends that both Defendants' present-day and historical statements about J&J's commitment to safety and quality assurance policies were materially misleading.  Pl. Br. at 27.  In that regard, Plaintiff points to Defendants' statements, in various SEC filings between 2013 and 2017, expressing that the Company was "committed to investing in research and development with the aim of delivering high quality," and "improving existing products."  *See, e.g.*, AC ¶¶256, 258, 263, 273, 275, 281, 296, 327, 356.  Plaintiff also alleges, for example, in July 2013, during a conference call with investors, Peterson allegedly informed investors that as part of its "quality initiative," the Company was "trying to ensure that we have the highest standard of quality for the safety and care of our patients and consumers" and the Company was identifying problems with its products early and taking any necessary corrective action.  *Id*. at ¶261.  As another example, during a healthcare conference on January 12, 2015, Gorsky allegedly stated that "quality and safety" was the Company's "number-one priority" and that they had made a number of changes to

"make sure that [J&J] addressed any of the outstanding issues that [the Company] was facing." *Id*. at 277. On several occasions, Gorsky and Glasgow, both in oral statements and on the Company's website, emphasized the Company's commitment to "taking care of mothers and babies" and helping people live longer, healthier, and happier lives." *Id*. at 278, 284

In Plaintiff's view, these statements regarding the safety and quality of J&J's products were material misstatements or omissions, because Defendants failed to disclose that (i) asbestos had repeatedly been found in the Company's Products, (ii) J&J purposely avoided "essential" testing methods, and (iii) J&J had purposely influenced and manipulated regulators and lied to the FDA regarding asbestos testing and safety. Pl. Br. at 29. Relying primarily on out-of-circuit cases, Plaintiff contends that "puffery in one context may be material in other contexts" and here, because the Company's actions were such an extreme departure from its public representations about J&J's current and past practices, the statements were materially misleading, rather than mere puffery. *Id*.

"[V]ague and general statements of optimism constitute no more than puffery and are understood by reasonable investors as such." *Advanta*, 180 F.3d at 538 (internal quotes and citations omitted); *see also Aetna*, 617 F.3d at 283 (noting that puffery includes "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism."). "[A]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *Aetna*, 617 F.3d at 283.

In *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), relied upon by Plaintiff, the defendant, a banking institution, characterized its lending policies as "prudent," "cautious,"

and "conservative," and also emphasized its "strict" credit administration practices, its "minimal" foreign loan exposure, and its "basic" approach to loan management. *Id.* at 276. It also represented that its loan loss reserves were "strong" or "very strong," and had been and would continue to be "maintained at a level adequate." *Id.* While making those representations, the company allegedly concealed the truth about the company's loan loss reserves, financial health, lending practices, and internal controls. *Id.* at 281–82. The Third Circuit explained that "[b]y addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Id.* at 282. Further, it found that, although the terms used by the company were general, "a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers." *Id.* Thus, the court found that defendant's general statements in that regard were actionable as securities fraud.

Here, although Defendants have broadly identified this category of statements as "[g]eneral statements regarding J&J's commitment to quality, research and development, and product safety," the Court finds that certain statements within this category are actionable as securities fraud, while others are not.

As an initial matter, some of the alleged misstatements within this category are clearly more general statements regarding the Company's values and motivations, and thus, constitute puffery. For example, the Amended Complaint identifies the following misstatements: (1) statements on the Company's website that J&J "continue[s] to take [its] research to the next level by looking at all the science . . . that help our babies thrive and grow" and that J&J "help[s] families make the little moments – like bath time" serve as "an opportunity to nurture your baby's ability

to learn," AC ¶278; (2) a statements by Gorsky during a January 2014 conference call that the Company's "Chief Medical and Chief Quality Officers are setting new benchmarks for medical safety and implementing a more consistent global approach for monitoring the use of our end market products that is very patient- and consumer-centric for ensuring that they are safe and performing as expected and as intended. While we're pleased with the progress that we've made here, we're not yet satisfied, and we'll keep doing whatever it takes to ensure that we continue to earn the trust of consumers and patients around the world," *id.* at ¶269; (3) a statement by Gorsky at an April 23, 2015 Shareholders Meeting, that "Johnson & Johnson is committed to helping mothers and babies, we never want to forget the needs of the world's smallest patients . . . Caring inspires us day in and day out as we strive to make a difference for people who count on us the most. And as the world's largest and best healthcare company in the world, we're committed to reaching more people in more places in more ways. We're helping people ultimately live longer, healthier, and happier lives," *id.* at ¶284; and (4) a statement by Gorsky at an April 2018 shareholder meeting that "at Johnson & Johnson, we are committed to meeting the needs of our stakeholders, as defined in Our Credo, the doctors, the nurses and patients and the mothers and fathers and all others who use our products. . . . Guided by our purpose-driven strategies and values that are rooted in our credo, we will always put the needs and well-being of the people we serve first," *id.* at ¶361. These statements – and other similar statements identified in the Amended Complaint – are general value-oriented statements regarding the Company's commitment to consumer safety; critically, many of these statements do not even specifically address the Talc Products or make any specific claims about the Company's quality assurance process and procedures, related to those products. *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (finding that company's statements that it was "committed to serving

safe, high quality food to [its] customers" and that its "food safety programs are also designed to ensure that [the company] compl[ies] with applicable federal, state and local food safety regulations" were inactionable puffery because they were "couched in aspirational terms."). Unlike in *Shapiro*, where the defendant addressed specific business practices, these statements are the type of "vague and general statements of optimism" and aspirational goal statements routinely issued by companies selling consumer products and not the type of assertions upon which a reasonable investor would rely. *Advanta*, 180 F.3d at 538; *see also U.S. S.E.C. v. Kearns*, 691 F. Supp. 2d 601, 617 (D.N.J. 2010) (finding that medical transcriptions company's statements about "disciplined business practice" and the experience and discipline of its management team, were merely puffery because no reasonable investor would have relied on them); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017), *aff'd sub nom*, 905 F.3d 106 (3d Cir. 2018) (finding that statements about "strong" and "record" financial results, as well as the generally optimistic statements, constituted puffery because they "are not determinate, verifiable statements."). Thus, I find that the identified value-oriented statements – and other similar statements -- are not sufficiently material to rise to liability for securities fraud, and Plaintiff's claims premised on such statements are dismissed.

However, certain statements regarding the Company's quality assurance process were ostensibly meant to preclude investors and the public from second-guessing the Company's approach to quality assurance and research, which according to Plaintiff, furthered the alleged scheme to cover up the truth about the safety of the Talc Products. In addition to the statements regarding quality control and assurance in the Company's SEC filings, many of the Individual Defendants made public announcements that, although they did not specifically reference the Talc Products, suggested that the Company was taking corrective action to address quality control

issues with its products. For example, in a July 2013 conference call regarding the Company's second-quarter 2013 financial results, Peterson explained that

> [the Company's] quality effort is across the enterprise, across all of our businesses, our manufacturing sites as well as all of our R&D sites, because they are under the scope of trying to ensure that we have the highest standard of quality for the safety and care of our patients and consumers. So, when we launched the quality initiative a number of years ago, the focus really was on ensuring that we've got consistent quality standards. . . . And we have, obviously as we've gone through all of this work, we have identified corrective actions, and we've immediately taken those corrective actions. . . . We're putting in place processes and systems so that we have early warning systems in place to understand if we think there may be something going on with a product. So we identify it early and we go out and correct it. . . . one of the very important changes that we have been making with our global supply chain is ensuring that all of our external suppliers – so, our material suppliers – are thoroughly reviewed, are thoroughly managed, and that they are living up to our quality standard

*id*. at ¶261. Similarly, during a healthcare conference on January 12, 2015, Gorsky stated that "quality and safety, [is] our number-one priority in dealing with patients and consumers. We've made a number of changes over the last few years, frankly to make sure that we addressed any of the outstanding issues that we were facing, but also more importantly to set us up for a benchmark going forward." *Id*. at ¶277.

