Jack N. Frost, Jr. Esq.
**FAEGRE DRINKER**
**BIDDLE & REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
(973) 549-7338
jack.frost@faegredrinker.com

*Counsel for Defendants*

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FRANK HALL, Individually and on Behalf of All Others Similarly Situated, | No. 3:18-CV-01833-FLW-TJB |
| Plaintiff, | Hon. Freda L. Wolfson |
| v. | Hon. Tonianne J. Bongiovanni |
| JOHNSON & JOHNSON et al., |  |
| Defendants. |  |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## <u>MOTION FOR CLASS CERTIFICATION</u>

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

BACKGROUND ....................................................................................................... 5

I.      Factual Background............................................................................................ 5

       A.     The Early 1970s Investigation Of Alleged Asbestos Contamination............... 5

       B.     The Modern Talcum Powder Product Liability Litigation............................. 6

          1.     The Cases And Allegations........................................................... 6

          2.     The Public Trials........................................................................ 8

          3.     The Public Broadcasting Of The Trials........................................ 9

          4.     The Public Press Coverage Of The Litigation............................. 11

          5.     The Public Websites About The Litigation. ................................ 12

       C.     The December 14, 2018, *Reuters* Article. ....................................... 14

II.     Procedural History.......................................................................................... 17

       A.     The Initial Complaint. .............................................................................. 17

       B.     The First Amended Complaint.................................................................. 18

       C.     The Motion to Dismiss.............................................................................. 19

       D.     The Motion For Class Certification. .......................................................... 20

ARGUMENT.......................................................................................................... 21

I.      The *Basic* Presumption Is Rebutted For The December 14, 2018, Alleged Corrective Disclosure From The *Reuters* Article.......................................... 23

       A.     All Of The Allegedly Corrective Information In The *Reuters* Article Was Publicly Available Prior To December 14, 2018..................................... 23

          1.     The Allegations Against J&J Were Not New. ....................................... 23

          2.     The Internal J&J Documents Were Not New. ..................................... 26

       B.     The Absence Of *New* Allegedly Corrective Information In The *Reuters* Article Establishes A Complete Lack Of Price Impact And Rebuts The *Basic* Presumption. .......................................................................... 32

C.       The December 14, 2018, Stock Drop Does Not Save Plaintiff.........................36

II.     The *Basic* Presumption Is Rebutted For The September 27, 2017, January 30, 2018, and July 12, 2018, Alleged Corrective Disclosures. .............................38

     A.       The Allegedly Corrective Information In The September 27, 2017, Plaintiffs' Lawyer Press Release Was Not New, And J&J's Stock Price Declined That Day Before The Press Release Was Issued. .............................39

     B.       All Of The Allegedly Corrective Information In The January 30, 2018, *Law360* Article Was Already Publicly Available. .............................41

     C.       The *Ingham* Verdict Did Not Disclose Any New Allegedly Corrective Information, And J&J's Stock Price Decline On July 13, 2018, Was Not Statistically Significant. .................................................................43

III.    The Class Cannot Begin Earlier Than July 16, 2013, And Cannot End Later Than February 7, 2018. .............................................................................45

     A.       The Class Period Cannot Begin Before July 16, 2013, Because That Is The Date Of The First Actionable Alleged Misstatement. .............................45

     B.       The Class Period Cannot Extend Past February 7, 2018, Because Individual Questions Of Reliance Predominate For The July 12, 2018, And December 14, 2018, Alleged Corrective Disclosures. .............................46

CONCLUSION ...................................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Allstate Corp. Sec. Litig.*,
  966 F.3d 595 (7th Cir. 2020) ............................................................35, 36

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  955 F.3d 254 (2d. Cir. 2020)...........................................................23, 38

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  879 F.3d 474 (2d Cir. 2018).......................................................22, 35, 36

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...................................................................... *passim*

*Bing Li v. Aeterna Zentaris, Inc.*,
  324 F.R.D. 331 (D.N.J. 2018).........................................................22, 33

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)....................................................................................21

*Erica P. John Fund, Inc. v. Halliburton*,
  309 F.R.D. 251 (N.D. Tex. 2015) ................................................... *passim*

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018).........................................35

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).......................................................................... *passim*

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)....................................................................21

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) ............................................................22, 41

*In re Johnson & Johnson Talc S'holder Deriv. Litig.*,
  19-CV-018874-FLW-LHG (D.N.J.) ..........................................................5

*In re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices &
  Prods. Liab. Litig.*,
  MDL 2738 (D.N.J.).....................................................................................6

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ..............................................................36

*Reyes v. Netdeposit, LLC*,
  802 F.3d 469 (3d Cir. 2015)..................................................................................21

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) .............................................34, 35, 36

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)...................................................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).............................................................................................21

Defendants Johnson & Johnson ("J&J" or the "Company"), Joan Casalvieri, Tara Glasgow, Carol Goodrich, and Alex Gorsky (collectively, "Defendants") respectfully submit this Opposition to Plaintiff's Motion for Class Certification (ECF No. 69, the "Motion" or "Mot.").

## <u>INTRODUCTION</u>

This case is an attempt to manufacture securities fraud claims from J&J's defense of product liability litigation regarding its "Talcum Powder Products," Johnson's Baby Powder and Shower to Shower. Product liability plaintiffs' lawyers have resurrected a discredited allegation originally made in the early 1970s that J&J's Talcum Powder Products were contaminated with asbestos, and they now accuse J&J of knowing about asbestos contamination for decades, and of conducting a long-running and far-reaching scheme to hide the contamination by manipulating scientists and regulators across the world. This conspiracy theory is false, and J&J has vigorously and publicly – and successfully – defended against it for years.

Nonetheless, Plaintiff here has tried to leverage this latest round of underlying product liability litigation, and the media coverage it generated in 2017 and 2018, into a securities fraud case. Plaintiff has reverse engineered securities fraud claims by first identifying days where J&J's stock price declined, and then hunting for something that could be construed as a "disclosure" of the "alleged truth" of the product liability plaintiffs' theory – even, on certain dates, relying on plaintiffs' lawyers' own self-serving press releases. For example, Plaintiff identified a stock price decline on September 27, 2017. The initial complaint in this case claimed that this decline was caused by a September 21 *Bloomberg* article about the product liability litigation. Because a stock price decline plainly was not caused by a news article released six days earlier, the operative First Amended Complaint (ECF No. 33, the "FAC" or "Complaint") changed this allegation to contend that a September 27 press release by a product liability

plaintiffs' law firm was actually the "corrective disclosure" that partially revealed the "truth," even though the press release was labeled "attorney advertising" and was explicitly based on the September 21 *Bloomberg* article.

Plaintiff also has tried to extend the putative class period by more than 10 months based on media coverage of the product liability litigation. The initial complaint alleged that the entire "alleged truth" about Defendants' purported "fraud" was publicly available by February 7, 2018. The amended Complaint, in contrast, seeks to extend the class period until a December 14, 2018, article by *Reuters* (the "*Reuters* Article"). But rather than reveal *new* facts, the *Reuters* Article merely recycled arguments that had been made by product liability plaintiffs' lawyers in multiple trials since 2017, relying on the same documents used in those trials. And the author of the *Reuters* Article fully took the plaintiffs' side, despite having received extensive cooperation and detailed explanations from J&J refuting her narrative. As a result, the *Reuters* Article served as a massive, free advertising campaign for product liability plaintiffs' lawyers to recruit new plaintiffs and impact potential jurors nationwide, as analysts and plaintiffs' lawyers recognized immediately upon its publication. Indeed, a leading product liability plaintiffs' lawyer – who was quoted in the *Reuters* Article and is cited as having provided materials for it – told CNBC a few days later that J&J's stock price decline on December 14, 2018, "serves my purposes as a litigator to say, 'Yes, get their attention; keep driving the stock down.'"

Plaintiff's opportunistic securities fraud pleading falls apart at class certification, however, because four of the six alleged "corrective disclosures" identified in the Complaint did not reveal *new* information to the public about the product liability plaintiffs' accusations, and thus about Defendants' purported "fraud" in defending against those accusations. This flaw is fatal because it vitiates the so-called "fraud on the market" or "*Basic*" presumption of reliance on

which certification depends for Rule 10b-5 claims. This presumption is predicated on the "efficient market" theory, which assumes that the market price of stock traded on well-developed markets promptly reflects all publicly available information. If all public alleged misrepresentations and public alleged corrective disclosures are rapidly incorporated into the market price, then all investors who transact at the market price also rely on the alleged fraud. Plaintiff invoked the *Basic* presumption and submitted an expert report concluding that the market for J&J stock was efficient.

But the efficient market theory is a double-edged sword for Plaintiff. By invoking it, Plaintiff benefits from a simplifying assumption that potentially enables it to gloss over individual questions of whether every investor in the proposed class was actually aware of the alleged misrepresentations and the alleged corrective disclosures. The theory also provides Defendants with a way to rebut the presumption of reliance and preclude certification for particular claims. Both Defendants' expert Allan Kleidon and Plaintiff's expert Steven Feinstein agree that the efficient market theory mandates that only *new* information can affect the stock price; all previously available information is assumed to be already fully incorporated into the price. Consequently, if an alleged corrective disclosure did not contain *new* information, it cannot have impacted the stock price. And as the Supreme Court explained in *Halliburton II*, a lack of "price impact" "severs the link" between the alleged fraud and the market price, thereby rebutting the presumption of reliance and causing individual questions of reliance to predominate under Rule 23(b)(3). *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 282–83 (2014).

A lack of price impact precludes certification of claims regarding the four corrective disclosures the Plaintiff added when it amended the Complaint: September 27, 2017, January 30,

2018, July 12, 2018, and December 14, 2018.[1] In particular, the December 14, 2018, *Reuters* Article did not reveal any *new* allegedly corrective information. The Complaint alleges that the Article revealed "new details" about Defendants' alleged fraud from "never-before-seen internal J&J documents." (FAC ¶¶ 223–32.) And the Article itself proclaims that it is based on "confidential" J&J documents "reported here for the first time." These claims are false. Defendants and their expert Kleidon have traced all 56 of those allegedly "never-before-seen internal J&J documents" and proven that *100% of them were publicly available before December 2018 from the following sources*:

- 95% (53 of 56) were used by September 2018 at one or more product liability trials that were open to the public and were broadcast live (and available for later on demand viewing) over the internet by Courtroom View Network.

- 75% (42 of 56) were available by November 2018 on the public website factsabouttalc.com maintained by J&J.

- 55% (31 of 56) were available by August 2018 in full (and two others were available in part) on the public website asbestosandtalc.com maintained by a product liability plaintiffs' expert, including the three documents that had not yet been used in a product liability trial.

- 25% (14 of 56) were linked or discussed by November 2018 in various public press articles.[2]

As a result, none of the "details" that Plaintiff points to in the *Reuters* Article were "new" to the public domain on December 14, 2018, and they could not have impacted J&J's stock price that day under Plaintiff's own efficient market theory. This lack of price impact rebuts the presumption of reliance for claims regarding the *Reuters* Article, and therefore individual

---

[1] At this procedural stage, although the allegations are flawed, Defendants do not challenge certification of claims regarding the alleged corrective disclosures on February 5 and February 7, 2018. (FAC ¶¶ 194–203.) Defendants strongly dispute the merits of Plaintiff's claims, including regarding these alleged corrective disclosures, and will disprove them at the appropriate time.

[2] This statistic is limited to express discussions in public press of the specific, allegedly "never-before-seen internal J&J documents" at issue. As discussed below, the press coverage of the product liability litigation has been extensive.

questions of reliance predominate for that corrective disclosure. That, in turn, precludes certification of those claims for classwide treatment. And for good reason. Allowing the repackaging of publicly available information about long-standing and hotly contested product liability lawsuits to support certification of a securities fraud class action would subject publicly traded companies to class actions based on plaintiffs' lawyers' media strategies.

For these and the further reasons addressed below and in the accompanying expert report of Allan Kleidon, any class certified by the Court: (i) should not include claims based on the four corrective disclosures on September 27, 2017, January 30, 2018, July 12, 2018, and December 14, 2018, because there was no price impact from those disclosures; (ii) should not extend beyond February 7, 2018, because that is the last corrective disclosure for which Defendants do not challenge price impact; and (iii) should not begin before July 16, 2013, because all of the alleged misrepresentations made before that date were previously dismissed.