By placing the nature of the Company's quality assurance procedures "in play," Defendants were also required to disclose "certain facts contradicting th[ose]representations." *Shapiro*, 964 F.2d at 281. Here, Plaintiff specifically alleges that, despite various individual defendants' attestations to the contrary, the Company was not focused on quality assurance, and research and development. The identified statements, and other similar attestations, go to the heart of Plaintiff's theory that the Company's quality assurance procedures were intentionally deficient, and that the Company deliberately avoided utilizing "essential" testing which might reveal the

existence of asbestos in its Talc Products. Other courts have similarly concluded that statements emphasizing the strength of a particular business operation may be actionable as securities fraud, where those operations are in reality deficient. *See e.g.*, *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1218–19 (N.D. Ga. 2019) (finding that defendants' alleged representations that it possessed a "highly sophisticated data information network" and "advanced security protections" were material misrepresentations where the plaintiff alleged "a variety of facts showing that [the company's] cybersecurity systems were outdated, below industry standards, and vulnerable to cyberattack, and that [the company] did not prioritize data security efforts."); *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012) (finding that defendants alleged representations that it "conducted 'extensive' training and safety programs" were materially misleading where the plaintiff alleged facts suggesting that "the measures were insufficient to address applicable legal requirements and created a high risk of legal exposure."); *cf. Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 547 (W.D. Pa. 2019) (finding that company's "general statements about its values, workplace safety, and ethics—which read like mission statements rather than guarantees" were not misleading where the plaintiff's securities fraud claims did not involve safety issues, but rather, involved allegations that the company sold a particular product for inappropriate end uses). Thus, at this juncture, in light of Plaintiff's allegations that the Company was knowingly hiding the existence of asbestos in its Talc Products, purposefully avoiding the use of testing methods which might reveal the existence of asbestos, and making misrepresentations to the FDA regarding asbestos testing and safety, the Court cannot conclude that the Company's representations that it was focusing on research and development, ensuring the quality of its outside materials, and providing high quality

products, were "so obviously unimportant to an investor that reasonable minds cannot differ on the questions of materiality." *Shapiro,* 964 F.2d. at 280.

## 2. Statements that the Talc Products were "safe" and "asbestos free"

Defendants also contend that the statements that the Talc Products are "safe" and "asbestos free" are inactionable. Def. Br. at 19-20. First, Defendants argue that those statements are actually true, as Plaintiff has failed to identify data, test results, or other facts supporting the inference that the statements were false at the time they were made; and second, that even if proven false, the statements are inactionable opinions. Def. Br. at 20; ECF No. 48, Reply Brief to Opposition to Motion ("Def. Reply Br.") at 5. In that connection, Defendants insist that Plaintiff has not provided "contemporaneous testing data" indicating the existence of asbestos in the Company's Talc Products and that Plaintiff relies on isolated and debunked testing results which are insufficient to adequately allege that the Talc Products were unsafe or contaminated with asbestos between 2013 and 2018. Def. Br. at 22-23. In Defendants' view, the historical allegations regarding the avoidance of essential testing methods in the 1970s and the finding of asbestos in the Baby Powder in 2004, "are irrelevant to the question of whether Defendants made misstatements regarding troubling testing results regarding asbestos during (or anywhere near in time) to the Class Period" which began in 2013. Def. Reply Br. at 5. Further, Defendants argue that the statements are "at most, subjective interpretations of complex data, which constitute inactionable opinion statements that cannot support a claim for securities fraud." Def. Reply Br. at 6.

Plaintiff disputes Defendants' characterization of the statements regarding the asbestos free nature of their products as opinions, and contends that Defendants' statements "were not 'subjective interpretation[s] or expression[s] of belief,'" but rather "'painted a favorable picture without including the details that would have presented a complete and less favorable one.'" Pl.

Br. at 18 (quoting *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 900 (E.D. Pa. 2018)). Furthermore, even if the statements are found to be opinions, in Plaintiff's view, Defendants did not honestly believe the proffered statements regarding the safety of talc, as indicated by the Company's internal documents, and Defendants lacked a reasonable basis for making the proffered statements. *Id*. at 19. Additionally, Plaintiff contends that "Defendants' statements put the safety and purported asbestos-free nature of the products at issue, but withheld existing material information on those same subjects," such as J&J's alleged avoidance of important testing methods, J&J's unsuccessful attempts to remove tremolite from its talc, and the Company's alleged scheme to conceal the asbestos contamination; according to Plaintiff, these omissions rendered the Company's statements materially misleading. Pl. Br. at 30. Thus, Plaintiff argues that both Defendants' historical statements, and those during the Class Period, are materially misleading. *Id*.

The Court finds that Plaintiff has sufficiently alleged facts suggesting that that Defendants' statements regarding the safety and asbestos free nature of its Talc Products were either false or materially misleading, at the time they were made. To begin, in addition to public statements in newspapers and to investors during conference calls, during the Class period, the Company repeatedly issued statements on its website reaffirming the safety of talc and its talc products. The Company's "Our Safety and Care Commitment" website was updated to include the following statement from Casalvieri, Director of Toxicology and Skincare, which stated that

> [a]s a toxicologist in our Consumer business, my job is to make certain a product is safe by assessing whether any ingredient in that product poses a risk. We want to assure women and caregivers who use our talc products that numerous studies support its safety, and these include assessments by external experts in addition to our company testing. Many research papers and epidemiology studies have specifically evaluated talc and perineal use and these studies have found talc to be safe.

AC ¶266.  On February 24, 2016, following the $72 million verdict in one of the first successful cases linking talc and ovarian cancer, J&J allegedly created a page on its website, entitled "The Facts About Talc Safety" which explained among other things, that "Johnson's talc products do not contain asbestos," the "[t]he safety of talc is based on a long history of safe use and decades of research by independent researchers and scientific review boards," and that the Company's "sources for talc undergo comprehensive qualification. The incoming talc is routinely evaluated using a sophisticated battery of tests designed to ensure quality, safety, and compliance with all global standards."  *Id*. at ¶299; *see also* ¶147.  Similarly, Goodrich was quoted in a New York Daily News article, following the *Lanzo* verdict, as stating that "Johnson's Baby Powder has been used for more than 120 years and it does not contain asbestos or cause mesothelioma."  *Id*. at ¶359

Notwithstanding those statements, Plaintiff's Complaint alleges that during the Class Period, J&J and Goodrich internally acknowledged that the Company could not espouse that "talc has over 100 years of safe use in personal care products," *id*. at ¶¶128, 267; *see also* AC Ex. 2; that J&J's outside testing laboratory did not think the testing method used by J&J was "optimal" for identifying asbestos, *id*. at 110; and that "[t]o this day, J&J has not adopted concentration method for testing its talc despite the Company's knowledge that this would allow detection of asbestos in its talc and talcum powders when present in trace amounts," *id*. at ¶67.  To the extent Defendants rely on other tests as providing a reasonable and good faith basis for their statements, Plaintiff has sufficiently alleged the existence of alternative testing and that Defendants allegedly chose to remain willfully ignorant of the possibility that there was asbestos in the Company's Talc Products.  Additionally, Plaintiff claims that Goodrich admitted internally that scientific sources "could be interpreted as suggesting a causal effect" between talc and ovarian cancer, and that studies cited by J&J "send mixed messages."  *Id*. at ¶¶266-268.

Indeed, as alleged, Defendants were admittedly aware of contrary test results and yet, indicated to the public at large, via statements on the Company website and elsewhere, that J&J had "carefully assessed all available data on talc and consumers can feel confident that the overwhelming body of research and clinical evidence continues to support the safety of cosmetic talc." *Id*. at ¶288. Thus, Plaintiff has sufficiently alleged the existence of scientific evidence, of which defendants were aware, suggesting the falsity of Defendants' statements; although expert discovery may eventually prove otherwise, at this early juncture, the Court assumes those statements to be true. Accordingly, the Court finds that Defendants' statements that their Talc Products were asbestos-free, in the face of the alleged contrary scientific evidence that Defendants were aware of, were arguably false.

Furthermore, even assuming Defendants' statements were merely opinions based on assessment of all the scientific evidence available to the Company, Plaintiff has sufficiently alleged that the statements were "materially misleading," because they did not express the actual belief of the Company and lacked a reasonable basis. *City of Edinburgh*, 754 f.3d at 170. In *Omnicare*, the Supreme Court explained that an opinion may be an actionable misrepresentation or misleading omission if (1) the statement expresses an opinion not actually held by the speaker (subjectively false) and contains an embedded assertion of incorrect facts (objectively false), or (2) the speaker omits facts concerning the basis for the opinion and "those facts conflict with what a reasonable investor would take from the statement itself." *Id*. at 1326, 1329; *see also City of Edinburgh*, 754 F.3d at 170 ("Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis.").