## BACKGROUND

### I.    Factual Background.

### A.    The Early 1970s Investigation Of Alleged Asbestos Contamination.

In the early 1970s, concerns arose that consumer talcum powder products could be contaminated with asbestos. (*See* FAC ¶ 51.) The FDA, talcum powder manufacturers, industry groups, and academic researchers investigated potential contamination and related safety concerns over the course of several years. (*See id.* ¶¶ 51–73.) Their results received widespread publicity, including in stories published by the *New York Times* and the *Wall Street Journal*.[3]

---

[3] Further background on the investigation of alleged asbestos contamination in the early 1970s is set forth in the Special Investigation Report to the Board of Directors of Johnson & Johnson dated July 10, 2020. *See In re Johnson & Johnson Talc S'holder Deriv. Litig.*, 19-CV-018874-FLW-LHG (D.N.J.) (ECF No. 40-6 at 110–18).

J&J's Talcum Powder Products were among those investigated. J&J had multiple outside experts test its raw talc and its finished products using a variety of testing methodologies; none concluded that J&J's Talcum Powder Products contained asbestos. J&J provided its testing results to the FDA and issued public statements confirming that its products were not contaminated with asbestos. For example, J&J told the *New York Daily News* and *New York Post* in 1971 that "[o]ur fifty years of research knowledge in this area indicates that there is no asbestos contained in the powder manufactured by Johnson & Johnson." (*See id.* ¶ 54.)

As a result of its investigation in the 1970s, the FDA determined not to mandate a testing or purity standard for talcum powder products. Currently, stringent testing and purity standards for pharmaceutical grade talc are specified in the Talc Monograph issued by U.S. Pharmacopeia, a scientific nonprofit organization that sets public standards for identity, strength, quality, and purity of medicines that are published in the United States Pharmacopeia–National Formulary.[4] J&J's Talcum Powder Products contain only USP grade talc. (*See id.* ¶¶ 151, 266, 288, 299.)

## B. The Modern Talcum Powder Product Liability Litigation.

### 1. The Cases And Allegations.

In the last decade, product liability litigation about J&J's Talcum Powder Products has proliferated, and is now one of the largest sets of product liability cases in the country, as this Court well knows. By October 2020, there were more than 20,000 lawsuits pending against J&J across the country, including more than 18,000 in an MDL pending in this District. (*See* Frost Cert. ¶ 3.) *See also In re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, MDL-2738 (D.N.J.).

---

[4] (*See* usp.org/about.)

These product liability suits generally allege that J&J's Talcum Powder Products caused the plaintiffs' ovarian cancer or mesothelioma. (*See* Certification of Jack N. Frost ("Frost Cert.") ¶ 4.) Although the first wave of suits alleged that talc itself caused ovarian cancer, within a few years plaintiffs' lawyers had shifted their theory. Most suits now contend that J&J's Talcum Powder Products contained asbestos, and the asbestos caused ovarian cancer or mesothelioma. (*Id.* ¶ 5.) Significantly, product liability plaintiffs' allegations of asbestos contamination generally focus on J&J's Talcum Powder Products sold prior to 2003, which were manufactured from talc mined in Vermont or Italy. (*Id.* ¶ 6.)[5]

Product liability plaintiffs' lawyers have heavily advertised the litigation. By April 2020, they had spent an estimated $63 million to air more than 175,000 TV ads touting their allegations and soliciting plaintiffs. (Ex. 22,[6] U.S. Chamber Institute for Legal Reform, "Gaming the System: How Lawsuit Advertising Drives the Litigation Lifecycle" (April 2020) ("U.S. Chamber Report") at 25–37 (analyzing talcum powder product liability litigation as a case study).) These ads, which can include "lengthy infomercials," "assert that the presence of asbestos is to blame" for ovarian cancer and mesothelioma, and "tell viewers that defendants knew of the presence of asbestos in their products." (*Id.* at 31–33.) The ads began running in January 2015, and "skyrocket[ed]" in early 2016; from May through August 2016, "plaintiffs lawyers and lead generators spen[t] a remarkable $15.8 million on over 33,000 ads." (*Id.* at 33–34.) At that point, J&J requested a venue change from St. Louis Circuit Court because the heavy advertising in St. Louis was having a prejudicial effect on the pool of potential jurors. (*See id.*; Frost Cert. ¶ 20.)

---

[5] After 2003, J&J used talc sourced from China for its Talcum Powder Products sold in the United States. (*Id.*)
[6] Exhibit numbers refer to exhibits attached to the Frost Cert.

### 2.    The Public Trials.

By November 2020, 35 product liability cases regarding J&J's Talcum Powder Products had gone to trial, resulting in 13 verdicts for J&J, 14 against, and 8 mistrials. (Frost Cert. ¶ 35.) J&J has appealed, or is in the process of appealing, all of the adverse verdicts. (*Id.*) With the exception of one adverse verdict that the Company is petitioning the Supreme Court of the United States to review, every one of the adverse verdicts that has made it through at least one stage of the appellate process has been reversed. (*Id.*)

The *Herford* case was the first to go to trial alleging asbestos contamination in J&J's Talcum Powder Products. Trial began in California state court in October 2017, and the jury returned a verdict for J&J in November 2017. (*Id.* ¶ 9.) The second case with asbestos allegations to go to trial was *Lanzo*; the trial in New Jersey state court began in January 2018 and ended in April 2018 with a verdict against J&J. (*Id.* ¶ 10.) The *Ingham* trial in June and July 2018 included claims by 22 plaintiffs and resulted in the largest asbestos-case verdict against J&J to date. (*Id.* ¶ 14.) Plaintiffs in these trials claimed that J&J's Talcum Powder Products were contaminated with asbestos, that J&J knew this, that J&J tried to remove asbestos from its talc, that J&J intentionally used deficient testing methodologies to test for asbestos, and that J&J had improperly influenced and manipulated regulators and scientists. (*See id.* ¶ 6.)

Including *Herford*, *Lanzo*, and *Ingham*, 10 alleged asbestos contamination cases went to trial before December 13, 2018, the end of Plaintiff's proposed class period in this matter:

| Case Name | Opening Date | Verdict/Mistrial Date | Location |
|---|---|---|---|
| *Herford* | 10/6/17 | 11/16/17 | Los Angeles County, California |
| *Lanzo* | 1/29/18 | 4/11/18 | Middlesex County, New Jersey |
| *Anderson* | 5/3/18 | 5/24/18 | Los Angeles County, California |
| *Bostic* | 5/18/18<br>11/5/18 (Retrial) | 5/25/18<br>11/15/18 (Retrial) | Darlington County, South Carolina |
| *Brick* | 5/29/18 | 6/8/18 | Los Angeles County, California |
| *Ingham* | 6/6/18 | 7/12/18 | City of St. Louis, Missouri |

| Weirick | 8/21/18 | 9/24/18 | Los Angeles County, California |
| Von Salzen | 9/10/18 | 10/2/18 | Los Angeles County, California |
| Henry | 9/17/18 | 10/11/18 | Middlesex County, New Jersey |
| Allen | 10/10/18 | 11/14/18 | Humboldt County, California |

(*See id.* ¶¶ 9–18) All of these trials were open to the public, and the trial transcripts and exhibits are part of the public record. (*Id.* ¶ 8.)[7]

### 3.    The Public Broadcasting Of The Trials.

Most of these trials were also broadcast live by Courtroom View Network ("CVN"), including the *Herford*, *Lanzo*, and *Ingham* trials. (Frost Cert. ¶¶ 8–10, 12, 14–15, 17 (containing links to CVN's homepage for the *Herford*, *Lanzo*, *Ingham*, *Bostic*, *Weirick*, and *Henry* trials, as well as 12 others).) CVN is "a national news organization" that broadcasts trials online "gavel to gavel, both live and for on demand viewing."[8] In its trial broadcasts, CVN offers a split-screen presentation: on one side of the screen a speaker, such as a witness, is displayed; on the other side of the screen, documents being discussed, such as exhibits or presentations, are displayed. The following screenshot from the *Ingham* trial shows Dr. Susan Nicholson, a J&J witness, being cross-examined on June 29, 2018, about plaintiff's exhibit 1 in that trial, a draft of J&J's "Safety & Care Commitment" webpage (which is discussed in the *Reuters* Article and is attached as exhibit 2 to Plaintiff's Complaint).

---

[7] Although some documents were initially designated as "confidential" when produced by J&J in the product liability litigation, none of the documents used in the trials listed above were sealed. (Frost Cert. ¶ 19.) Further, by mid-2018 J&J had de-designated almost all of its documents, and currently less than 1% of J&J's documents are designated "confidential." (*Id.*)

[8] (*See* cvn.com (also stating that CVN "opens unprecedented live and on demand access to courtroom proceedings," is part of the Courtroom Connect family of legal technology companies (along with Remote Counsel and LexisNexis Courtroom Cast), has broadcast civil trials online since 2004, and currently has a library of "over 1,000 trials with tens of thousands of hours of fully-indexed, searchable video").)



Gail Ingham, et al. v. Johnson & Johnson, et al.
2018-06-29

    CVN's website states that its broadcasts are "used by attorneys, corporate counsel, business people, and investors," and its subscribers include "insurance companies, well-known journalists, [and] media sites"; indeed, CVN specifically markets itself to "journalists and media" so they can "have an accurate account" of trials.[9] Public press stories confirm that journalists frequently rely on CVN's broadcasts of J&J product liability trials. Numerous *Reuters* articles about the litigation from 2016 to 2018 include statements like, "*Reuters* viewed the proceedings on Courtroom View Network," "*Reuters* watched the verdict through Courtroom View Network, which broadcast it online," or "according to an online broadcast of the trial by Courtroom View Network." (Ex. 27 (compilation of such articles).) Many other news organizations include similar references to CVN's broadcasts in their stories, including the *Wall Street Journal*, *Dow Jones Newswires*, *Law360*, *FairWarning.org*, the *National Law Journal*, the *New York Law Journal*, the *New Jersey Law Journal*, and the *St. Louis Record*. (*See id.*; *see also* Ex. 21

---

[9] (*See* cvn.com.)

(compilation of advertising emails sent by CVN to equity research firm CFRA, including ads to watch the *Ingham* trial).)

### 4. The Public Press Coverage Of The Litigation.

The product liability litigation relating to J&J's Talcum Powder Products has been widely covered in the public press. Between January 2016 and the end of the proposed class period in December 2018, approximately 40,000 press articles about the litigation were published. (Ex. 6, Montagnino Decl. ¶ 8.) The sources covering the litigation ranged from national mass market publications like the *New York Times* and the *Wall Street Journal*, to legal industry newspapers like *Law360*, *American Lawyer,* and the *National Law Journal*, to regional and other media focused on specific cases like the *St. Louis Record*. (*See*, *e.g.*, Exs. 10, 20, & 27.)

Many of these articles specifically discussed evidence and argument in pretrial proceedings and trials. For example, between the June 6, 2018, opening of the *Ingham* trial in St. Louis, Missouri, and the July 12, 2018, verdict, the *St. Louis Record* published more than twenty articles about the trial. The near-daily articles recounted the events of the trial in detail, quoting testimony, discussing documentary evidence, and analyzing arguments based on live viewing of the trial on CVN. (Ex. 20 (compilation of *St. Louis Record* articles, each stating that reporting was based on viewing the CVN broadcast, and including a link to CVN's coverage of the trial); *see also, e.g.*, Ex. 25, Kleidon Report Ex. B (documents considered list, including dozens of articles about the litigation from 2016–2018, many of which quoted trial testimony and arguments, explained and described specific exhibits used at trials, and reported details of expert testimony and court rulings).)