Although Defendant's statements regarding the safety of its Talc Products required some degree of interpretation of scientific evidence, here, unlike in *City of Edinburgh*, Plaintiff alleges

that defendant's own internal statements undercut their public interpretations of the data available. In that case, investors brought a securities fraud suit against Pfizer, a pharmaceutical manufacturer, and the company's executives. *City of Edinburgh*, 754 F.3d at 170. The plaintiff alleged that the pharmaceutical manufacturer's statement in a press release, that it planned to proceed to the third phase of a clinical trial of an experimental drug based on the success of the second phase's interim results, was false and actionable as securities fraud. *Id*. The plaintiff alleged that confidential witnesses from the company indicated that phase 2 of the trial had presented certain safety concerns and did not show a significant deviation between patients treated with the experimental drug and the placebo. *Id*. In reviewing the allegations, the Third Circuit concluded that at best, plaintiff's allegations demonstrated "a difference of opinion" regarding whether initiating phase 3 of the clinical trial was warranted, and absent allegations that defendants "did not honestly believe their interpretation of the interim results or that it lacked a reasonable basis" the opinion was not actionable as securities fraud. *Id*. Further, the Third Circuit noted that that the press release did not proffer statements about the efficacy or safety of the drug, or the strength of the results, and in fact, explicitly cautioned investors that no conclusion could be drawn about the phase 2 interim results until the conclusion of the phase 2 trial. *Id*. at 174-75. Here, unlike in *City of Edinburgh*, J&J's statements regarding the safety of its Talc Products and the existence of asbestos in those products, as alleged, do not merely stem from a difference in opinion regarding the efficacy of the testing utilized or the interpretation of the scientific results. Critically, Plaintiff has alleged that the Company's own internal documents and statements directly contradicted the Company's public statements regarding the safety of the Talc Products. *C.f. Hoey v. Insmed Inc*., No. 16-4323, 2018 WL 902266, at *15-17 (D.N.J. Feb. 15, 2018)(finding that plaintiff had failed to adequately allege falsity where there were no allegations of the company being "informed about

any concerns" with the trial and no allegations that defendant doubted or contradicted the opinion it represented to investors). For example, the draft version of the Company's "Safety & Care Commitment" deliberately omitted the word "safe" from the Company's statement that "Talc has over 100 years of *safe* use in personal care products" and internal comments by Goodrich stated "I don't think we can link cosmetic talc to 100 years of use," and that J&J "cannot say [the company's Talc Products have] 'always'" been asbestos free. AC ¶128; *see also* AC, Ex. 2. Furthermore, another note in the draft document acknowledged that there were omitted scientific sources from the webpage which "could be interpreted as suggesting a causal effect [between ovarian cancer and talc]" and noted that even some of the studies references on the webpage "send mixed messages," because one of the studies cited indicated that "that 'perineal talc use may modestly increase the risk of invasive serous ovarian cancers.'" *Id*. at ¶131. Furthermore, the internal documents referenced in the Reuters article allegedly show that from at least 1971 to the early 2000s, the Company's raw talc and finished powders sometimes tested positive for small amounts of asbestos, and that company executives, mine managers, scientists, doctors and lawyers discussed the problem and how to address it while failing to disclose it to regulators or the public. *Id*. at ¶223. Although Defendants correctly contend that the last alleged test which identified asbestos in any of the Talc Products was conducted in 2004, the lack of contemporaneous testing during the Class Period is not dispositive of Plaintiff's claims. *See* Def. Br. at 23. The misstatements identified by Plaintiff do not only address the present-day safety of Talc Products during the Class Period. Plaintiff alleges that, in addition to making statements about the current safety of the Talc Products, at various points throughout the Class Period defendants also allegedly represented that the Talc Products had never contained asbestos and had always been safe. *See e.g.*, AC ¶338 (Since the 1970s, talc used in consumer products has been

required to be asbestos-free, so Johnson's talc products do not contain asbestos"), *id*. at ¶339 ("We are confident that our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation"), *id*. at ¶350 (same), *id*. at ¶369 ("While our ingredients have always been safe, our new formulations contain no unwanted ingredients."). More importantly, Plaintiff alleges that despite being aware of potential asbestos contamination in its Talc Products, J&J did not conduct further scientific studies, using the appropriate methodology, because it chose to remain willfully blind to the existence of asbestos in its talc. Accordingly, the alleged evidence of historical testing – of which Defendants were allegedly aware – renders those statements materially misleading, at this pleading stage.

Accordingly, Plaintiff has sufficiently alleged that Defendants statements that J&J's Talc Products were "safe" and "asbestos free" were either false or materially misleading.

### 3. The Statements Regarding the Product Liability Lawsuits

Plaintiff alleges that Defendants repeatedly represented to J&J's investors that the Company believes it has "substantial defenses" to the Product Liability lawsuits. *See* AC at ¶¶259, 272, 274, 297. The Amended Complaint alleges that in various SEC filings, Defendants "boasted of having substantial defenses" to talc-related litigation, but omitted critical information that undermines its statements such as, the prior findings of asbestos in the Company's talc, the Company's attempts to remove tremolite from its talc, and the Company's avoidance of concentration methods that could potentially detect asbestos. *Id*. at ¶¶166, 169, 272, 389, 390-91. For example, in the Company's First Quarter 2013 10-Q, it disclosed that

> [c]ertain subsidiaries of [J&J] are involved in numerous product liability cases. The damages claims are substantial, and while these subsidiaries are confident of the adequacy of the warnings and instructions for use that accompany the products at issue, it is not feasible to predict the ultimate outcome of litigation. The Company has established product liability accruals in compliance with ASC

> 450-20 based on currently available information, which in some
> cases may be limited. Changes to the accruals may be required in
> the future as additional information becomes available.

AC ¶259. Additionally, various individual defendants made statements criticizing the *Lanzo* and

*Ingham* verdicts against J&J and avowing that they would be overturned on appeal, such as, "[w]e

believe that once the full evidence is reviewed, this decision will be reversed," and "the evidence

in the case was simply overwhelmed by the prejudice," and that there were "multiple errors" in

the verdicts. *Id.* at ¶¶148, 205, 219-22, 358. Plaintiff argues that Defendants "understood J&J

faced massive litigation exposure," yet did not disclose the degree of that exposure to its investors,

thus Defendants' statements regarding the Talc Litigation were "false and misleading statements."

Pl. Br. at 30.

Defendants contend that those statements are nonactionable opinions, as indicated by the

repeated use of the word "believe," and Plaintiff has not demonstrated that Defendants did not

actually believe that the Company had substantial defenses. Def. Br. at 29. In that regard, the

Defendants highlight "numerous recent jury verdicts" in favor the Company. Def. Reply Br. at 9-

10.

Defendants' statements regarding the viability of the lawsuits against J&J clearly constitute

opinions regarding the success of the litigation, rather than statements of fact. *See Axar Master

Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 756-57 (S.D.N.Y. 2018) (finding litigation disclosure

stating that "[w]e believe the allegations [in a lawsuit] are unfounded and without merit" and that

defendant intended to "pursue [its] rights, remedies and defenses in the litigation" was non-

actionable opinion statement). Plaintiff has not adequately alleged facts suggesting that

Defendants' opinion statements regarding the existence of defenses to the product liability lawsuits

were "not honestly believed and lack a reasonable basis." *City of Edinburgh*, 754 F.3d at 170.

Plaintiff's argument on this point is, essentially, that because Defendants knowingly engaged in a fraudulent scheme to conceal the truth about its asbestos products, none of the statements regarding the viability of the lawsuits against the Company could have possibly been in good faith. That type of circular reasoning is insufficient to satisfy the Supreme Court's decision in *Omnicare*. Notably, even assuming as true that there was asbestos in J&J's Talc Products, the Company may very well have defenses to the lawsuits premised on other bases such as lack of causation, or procedural issues occurring at trial. Plaintiff has not identified any specific facts indicating that any of the Defendants possessed information regarding the viability of the lawsuits against the Company or suggesting that Defendants knew they had no viable defenses against the lawsuit. Indeed, the Company continues to actually litigate these cases to resolution, with some success, demonstrating its belief in the viability of its defenses. Accordingly, Plaintiff's claims premised on alleged misstatements regarding the viability of the Product Liability lawsuits are dismissed.