Some articles provided both the plaintiffs' and J&J's sides, and pointed to specific J&J documents produced in the litigation. For example, *Bloomberg* published an article on September 21, 2017 (updated on September 22), by Jef Feeley, Margaret Cronin Fisk, and Jaren S. Hopkins

11

titled "J&J Was Alerted To Risks of Asbestos in Talc in '70s, Files Show." (Ex. 9, the *Bloomberg* Article.") The *Bloomberg* Article reported both that "plaintiffs say . . . unsealed documents indicate that J&J has known for decades that its talc products include asbestos fibers," and that "[d]ocuments provided by J&J show tests of its talc stretching back to at least 1972 found no traces of asbestos." (Ex. 9.2.) The Article also linked to and quoted from internal J&J documents, including reports, memos, and correspondence from the early 1970s, that had been used in pretrial discovery in the *Ingham* case. (*Id.*)

Other articles, however, endorsed the product liability plaintiffs' theories. For example, on January 16, 2018, *FairWarning.org* published an article by Myron Levin titled "Baby Powder Battles: Johnson & Johnson Internal Documents Reveal Asbestos Worries." (Ex. 8, the "*FairWarning.org* Article.") The Article reported on the "burst of litigation" brought by "victims of mesothelioma" claiming that "talc powders were contaminated by traces of asbestos." (Ex. 8.1) The Article claimed to have been based on "a trove of about 175,000 pages of J&J documents" that included "revealing" "internal company memos" from "an asbestos scare that rocked the cosmetics industry in the 1970s." (*Id.*) *FairWarning.org* posted more than 20 of these internal J&J documents on its website, and the Article linked to them. (Ex. 8) The same day, the Article was republished in more than 30 newspapers nationwide, including the *Sacramento Bee*, the *Kansas City Star*, the *Fort Worth Star-Telegram*, and the *Miami Herald*. (*See* Ex. 8.1.)

### 5.     The Public Websites About The Litigation.

Thousands of the internal documents J&J has produced in the product liability litigation have also been posted on two publicly available websites: asbestosandtalc.com and factsabouttalc.com. Asbestosandtalc.com is run by Dr. David Egilman, who has served as an expert witness for product liability plaintiffs and has testified that he is "doing whatever [he] can to get [J&J's documents] into the public domain." (Ex. 17.2, 11/20/18 Egilman Dep. Tr. at 358.)

12

Consistent with this, Egilman has uploaded more than a thousand documents to asbesosandtalc.com. A copy of asbestosandtalc.com as it existed on August 4, 2018 (the only date in 2018 available on the Internet Archive) hosted more than 1,800 documents, including exhibits used in multiple J&J Talcum Powder Products trials, exhibits from depositions, and many other internal J&J documents. (*See* Ex. 7, Song Decl. ¶¶ 2–4 (explaining process for capturing a copy of the website from the Internet Archive).) The documents are organized in folders with titles like "Admitted in Ingham v. JNJ," "De-designated Docs," and "fooling lewin and the fda." When asked in a November 2018 deposition how he determines which J&J documents to upload, Egilman answered: "[a]s they become de-designated, I put them up," and he acknowledged that J&J had by then "de-designated almost all their documents." (Ex. 17.1, 11/19/18 Egilman Dep. Tr. at 163; Ex. 17.2, 11/20/18 Egilman Dep. Tr. at 358.)

Egilman has also publicized asbestosandtalc.com to journalists. For example, he testified that he is "sure" that he "told Lisa Girion [the author of the *Reuters* Article] about it." (Ex. 17.3, 9/21/20 Egilman Dep. Tr. at 50, 64 (also reiterating, "I'm sure I told her about the Asbestos and Talc website").) Egilman testified that he probably first had contact with Girion in 2013, and that he first talked with her about asbestos and talc in 2016 or 2017. (*Id.*) He also communicated with and sent materials to Jef Feeley, an author of the *Bloomberg* Article, and Myron Levin, the author of the *FairWarning.org* Article. (*Id.* at 62–64.) As he summarized, he "tell[s] all the reporters about [asbestosandtalc.com]." (Ex. 17.1, 11/19/18 Egilman Dep. Tr. at 162.)[10]

---

[10] Links to asbestosandtalc.com have also appeared in Egilman's articles, at least one book, and the Federal Register. (*See, e.g.*, Ex. 18.1, "Commentary on 'Assessment of Health Risk from Historical Use of Cosmetic Talcum Powder,'" *New Solutions: A Journal of Environmental and Occupational Health Policy* (2018) (stating, "[t]he documents referenced in this article were released in litigation and are all in the public domain" and directing readers to asbestosandtalc.com multiple times); Ex. 18.2, Federal Register, Department of Health and Human Services, "Testing Methods for Asbestos in Talc and Cosmetic Products Containing

J&J has also published thousands of its documents on its own publicly available website, factsabouttalc.com. J&J launched factsabouttalc.com in 2016 to provide factual and scientific information about its Talcum Powder Products, including "where talc comes from, how it is used in everyday products, and why it is safe to use as part of your personal care routine." (Ex.6, Montagnino Decl. ¶ 4.) The website discusses a range of safety information about talc, including scientific studies of talc such as the Nurses' Health Study with over 31,000 women talc users and the Women's Health Initiative study with 61,000 women talc users, both of which showed no increased risk of ovarian cancer in women who used talcum powder.[11]

On November 29, 2018, J&J updated factsabouttalc.com to include documents used in the product liability litigation.[12] (Id. ¶ 5.) The website states that J&J "is committed to defending [the product liability litigation] based on the strong scientific evidence showing that talc does not cause cancer," and invites readers "to review the evidence and make up [their] own mind."[13]

### C.    The December 14, 2018, *Reuters* Article.

The *Reuters* Article was published on December 14, 2018. The lead piece was titled "Powder Keg: Johnson & Johnson Knew For Decades That Asbestos Lurked In Its Baby Powder"; a companion piece was titled "A Guiding Hand On Talc Safety Research." (Ex. 4.)

The *Reuters* Article recapitulated the theories and claims that the product liability plaintiffs had put forward in the *Herford*, *Lanzo*, and *Ingham* trials, among others. The Article asserted that "from at least 1971 to the early 2000s," J&J was aware that its "raw talc and

---

Talc; Public Meeting; Request for Comments" (2020); Ex. 18.3, "Inhalation Toxicity of Talc," *Journal of Aerosol Medicine* and *Pulmonary Drug Delivery* (2020); Ex. 18.4, Egilman, et al., "Health Effects of Censored Elongated Mineral Particles: A Critical Review," *Detection Limits in Air Quality and Environmental Measurements* (2020).)

[11] (*See* factsabouttalc.com/studies.)

[12] (*See also* jjcloud.ent.box.com/s/2x692lcj24crvjunf0lnu590zw5g528e, linked at factsabouttalc.com/litigation.)

[13] (*See* factsabouttalc.com/litigation.)

finished powders sometimes tested positive for small amounts of asbestos." (*Id.*) It also claimed that J&J "influenced U.S. regulators' plans to limit asbestos in cosmetic talc products and scientific research on the health effects of talc" by hiding test results from regulators while advocating for a regime of industry self-regulation, and by pushing for the adoption of test methods that were insufficiently sensitive to reliably detect asbestos. (*Id.*)

The *Reuters* Article states that it is based on J&J's "internal documents," and that only a "small portion of [them] have been produced at trial and cited in media reports." (*Id.*) The online version of the Article contained links to the documents on which it is based,[14] and the documents were posted to a document hosting website.[15]

The Article was heavily promoted by *Reuters*. The same morning it was published, *Reuters* released a promotional video that featured Girion. (Ex. 11.3, 12/14/18 *Reuters* Girion Interview Tr.[16]) Girion also did interviews in the afternoon on CNBC and MSNBC. In the CNBC interview, Girion confirmed that the Article was "based entirely on [J&J's] documents" and she directed viewers to *Reuters*' website where they could view the documents. (Ex. 11.1, 12/14/18 CNBC Girion Interview Tr. at 2–3.[17]) She also stated that her "report does not at all talk about the products that they're selling today. . . . [T]here's no evidence that what they're selling today has any asbestos in it." (*Id.* at 7.) She reiterated this during the MSNBC interview: the Article had "nothing to do with the Baby Powder [J&J] sells today," but rather was about the talc used from the 1950s until "as late as 2003." (Ex. 11.2, 12/14/18 MSNBC Girion Interview Tr. at 4.[18])

---

[14] (*See* reuters.com/investigates/special-report/johnsonandjohnson-cancer/.)
[15] (*See* documentcloud.org/public/search/projectid:40934-Johnson-Johnson.)
[16] (*See also* reuters.com/video/watch/idRCV0061NI.)
[17] (*See also* cnbc.com/video/2018/12/14/reuters-lisa-girion-details-her-report-on-johnson-johnson-baby-powder.html.)
[18] (*See also* msnbc.com/velshi-ruhle/watch/baby-powder-tainted-by-asbestos-johnson-johnson-knew-for-decades-1398228035626.)

J&J's stock price declined by approximately 10% by the close of trading on December 14, 2018. The "clear consensus" among analysts who covered J&J was that the *Reuters* Article was "a reiteration of previously disclosed factual issues and public documents from numerous talc-related litigation matters." (Ex. 25, Kleidon Report ¶¶ 149, 182–92.) For example, Morgan Stanley issued a report stating that "[t]oday's Reuters article did not raise new factual issues but has led to increased awareness around litigation risk" and "may inflate potential legal exposure." (Ex. 12.5, 12/14/18 Morgan Stanley Report.) The Morgan Stanley report further said that "[w]e are not convinced that the article uncovered new evidence that was not presented to juries or part of the ongoing legal discovery process, but it has raised a level of awareness around the issue that did not occur after the $4.7bn verdict in July." (*Id.*) Similarly, J.P. Morgan's same-day report noted that "all issues reported [in the *Reuters* Article] were previously disclosed as part of talc litigation discovery." (Ex. 12.3, 12/14/18 JP Morgan Report.)

J&J responded to the Article the same day, saying: "The *Reuters* article is one-sided, false and inflammatory. Johnson & Johnson's baby powder is safe and asbestos-free." (Ex. 23.1.) J&J also pointed out that it had "directly responded to dozens of questions [from the reporter] in order to correct misinformation and falsehoods," but *Reuters* "repeatedly refused to meet with our representatives to review the facts and refused to incorporate much of the material we provided." (*Id.*) In another statement, J&J summed up: "Simply put, the *Reuters* story is an absurd conspiracy theory, in that it apparently has spanned over 40 years, orchestrated among generations of global regulators, the world's foremost scientists and universities, leading independent labs, and J&J employees themselves." (Ex. 10.30.)

J&J issued a further nine-page rebuttal to the *Reuters* Article on December 16, 2018. (Ex. 23.2) J&J stated that the Article "misrepresented J&J, our product, our actions, and the science

about talc," and "misled [] readers by printing inaccurate statements, [and] withholding crucial information." (*Id.*) The rebuttal then went through the *Reuters* Article's errors point by point, providing detailed factual and scientific information countering the Article's narrative. (*Id.*) J&J also noted that "[t]he information Reuters relied upon has been publicly available for years." (*Id.*)

Since December 2018, J&J has continued to publicly and repeatedly deny the allegations about its Talcum Powder Products made in the product liability litigation and repeated in the *Reuters* Article. (*See, e.g.*, Ex. 23.4 (11/3/20 J&J press release discussing appeal of the *Ingham* verdict and stating that it is "at odds with decades of independent scientific evaluations confirming Johnson's Baby Powder is safe, does not contain asbestos and does not cause cancer"); Ex. 23.3 (12/20/19 J&J press release announcing the "fourth consecutive" favorable verdict and the "eighth defense verdict this year"); *see also* factsabouttalc.com.)

## II.    Procedural History.

### A.    The Initial Complaint.

This case was filed on February 8, 2018, more than ten months before the *Reuters* Article was published. (ECF No. 1, the "Initial Complaint.") The Initial Complaint alleged violations of Rule 10b-5 on behalf of a putative class of investors who purchased J&J stock between February 22, 2013, and February 7, 2018. The Initial Complaint alleged that J&J had "known for decades," yet failed to disclose, "that its talc products include asbestos fibers and that the exposure to those fibers can cause ovarian cancer and mesothelioma." (*Id.* ¶¶ 2, 59.)