### ii. Scienter

Scienter" stands for the "mental state [of] intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). Under the PSLRA's pleading requirement, a plaintiff must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Avaya*, 564 F.3d at 267 (quoting 15 U.S.C. § 78u-4(b)(2)). The scienter standard requires a plaintiff to allege facts giving rise to a strong inference "of either reckless or conscious behavior." *Advanta*, 180 F.3d at 534-35. Courts must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 314; *see id*. at 324 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-

gun' genre, or even the most plausible of competing inferences" (internal quotation marks omitted)).  Scienter can typically be shown via recklessness, which is defined as "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading . . . that is either known to the defendant or is so obvious that the actor must be aware of it."  *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir. 1989) (internal quotation marks omitted).  However, "it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false."  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004).  Rather, a plaintiff must, at least, specifically allege facts constituting strong circumstantial evidence that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  *In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 599 (D.N.J.2001).

In conducting the scienter analysis, "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322-23 (emphasis in original).  However, the Third Circuit has "explicitly approved of scienter analyses that assess individual categories of scienter allegations individually when it is clear, as it is here, that a district court ultimately considered the allegations as a whole."  *Hertz*, 905 F.3d at 115 (citing *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493 (3d Cir. 2016) (concluding that just because a court is "thorough in explaining why it found scienter lacking as to each asserted misrepresentation does not suggest that it did not consider the allegations as a whole")); *see also Avaya*, 564 F.3d at 280 ("Although we have discussed each of the alleged facts bearing on defendants' scienter one at a time, we have heeded *Tellabs*'s command to evaluate [the plaintiffs'] allegations collectively rather than individually.").  Accordingly, the Court will, therefore, follow this approach and

consider the alleged facts bearing on scienter individually, while at the same time considering whether, holistically, they give rise to a strong inference of scienter.

Here, Plaintiff contends that Defendants' consistent and repeated denials that there was not, and has never been, asbestos in the Company's Talc Products are indicative of scienter in light of the various efforts allegedly taken by Defendants to conceal the truth. *Id.* at 37. In that regard, Plaintiff identifies certain public statements by Glasgow, Casaliveri, and Gorsky, as well as internal documents drafted by Casalvieri and Goodrich, which, Plaintiff argues, are also indicative of scienter. *Id.* at 37-40. Furthermore, Plaintiff alleges that because Baby Powder is the Company's "sacred cow" and "flagship" product, "[t]he perceived importance of [Baby Powder] supports an inference that [defendants were] paying close attention to [it]," Pl. Br. at 44 (quoting *Avaya*, 564 F.3d at 271), as does the extensiveness of the Company's scheme and the number of employees allegedly involved, *id.* at 47. Additionally, Plaintiff contends that ongoing government investigations, including by the FDA, SEC, DOJ, and U.S. Senate, further support the strong inference of scienter. *Id.* at 48.

Defendants, in turn, argue that the "core operations doctrine" does not support an inference of scienter under the circumstances, as the Talc Products represent .3% of J&J's combined company sales. Def. Br. at 36-37; Def. Reply Br. at 12; AC at ¶186. Further, Defendants argue that Plaintiff has not pled specific facts showing that "any individual Defendant was aware of any credible test results that contradicted JJ's public statements, let alone that any Defendant intended to deceive investors." Def. Reply Br. at 12.

As an initial matter, the Court finds that the each of the alleged misrepresentations at issue involve the "core operations" of J&J, supporting an inference of scienter. The "core operations

doctrine"[6] provides that a plaintiff may be able to demonstrate a strong inference of scienter by alleging "that a defendant made misstatements concerning the 'core matters' of central importance to a company." *Martin v. GNC Holdings, Inc.,* 757 F. App'x 151, 155 (3d Cir. 2018); *see also Avaya*, 564 F.3d at 268 (explaining that when the misrepresentations and omissions involve " 'core matters' of central importance" to the company and its principle executives, an inference of scienter may arise). In order to support a finding of scienter based upon the core operations doctrine, plaintiff must also allege "some additional allegation of specific information conveyed to management and related to the fraud." *Id.* (internal quotation marks omitted); *see Rahman*, 736 F.3d at (declining to apply core operations doctrine in the absence of allegations demonstrating that defendants knew the information they disseminated was false)*; PharmaNet*, 720 F. Supp. 2d at 566 (rejecting application of the core operations doctrine in absence of "other individualized allegations"); *In re Amarin Corp. PLC*, Civ. No. 13-6663, 2015 WL 3954190, at *12 (D.N.J. Jun. 29, 2015) (rejecting application of the core operations doctrine "absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements").

---

[6] In addition to the core operations doctrine, the parties also discuss the "corporate scienter," also known as "collective scienter" doctrine. Under that doctrine, a plaintiff may successfully "plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." *Rahman*, 736 F.3d at 246. Defendants contend that Plaintiff implicitly raises a "corporate scienter" theory because the Amended Compliant does not tie the scienter allegations to any Individual Defendants. Plaintiff contends that the Third Circuit has suggested that the corporate-scienter doctrine may be viable where a company "engaged in a variety of tactics . . . to keep news of the scope of the problem from reaching safety regulators and investors," as alleged here. Pl. Br. at 49. n.42 (internal citations and quotation marks omitted). The Third Circuit has "neither ... accepted nor rejected the doctrine of corporate scienter in securities fraud actions." *Rahman*, 736 F.3d at 246; *see also City of Roseville Emps. Ret. Sys.*, 442 F. App'x at 676-77 (declining to decide "if ... it were possible to plead scienter against a corporation without pleading scienter against an individual"). However, Plaintiff does not rely solely on corporate scienter; the Amended Complaint does, in fact, proffer individualized allegations of scienter as to each Individual Defendant. Accordingly, this Court need not – and does not -- determine whether corporate scienter, alone, is applicable to the instant facts.

Plaintiff has sufficiently alleged that the Talc Products are a "core matter" of central importance." *Avaya*, 564 F.3d at 268. Although Defendants contend that the Talc Products make up only .3% of the Company's total sales, Plaintiff has alleged that that the Company views its Talc Products, more specifically Baby Powder, as "an institution," "flagship product," and "sacred cow." AC ¶¶43,47. One corporate representative allegedly testified under oath that Baby Powder is among "the top one or two products that people think of when they think of J&J." *Id*. at ¶412. In June 2012, the entire Board of Directors allegedly received, via email, a presentation on the "reputational risk" the talc-related lawsuits posed to the Company. *Id*. at ¶171. The safety of J&J's self-professed flagship product clearly falls within the Company's core operations. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (noting that alleged misrepresentations at issue in securities fraud case involved company's "flagship product" thus, finding it "exceedingly unlikely" that false statements about product were innocently made by corporate executives); *In re Allergan Generic Drug Pricing Sec. Litig*., No. 16-9449, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (applying core operations doctrine where alleged misrepresentations addressed three drugs that made up a "substantial portion" of the defendant company's revenues and operations during the class period). Accordingly, Plaintiff has sufficiently alleged that the misstatements and omissions at issue in this case touch upon J&J's "core operations." However, the Court must also assess whether Plaintiff's core operations theory of scienter is supported by additional specific allegations that each of the Individual Defendants' had access to specific information related to the alleged fraud and the Talc Products. *Rahman*, 736 F.3d at 247.

## 1. Gorsky

With respect to defendant Gosky, Plaintiff alleges that that he publicly stated that he had been "paying attention to 'the significant amount of clinical information [and] control data' involving talc and talcum powders, including from agencies like the National Cancer Institute ("NCI") and FDA, and claimed to have sufficient knowledge to form an opinion on 'the safety of talc." AC ¶394. During a health care conference in September 2017, Gorsky allegedly assured investors that "more than a 100 years of experience," and findings from agencies, including the FDA "clearly demonstrate[d] the safety of talc." *Id*. at ¶335. Further, Plaintiff alleges that on June 6, 2017, Gorsky received an email which provided an update on the talc lawsuits and discussed the potential "reputational risk" the lawsuits posed to the Company. *Id*. at ¶171. Gorsky also assured investors, on at least one occasion, that the Company's "Chief Medical and Chief Quality Officers [were] setting new benchmarks for medical safety" and J&J was "monitoring the use of our end market products" to "ensu[re] that they are safe." *Id*. at ¶133

As alleged, Gorsky repeatedly professed to have knowledge regarding both the current science as to the safety of Talc and the Company's quality assurance procedures. However, Gorsky began serving as the Company's CEO in 2012, just as the allegations between talc and cancer began to reach their zenith, and has continued to serve as CEO throughout the Class Period. In that time period, a 2016 internal audit report allegedly discovered quality assurance issues at the lab where J&J performed its asbestos testing, and revealed that the Company's methods for testing its talc were "questionable at best" and "not an optimal method for asbestos testing." *Id*. at ¶¶65, 111. Given Gorsky's professed knowledge of the safety of talc, at best, he recklessly disregarded potentially contrary facts – many of which involved incidents which occurred during his tenure as CEO – Gorsky's failure to disclose the contrary information of which he was allegedly aware is suggestive of scienter. *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906

(E.D. Pa. 2018) (finding scienter where plaintiff alleged that company executives made "public comments regarding the clinical data in press releases and earnings calls" because the "officers were speaking as authoritative sources who possessed the information to support their statements. When they did so, they knew that withholding the negative data that contradicted their public statements was misleading to investors.") Accordingly, the Court finds that Plaintiff has sufficiently alleged that Gorsky knew, or had reason to know, of the alleged falsity of his statements, thus Plaintiff has adequately alleged a strong inference of scienter as to Gorsky.