The Initial Complaint identified three corrective disclosures that allegedly "revealed" this "truth" to the public:

- September 21, 2017: The *Bloomberg* Article reported that "unsealed" J&J documents "indicate that J&J has known for decades that its talc products include asbestos fibers." (*Id.* ¶ 61.)

- February 5, 2018: A *CNBC* article stated that "court proceedings [in the then-ongoing *Lanzo* trial] could expose potentially damaging documents." (*Id.* ¶ 63.)

- February 7, 2018: A press release by plaintiffs' firm Beasley Allen asserted that the product liability litigation was "revealing never-before-seen documents from Johnson & Johnson . . . that shed light on just how prevalent asbestos and heavy metals are in the talc used in Baby Powder." (*Id.* ¶ 65.)

The filing of the Initial Complaint was publicized, including through press releases issued in accordance with the PSLRA, 15 U.S.C. §78u4(a)(3)(B)(i), and in national media such as *Law360*. (*See* Exs. 10.31 & 10.32.)

Plaintiff San Diego County Employees' Retirement Association ("SDCERA") moved for appointment as lead plaintiff pursuant to the PSLRA in April 2018. (ECF No. 9.) SDCERA's motion reiterated the claims in the Initial Complaint, and quoted the September 21, 2017, *Bloomberg* Article, a February 4, 2018, *Salon* article that reprinted the *FairWarning.org* Article, and the February 7, 2018, Beasley Allen press release. (ECF No. 9-1 at 3.) In November 2018, the Court appointed SDCERA as lead plaintiff. (ECF No. 20.)

### B.    The First Amended Complaint.

On February 28, 2019, Plaintiff amended the Complaint. The core allegation remained the same: that J&J made false or misleading statements that concealed its knowledge that "Johnson's Baby Powder was contaminated with cancer-causing asbestos." (FAC ¶ 1.) However, Plaintiff added four new corrective disclosures, including changing the first corrective disclosure and extending the class period until the publication of the December 14, 2018, *Reuters* Article. (*Id.* ¶¶ 2, 421.) The Complaint's six alleged corrective disclosures are:

- September 27, 2017: A press release by the product liability plaintiffs' firm Bernstein Liebhard claimed "unsealed documents" showed J&J "knew of talc asbestos danger in 1970s." (*Id.* ¶ 184.)

- January 30, 2018: A *Law360* article reported on product liability plaintiffs' opening statements in the *Lanzo* trial that "asserted that Johnson & Johnson . . .

[was] aware that talc contained asbestos in the 1970s," and referenced a 1975 report that allegedly stated asbestos was found in J&J talc. (*Id.* ¶ 192.)

- February 5, 2018: A *Mesothelioma.net* blog post referred to the *Lanzo* trial and stated that "experts" were "anticipating the release of numerous damaging internal [J&J] documents . . . show[ing] that as long ago as the early 1970s, company officials were questioning each other about the impact of asbestos." (*Id.* ¶ 194.)

- February 7, 2018: The Beasley Allen press release asserted that "lawsuits filed by ovarian cancer and mesothelioma victims are revealing never-before-seen documents from Johnson & Johnson." (*Id.* ¶ 201.)

- July 12, 2018: The $4.69 billion jury verdict against J&J in the *Ingham* trial, which "was the first trial against J&J in which the plaintiffs alleged that their ovarian cancer was caused by asbestos in the talc." (*Id.* ¶ 213.)

- December 14, 2018: The *Reuters* Article allegedly "disclosed new information and new analysis, including internal J&J documents 'reported to the public for the first time.'" (*Id.* ¶¶ 12, 223.)

## C.    The Motion to Dismiss.

In December 2019, the Court granted in part and denied in part Defendants' motion to dismiss. (ECF No. 49, the "MTD Opinion.") The Court held that Plaintiff had adequately pleaded falsity and scienter for statements that J&J's Talcum Powder Products were "safe" and "asbestos-free," as well as for certain sufficiently-specific statements "regarding the Company's quality assurance process." (*Id.* at 32–33, 35–41, 43–54.) The Court dismissed claims regarding "general statements regarding the Company's values and motivations" (*id.* at 30–32), as well as regarding the product liability litigation (*id.* at 30–32, 41–43). The Court also dismissed claims against three individual defendants. (*Id.* at 49, 51–55.)

The Court denied Defendants' motion to dismiss claims regarding certain corrective disclosures, including challenges that would have shortened the alleged class period. The Court rejected these challenges because Plaintiff had sufficiently alleged, for purposes of the motion to dismiss, that the *Reuters* Article disclosed information "from internal J&J documents" that was "new" and did not "merely repeat information" that was previously available. (*Id.* at 62.)

19

Plaintiff sufficiently pleaded that the *Reuters* Article "provided new information" because, "[a]s alleged, the *Reuters* article purportedly indicated that it was disclosing new information *from internal J&J documents* which were being 'reported to the public for the first time.'" (*Id.* at 62–63, 65–66) (emphasis added).

### D.    The Motion For Class Certification.

In July 2020, Plaintiff moved to certify a class under Rule 23(b)(3) consisting of "[a]ll persons who purchased or otherwise acquired publicly traded J&J equity securities, as defined in 15 U.S.C. § 78c(11) and 17 C.F.R. § 240.3a11-1, between February 22, 2013 through December 13, 2018." (Mot. at 1.)[19] Plaintiff also seeks to pursue on a classwide basis all claims that survived the motion to dismiss. (*See id.* at 9–11.)

As is typical in securities cases, Plaintiff relies on the *Basic* presumption of reliance in order to satisfy Rule 23(b)(3)'s predominance requirement. (*Id.* at 16.) The presumption is predicated on the "efficient market" theory, which posits that "the market price of shares traded on well-developed markets reflects all publicly available information." (*Id.*) Because any public alleged misrepresentations and public alleged corrective disclosures are promptly incorporated into the price in an efficient market, and all investors transact at – and thus rely on – the market price, the *Basic* presumption allows plaintiffs to avoid individualized questions of whether each investor in the proposed class was in fact aware of and relied on the alleged misrepresentations and the alleged corrective disclosures. (*See id.*) *See also Halliburton II*, 573 U.S. at 281–82; *Basic Inc. v. Levinson*, 485 U.S. 224, 246–47 (1988).

---

[19] "Excluded from the Class are defendants, present or former executive officers of defendants and members of their immediate families, present or former directors of defendants and members of their immediate families, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded party." (Mot. at 1.)

To invoke the *Basic* presumption, Plaintiff relies primarily on the expert report of Steven Feinstein, which concludes that J&J's stock "traded in an efficient market over the course of the Class Period." (ECF No. 69-2, the "Feinstein Report" ¶ 17; *see also id.* ¶ 35 (defining an efficient market as one "in which available information is incorporated into the price of a security such that the trading price reflects available information with reasonable promptness").)

## ARGUMENT

Class certification is no routine matter. It is the "'exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Rule 23 does not set forth a mere pleading standard," and the Court must engage in a "rigorous analysis" of the evidence bearing on Rule 23's requirements, even if that "overlap[s] with the merits." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–52 (2011); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015) ("[T]he district court 'cannot be bashful'" and "must resolve all factual or legal disputes relevant to class certification . . . including disputes touching on elements of the cause of action."). Plaintiff must prove compliance with Rule 23 by "a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008).

Class certification in this case turns on the *Basic* presumption of reliance. "[W]ithout the presumption of reliance," individual issues of reliance predominate and Rule 10b-5 claims "cannot proceed as a class action." *Halliburton II*, 573 U.S. at 279–82. Defendants may rebut Plaintiff's invocation of the presumption and defeat or limit class certification by presenting "evidence that the asserted misrepresentation (*or its correction*) did not affect the market price of

21

[the] stock." *Id.* (emphasis added).[20] Without "price impact," "the basis for finding that the fraud had been transmitted through [the] market price would be gone," *id.*, and the *Basic* presumption "would completely collapse," *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman II*"), 879 F.3d 474, 486 (2d Cir. 2018) (cleaned up). "Price impact is thus an essential precondition for any Rule 10b-5" claims to be certified. *Halliburton II*, 573 U.S. at 281–82.

A lack of price impact can be shown if the price decline occurred before the corrective disclosure at issue, *see, e.g.*, *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782–83 (8th Cir. 2016), or if the price decline after a corrective disclosure is not statistically significantly different from zero at the 95% confidence level, *see, e.g.*, *Erica P. John Fund, Inc. v. Halliburton* ("*Halliburton II Remand*"), 309 F.R.D. 251, 269, 272 (N.D. Tex. 2015). Particularly important for this case, a lack of price impact can also be shown if an alleged corrective disclosure did not "reveal[] *new* . . . information to the market," because all previously available information is already fully incorporated into the price according to the efficient market theory. *See Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman IV*"), 955 F.3d 254, 271 (2d. Cir. 2020) (emphasis added), *cert. granted sub nom. Goldman Sachs Group, et al. v. AR Teacher Retirement, et al.*, No. 20-222, 2020 WL 7296815 (*Dec. 11, 2020*). (*See also* Ex. 25, Kleidon Report ¶¶ 48–64 (explaining the implications of the efficient market theory relied on by Plaintiff and its expert Feinstein).)

---

[20] The Third Circuit has not addressed the burden on Defendants to rebut the *Basic* presumption at class certification. Courts in this District have stated that "[t]o meet this burden, defendant need only produce enough evidence 'to withstand a motion for summary judgment or judgment as a matter of law.'" *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 344 (D.N.J. 2018), *aff'd*, *Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019). The Second Circuit has held that "defendants must rebut the *Basic* presumption by disproving reliance by a preponderance of the evidence." *Waggoner v. Barclays PLC*, 875 F.3d 79, 99 (2d Cir. 2017). Regardless of the standard, Defendants readily meet it here.

The evidence demonstrates that there was no price impact for four of Plaintiff's six alleged corrective disclosures: December 14, 2018; July 12, 2018; January 30, 2018; and September 27, 2017. The *Basic* presumption is therefore rebutted for claims regarding those four corrective disclosures. Consequently, individual questions of reliance predominate for those claims, and they cannot be certified for class treatment under Rule 23(b)(3).

**I.    The *Basic* Presumption Is Rebutted For The December 14, 2018, Alleged Corrective Disclosure From The *Reuters* Article.**

**A.    All Of The Allegedly Corrective Information In The *Reuters* Article Was Publicly Available Prior To December 14, 2018.**

Plaintiff alleges that the *Reuters* Article "reveal[ed]" "new information and new analysis" about allegations of "J&J's knowledge of the asbestos in the Company's talcum powder and J&J's longstanding fraudulent scheme to cover it up." (FAC ¶ 223; *see also id.* ¶¶ 223–32 (specifying the allegedly corrective information in the *Reuters* Article).) Such an allegation standing alone was sufficient to survive a motion to dismiss. But it is not sufficient to survive class certification, when the evidence must be rigorously analyzed. And the evidence is clear: neither the general allegations against J&J nor the specific internal documents on which the Article was based were new.

**1.    The Allegations Against J&J Were Not New.**

The market was well aware of the (baseless) allegations that J&J knew of and covered up asbestos contamination long before they were rehashed in the December 14, 2018, *Reuters* Article. In fact, the Initial Complaint made that very accusation on February 8, 2018. (*See, e.g.*, ECF No. 1 ¶ 59 (alleging that J&J "failed to disclose" that it "ha[d] known for decades that its talc products include asbestos fibers").) And product liability plaintiffs have been pitching that conspiracy theory for years. That was the plaintiffs' theory of the case in, among others, the trials in *Herford* (10/6/17–11/6/17), *Lanzo* (1/29/18–4/11/18), and *Ingham* (6/6/18–7/12/18), each of

which was public and broadcast "gavel-to-gavel" on CVN.[21] For example, New Jersey Superior Court Judge Viscomi stated that the jury in the *Lanzo* trial had been presented with evidence purportedly showing (i) that J&J's talc was contaminated with asbestos, (ii) that J&J knew and was warned of this, (iii) that J&J knew its testing methodology was deficient but chose to use and publicly support that methodology, and (iv) that J&J withheld from the FDA testing results that showed asbestos contamination. (Ex. 19, 6/29/18 *Lanzo* Transcript of Decision at 6–7, 18.) Product liability plaintiffs' lawyers have also pushed this theory in their advertising, including through TV ads and infomercials, press releases, and blog posts. (*See, e.g.*, Ex. 22, U.S. Chamber Report at 31–33 (describing millions of dollars of TV advertising by plaintiffs' lawyers from 2016–2018, which "tell viewers that [J&J] knew of the presence of asbestos"); Ex. 24 (compilation of plaintiffs' lawyers client-solicitation press releases and blog posts regarding J&J's alleged knowledge of asbestos contamination).)