### 2. Caruso

As to Caruso, Plaintiff alleges that as CFO of the Company, he was responsible for signing the Company's SEC filings and ensuring that the statements contained therein were not false or materially misleading. AC at ¶395. Additionally, Plaintiff alleges that during the Class Period, Caruso led the Company's investor relations activities, which "effectively guaranteed that Caruso had access to the information that defendants withheld from investors during the Class Period." *Id.*

Plaintiff has not sufficiently alleged that specific information regarding the alleged fraud was conveyed to Caruso. Plaintiff's only allegations in that regard are that Caruso must have had information regarding the Company's fraudulent scheme because he was the CFO who signed the Company's SEC filings. However, a "general awareness of the the day-to-day workings of the company's business does not establish scienter." *Rahman.*, 736 F.3d at 247. Accordingly, the Court finds that Plaintiff has not alleged any specific facts suggesting that Caruso had knowledge of the alleged falsity of any of the statements in the SEC filings.

### 3. Goodrich

Goodrich allegedly personally worked on the Company's "Our Safety & Care Commitment" webpage, and touted talc's "long history of safe use," and use "for over 100 years," despite internally expressing misgivings that J&J could not accurately say that talc was "always" safe. *Id.* at ¶401. Goodrich was also allegedly aware, as indicated by commentary on a draft of the webpage, that other scientific sources not cited on the "Our Safety & Care Commitment" website could actually "be interpreted as suggesting a causal effect" between talc and ovarian cancer. *Id.* Additionally, she recognized that "[e]ven some of the studies" cited by J&J on its website sent "mixed messages," including a study recognizing that "perineal talc use may modestly increase" the risk of ovarian cancer. *Id.* These alleged contradictions between Goodrich's public and internal statements demonstrate actual knowledge of the alleged falsity of her public statements. Thus, the Court finds that Plaintiff has adequately alleged a strong inference of scienter as to Goodrich.

### 4. Casalvieri

Like Goodrich, Casalvieri is also alleged to have been involved in drafting and issuing public statements on the Company's website. Casalvierri was featured on the Company's "Our Safety & Care Commitment," which represented that "[w]e have carefully assessed all available data on talc," including the "body of research and clinical evidence." *Id.* at ¶402. She also issued other public statements where she professed to examine "assessments by external experts" and emphasized that "[a]s a toxicologist in our Consumer business," "my job is to make certain a product is safe." *Id.* Furthermore, internal company emails indicate that she was allegedly assigned the task of directing J&J's project "to defend talc" from potential inclusion in the NTP's biennial RoC. *Id.* at ¶403. That project allegedly included "develop[ing] documents that scientifically support the lack of a relationship of talc and ovarian cancer," and secretly funding a

-study supportive of talc. *Id*. at ¶403. As alleged, Casalvieri was heavily involved in the Company's scheme to preclude the NTP and other organizations from listing talc as a potential carcinogen. Accordingly, the Court finds that Plaintiff has sufficiently alleged a strong inference of scienter as to Casalvieri.

### 5. Peterson

Plaintiff generally alleges that because of her position in the Company, Peterson was, at the very least, reckless to the potential falsity of her statements regarding the Company's quality assurance systems. In that regard, Plaintiff alleges that Peterson was brought into her role as Group Worldwide Chair, for the purpose of "fixing the consumer and supply chain issues once and for all." *Id*. at ¶404. In that role, she allegedly represented to investors that she was paying attention to and implementing J&J's "processes and systems so that [J&J has] early warning systems" to monitor potential product problems. *Id*. at ¶405. However, Plaintiff has not alleged facts suggesting that during her tenure at J&J, Peterson was aware of, or should have been aware of, specific facts alerting her to existing quality control issues, rendering her statements false. Peterson joined the Company in September 2012, well after the most recent testing in 2004 which indicated asbestos in J&J's Talc Products. *Id*. at ¶88. Similarly, the audit report indicating quality control issues with J&J's outside asbestos testing facility was released in April 2012, before she was hired by J&J. *Id*. at ¶110. Plaintiff has not adequately alleged that Peterson's had knowledge of, or reason to know, that her statements regarding the Company's quality control systems were false, or that Peterson was aware of the alleged scheme to prevent the truth about the safety of talc from reaching the public.

In addition to Peterson's alleged knowledge of the Company's core operations, Plaintiff alleges that Peterson retired under suspicious circumstances, supporting an inference of scienter:

"(i) Peterson's retirement was close in time to the first jury finding in favor of a plaintiff alleging harm from asbestos in J&J's talcum powders, (ii) Peterson had been brought in to fix the JJCI business's quality control issues but elected to retire at a time when the business had very serious quality control issues still unresolved, (iii) Peterson had taken on an additional leadership role only one year prior, (iv) J&J was required to shuffle various executives around as a result of Peterson's departure to leave, indicating lack of a premeditated transition plan, and (v) at least one analyst following J&J expressed surprise at the announcement due to the strange timing." *Id*. at ¶406.

Under certain circumstances, the departure of a corporate executive can strengthen an inference of scienter. "For a resignation to add to an inference of scienter, a pleading must set forth allegations suggesting a compelling inference that the resignation was the result of something other than 'the reasonable assumption that the resignation occurred as a result of' the release of bad news." *Hertz*, 905 F.3d at 118 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009), amended on other grounds, (Feb. 10, 2009)). As the Third Circuit explained in *Hertz*, "[c]hanges in leadership are only to be expected when leadership fails. That is not a symbol of fraud. Corporate resignations do not strengthen an inference of scienter, when, as here, the allegations do not cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud." *Id*. In this case, Plaintiff alleges that the announcement of Peterson's resignation occurred on June 22, 2018, just over two months after the first jury verdict against J&J in a case alleging harm from asbestos in the Company's Talc Products. AC ¶211. First, as alleged, there is no indication, aside from the timing of the announcement, that Peterson's departure from the company was related to a discovery of her involvement in the fraud. *Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 WL 3601229, at *20 (D.N.J. July 27, 2018) (finding "some probative value," in employee's resignation, which was

announced the same day as an investigation into company's revenue recognition practices but noting that departure was not "involuntary or accompanied by some form of corporate sanction."); *In re Intelligroup Sec. Litig.*, 527 F.Supp.2d 262, 347 (D.N.J. 2007)("a defendant's resignation could constitute a 'piece to the scienter puzzle' if the resignation both takes place within a couple of months of the announcement of the errors committed and is accompanied by an extraordinary corporate punishment measure, *e.g.*, denial of severance payment."). Furthermore, Plaintiff's own theory of the case undercuts the inference of scienter. "A resignation may support a finding of scienter because it may be implied that the individual knew of the fraud being perpetrated. Once those outside the fraud find out, supposedly, they terminate (or force to resign) all those who may have been responsible." *In re Toronto-Dominion Bank Sec. Litig.*, No. 17-1665, 2018 WL 6381882, at *18 (D.N.J. Dec. 6, 2018). Here, however, Plaintiff's theory of the case is that the alleged fraud was a long-standing comprehensive scheme, reaching into every crevice of the Company; yet, paradoxically, Peterson was the employee allegedly impacted by the scheme's reveal. The inference that Peterson resigned, or was forced to resign, due to her role in the fraudulent scheme, is not as compelling or cogent as the inference that she resigned for other business reasons.