The allegations against J&J were also reported widely and repeatedly in the press. Most articles attributed the claims to the plaintiffs or their lawyers.[22] Sometimes, however, particular reporters adopted the product liability plaintiffs' narrative and presented it as the "truth." For example, the January 16, 2018, *FairWarning.org* Article contended that internal J&J documents showed (i) that J&J's talc and Talcum Powder Products repeatedly tested positive for asbestos and J&J knew this, (ii) J&J tried but failed to remove asbestos from its talc and Talcum Powder Products, (iii) that J&J knew its chosen testing methodology was not sensitive enough to detect

---

[21] (*See* cvn.com/search?utf8=%E2%9C%93&q=johnson+%26+johnson&sa=.)

[22] (*See, e.g.*, Ex. 10.4, Daniel Siegal, "J&J's Talc Bore Harmful Asbestos, Calif. Retrial Jury Told," *Law360* (Oct. 19, 2017); Ex. 10.8, Daniel Siegal, "J&J Tests Weren't Meant to Find Asbestos in Talc, Jury Told," *Law360* (Apr. 3, 2018); Ex. 10.15, Amanda Bronstad, "J&J 'Rigged Tests' on Whether Baby Powder Was Laced With Asbestos, Lanier Tells Jury," *National Law Journal* (Jun. 6, 2018).)

asbestos and it lobbied against more sensitive methodologies, and (iv) that J&J manipulated scientific and regulatory work related to asbestos in talc. (Ex. 8.1 (noting in a sidebar that the Article was republished in more than 30 newspapers across the country).)

The *Reuters* Article – like the *FairWarning.org* Article and the Plaintiff here – adopted wholesale the product liability plaintiffs' claims. (*See* Ex. 4; *cf.* FAC ¶¶ 2, 12 (alleging that Defendants "concealed" and the *Reuters* Article "revealed" that "(i) J&J's talc and talcum powder products were contaminated with asbestos, as J&J had been repeatedly informed; (ii) J&J had attempted to find ways to remove asbestos minerals from its talc; (iii) J&J purposely avoided the use of testing methods that could detect the asbestos present in the Company's talc, and (iv) J&J had influenced and manipulated regulators and scientists in order to protect the Company's flagship product and reputation").) That the *Reuters* Article is a retread of the allegations from the product liability litigation is not surprising. The Article is about the litigation and based on documents produced in the litigation. It quotes and links to Judge Viscomi's decision in *Lanzo*. (*See* Ex. 4; Ex. 2 at Row 78.) It points to trial and deposition testimony from the litigation. (Ex. 4.) It quotes the lead plaintiffs' lawyer in *Ingham*, and features photos provided by him. (*Id.*) The accompanying video released by *Reuters* the same day features the author explaining her interest in and investigation of the product liability litigation that led to the Article. (Ex. 11.3, 12/14/18 *Reuters* Girion Interview Tr.[23]) The video also contains clips from CVN's coverage of the *Ingham* trial, including plaintiffs' opening statement. (*Id.*) And product liability plaintiffs' expert Egilman testified that he communicated with Girion (among other reporters) about internal J&J documents used in the litigation. (Ex. 17.3, 9/21/20 Egilman Dep. Tr. at 51.)

---

[23] (*See also* reuters.com/video/watch/idRCV0061NI.)

### 2.    The Internal J&J Documents Were Not New.

The *Reuters* Article states that it is based on "internal documents" produced by J&J in the product liability litigation. (Ex. 4.) Those documents are almost all from the 1970s and were hyperlinked and quoted in the online version of the Article.[24] In an interview the day the Article was published, Girion confirmed that her story was "based entirely on [J&J's] documents" and directed viewers to access the documents on the internet. (Ex. 11.1, 12/14/18 CNBC Girion Interview Tr. at 2–3; *see also* Ex. 25, Kleidon Report ¶ 161 (discussing *Reuters'* online posting of documents).)

The Complaint pleads that the "internal J&J documents" in the *Reuters* Article "reveal[ed] new details" about the alleged fraud because those documents were "never-before-seen." (FAC ¶¶ 223–44; *see also* MTD Opinion at 62–63, 65–66 (denying aspects of the motion to dismiss based on Plaintiff's allegation that the *Reuters* Article "disclos[ed] new information from internal J&J documents which were being 'reported to the public for the first time'").) The record now demonstrates the contrary: *every internal J&J document linked or quoted in the Reuters Article was publicly available prior to December 14, 2018.*

Defendants and their expert Kleidon have traced every document linked or quoted in the *Reuters* Article. Exhibit 1 lists all 56 internal J&J documents in chronological order.[25] Exhibit 2 supports Exhibit 1 by quoting the *Reuters* Article in full, identifying every document linked or quoted in the text of the Article, listing where each document was previously publicly available,

---

[24] (*See* reuters.com/investigates/special-report/johnsonandjohnson-cancer/.)
[25] To be conservative, Defendants included as internal J&J documents three internal documents from Imerys and one set of minutes from a 1970s meeting between J&J and the FDA. Twenty-one documents linked or quoted in the Article are not included as internal J&J documents: 10 court filings, 2 product liability plaintiffs' expert reports, 3 government documents, 1 World Health Organization document, 2 third-party websites, 2 research journal articles, and 1 newspaper article. (*See* Ex. 2, Rows 2–3, 23, 33–34, 78, 86–88, 96–97, 99–104, 108, 114.)

and cross-referencing to Exhibit 1. Exhibit 3 compiles all 56 of the internal J&J documents linked or quoted in the Article, numbered 3.1 through 3.56.[26]

Of the 56 internal J&J documents in the *Reuters* Article that Plaintiff contends revealed "new" details on December 14, 2018, 100% were publicly available from at least one (many from more than one) of the following four sources by September 2018:

- 95% (53 of 56) were used at one or more public trials broadcast on CVN by September 2018.

- 75% (42 of 56) were available on the public website factsabouttalc.com by November 2018.

- 55% (31 of 56) were available on the public website asbestosandtalc.com by August 2018 (and two others were partially available), including the three documents that had not yet been used in a product liability trial.

- 25% (14 of 56) were linked or discussed in public press articles by November 2018.

(Ex. 1; *see also* Ex. 2 (citing trial transcripts and press articles); Ex. 7, Song Decl. ¶¶ 2–6 (describing the collection and verification of documents from asbestosandtalc.com and factsabouttalc.com); Ex. 6, Montagnino Decl. ¶¶ 4–8 (describing the posting of documents on factsabouttalc.com).)

The documents that Plaintiff specifically points to as containing allegedly corrective information are illustrative. In the section pleading that the *Reuters* Article was a corrective disclosure, the Complaint highlights five examples of internal J&J documents that "revealed" "new" allegedly corrective information. (*See* FAC ¶¶ 223–32.) None of these documents actually were new, and thus none of the allegedly corrective information in them was new.

---

[26] The Kleidon Report provides further information regarding his methodology in tracing these documents, and also opines that the sources from which the *Reuters* documents were previously available – trials, websites, and press reports – were public such that each of the documents was fully incorporated into the stock price pursuant to Plaintiff's efficient market theory. (*See* Ex. 25, Kleidon Report ¶¶ 78, 81, 167–81.)

*First*, the Complaint claims that the *Reuters* Article "revealed" an internal, tracked-changes draft of J&J's "Our Safety & Care Commitment" website from 2013. (*Id.* ¶¶ 224–25; *see also* Ex. 1, Doc. 55; Ex. 2, Row 28; Ex. 3.55.) This document is foundational to Plaintiff's claims: a screenshot is included in paragraph 128 of the Complaint, and the full document is attached as exhibit 2 to the Complaint. (*See* FAC.) Plaintiff contends that the draft "contains the admission" that J&J "cannot say 'always' when it comes to asbestos not being in J&J's talcum powder products." (*Id.* ¶¶ 128, 224 (cleaned up).) Plaintiff also asserts that the draft "demonstrated defendants' knowledge that the science . . . was not clearly in J&J's favor," and that "even some of the studies [Defendants] cite send mixed messages." (*Id.* ¶ 225.) These characterizations are repeated dozens of times in the Complaint as the reasons why specified statements were false or misleading. (*See id.* ¶¶ 253–391.)[27]

But this document was publicly available long before the *Reuters* Article. (*See* Ex. 1, Doc. 55.) It was used as plaintiff's exhibit 1 in the *Ingham* trial. CVN's live broadcast of the *Ingham* trial on Friday, June 29, 2018, included extensive testimony about the document and displayed it on a split screen. (*See* Ex. 2, Row 28; *see also* Background Section I.B.3 *supra* (screenshot of CVN feed showing this document).[28]) A Monday, July 2, 2018, article in the *St. Louis Record* reported in detail on the document and related testimony. (Ex. 20.14, John Sammon, "Plaintiff lawyer says J&J accused of altering records as scientist maintains product is asbestos free," *St. Louis Record* (July 2, 2018).) In addition, the document was posted to asbestosandtalc.com no later than August 2018, and to factsabouttalc.com by November 2018. (*See* Ex. 2, Row 28.)

---

[27] As Defendants will demonstrate at the appropriate time, the Complaint mischaracterizes this document and takes it out of context, as Plaintiff does with the rest of the documents at issue.
[28] (*See also* cvn.com/proceedings/gail-ingham-et-al-v-johnson-johnson-et-al-trial-2018-06-04.)

*Second*, Plaintiff claims that a pair of 1969 internal memos discussing tremolite and potential litigation "provided new details of J&J's early awareness of the dangers of tremolite in the Company's talc." (FAC ¶ 226; *see also* Ex. 1, Docs. 4 & 5; Ex. 2, Rows 38 & 39; Exs. 3.4 & 3.5.) These two documents were used in the *Herford*, *Lanzo*, and *Ingham* trials. (*See* Ex. 2, Rows 38 & 39.) Multiple press articles specifically reported on these memos by at least April 2018, including highlighting their use in the *Lanzo* trial. (*See id.*) And Egilman uploaded these documents to asbestosandtalc.com by August 2018, and J&J posted copies to factsabouttalc.com by November 2018. (*See id.*)

*Third*, the Complaint says that the *Reuters* Article "corrected defendants' statements about early talc testing and J&J's interaction with the FDA," claiming that the Article "disclosed that 'at least three tests by three different labs from 1972 to 1975 had found asbestos'" but were not disclosed by J&J in a 1976 letter to the FDA. (FAC ¶ 227; *see also* Ex. 1, Docs. 11, 30, & 40; Ex. 2, Rows 8, 10–11, 18, 51, & 73–75; Exs. 3.11, 3.30, & 3.40.) The lab reports purportedly showing positive asbestos tests were used in trials, including *Herford* and *Lanzo*, and Judge Viscomi's ruling in the *Lanzo* trial referenced alleged asbestos contamination, as did the *FairWarning.org* Article. (*See* Ex. 2, Rows 8, 10–11, 18, 51, & 73–75; Ex. 8.1, 1/16/18 *FairWarning.org* Article at 3–4.) Moreover, two of the lab reports were previously available on asbestosandtalc.com and factsabouttalc.com. (*See* Ex. 2, Rows 10–11, 18, & 73–75.) And J&J's 1976 letter to the FDA was used in the *Lanzo* trial, available on factsabouttalc.com, and covered by the press. (*See id.*, Rows 17 & 72.) Further, Judge Viscomi's ruling in the *Lanzo* trial specifically referenced purported evidence that J&J failed to disclose to the FDA positive tests for asbestos. (Ex. 19, 6/29/18 *Lanzo* Transcript of Decision at 6–7.)