Accordingly, the Court finds that Plaintiff has not sufficiently alleged, utilizing the core operations theory or otherwise, particularized facts supporting a strong inference of scienter as to Peterson.

### 6. Glasgow

Plaintiff alleges that Glasgow, the Company's Vice President of Research and Development, made public statements emphasizing that she, and others at the Company had allegedly reviewed "decades" of scientific data on the safety of talc. AC at ¶407. She allegedly,

"held herself out as having reviewed "30 years of scientific studies and regulatory reviews," along with "the medical facts and science" regarding the Company's talcum powder products" and represented that she had reviewed the studies, "science, research and clinic evidence" regarding the safety of talc. *Id*. at ¶408.

Taking those allegations at face-value, Glasgow would have been aware of the allegedly contrary scientific evidence identified by Plaintiff. Accordingly, the Court finds that Galsgow's unqualified statements regarding the safety of talc, in the face of the contrary evidence, are suggestive of scienter. *See In re RAIT Fin. Tr. Sec. Litig*., 2008 WL 5378164, at *12-*13 (E.D. Pa. Dec. 22, 2008) (finding scienter where plaintiff alleged that the individual defendants were senior executives, with access to information contradicting their public statements).

### 7. Sneed

As to Sneed, Plaintiff alleges that as VP of Global Corporate Affairs, Sneed was "responsible for public relations and knew that checking the accuracy of corporate statements was vitally important." *Id*. at ¶409. Thus, in Plaintiff's view, he knew or recklessly disregarded that his statements were false and misleading. *Id*. As an initial matter, many of the misstatements attributed to Sneed fall within the category of statements which this Court has already identified as puffery and determined to be inactionable as securities fraud. Plaintiff alleges that the misleading statements proffered by Sneed include, statements made at a 2013 annual shareholder meeting that that J&J had "really embraced transparency"; that J&J had a history of and was driven by "'car[ing] unconditionally for others'" and that it had "'own[ed] up to [its] mistakes,'" and that J&J made "great strides" in "really get[ting] past" the quality issues the Company faced. *Id*. at ¶257. To the extent those statements are the only ones alleged to have been made by Sneed, the

Court need not assess whether they were made with scienter, because Plaintiff has not adequately alleged that the statements were materially misleading.

Regardless, the Court finds that Plaintiff has not adequately alleged facts suggesting that Sneed acted with scienter. The sole allegations Plaintiff makes in that regard are generalized allegations regarding his role in the Company. Absent additional allegations of specific information conveyed to Sneed, such generalized statements cannot adequately allege scienter. *Rahman*, 736 F.3d at 247.

### 8. The Context and Content of the Individual Defendant's Statements Indicates Scienter

Additionally, irrespective of the core operations doctrine, the content and context of many of the alleged misleading statements further enhances the finding of scienter with respect to the individual defendants whom the Court has found to have the requisite scienter. *See Utesch v. Lannett Co., Inc,* 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) ("'the most powerful evidence of scienter is the content and context' of the misleading statements.") (quoting *Avaya*, 564 F.3d at 269).). In *Avaya*, the company's CEO made statements "repeatedly assur[ing] analysts and investors that although there was pressure in the market, there were no significant changes to the pricing environment." 564 F.3d at 245. The plaintiffs alleged that the CFO made these statements while "kn[owing] of or recklessly disregard[ing] the fact that competition was forcing unusually large 20% to 40% price discounts that were hurting profit margins." *Id.* Addressing whether the complaint adequately alleged that those statements were made with scienter, the Third Circuit explained that:

> [t]aken together, the extent of the alleged discounting, the importance to the "Avaya story" of maintaining margins, the amount by which the second quarter results missed expectations, the proximity of [the CFO]'s statements to the end of the quarter and the release of results, [the CFO]'s

> position as Chief Financial Officer, and most significantly,
> the content and context of the statements themselves, give
> rise to a strong inference that [the CFO] either knew at the
> time that his statements were false or was reckless in
> disregarding the obvious risk of misleading the public.

Thus, the Third Circuit found that "the context (specific analyst queries) and content (consistent denials of unusual discounting) of the statements," supported the inference that the statements were made with scienter. *Id*. at 270. Similarly, here, the content and context of many of the Individual Defendants' statements suggest that the Invidual Defendants were, at best, reckless to the possibility that their statements might mislead investors. As alleged, Defendants repeatedly stated that the Talc Products were safe, in the face of contrary test results, various lawsuits, and inquiries from the press and investors. Even following two high-figure jury verdicts linking the Talc Products to ovarian cancer and mesothelioma, Defendants allegedly doubled down on their insistence that the Talc Products were "safe" and "asbestos free." Such repeated, unqualified assurances, in the face of inquiries from the public, and regulatory authorities such as the FDA, further suggest that Defendants' statements were made with scienter. *See Utesch*, 385 F. Supp. 3d at 422 (finding that defendants' repeated statements, in the face of ongoing investigations by multiple law enforcement bodies, and questions from the press, were indicative of scienter.); *Roofer's Pension Fund,* 2018 WL 3601229, at *21 (finding that defendant repeatedly responded to questions from analysts and investors with answers that indicated knowledge about drug pricing and the repeated inquiries "would have made Defendants aware of the importance of generic drug pricing to the investing public" thus defendants' failure to disclose certain facts in its answers was indicative of scienter).

The internal acknowledgements of potential asbestos contamination in the Talc Products, and the potential association with mesothelioma and ovarian cancer, coupled with the fact that the

allegations of fraud relate to a core operation of the Company, collectively, give rise to a strong inference of scienter. Defendants assert that the facts as alleged support a plausible inference that after reviewing the scientific data, defendants concluded that the bulk of the evidence supports their position that the Company's Talc Products were safe. However, taken together, Plaintiff's allegations are "as compelling as [that] opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314. Although Plaintiff has failed to specifically allege scienter as to certain defendants, and those defendants are dismissed from the lawsuit, Plaintiff's contentions, when considered holistically, satisfy the scienter pleading standard as to Gorsky, Goodrich, Casalvieri, and Glasgow. Plaintiff has sufficiently pled that, at minimum, those defendants had access to information which would have alerted them to the allegedly misleading nature of their statements regarding the safety of the products. As alleged, Defendants either failed to adequately investigate the potential dangers of the Talc Products, despite its obvious relevance evidenced by the many public inquiries, or Defendants knowingly disseminated false and inaccurate statements as part of a long standing fraudulent scheme. Either scenario is suggestive of scienter. The Court finds that, viewing Plaintiff's scienter allegations, holistically, Plaintiff has adequately pled scienter.

### iii. Loss Causation

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). "The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 426 (3d Cir.2007). The fact that a misrepresentation occurred and the share price declined is not enough. *Id.* Instead, to demonstrate loss causation, the plaintiff must prove "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Id.* (quotation and citation omitted).

The Third Circuit has repeatedly cautioned that this determination is a fact-sensitive inquiry typically left to the trier of fact. *See id.* at 427 n. 4; *EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 884 (3d Cir. 2000).

As an initial matter, the parties dispute the applicable pleading standard for analyzing whether Plaintiff has adequately pled loss causation. Defendants urge this court "to follow the clear trend" and apply the heightened pleading requirements of Rule 9(b) to Plaintiff's loss causation allegations, consistent with the approach utilized by the Fourth, Seventh, Ninth, and Eleventh Circuits. Def. Br. at 50 n. 37. However, Plaintiff contends that under Rule 8(a) it "need only provide a 'short and plain statement' giving defendants 'some indication of the loss and the causal connection that [they have] in mind,'" Pl. Br. at 51 (quoting *Dura*, 544 U.S. at 336), and that it has adequately alleged loss causation under either standard. *Id*. at 52 n.45.