*Fourth*, Plaintiff asserts that *Reuters* "reported that J&J had never adopted a concentration method for its asbestos testing, even after being informed that it was 'the best way to detect asbestos in talc.'" (FAC ¶ 230 (cleaned up).) To support this, the Complaint points to three documents: a December 1973 report to J&J by the Colorado School of Mines; a May 1973 memo observing that a "preconcentration method" of testing could be "too sensitive"; and a 1976 memo describing an FDA testing proposal requiring use of "concentration procedures." (*Id.*; *see also* Ex. 1, Docs. 23, 26, & 44; Ex. 2, Rows 64–65 & 82–83; Ex. 3.23, 3.26, & 3.44.) The December 1973 report was used in the *Ingham* trial and was posted on asbestosandtalc.com. (*See* Ex. 2, Rows 64 & 82.) The May 1973 memo was used in the *Herford*, *Lanzo*, and *Ingham* trials, and was also available on asbestosandtalc.com and factsabouttalc.com. (*See id.*, Row 65.) Plus, public press frequently reported plaintiffs' argument that "J&J sought out testing methods that weren't 'too sensitive.'" (Ex. 10.24.) The 1976 memo was used in the *Herford* and *Ingham* trials, and was available on both asbestosandtalc.com and factsabouttalc.com. (*See* Ex. 2, Row 83.)

*Fifth*, Plaintiff claims that the *Reuters* Article "revealed that J&J had purposely set out to manipulate scientists and regulators." (FAC ¶¶ 231–32.) The Complaint cites an August 1977 report and a March 1975 memo describing funding of scientific research on talc safety, as well as a 1973 memo suggesting that the Company sought to "influence the conclusions" of a study of talc workers. (*Id.*; *see also* Ex. 1, Docs. 17, 38, & 45; Ex. 2, Rows 84 & 106–07; Ex. 3.17, 3.38, & 3.45.) Yet again, the documents that Plaintiff highlights as "reveal[ing]" allegedly corrective information were public long before December 2018. The August 1977 report was used in both the *Herford* and *Lanzo* trials, and was available on factsabouttalc.com. (*See* Ex. 2, Row 84.) The *FairWarning.org* Article included a copy of the March 1975 memo and quoted the same passages that the *Reuters* Article did. (*See* Ex. 8.1 at 3; Ex. 8.10 at 1; Ex. 2, Row 106.) The

March 1975 memo was also used in the *Lanzo* trial and posted to factsabouttalc.com. (*See* Ex. 2, Row 106.) Finally, the 1973 memo was used in the *Herford*, *Lanzo*, and *Ingham* trials, and was also on both asbestosandtalc.com and factsabouttalc.com. (*See id.*, Row 107.)

In addition to the documents discussed above, the Complaint briefly references 10 other internal J&J documents from the *Reuters* Article and suggests that they, too, revealed allegedly corrective "facts." (FAC ¶ 228.[29]) The following chart based on Exhibit 1 shows that each of those documents, too, was publicly available prior to December 14, 2018:

| Ex. 1 Doc. # | Document Description (*See* FAC ¶ 228) | Prior Disclosures |
|---|---|---|
| 8 | W. Nashed Letter to L. Foster re: Talc/Asbestos (Jul. 29, 1971) discussing "trace amounts of fibrous minerals (tremolite/actinolite)" | *Herford* trial, 10/30/17<br>*Lanzo* trial, 2/14/18<br>Asbestosandtalc.com, 8/4/18<br>Factsabouttalc.com, 11/29/18 |
| 10 | A. Langer Letter to G. Hildick-Smith re: Tenovus Samples (Nov. 10, 1971) discussing "a relatively small amount of chrysotile asbestos" | *Herford* trial, 10/30/17<br>*Lanzo* trial, 2/13/18<br>Asbestosandtalc.com, 8/4/18<br>Factsabouttalc.com, 11/29/18 |
| 16 | G. Hildick-Smith Letter to D. Johnson re: Antagonistic Personalities in the Talc Story in the U.S.A. (Nov. 29, 1972) | *Herford* trial, 10/30/17<br>*Lanzo* trial, 2/13/18<br>Factsabouttalc.com, 11/29/18 |
| 18 | T. Shelley Letter to I. Sloan re: Prof. Pooley's Process for Tremolite Removal (Feb. 20, 1973) | *Lanzo* trial, 2/8/18<br>Factsabouttalc.com, 11/29/18 |
| 19 | T. Shelley Letter to H. Warner re: Talc/Asbestos Patents (Mar. 30, 1973) "recogniz[ing] that 'we may wish to keep the whole thing confidential rather than allow it to be published in patent form and thus let the whole world know'" | *Herford* trial, 10/31/17<br>*Lanzo* trial, 2/8/18<br>Factsabouttalc.com, 11/29/18 |
| 25 | W. Nashed Letter to J. Mullen re: Proposed FDA Regulation (Oct. 23, 1973) describing an "October 1973 recognition that 'our talc is acceptable' under a regulation proposed by the FDA, but 'if they change the method, we may have problems'" | *Herford* trial, 10/31/17<br>*Lanzo* trial, 2/8/18<br>Factsabouttalc.com, 11/29/18 |

---

[29] One of the documents listed in FAC ¶ 228, a 1972 University of Minnesota lab report, was also highlighted in FAC ¶ 227 and so was already addressed above. (*See* Ex. 1, Doc. 11.)

| Ex. 1 Doc. # | Document Description (*See* FAC ¶ 228) | Prior Disclosures |
|---|---|---|
| 49 | R. Munro Memorandum re: Cyprus Ore Reserves - Arsenic & Tremolite (Mar. 25, 1992) referring to a "1992 Cyprus Minerals report stating that 'Cyprus staff report past tremolite from the Hammondsville' deposit" | *Lanzo* trial, 2/27/18 Asbestosandtalc.com, 8/4/18 |
| 50 | R. Denton Letter to W. Ashton and D. Jones re: Talc Validation Team Meeting (Nov. 23, 1993) referring to a "1993 J&J memorandum revealing that 'records of the Hammondsville mine . . . were destroyed'" | *Ingham* trial, 7/6/18 Factsabouttalc.com, 11/29/18 |
| 51 | A. Blount Letter to R. Hatcher re: Trace Amounts of Asbestos in J&J Talc Below OSHA Limits (Apr. 23, 1998) "confirm[ing] that she had found 'trace amounts of asbestos' in 'Johnson & Johnson's Vermont talc'" | *Lanzo* trial, 1/31/18 *Ingham* trial, 6/28/18 Asbestosandtalc.com, 8/4/18 Factsabouttalc.com, 11/29/18 |
| 56 | TEM Asbestos Analysis of Argonaut Product Composites, Summary Report (referring to testing of 2001-04 samples) (Mar. 3, 2018) stating that "[i]n 2002 and 2003, Vermont mine operators found chrysotile asbestos fibers on several occasions in talc . . . a finding deemed 'BDL' – below detection limit" | *Weirick* trial, 9/6/18 |

That Plaintiff's claims about the "newness" of these documents do not withstand scrutiny is unsurprising. Girion herself admitted when questioned in an interview that "as a result of the trials, a lot of these documents, which would have been confidential, their internal corporate documents, *came out into the public domain*." (Ex. 11.2, MSNBC Girion Interview Tr. at 6 (emphasis added).)

**B.     The Absence Of *New* Allegedly Corrective Information In The *Reuters* Article Establishes A Complete Lack Of Price Impact And Rebuts The *Basic* Presumption.**

Because every internal J&J document in the *Reuters* Article was publicly available prior to December 14, 2018, the Article did not, contrary to Plaintiff's allegations, provide any "new information as to the seriousness and extent of the Company's alleged fraud" (MTD Opinion at

32

62–63). And without anything *new*, the allegedly corrective information in the Article cannot have impacted J&J's stock price.

As Defendants' expert Kleidon explains, under the efficient market theory relied on by Plaintiff and its expert Feinstein, any internal J&J document that was publicly available prior to December 14, 2018, was fully incorporated into J&J's stock price, such that repetition of the document or its contents in the *Reuters* Article could not affect the price. (Ex. 25, Kleidon Report ¶¶ 148–50, 167–81.)[30] And Kleidon opines that *every* internal J&J document linked or quoted in the *Reuters* Article was publicly available so that, according to Plaintiff's efficient market theory, all of the information in those documents had been fully incorporated into the stock price prior to December 14, 2018. (*Id.* ¶¶ 78, 81, 148–50, 172 (also addressing Plaintiff's and Feinstein's admissions regarding the public availability of sources including trials, public press, and factsabouttalc.com).) Because Plaintiff's claim that there was new allegedly corrective information in the *Reuters* Article is based on those purportedly "never-before-seen internal J&J documents" (*see* FAC ¶¶ 223–32), the fact that every document was actually already in the public domain and incorporated into the stock price precludes any price impact. (Ex. 25, Kleidon Report ¶¶ 4, 148–50, 180–81, 218 (opining that the allegedly corrective information in the *Reuters* Article did not have price impact).)

Feinstein's own testimony demonstrates this point. As Feinstein admitted in his deposition, disclosure of "stale information" that has "no new content, no new information" cannot have price impact because the information "would already have been incorporated [into

---

[30] *See also Goldman IV*, 955 F.3d at 261 ("The idea behind *Basic* is that investors presume that theoretically efficient markets, such as the New York Stock Exchange or Nasdaq, incorporate all public information."); *Bing Li*, 324 F.R.D. at 343 (the efficient market theory "is predicated on the assumption that the market price of shares traded on well-developed markets reflects all publicly available information").

the price] previously." (Ex. 26, 10/22/20 Feinstein Dep. Tr. at 65:23–66:6.) The internal J&J documents at issue here are just such "stale information": they had "no new content, no new information" at the time of the *Reuters* Article than when they had been disclosed months earlier in public trials, on public websites, or in public press reports.

Three recent cases are instructive, and demonstrate Defendants' proof of a lack of price impact and consequent rebuttal of the *Basic* presumption. On remand after *Halliburton II*, the district court denied certification for two corrective disclosures where the corrective information was publicly available before the dates of the corrective disclosures. *Halliburton II Remand*, 309 F.R.D. at 270–76, 280 (also denying certification for three other corrective disclosures on other grounds, and certifying a class for only one corrective disclosure). The decision explains that the efficient market theory "required [the court] to assume that the market had already absorbed [the previously available] information by the time" of these two corrective disclosures. *Id.* at 274. Thus, there was no corrective information "that was not already impounded in the market price of the stock" as of the corrective disclosure dates, and without new corrective information "there can be no price impact." *Id.* at 270–71. So too here.

The district courts in the *Goldman* and *Signet* cases followed the same analytical approach, though each rejected defendants' argument that there was a lack of new information on different facts from this case. In *Goldman*, the court rejected the defendants' claim that prior news reports regarding conflicts of interest showed that there was no new corrective information in the corrective disclosure at issue. *In re Goldman Sachs Grp., Inc. Sec. Litig.* ("*Goldman III*"), 2018 WL 3854757, at *4 (S.D.N.Y. Aug. 14, 2018). The *Goldman* court determined that the prior disclosures were "generic reports on conflicts," while the corrective disclosure at issue "was the first time that any hard evidence" – "direct quotes from damning emails" and "internal

memoranda" – "of Goldman's conflicts was reported." *Id.* at \*4–5. Here, in contrast, all of the purported "hard evidence" of Defendants alleged fraud – the internal J&J documents themselves – was publicly available prior to the *Reuters* Article.