In *Dura*, the Supreme Court reversed a Ninth Circuit decision that had found that a Section 10(b) complaint adequately pleaded loss causation merely by alleging that the price of the security on the date of purchase was inflated because of the defendants' misrepresentations. 544 U.S. at 338. In analyzing the plaintiff's claims, the Court suggested that the pleading standard for loss causation was governed by Rule 8(a)(2). *Id*. at 346. The Court noted that Rule 8(a)(2) merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and "assume[d], at least for argument's sake, that neither the [Federal] Rules [of Civil Procedure] nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss." *Id*. at 346 (finding that plaintiffs' complaint failed to allege loss causation under Rule 8 where it contained only one sentence addressing loss causation). Since that time, the Supreme Court has not provided any further guidance as to the applicable pleading standard for analyzing loss causation, and the Circuit courts have reached diverging

conclusions. As Defendants note, the Fourth Seventh, Ninth, and Eleventh Circuits apply Rule 9(b) as the pleading standard for loss causation. *See e.g.*, *In re Mutual Funds Investment Litigation*, 566 F.3d 111, 119–20 (4th Cir. 2009) (noting that prior to the enactment of the PSLRA, Section 10(b) fraud claims were governed by Rule 9, and holding that, because the PSLRA does not govern the analysis of loss causation or reliance, the traditional pleading requirement for fraud claims applies to loss causation); *Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (applying Rule 9(b) as the pleading standard for all elements of a securities fraud claim without discussion); *Oregon Public Employees Retirement Fund v. Apollo Group Inc.,* 774 F.3d 598, 605 (9th Cir. 2014) (holding that Rule 9(b) is the appropriate pleading standard for loss causation because 1) the rule "applies to all circumstances of common law fraud" and since securities fraud is derived from common law fraud, it makes sense to apply the same pleading standard; 2) "Rule 9(b) clearly states that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" and "[l]oss causation is part of the circumstances constituting fraud because, without it, a claim of securities fraud does not exist" and 3) applying rule Rule 9(b) provides for a "consistent standard" for assessing pleadings in a Rule 10(b) action); *Sapssov v. Health Mgmt. Assocs., Inc.,* 608 F. App'x 855, 861 (11th Cir. 2015) (applying Rule 9(b) as the pleading standard for all elements of a securities fraud claim without discussion).

However, the Fifth and Second Circuits generally apply Rule 8(a) to determine whether a plaintiff has adequately pled loss causation. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (holding that in light of *Dura* and *Twombly*, in order to establish loss causation, a plaintiff must plead a "facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss"); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*,

LLC, 797 F.3d 160, 183 (2d Cir. 2015) (noting that the level of particularity necessary to plead loss causation "is an open question" in the Second Circuit but also noting that pleading loss causation is "not a heavy burden"); *Wilamowsky v. Take–Two Interactive Software, Inc.*, 818 F.Supp. 2d 744, 753 & n. 7 (S.D.N.Y.2011) ("The question of whether Rule 9(b) applies to loss causation has not yet been definitively addressed by the Second Circuit, but the vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8."). Moreover, although the Third Circuit has not yet addressed the issue, courts of this district have consistently analyzed loss causation under Rule 8(a), rather than the more stringent requirements of Rule 9(b). *See In re Galena Biopharma, Inc. Sec. Litig.*, No. 17-929, 2019 WL 5957859, at *18 (D.N.J. Nov. 12, 2019) ("[a] [p]laintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)" (quoting *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010)(Wolfson J.)); *In re Allergan Generic Drug Pricing Sec. Litig.*, No. 16-9449, 2019 WL 3562134, at *13 (D.N.J. Aug. 6, 2019)("The PSLRA does not impose any heightened pleading standards on the element of loss causation; ordinary pleading rules apply" (quoting *Dura*, 544 U.S. at 347)); *Hull v. Glob. Digital Sols., Inc.,* No. 16-5153, 2017 WL 6493148, at *11 (D.N.J. Dec. 19, 2017) (Wolfson J.)("Importantly, alleging loss causation or economic loss does not require a plaintiff to satisfy the heightened pleading standard under Rule 9(b)"); *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 558 ("Plaintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)"); *Dudley v. Haub*, No. 11-5196, 2013 WL 1845519, at *18 (D.N.J. Apr. 30, 2013) ("Allegations of loss causation are not subject to the heightened pleading requirements of Rule

9(b) and the PSLRA....").  In light of the Supreme Court's reasoning in *Dura*, and absent guidance from the Third Circuit, this Court aligns itself with the decisions of its sister districts, as well as this Court's prior decisions on this issue,  and applies the standard provided by Rule 8(a) to Plaintiff's loss causation allegations.

Plaintiff relies on six disclosures to show loss causation: the Bernstein Liebhard Press Release on September 27, 2017; the *Lanzo* Law 360 Article on January 30, 2018; the *Lanzo* Metholeliona.net Article on February 5, 2018; the Beasley Allen Press Release on February 7, 2018; the *Ingham* Verdict on July 12, 2018; and the Reuters Article on December 14, 2018, Plaintiff contends that after each of these disclosures, J&J's stock price suffered statistically significant declines. AC ¶ 421.

Defendants challenge loss causation on two bases.  First, that none of the alleged corrective disclosures revealed "new" information, but rather the alleged disclosures repeated or shed additional light on longstanding allegations of asbestos contamination in J&J's Talc Products and a link between talc and cancer.  Def. Br. at 48-57.  In Defendants' view, none of the alleged disclosures contain material information which was disclosed for the first time, rather, the identified disclosures merely proffer additional details about previously available information and do not constitute  corrective disclosures.  Def. Br. at 51-55.  Furthermore, Defendants contend that Plaintiff cannot establish that the Class Members' alleged losses are attributable to the alleged misrepresentations rather than "overall market trends and market reaction to litigation risk."  *Id*. at 58-60.  For example, Defendants note that on February 5 and February 8, 2018, the Dow Jones Industrial Average dropped significantly, suggesting that any loss on those dates "can only be reasonably attributed to market-wide phenomena that day" rather than the alleged corrective disclosures.  *Id*. at 60.

The Court, first, addresses Defendants' contention that the identified disclosures did not proffer "new" information. [7] "A corrective disclosure need not take a particular form; it is the exposure of the falsity of the fraudulent representation that is the critical component." *Hull v. Glob. Digital Sols., Inc.,* No. 16-5153, 2017 WL 6493148, at *14. Ultimately, "so long as the plaintiff alleges that the public disclosure reveals that the defendant company made false claims, and that based on those disclosures, a corresponding drop in stock price occurred, loss causation is adequately pled." *Id.* Viewed in the light most favorable to Plaintiff, the facts as alleged suggest that the disclosure do not merely repeat information. Although many of the alleged disclosures address the same subject matter – J&J's alleged knowledge of asbestos in its Talc Products and the ensuing scheme to prevent the dissemination of that information – each provided new information as to the seriousness and extent of the Company's alleged fraud. *See In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828–29 (D.N.J. 2006) (finding that the revelation of the truth about the Company's misrepresentations "did not take the form of a single unitary disclosure, but occurred through a series of disclosing events."). In that regard, some of the disclosures clearly profess that the information being conveyed is new. As alleged, the Reuters article purportedly indicated that it was disclosing new information from internal J&J documents

---

[7] In support of their argument that the disclosures did not convey "new" information, Defendants cite *Lanzo* for the proposition that "a large volume of [information regarding the product liability lawsuits ] including copious internal testing documents – were cited and attached as exhibits in support of publicly filed motions" prior to two of the alleged corrective disclosures identified by Plaintiff, the release of the Bloomberg article and the Bernstein Liebhard Press Release. *See* Def. Br. at 52. In its opposition to Defendants' motion for judicial notice, Plaintiff moves to strike Defendant's reference to *Lanzo* pursuant to Federal Rule of Civil Procedure 12(f), arguing that "the reference is confusing, immaterial and should not be considered." Pl. Judicial Notice Br. at 14. Plaintiff further argues that the citation to *Lanzo* "lacks meaning" and notes that there is no docket entry or date associated with the citation provided. *Id.* The Court denies Plaintiff's motion to strike and finds it appropriate to consider *Lanzo* in connection with Defendant's argument that certain allegedly damaging disclosures were already publicly available.

which were being "reported to the public for the first time." ¶223-232. Accordingly, the Court finds that Plaintiff has sufficiently alleged that each of the identified disclosures provided new information.[8]

Furthermore, Defendant's argument that the drop in J&J's stock price was attributable to other causes such as market trends and the market's reaction to litigation risk is premature. Plaintiff's theory of loss causation is that J&J made fraudulent misrepresentations and that the truth was slowly revealed throughout the course of 2017 and 2018, culminating when the Reuters Article revealed the true extent of the Company's alleged deceptions. In support of that theory, Plaintiff has identified specific disclosures of new information and corresponding impacts on stock price. Each of the alleged drops in stock price is allegedly supported by an event study which found the drops to be statistically significant and isolated the impact of the disclosure.