The *Signet* decision is similar. The court there rejected a challenge to a corrective disclosure from a *Washington Post* article because the defendants' argument that the article contained no "new" information was "simply not correct." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at \*16 (S.D.N.Y. July 10, 2019). The underlying documents reported in the article – detailed declarations by sexual harassment plaintiffs – "were quoted and disseminated for the first time in the *Washington Post* article." *Id.* at \*15 (noting that "[e]veryone agree[d] . . . that the [underlying documents] were kept confidential until the night [before the article]"). Again, that is not this case: the underlying documents in the *Reuters* Article were all previously available, and were *not* "quoted and disseminated for the first time in the [*Reuters*] article," *id.*

The *Signet* court did agree with the defendants regarding a different corrective disclosure, on grounds that are directly applicable here. The defendants argued that a different report merely "reported on already-public facts" and was "simply a negative journalistic characterization of previously disclosed facts." *Id.* at \*17 (cleaned up). The court concurred, concluding that this disclosure "did not actually reveal to the market anything." *Id.* Neither did the *Reuters* Article. It, too, merely "reported on already-public facts" and was a "negative journalistic characterization of previously disclosed facts," *id.*[31] (*See also* Ex. 25, Kleidon Report ¶¶ 4, 182–213 (detailing the

---

[31] As these cases confirm, rigorous analysis of whether alleged corrective disclosures provided new allegedly corrective information is appropriate and necessary at the class certification stage. That this analysis may also be relevant to the merits issues of loss causation and materiality does not matter. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 601 (7th Cir. 2020) (reversing certification order and explaining that even if defendants' evidence is also relevant to materiality and loss causation, the district court "*must* consider [that] evidence if the defense offers it to show the absence of transaction causation, also known as price impact"); *Goldman II*, 879 F.3d

"critical tone of the high-profile Powder Keg Special Report," which was "the author's interpretation and critical characterization of previously disclosed documents and already public information").)

### C. The December 14, 2018, Stock Drop Does Not Save Plaintiff.

The evidence demonstrates that the allegedly corrective information in the *Reuters* Article could not, as a matter of fact or law, have impacted J&J's stock price on December 14, 2018. That does not mean that the Article itself cannot have affected the price. J&J's stock price did decline by 10% that day. But the fact that the market reacted to the *Article* does not establish that the *allegedly corrective information in the Article* impacted the price. Those are critically different things; the latter is what the law requires. *See, e.g.*, *Allstate*, 966 F.3d at 612 ("[P]rice *reaction* (the simple movement of the price in response to a given statement) is quite different from the legal concept of price *impact*.").

Defendants have proven that every piece of allegedly corrective information identified by Plaintiff in the Complaint (*see* FAC ¶¶ 223–33) was already in the public domain before the *Reuters* Article was published. Thus, the allegedly corrective information could not have impacted the stock on December 14, 2018, under Plaintiff's own efficient market theory.[32] As

---

at 485–86 (reversing certification order and explaining that defendants' argument that the alleged corrective disclosures contained no new information was a price impact argument that "has everything to do with the issue of predominance at the class certification stage"); *Halliburton II Remand*, 309 F.R.D. at 270–74 (considering evidence regarding whether information in corrective disclosures was "new" but not whether it was "corrective").

[32] If previously publicly available J&J documents did impact the stock price on December 14, 2018, then the market would not be efficient, the *Basic* presumption would fail for all claims, and no class could be certified. *See Halliburton II*, 573 U.S. at 280–82; *see also Halliburton II Remand*, 309 F.R.D. at 276 (price impact from previously available information would be "inconsistent with an efficient market, which is said to digest or impound news into the stock price in a matter of minutes"); *cf. Meyer v. Greene*, 710 F.3d 1189, 1198–99 (11th Cir. 2013) ("Either the market is efficient or it is not. A plaintiff . . . must take the bitter with the sweet [] if he chooses to embrace the efficient market theory.").

Defendants' expert Kleidon notes, this matches the "clear consensus" of securities analysts that the *Reuters* Article introduced no new information. (*See* Ex. 25, Kleidon Report ¶¶ 182–92; *see also, e.g.*, Ex. 12.4, 12/14/18 Leerink Report ("There was no new information in the *Reuters* article."); Ex. 12.5, 12/14/18 Morgan Stanley Report ("Today's *Reuters* article did not raise new factual issues."); Ex. 12.3, 12/14/18 J.P. Morgan Report ("We note that all issues reported [in the *Reuters* Article] were previously disclosed as part of talc litigation discovery."); Ex. 12.1, 12/14/18 Barclays Report ("[W]e do not think the story or the risk [from pending cases] has materially changed.").) Thus, "the entire decline on the corrective-disclosure date[] was due to something other than the corrective disclosure[]." *Goldman IV*, 955 F.3d at 271.

Kleidon explains this – how the fact *of* the Article and its wholesale adoption of the product liability plaintiffs' lawyers' arguments, as opposed to the (alleged) facts *in* the Article, affected the stock price. (*See* Ex. 25, Kleidon Report ¶¶ 193–213, 218.) The Article trumpeted the product liability plaintiffs' theories in a one-sided way, under an incendiary headline, and in slanted language. And it was accompanied by a promotional blitz: *Reuters* released a companion video featuring Girion, and she did two live TV interviews during the trading day, plus further appearances in the evening. As a result, the Article served as a massive, free advertising campaign for product liability plaintiffs' lawyers to recruit new plaintiffs against J&J and impact the nationwide jury pool. (*See id.*) It is therefore no surprise that the market reacted to increased uncertainty regarding J&J's financial exposure from additional product liability cases and increased litigation costs. (*See id.*) In particular, analysts recognized in their same-day reports that the number of cases could dramatically increase after the Article. For example, one analyst stated that they "expected [the number of lawsuits] to climb as legal entities pursue additional plaintiffs," and modeled a scenario where the number of cases increased from "the current

11,700 claimants" to a "higher claimant count of *100k*." (Ex. 12.2, 12/14/18 Cowen Report (emphasis added).) Another analyst suggested that "the current number of cases [could] double" over just the next year. (Ex. 12.6, 12/14/18 Wells Fargo Report; *cf. also* Ex. 22, U.S. Chamber Report (describing the impact of plaintiffs' lawyer advertising on increasing case counts and thereby driving litigation and settlement costs).[33])

The lead plaintiffs' lawyer in *Ingham* effectively acknowledged this impact during an interview about the *Reuters* Article on CNBC, saying that "every case ultimately settles," and the Article and stock price decline "serve [his] purposes as a litigator to say, 'Yes, get their attention; keep driving the stock down.'" (Ex. 10.29 Matthew J. Belvedere, *Attorney Behind a Huge Talc Verdict: J&J's Stock Drop 'Serves My Purpose' in Seeking a Settlement*, CNBC (Dec. 18, 2018).) If the litigation impact of the Article is sufficient to support certification, securities fraud class actions could be manufactured out of plaintiffs' lawyer marketing and intentional negative publicity. The law should not endorse or encourage such efforts.

## II.    The *Basic* Presumption Is Rebutted For The September 27, 2017, January 30, 2018, and July 12, 2018, Alleged Corrective Disclosures.

Three of Plaintiff's other alleged corrective disclosures also did not impact J&J's stock price: September 27, 2017, January 30, 2018, and July 12, 2018. As a result, the *Basic* presumption is rebutted for these alleged corrective disclosures as well.

---

[33] Reports also noted that the *Reuters* Article's strident assertion of the "truth" of the product liability plaintiffs' theories potentially prejudiced the jury pool nationwide. (*See* Ex. 25, Kleidon Report ¶ 202 (quoting a *Bloomberg* article noting the impact on "potential jury pools").) Unlike at trial, readers of the *Reuters* Article did not receive J&J's side of the story. J&J sought to transfer cases from St. Louis because of this precise effect of the plaintiffs' strategy of running heavy advertising campaigns there. (*See* Ex. 22, U.S. Chamber Report at 34; Frost Cert. ¶ 20.)

A. **The Allegedly Corrective Information In The September 27, 2017, Plaintiffs' Lawyer Press Release Was Not New, And J&J's Stock Price Declined That Day Before The Press Release Was Issued.**

Plaintiff contends that a September 27, 2017, press release by plaintiffs' firm Bernstein Liebhard LLP, titled "Talcum Powder Lawsuit Plaintiffs Claim Unsealed Documents Show Johnson & Johnson Knew of Talc-Asbestos Danger in 1970s, Bernstein Liebhard LLP Reports" (the "Bernstein Release"), was corrective because it quoted two "newly unsealed documents" that supposedly show that J&J has known since the 1970s that its Talcum Powder Products contained asbestos, and because it "signaled to J&J investors that plaintiffs in ovarian cancer lawsuits throughout the country were looking to add asbestos allegations to their ovarian cancer claims." (FAC ¶ 184.) The Bernstein Release did not impact J&J's stock price for two reasons.

First, the Bernstein Release did not disclose any new allegedly corrective information about "newly unsealed documents." It stated that "*[a]ccording to Bloomberg.com*, documents were unsealed" *earlier that month* in connection with the *Ingham* case. (Ex. 13 (emphasis added).) The *Bloomberg* Article referenced by the Release was titled "J&J Was Alerted to Risk of Asbestos in Talc in '70s, Files Show," and was published six days earlier on September 21 (and was updated on September 22). (Exs. 9.1 & 9.2.) That *Bloomberg* Article reported on "unsealed documents [that] indicate that J&J has known for decades that its talc products include asbestos fibers," and claimed that these documents "add another dimension to the claims against J&J." (Ex. 9.2) The *Bloomberg* Article also linked to specific internal J&J documents, including a May 1974 memo mentioned in the Bernstein Release, which recommended "the use of citric acid in the depression of chrysotile asbestos" and advocated for the use of such systems against materials "presenting a severe health hazard . . . in all talc ores." (*Compare* Ex. 9.1 *with* Ex. 13.) On September 22, 2017, *Bloomberg* updated the Article to specify that the May 1974 memo had been unsealed on September 6, 2017, and expanded its discussion of additional unsealed

documents, including a 1973 report (also mentioned in the subsequent Bernstein Release) allegedly suggesting that J&J's baby powder contained "sub-trace quantities" of what "might be classified as asbestos fiber," and suggesting the use of cornstarch as an alternative to talc. (*Compare* Ex. 9.2 *with* Ex. 13.) *Bloomberg* also linked to the 1973 report. (*See* Ex. 9.16; *see also* FAC ¶¶ 181–82 (admitting that the *Bloomberg* Article cites and discusses both documents); ECF No. 1 ¶¶ 61–62 (Initial Complaint pleading that the *Bloomberg* Article was the corrective disclosure for the September 27, 2017, stock drop).)

The Bernstein Release also did not disclose any new information about "plaintiffs looking to add asbestos allegations" to their claims. On September 15, 2017, 12 days before the Bernstein Release, *Bloomberg* published another article, titled "Johnson & Johnson's Newest Talc Problem? Asbestos." (Ex. 10.2.) That article described ovarian cancer claims against J&J and asserted that J&J "faces a new battle involving those same talc products" based on allegations that "some J&J talc products made decades ago were contaminated with asbestos." (*Id.*) The September 15 *Bloomberg* article also noted that the *Herford* trial was "the first such case slated for trial against J&J," and asserted that the "asbestos-in-talc litigation is expected to be both protracted and contentious, with "many more cases [] likely on the way." (*Id.*; *see also* FAC ¶¶ 179–80 (citing and discussing this *Bloomberg* article[34]); Ex. 10.1 (8/29/17 *New Jersey Law Journal* article reporting a statement by product liability plaintiffs' counsel that "plaintiffs are currently investigating the link between our clients' ovarian cancers and talcum powder containing asbestos fibers").)

---

[34] The Complaint alleges that the article was published on September 14, but the title and language quoted in the Complaint appear in the September 15 article.

Thus, all of the allegedly corrective information in the Bernstein Release was already publicly available and "impounded in the market price" as of September 27, 2017. *Halliburton II Remand*, 309 F.R.D. at 271–74, 280. As a result, "there can be no price impact." *Id.*

Second, J&J's stock price movement on September 27, 2017, confirms that the Bernstein Release did not have any price impact. J&J's stock price opened at $131.00 and closed at $129.75, a decline of $1.25. (Ex. 25, Kleidon Report ¶¶ 96–99.) The Bernstein Release was issued at 11:46 AM ET, and J&J's intraday trading history shows that 97% of the day's decline – $1.21 of $1.25 – occurred before then. (*Id.*) An intraday event study performed by Kleidon confirmed that the $0.04 decline in J&J's stock price after the Bernstein Release was issued was not statistically significant. (*Id.*) In other words, J&J's stock price declined *before* the Bernstein Release, not in response to it. There was no price impact. (*Id.*) *See also Best Buy*, 818 F.3d at 782–83.

### B. All Of The Allegedly Corrective Information In The January 30, 2018, *Law360* Article Was Already Publicly Available.

Plaintiff alleges that the January 30, 2018, *Law360* article titled "No Asbestos in J&J Talc, NJ Jury Told In Mesothelioma Case," which reported on the first days of the *Lanzo* trial, was corrective because (1) it stated that plaintiffs in the product liability cases "have asserted that Johnson & Johnson . . . [was] aware that talc contained asbestos in the 1970s," and cited "a 1975 report in which the predecessor company allegedly said it found asbestos in the Johnson & Johnson powder" as evidence for this claim, and (2) the article described a statement by plaintiffs' attorney in *Lanzo* that "Johnson & Johnson 'got together with other companies that were selling talc and they chose to call the asbestos something else.'" (FAC ¶ 192.) But all of this was disclosed before the January 30, 2018, *Law360* Article.

First, allegations that J&J has known since the 1970s that its Talcum Powder Products were contaminated with asbestos were broadly publicized, including in the January 16, 2018, *FairWarning.org* Article, which made those allegations just two weeks earlier in much greater detail than the *Law360* Article. (*See* Ex. 8.1.) Additionally, articles published by *Law.com* and *Law360* on January 29, the day before the allegedly corrective *Law360* Article, also reported on the opening statements in the *Lanzo* trial. Those articles included plaintiffs' allegations that J&J's talc "was known to contain asbestos since the early 1970s," and "company documents [] purportedly show the business tried to remove asbestos from the talc, destroy the asbestos and reduce the amount of asbestos, but was unable to do so." (*See* Exs. 10.6 & 10.7.) In fact, the 1975 report mentioned in the *Law360* Article was specifically highlighted in the plaintiff's opening statement in *Lanzo* on January 29, which was broadcast live on CVN. (Ex. 5.23, *Lanzo* Trial Tr., Vol. 3, Jan. 29, 2018, pp. 307:5–308:5 (arguing that this report showed the presence of tremolite in J&J talc).) And as early as October 2017, documents allegedly showing that testing in 1975 revealed that J&J talc contained asbestos were discussed and presented to the jury in the *Herford* trial (which again, was broadcast live on CVN). (Ex. 5.24, *Herford* Trial Tr., Oct. 6, 2017 AM, pp. 37:6–11; Ex. 5.1, Oct. 30, 2017 AM, pp. 1932:27–38:28; Ex. 5.4, Nov. 2, 2017 AM, pp. 2444:16–45:10.)

Second, the allegation that J&J "got together with other companies that were selling talc and they chose to call the asbestos something else" was also made in the *Lanzo* plaintiffs' opening statement the morning of January 29. (Ex. 5.23, *Lanzo* Trial Transcript, Vol. 3, Jan. 29, 2018, p. 294:17–22.) In addition, the same statement was included in the January 29 *Law.com* and *Law360* articles, which contained quotes *identical* to that in the January 30 *Law360* Article that Plaintiff says was "corrective." (Ex. 10.6 (alleging that J&J "got together with other

companies that were selling talc and they chose to call the asbestos something else – I guess on the theory that if you don't call it asbestos, then it can't cause asbestos-related diseases"); Ex. 10.7 (reporting that plaintiff alleged that J&J "decided to inform the public that the asbestos in talc was something else").)

For this corrective disclosure, too, the absence of new allegedly corrective information means "there can be no price impact." *Halliburton II Remand*, 309 F.R.D. at 270–74.

### C. The *Ingham* Verdict Did Not Disclose Any New Allegedly Corrective Information, And J&J's Stock Price Decline On July 13, 2018, Was Not Statistically Significant.

Plaintiff alleges that the $4.69 billion *Ingham* verdict announced after market close on July 12, 2018, was corrective because it was "the first trial against J&J in which the plaintiffs alleged that their ovarian cancer was caused by asbestos in the talc, rather than the talc itself." (FAC ¶ 213.) There was no price impact for this allegedly corrective disclosure for two reasons.

First, the *Ingham* verdict conveyed no new allegedly corrective information – the only new information it conveyed was that the jury accepted the plaintiffs' theory of the case. As this Court recognized, the *Ingham* verdict can only be corrective "[t]o the extent the jury verdict or documents publicly released during the lawsuit contained new information regarding an association between asbestos and ovarian cancer, and the existence of asbestos in the Company's [Talcum Powder] Products." (MTD Opinion at 63 n.8.) But all of the evidence – the documents and testimony about an alleged association between asbestos and ovarian cancer, and about the alleged asbestos contamination – was disclosed during the six-week trial that preceded the verdict and was publicly broadcast "gavel-to-gavel" by CVN. Articles in *Law360*, *The National Law Journal*, *Law.com*, *Bloomberg*, and the *St. Louis Record*, among other media outlets, closely reported on the high-profile trial. (*See, e.g.*, Exs. 10.14, 10.15, 10.16, 10.17, 10.18, 10.19, 10.20, 10.21, 10.22, 10.23, & 20.) Thus, any J&J stock price reaction to the *Ingham* verdict was not a

response to new information about J&J's Talcum Powder Products, but rather was a response to the realization of known litigation risk. (*See* Ex. 25, Kleidon Report ¶¶ 119–44 (also discussing J&J's public SEC filings disclosing the product liability litigation and the risk from it, as well as articles and analyst reports commenting on the litigation risk from *Ingham* and its unique merging of 22 plaintiffs' claims into a single trial).) The fact that all of the evidence in the *Ingham* trial was publicly available prior to the verdict therefore means "there can be no price impact," *Halliburton II Remand*, 309 F.R.D. at 270–74, 280.

Second, Plaintiff's own expert's event study demonstrates that the *Ingham* verdict did not have any price impact. The Feinstein Report recognizes that a stock price return is only "deemed statistically significant" – i.e., statistically different from zero – if "the residual return is far greater (positively or negatively) than the typical residual return," as measured by the "*t*-test" and t-statistic. (Feinstein Report ¶ 121.) The Feinstein Report further admits that "[i]f the absolute value of the t-statistic is greater than . . . 1.96 . . . the likelihood that the residual return could have been caused by random volatility alone is less than 5%," and "[t]his is generally accepted to be so unlikely that the random volatility explanation can be rejected, and the stock return for that day is deemed statistically significant at the 95% confidence level." (*Id.* n.58.) This is consistent with case law on this issue. "To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard." *Halliburton II Remand*, 309 F.R.D. at 262. (*See also* Ex. 25, Kleidon Report ¶ 145–47.)

But the Feinstein Report shows that J&J's stock price movement on July 13, 2018, was not statistically significant at the 95% level. Rather, according to the results of Feinstein's own event study, the t-statistic of J&J's stock price movement on July 13, 2018 was 1.93 (i.e., less

than 1.96), and the residual return on that day is not labeled with "**" or "***", which indicate residual returns statistically significant at the 95% and 99% levels respectively. (*See* Feinstein Report, Ex. 8 at 270.) As a result, Plaintiff's own evidence demonstrates that there was no statistically significant price impact from the *Ingham* verdict. *See Halliburton II Remand*, 309 F.R.D. at 262 (holding that the *Basic* presumption was rebutted where price reactions were not statistically significant at the 95% confidence level).

## III.   The Class Cannot Begin Earlier Than July 16, 2013, And Cannot End Later Than February 7, 2018.[35]

### A.   The Class Period Cannot Begin Before July 16, 2013, Because That Is The Date Of The First Actionable Alleged Misstatement.

The class period cannot begin before July 16, 2013, because the Court dismissed claims relating to each of the five alleged misstatements made prior to that date.

The alleged misstatements on February 22, 2013, April 25, 2013, and May 3, 2015, are "general value-oriented statements" that do not specifically address the Talcum Powder Products or make any specific claims about the Company's quality assurance process and procedures. (ECF No. 45-1, Pl. MTD Opp. Chart at 1–4; *see also* FAC ¶¶ 253, 256, 258.) The Court dismissed such statements. (MTD Opinion at 31.)

And the alleged misstatements on February 22, 2013, and May 3, 2013, discuss the product liability cases, the Company's confidence in the products at issue, and the inability to predict the outcome of litigation. (ECF No. 45-1 at 1–2, 4–5; *see also* FAC ¶¶ 254, 259.) Those statements were also dismissed by this Court. (MTD Opinion at 31.)

---

[35] Defendants strongly dispute the merits of Plaintiff's claims regarding all six alleged corrective disclosures. But at this procedural stage, Defendants do not challenge certification of claims regarding the alleged corrective disclosures on February 5 and February 7, 2018. (*See* FAC ¶¶ 194–203.).

**B.**    **The Class Period Cannot Extend Past February 7, 2018, Because Individual Questions Of Reliance Predominate For The July 12, 2018, And December 14, 2018, Alleged Corrective Disclosures.**

As demonstrated in the preceding sections, there was no price impact for the alleged corrective disclosures on July 12, 2018, and December 14, 2018, pursuant to Plaintiff's efficient market theory. Accordingly, under *Halliburton II*, the *Basic* presumption is rebutted and individual questions of reliance predominate for claims regarding those alleged corrective disclosures, and they cannot be pursued on a classwide basis. *See Halliburton II*, 573 U.S. at 280–82; *see also Halliburton II Remand*, 309 F.R.D. at 270–76, 280 (not certifying claims for particular corrective disclosures). Because the last alleged corrective disclosure for which claims could be pursued on a classwide basis is February 7, 2018 (*see* FAC ¶ 201), the class period cannot extend beyond February 7, 2018.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants request that the Court rule that any class (i) not include claims based on the September 27, 2017, January 30, 2018, July 12, 2018, and December 14, 2018, corrective disclosures, (ii) not begin before July 16, 2013, and (iii) not extend beyond February 7, 2018.

Dated: December 11, 2020                          Respectfully Submitted,

                                                  /s/ *Jack N. Frost, Jr.*
                                                  Jack N. Frost, Jr.
                                                  **FAEGRE DRINKER BIDDLE & REATH LLP**
                                                  600 Campus Drive
                                                  Florham Park, NJ 07932
                                                  Telephone: (973) 549-7338
                                                  jack.frost@faegredrinker.com

Walter C. Carlson (admitted *pro hac vice*)
Kristen R. Seeger (admitted *pro hac vice*)
John M. Skakun III (admitted *pro hac vice*)
Christopher Y. Lee (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
wcarlson@sidley.com
kseeger@sidley.com
jskakun@sidley.com
chris.lee@sidley.com

Robert M. Stern (admitted *pro hac vice*)
**ORRICK HERRINGTON & SUTCLIFF LLP**
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 339-1706
rstern@orrick.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, Jack N. Frost, hereby certify that on December 11, 2020, I caused the foregoing **Defendants' Opposition to Plaintiff's Motion for Class Certification** to be served by email on the following counsel, per the Court's instruction:

*Counsel for Plaintiff*:

James E. Cecchi (jcecchi@carellabyrne.com)
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700

Darren J. Robbins (darrenr@rgrdlaw.com)
Arthur C. Leahy (artl@rgrdlaw.com)
Robert R. Henssler Jr. (bhenssler@rgrdlaw.com)
Nathan R. Lindell (nlindell@rgrdlaw.com)
Hillary B. Stakem (hstakem@rgrdlaw.com)
Matthew J. Balotta (mbalotta@rgrdlaw.com)
Laura Andracchio (landracchio@rgrdlaw.com)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058

*Counsel for Defendants*:

Walter C. Carlson (wcarlson@sidley.com)
Kristen R. Seeger (kseeger@sidley.com)
John M. Skakun III (jskakun@sidley.com)
Christopher Y. Lee (chris.lee@sidley.com)
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000

Robert M. Stern (rstern@orrick.com)
**ORRICK HERRINGTON & SUTCLIFF LLP**
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 339-1706

Dated: December 11, 2020

/s/ *Jack N. Frost, Jr.*
Jack N. Frost, Jr.
**FAEGRE DRINKER BIDDLE & REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7338
jack.frost@faegredrinker.com

*Counsel for Defendants*