At this stage, plaintiff has sufficiently alleged loss causation, by alleging that after Defendants' purportedly misleading statements and fraudulent scheme were revealed, J&J's stock prices decreased significantly. Although Defendants point to other possible bases for the decline in stock price, such a factual dispute cannot be adjudicated at this early, motion to dismiss stage of the litigation. *See Omanoff v. Patrizio & Zhao LLC,* No. 14-723, 2015 WL 1472566, at *6

---

[8] Defendants also contend that the articles about jury verdicts cannot constitute a corrective disclosure because "Plaintiffs cannot use a jury verdict as a conclusive disclosure of the 'truth.'" Def. Br. at 57-58 (collecting cases). However, none of the cases cited by Defendant stand for the proposition that a jury verdict cannot, as a matter of law, constitute the disclosure of new information. The *Ingham* jury verdict was allegedly the first to award damages to a plaintiff linking ovarian cancer to asbestos in J&J's talc products, rather than to the talc, itself. AC ¶213. To the extent the jury verdict or documents publicly released during the lawsuit contained new information regarding an association between asbestos and ovarian cancer, and the existence of asbestos in the Company's Talc Products – revealing the alleged falsity of Defendants' assertions to the contrary – the jury verdict may have been a corrective disclosure.

(D.N.J. Mar. 31, 2015) (rejecting defendants argument, on a motion to dismiss, that decline in share price was attributable to other weaknesses disclosed by the company because argument raised "a factual dispute that cannot be adjudicated at this early stage"). Accordingly, Plaintiff has sufficiently pled loss causation.

### a. The Class Period

Defendants also seek to limit the Class Period to February 7, 2018, rather than December 13, 2018. Def. Br. at 60-62. Defendants contend that the allegations relating to events occurring after February 7, 2018 – the date when this lawsuit was initiated – are not plausible because they could not have "been material to investors." Def. Br. at 61. Defendants argue that as of February 8, 2018 – when Plaintiff initiated this lawsuit – the market was fully aware of the allegations regarding the Talc Products, thus Plaintiff's allegations related to events occurring after that date could not have "been material to investors." Def. Br. at 61. In Defendants' view, following the filing of the Complaint, "no reasonable investor would consider any information allegedly misstated or omitted form Defendants' statements to 'significantly alter the total mix of information available.'" *Id.* Further, Defendants contend that Plaintiff's theory of the case is identical to the one alleged in the initial complaint "that J&J has known for decades that its talc products . . . include asbestos fibers and that the exposure to those fibers can cause ovarian cancer and mesothelioma," and that Defendants allegedly "misrepresented and failed to disclose the danger that J&J's talc products posed to consumers . . . ." rendering it implausible that, "after Plaintiffs had enough knowledge to file their claim, additional details could have significantly altered the total mix of information available or served as a corrective disclosure." Def. Br. at 24-25 (comparing ECF No.1 ¶ 2 with AC ¶¶ 1-14).

Plaintiff contends that the Class Period is appropriate because Plaintiff alleges that the true extent of Defendants' several decades long scheme was revealed for the first time by the Reuters article published on December 14, 2018. Pl. Br. at 64. Furthermore, in Plaintiff's view, the theory of the operative complaint has changed significantly since the, now moot, initial complaint, supporting the extension of the Class Period in light of the complex scheme detailed in the Amended Complaint. *Id*. Accordingly, "considering all the information provided to the market after February 7, 2018, '[p]articularly in light of defendants' repeated' reassuring statements, 'it was reasonable for plaintiffs to rely upon defendants' statements until the publication of the' Reuters report." Pl. Br. at 64-65 (quoting *Pharmacia*, 554 F.3d at 351-52).

As a general rule, liability based on material misrepresentations or omissions is terminated "when curative information is publicly announced or otherwise effectively disseminated." *In re Data Access Sys. Sec. Litig*., 103 F.R.D. 130, 143 (D.N.J.1984) (quoting *McFarland v. Memorex Corp.*, 96 F.R.D. 357, 364 (N.D. Cal. 1982)). Whether a release of corrective information terminates liability based on misrepresentations or omissions is a determination of "whether the facts which underlie the gravamen of the plaintiff's complaint continue to represent a reasonable basis on which an individual purchaser or the market would rely." *Id*. "[D]oubts regarding the reasonableness of the reliance should be resolved in favor of extending the class period." *Id*. (citing *In re LTV Sec. Litig*., 88 F.R.D. 134, 147 (N.D.Tex. 1980)).

At this juncture, the Court finds that there is sufficient doubt as to whether the true extent of the Company's alleged fraudulent scheme was revealed prior to the publication of the Reuters article on December 14, 2014. *In re Alstom SA Sec. Litig.,* 253 F.R.D. 266, 292 (S.D.N.Y. 2008) (finding that class period should close once plaintiffs had received sufficient notice regarding the facts giving rise to fraud, "which in the exercise of reasonable diligence, would have led to actual

knowledge," rather than on earlier date when accounting improprieties were first revealed, because "[a]t that time, neither the full financial impact of the alleged improprieties nor the fact that it was allegedly attributable to fraud by Alstom senior corporate officials had been revealed."). Although the alleged asbestos contamination and connection between ovarian cancer and talc, and mesothelioma and talc, had already been publicly discussed and several product liability lawsuits had already been filed prior to the publication of the Reuters article, Plaintiff has alleged that the Company continued to issue public denials of wrongdoing and repeatedly averred that its products were "safe" and "do not contain asbestos or cause mesothelioma." *See e.g,* AC ¶¶379-380, 382, 390. As pled, it was the publication of the Reuters article that directly refuted Defendants' allegedly false statements and provided never-before-seen internal Company documents that detailed J&J's knowledge of the asbestos in the Company's talcum powder and J&J's longstanding fraudulent scheme to cover it up. *Id*. at ¶223. According to Plaintiff, the Reuters article kicked off a crisis for J&J by exposing new details and analysis regarding the Company's alleged fraudulent scheme to conceal the truth about the safety of its Talc Products. The Reuters report, itself, even professes that the information being reported was novel, stating "[a] small portion of the documents have been produced at trial and cited in media reports. Many were shielded from public view by court orders that allowed J&J to turn over thousands of documents it designated as confidential. Much of their contents is reported here for the first time." *Id*. at ¶223. Accordingly, the Court finds that December 14, 2018, the publication date of the Reuters article, is an appropriate conclusion for the Class Period.

### b. The Section 20(a) Claims

Plaintiff also alleges that Individual Defendants are liable under Section 20(a) of the Exchange Act. This statute reads, in pertinent part:

§ 78t. Liability of controlling persons and persons who aid and abet violations

(a) Joint and several liability

...

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ...

15 U.S.C. § 78t(a); *see also Suprema*, 438 F.3d at 285 (discussing the statute). However, "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252 (citing *In re Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004)). Where a Plaintiff fails to sufficiently plead a claim under Section 10(b), it is "impossible to hold the [Individual Defendants] liable under § 20(a)." *Shapiro*, 964 F.2d at 279.

Because Defendants' only arguments in support of dismissal of the Section 20(a) claim is that Plaintiff failed to plead a claim under Section 10(b), Defendants' motion to dismiss the Section 20(a) claim is also denied. However, because Plaintiff has failed to adequately plead a Section 10(b) claim against Caruso, Peterson, and Sneed, the Section 20(a) claims against those defendants are dismissed, as well.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss is denied in part and granted in part. Plaintiff's Section 10(b) and Rule 10b–5 claim is limited to Defendants' statements regarding the safety of its Talc Products, the "asbestos-free" nature of its talc, and the Company's commitment to product safety, quality assurance, and research. Plaintiff's claims based upon Defendants' alleged misstatements about the viability of the Product Liability lawsuits are dismissed. Furthermore, because Plaintiff has not adequately alleged facts suggesting a strong

inference of scienter as to defendants Caruso, Peterson, and Sneed, those defendants are dismissed from the lawsuit.

Although the Court finds that Plaintiff has adequately alleged, for purposes of this motion to dismiss and assuming the facts pled to be true, that Defendants made materially misleading or false statements regarding the safety of J&J's Talc Products, such a ruling should not be construed as the Court's acknowledgment of the underlying merits of the substance of Plaintiff's claims, including whether the scientific evidence supports Plaintiff's allegations. Any such a determination must be based upon a full record and not upon the pleadings alone.

Date: December 27, 2019

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge