CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)

Local Counsel

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANK HALL, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> JOHNSON & JOHNSON, et al., <br><br> Defendants. | No. 3:18-cv-01833-FLW-TJB <br><br> <u>CLASS ACTION</u> <br><br> LEAD PLAINTIFF SAN DIEGO COUNTY EMPLOYEES RETIREMENT ASSOCIATION'S REPLY IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION |

4816-4886-2945.v1

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ..................................................................................................1

II.    SUMMARY OF RELEVANT FACTS .................................................................3

III.    ARGUMENT .......................................................................................................8

    A.    Overview of the *Basic* Presumption of Reliance and "Price Impact" ....................9

    B.    Lead Plaintiff Has Established, and Defendants Fail to Rebut, the Fraud-on-the-Market Presumption of Reliance.................................................11

        1.    Defendants Concede Market Efficiency ..................................................11

        2.    Defendants Fail to Prove a Complete Lack of Price Impact.....................12

            a.    Defendants' Concession of Price Impact for Two Class Period Disclosures Precludes Any Rebuttal of the *Basic* Presumption ......................................................................13

            b.    Defendants Fail to Rebut Plaintiff's Evidence of Statistically Significant Price Declines Following the December 14, 2018, July 12, 2018, January 30, 2018 and September 27, 2017 Alleged Corrective Disclosures ...................14

    C.    Defendants' Truth-on-the-Market Defense Is Not Properly Considered at Class Certification, and Cannot Preclude Certification Under *Amgen* .................17

        1.    Defendants' Truth-on-the-Market Defense Is Not an Appropriate Certification Inquiry and Should Be Rejected ...........................................17

        2.    Defendants' Repeated Class Period Denials and False and Misleading Statements Preclude Them from Succeeding on a Truth-on-the-Market Defense ..................................................................21

    D.    Defendants' Purported Evidence Fails to Prove a Complete Lack of Price Impact ..........................................................................................................23

        1.    Defendants Fail to Prove a Complete Absence of Price Impact for the December 14, 2018, *Reuters* Report ...................................................24

            a.    The *Reuters* Report Contained New Information, Not a Rehash of Allegations ................................................................30

Page

b.      The *Reuters* Report Contained New Information, Not Just a Collection of Documents ................................................32

        (1)     Defendants' References to the Public Press Do Not Establish Truth-on-the-Market..............................34

        (2)     J&J's Box.com Webpage Does Not Establish Truth-on-the-Market .......................................................35

        (3)     Asbestosandtalc.com Does Not Establish Truth-on-the-Market ....................................................35

        (4)     CVN Broadcasts of Trials Does Not Establish Truth-on-the-Market .........................................36

c.      Defendants Failure to Identify Any Non-Fraud Related Cause of the December 14, 2018 Stock Price Decline Means They Cannot Establish a Lack of Price Impact ................36

2.      Because Defendants Fail to Demonstrate a Complete Absence of Price Impact on December 14, 2018, the Entire Class Period Should Be Certified..................................................39

        a.      Defendants Fail to Show an Absence of Price Impact for the July 12, 2018 Corrective Disclosure .......................39

        b.      Defendants Fail to Show an Absence of Price Impact for the January 30, 2018 Corrective Disclosure ..................42

        c.      Defendants Fail to Show an Absence of Price Impact for the September 27, 2017 Corrective Disclosure............45

E.      The Class Period Should Begin on February 22, 2013 ..........46

F.      The Class Period Should End on December 13, 2018 ...........47

IV.    CONCLUSION..................................................49

## TABLE OF AUTHORITIES

Page

**CASES**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    554 F.3d 342 (3d Cir. 2009)................................................................21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)............................................................ *passim*

*Aranaz v. Catalyst Pharm. Partners Inc.*,
    302 F.R.D. 657 (S.D. Fla. 2014).......................................................15, 37

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    955 F.3d 254 (2d Cir. 2020)...........................................................14, 20

*Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    879 F.3d 474 (2d Cir. 2018)........................................................12, 19, 20

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................ *passim*

*Benak ex rel. All. Premier Growth Fund v.*
*All. Cap. Mgmt. L.P.*,
    435 F.3d 396 (3d Cir. 2006)...........................................................17, 22

*City of Cape Coral Mun. Firefighters' Ret. Plan v.*
*Emergent Biosolutions, Inc., HQ*,
    322 F. Supp. 3d 676 (D. Md. 2018)..................................................10, 12, 15

*City of Sterling Heights Gen. Emps' Ret. Sys. v.*
*Prudential Fin., Inc.*,
    2015 WL 5097883 (D. N.J. Aug. 31, 2015) ................................. *passim*

*Di Donato v. Insys Therapeutics, Inc.*,
    333 F.R.D. 427 (D. Ariz. 2019)...........................................................42

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015).......................................................19, 40, 41

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)...........................................................................11

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    2020 WL 7296815 (U.S. Dec. 11, 2020) ................................10, 13, 14

**Page**

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019) .................................................................. *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .................................................................. *passim*

*Hull V. Glob. Digit. Sols., Inc.*,
  2017 WL 6493148 (D.N.J. Dec. 19, 2017) .................................................................. 22, 30

*In re Allstate Corp. Sec. Litig.*,
  2020 WL 7490280 (N.D. Ill. Dec. 21, 2020) .................................................................. 16, 18, 20, 37

*In re Allstate Corp. Sec. Litig.*,
  966 F.3d 595 (7th Cir. 2020) .................................................................. 11, 14

*In re Celgene Corp. Sec. Litig.*,
  2020 U.S. Dist. LEXIS 230548
  (D.N.J. Nov. 29, 2020) .................................................................. *passim*

*In re Centurylink Sales Pracs. & Sec. Litig.*,
  337 F.R.D. 193 (D. Minn. 2020) .................................................................. 16, 18, 41

*In re Chi. Bridge & Iron Co N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .................................................................. 41

*In re Data Access Sys. Sec. Litig.*,
  103 F.R.D. 130 (D.N.J. 1984),
  *rev'd on other grounds*,
  843 F.2d 1537 (3d Cir. 1988) .................................................................. 48

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018),
  *aff'd sub nom. Goldman II*,
  955 F.3d 254 (2d Cir. 2020) .................................................................. 22

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) .................................................................. 22

*In re Petrobras Sec. Litig.*,
  312 F.R.D. 354 (S.D.N.Y. 2016),
  *aff'd in part and vacated in part*,
  862 F.3d 250 (2d Cir. 2017) .................................................................. 41

Page

*In re Sandridge Energy, Inc. Sec. Litig.*,
  2019 WL 4752268 (W.D. Okla. Sep. 30, 2019) ....................................................18

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) ............................................... *passim*

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  2017 WL 2062985 (S.D.N.Y. May 15, 2017) .......................................................19

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2nd Cir. 2016)..............................................................................14

*Lapin v. Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) ........................................................................22

*Li v. Aeterna Zentaris, Inc.*,
  324 F.R.D. 331 (D.N.J. 2018),
  *aff'd sub nom. Vizirgianakis*,
  775 F. App'x 51 (3d Cir. 2019) ....................................................................16, 41

*Marcus v. J.C.Penney Co.*,
  2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ....................................................19

*Marcus v. J.C. Penney Co. Inc.*,
  2017 WL 907996 (E.D. Tex. Mar. 8, 2017) ........................................................31

*Pearlstein v. BlackBerry Ltd.*,
  2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ..................................................15, 38

*Pirnik v. Fiat Chrysler Autos. N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ..........................................................................41

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
  2020 WL 5757695 (D. Minn. Sept. 28, 2020)....................................................16

*Ret. Sys. v. S. Co.*,
  332 F.R.D. 371 (N.D. Ga. 2019).................................................................. *passim*

*Rooney v. EZCORP, Inc.*,
  330 F.R.D. (W.D. Tex. 2019) .............................................................................42

*Silverman v. Motorola, Inc.*,
  798 F. Supp. 2d 954 (N.D. Ill. 2011) ..................................................................36

4816-4886-2945.v1

**Page**

*Thorpe v. Walter Inv. Mgmt., Corp.*,
    2016 WL 4006661 (S.D. Fla. March 16, 2016)........................................................16, 19, 20

*Vizirgianakis v. Aeterna Zentaris, Inc.*,
    775 F. App'x. 51 (3rd Cir. 2019) ...................................................................................12, 43

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2nd Cir. 2017), *cert denied*,
        ___ U.S. ___, 138 S. Ct. 1702 (2018).....................................................................14, 37, 38

*West Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ...............................................................10, 11, 41

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
    Rule 23 .............................................................................................................................9, 17
    Rule 23(b) ..............................................................................................................................11
    Rule 23(b)(3).....................................................................................................................8, 9, 11
    Rule 56 ..................................................................................................................................17

17 C.F.R.
    §240.10b-5 .............................................................................................................................10

4816-4886-2945.v1

## I.    INTRODUCTION

In opposing Lead Plaintiff San Diego County Employees Retirement Association's Motion for Class Certification (ECF No. 69) (the "Motion"), defendants concede far more than they contest.[1] They do not dispute that requirements of numerosity, commonality, typicality, adequacy and superiority are all satisfied.  They also admit that plaintiff and the Class are entitled to invoke the *Basic* fraud-on-the-market presumption of reliance, and that the presumption is not rebutted between July 16, 2013 and February 7, 2018.  Thus, defendants admit that a class should be certified.

Instead of opposing class certification, defendants attempt to minimize their liability by asserting that the Class Period should be shortened because their false statements after February 7, 2018 purportedly had no impact on J&J's stock price.  But defendants have failed to meet their burden to rebut the presumption of reliance which requires showing a total absence of price impact from their false statements and omissions.  *See Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 282-84 (2014) ("*Halliburton II*").  Plaintiff's Motion and accompanying report by Steven P. Feinstein ("Feinstein") provided empirical statistical evidence showing that J&J common stock suffered a statistically significant price decline following each of the alleged corrective disclosures, including the disclosures after February 7, 2018.  Fatal to defendants' price impact challenge, their expert, Allen Kleidon ("Kleidon"), did not identify any non-fraud-related cause of any of the price declines.  *Infra*, §III.B.2.b.

Unable to rebut the *Basic* presumption, defendants resort to mischaracterizing plaintiff's claims and premature merits-based truth-on-the-market arguments, contending that the alleged

---

[1]    "SDCERA" or "plaintiff" is Lead Plaintiff San Diego County Employees Retirement Association.  Defendants are Johnson & Johnson ("J&J" or the "Company"), Alex Gorsky ("Gorsky"), Carol Goodrich ("Goodrich"), Joan Casalvieri ("Casalvieri") and Tara Glasgow ("Glasgow") (collectively, "defendants").

corrective disclosures did not reveal any new information.  But defendants' truth-on-the-market argument ignores their constant false denials and that this case concerns the falsity of those denials. Moreover, as the party seeking to rebut the *Basic* presumption, defendants are obligated to come forward with evidence establishing that their misstatements and omissions caused ***no*** price impact. *Infra*, §III.A.  Defendants' failure to provide an event study or statistical analysis demonstrating that the December 14, 2018, July 13, 2018, January 31, 2018 and September 27, 2017 price drops were due entirely to non-fraud factors dooms their rebuttal attempt.

Even if defendants' truth-on-the-market defense were proper here (it is not), and even if defendants did not inundate the market with false denials (they did), defendants' argument would still fail because the alleged corrective disclosures contained new information exposing the falsity of defendants' misrepresentations.  As detailed below, the December 14, 2018 *Reuters* articles entitled: "Powder Keg: Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder" and "A Guiding Hand on Talc Safety Research" (collectively, the "*Reuters* Report"), contained new information directly contradicting defendants' misstatements, including details from interviews conducted by *Reuters*, discussions with J&J, and conclusions from an investigative review and independent analysis of thousands of pages of documents.  *Infra*, §§II, III.D.1; Feinstein Rebuttal, ¶¶42-48.[2]  Indeed, during his deposition, Kleidon admitted that the *Reuters* Report revealed new fraud-related information.  *Infra*, §III.D.1.  The fact that the *Reuters* Report revealed new information is further confirmed by the fact that it led immediately to governmental investigations of J&J, including by the U.S. Securities and Exchange Commission ("SEC"), the Department of Justice

---

[2]    "Feinstein Rebuttal" refers to the Rebuttal Report on Price Impact by Professor Steven P. Feinstein, PH.D., CFA, dated March 19, 2021 attached as Exhibit 1 to the Declaration of Robert R. Henssler Jr. in Further Support of Lead Plaintiff San Diego County Employees Retirement Association's Motion for Class Certification, filed concurrently herewith.  Additionally, unless otherwise noted, all "Ex._" citations herein are to the Henssler Declaration.

("DOJ") and Congress. *Infra*, §III.D.1. In light of defendants' repeated misrepresentations throughout the Class Period that, for example, J&J talc products were "safe," had never contained asbestos, and "all" tests and the FDA confirmed this, the purported prior disclosures could not – and, as demonstrated by the statistically significant price decline on December 14, 2018, ***did not*** – dissipate the full inflation caused by defendants' fraudulent conduct. *Infra*, §§II.B-D. Indeed, in contemporaneous emails, defendants admitted that the *Reuters* Report negatively "impacted" J&J's stock price. *Infra*, §III.D.1.

Because defendants have not rebutted the presumption of reliance, predominance is satisfied, and plaintiff's Motion should be granted.

## II.    SUMMARY OF RELEVANT FACTS

During the Class Period, defendants conducted a campaign of denial and deceit to conceal the truth about J&J's flagship product, Johnson's Baby Powder, and J&J's longstanding fraudulent scheme to protect that product and the Company's reputation.

J&J has repeatedly recognized the importance of Johnson's Baby Powder to the Company. ¶¶43 n.3, 47, 87, 93.[3] The product was first sold in 1894, birthing J&J's baby products business, with J&J going on to enjoy "a longstanding reputation as 'the Baby Company.'" ¶¶44, 46.[4] But by the late 1960s and into the 1970s, Company insiders acknowledged (internally) that there was asbestos in J&J's talc and powders, evidenced in non-public reports. ¶¶52-53, 55, 57, 59, 61, 64, 72. Rather than inform the public or discontinue the product, J&J worked to conceal the truth. J&J withheld positive asbestos findings from the FDA and conducted a "talc safety defense program" of

---

[3]    Unless otherwise noted, all "¶_" and "¶¶_" references are to the First Amended Complaint for Violations of the Federal Securities Laws (ECF No. 33) (the "Complaint").

[4]    All citations are omitted and emphasis added unless otherwise indicated.

4816-4886-2945.v1

sponsoring studies that were then "disseminated effectively to the scientific and medical communities," which successfully neutralized any questioning of talc's safety by "disruptive influences" in the 1970s. ¶¶68, 70-71, 227. J&J also purposely avoided "concentration" testing methods that J&J executives knew were capable of detecting the asbestos in the talc and powder. ¶¶63-67, 230. And while the Company tried to find a way to remove asbestos from talc and even considered a patent on such a procedure, J&J eventually decided to just not "let the whole world know." ¶¶58, 60.

In the 1980s, mounting scientific research suggested a link between ovarian cancer and talc, resulting in increased scrutiny of talc in the 1990s and early 2000s. ¶¶74, 77, 82, 86. And J&J took even more aggressive action in response. In 1989, J&J destroyed most of the records from the primary source of talc for Johnson's Baby Powder for over 30 years, a site at which mine staff knew asbestos was present. ¶¶75-76. Then, in 2000, J&J and its industry allies successfully manipulated the National Toxicology Program ("NTP") into deferring a decision on listing talc as a carcinogen, using the "Fatal-Flaw Strategy." ¶¶37, 82-84. But J&J knew that its talc continued to be contaminated with asbestos and that the testing was purposely inadequate. ¶¶63-67, 81, 85, 230.

In 2004, J&J's talc situation came to a head, as the NTP renewed its review of talc, the World Health Organization's International Agency for Research on Cancer ("IARC") also reviewed talc as a potential carcinogen, and J&J learned that an independent lab had recently found asbestos in Johnson's Baby Powder. ¶¶86, 88-90, 93-95, 100-102. J&J knew that a bad ruling by the NTP "would have a major ripple effect as J&J Baby Powder is a primary link to the positive J&J name in the public mind." ¶93. Thus, rather than inform the NTP that the independent lab had found asbestos in Johnson's Baby Powder or that J&J's talc supplier had gone three years without doing asbestos testing, J&J conducted a "project" under the direction of defendant Casalvieri in order to

- 4 -

defend talc from regulatory scrutiny.  ¶¶88, 90, 93-95.  This project included the development of documents to be submitted to the NTP and for publication, including the secret funding of a meta-study siding with J&J on talc safety.  ¶¶95-99.  J&J also worked to influence IARC.  ¶¶35, 86, 100-102.  The NTP withdrew talc from consideration as a carcinogen in 2005, and when it did, J&J took credit for the "direct result" of its scheme, exclaiming: "We did it!" and specifically congratulating Casalvieri on the success.  ¶¶37, 94-95, 103-104.

During the Class Period, J&J faced lawsuits brought by consumers alleging that J&J's talc had contributed to their cancer.  ¶¶120, 179-186, 192-201, 204, 213-222.  Knowing the importance of Johnson's Baby Powder to J&J's reputation – and stock price – defendants made numerous false and misleading statements to conceal the truth about the Company's talc and powders.  ¶¶120, 253-391.  Defendants promised that J&J's talc and powders have "always" been asbestos-free and "a safe choice."  *See, e.g.*, ¶¶266, 288, 299, 302-304, 335, 338-339.  In truth, J&J and defendant Goodrich, J&J's Director of Corporate Media Relations, recognized internally that "we cannot say 'always' asbestos free."  ¶¶128, 267.  Defendants also made numerous misrepresentations about scientists and regulators confirming the safety of talc and Johnson's Baby Powder, concealing that J&J had lied to and manipulated those regulators and scientists.  *See, e.g.*, ¶¶150-152, 292, 299, 302-303, 311, 318, 321, 331, 335, 339.  And defendants repeatedly boasted of efforts J&J took to ensure the safety of its products, including testing that purportedly confirmed the talc was and is "asbestos free."  *See, e.g.*, ¶¶261, 266, 277, 288, 292, 299, 303, 309, 311, 318, 321, 339.  But J&J knowingly refused to ever adopt testing methods that could actually find the asbestos in its talc and powders.  ¶¶63-67, 230.  The market credited J&J's assurances.  ¶¶186, 198; Feinstein Rebuttal, ¶¶53-62.

The falsity of defendants' Class Period statements leaked out through a series of partial disclosures.  ¶¶184-243.  These disclosures included the September 27, 2017 Bernstein Liebhard

LLP press release (¶¶184-185), the January 30, 2018 *Law360* article entitled: "No Asbestos In J&J Talc, NJ Jury Told in Mesothelioma Case" (the "Jan. *30 Law360* article") (¶¶192-193), the February 5, 2018 Mesothelioma.net posting (¶¶194-197), the February 7, 2018 Beasley Allen press release (¶¶201-202) and the July 12, 2018 $4.69 billion jury verdict (¶¶213-218). The disclosures provided incremental new information and new analysis, were fraud related and caused statistically significant stock price declines. *Id.*; Feinstein Rebuttal, ¶¶33-37, 74-95. But defendants' nonstop, vociferous denials prevented investors from understanding the seriousness and extent of the alleged fraud. *See, e.g.*, ¶¶200, 204, 206, 208-210, 219, 222, 340-341, 346-347, 350, 359, 370, 375-376, 379-380, 382.

There was very little analyst coverage of asbestos and talc until at least well into 2017, as the first trial alleging asbestos contamination did not occur until September 2017. *See* ¶¶179, 186; Feinstein Rebuttal, ¶53. And the analysts largely parroted defendants' denials and misrepresentations. *Id.*, ¶¶53-62; *see also* ¶186 (October 11, 2017 Jefferies analyst report stating that "Scientific evidence appears to support JNJ" and the Company appears to have studies and FDA "on its side."); ¶198 (February 2018 Wells Fargo analysts report stating that "Talc Litigation Concerns Appear Overblown" and repeating J&J's assurance that "the products have been free of asbestos, based on decades of monitoring, testing and regulation dating back to the 1970s.").

On December 14, 2018, *Reuters* published the *Reuters* Report, a highly-detailed investigative report revealing J&J's conduct and knowledge concerning its Johnson's Baby Powder, disclosing new information and new analysis. ¶¶223-243; Opp., Exs. 3, 4.[5] *Reuters* had conducted a thorough investigation concerning J&J's talc and powders, examining many of the "thousands of pages" of confidential documents from talc litigation, conducting interviews with relevant third parties, and

---

[5] Defendants' Opposition to Plaintiff's Motion for Class Certification, dated December 11, 2020 (the "Opposition" or "Opp."). All "Opp., Ex.\_" citations herein refer to the exhibits attached to the Certification of Jack N. Frost filed in support of Defendants' Opposition.

having lengthy discussions with J&J and its counsel.  *See, e.g.*, Opp., Ex. 2, Rows 40, 45, 81, 85-86, 95, 105; Opp. at 16 (J&J "directly responded to dozens of questions from the reporter"); Ex. 2 at 928 (J&J's attorneys provided over 40 pages of "detailed factual responses" to *Reuters* relating to the *Reuters* Report).  Based on its investigation, *Reuters* definitively found that "from at least 1971 to the early 2000s, the company's raw talc and finished powders sometimes tested positive" for asbestos, and Company insiders failed to disclose this to regulators or the public.  ¶223.  *Reuters* also found that J&J had conducted "successful efforts to influence U.S. regulators" and "scientific research" concerning talc.  *Id.*  In response to the many revelations in the *Reuters* Report, J&J's stock price dropped 10% in one day – the Company's largest single day decline in over 15 years.  ¶233.  Internally, in contemporaneous emails, defendants admitted that the *Reuters* Report "impacted" J&J's stock price.  *Infra*, §III.D.1.

Following the *Reuters* Report, J&J faced intense government scrutiny.  U.S. Senator Ed Markey requested that the FDA immediately investigate the Company, U.S. Senator Patty Murray sent defendant Gorsky a letter requesting related documents, and J&J faced "preliminary inquiries and subpoenas" from the DOJ and SEC.  ¶¶245, 248, 250.  In March 2019, the House Oversight Committee's Subcommittee on Economic and Consumer Policy held a hearing on the public health risks of asbestos in talc, focusing on Johnson's Baby Powder.  Ex. 3.  And in July 2019, it was revealed that the DOJ was conducting a criminal probe into whether J&J lied about its talcum powder's cancer risks, with a Grand Jury examining what J&J officials knew about those risks.  Ex. 4.[6]

---

[6]    In response to this disclosure J&J's stock price dropped more than $5.82 per share.

Then, on October 16, 2019, the FDA informed J&J that it had found asbestos in Johnson's Baby Powder, eventually leading to a recall of nearly 33,000 bottles of Baby Powder.  Ex. 5; Ex. 6.[7] Notably, J&J's own expert, hired by the FDA, found the asbestos.  Ex. 7.  On October 24, 2019, four major retailers in the U.S. (Target, Walmart, CVS and Rite Aid) pulled Johnson's Baby Powder from their shelves.  Ex. 8.[8]  Another Congressional hearing focusing on asbestos in Johnson's Baby Powder and J&J's insufficient asbestos testing methods was held on December 10, 2019.  Ex. 9.  The FDA held a public meeting on the topic of talc asbestos testing on February 4, 2020 and issued preliminary recommendations for improving the testing methods.  Ex. 10.  In a March 3, 2020 letter to the FDA, Subcommittee Chairman Raja Krishnamoorthi ("Krishnamoorthi") commended the agency for its work generally, but also emphasized the importance of preparing the talc samples using a concentration method (specifically "heavy liquid-separation").  *Id.*  The Chairman warned that if the FDA did not include this in its recommendations, legislation could be forthcoming.  The letter emphasized that the need for testing reforms was highlighted by J&J's "brazen attempts to cover up the presence of asbestos."  *Id.* at 2-4.

Finally, on May 19, 2020, J&J announced that it was discontinuing talc-based baby powder in the U.S. and Canada.  Ex. 3.  Chairman Krishnamoorthi celebrated this as a "major victory for public health" because J&J's "asbestos-containing baby powder finally will be taken off store shelves."  *Id.*

## III.    ARGUMENT

Defendants challenge only one prerequisite to class certification: Whether common questions of reliance predominate over questions affecting only individual class members.  Rule 23(b)(3).  In

---

[7]    In response to this disclosure J&J's stock price dropped more than $5.61 per share.

[8]    In response to this disclosure J&J's stock price dropped more than $2.29 per share.

- 8 -

doing so, defendants primarily rely on the recycled motion to dismiss argument, previously rejected by this Court, that corrective disclosures after February 7, 2018 contained no "new" information. *See* ECF No. 44-1 at 48-62 and *Hall v. Johnson & Johnson*, No. 18-1833 (FLW), 2019 WL 7207491, *28-*29 (D.N.J. Dec. 27, 2019) (ECF No. 49) (the "Opinion"). Defendants claim their re-packaged argument bears on Rule 23(b)(3) predominance, arguing that a portion of the class is not entitled to the presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988), because the disclosures purportedly did not impact J&J's stock price. Opp. at 23-46. At best, defendants are presenting a premature merits-based defense that cannot preclude certification, because it goes to whether entire claims should be dismissed, not whether individual reliance issues will predominate. Even if the argument were properly considered at the class certification stage, defendants wholly fail to rebut the *Basic* presumption of reliance because they present no direct evidence, showing a complete lack of price impact for any of the disclosures. Beyond these procedural deficiencies, the factual basis for defendants' entire argument – that none of the information in the disclosures was new or corrective – is wrong. Because defendants cannot rebut the presumption of reliance and have otherwise conceded that plaintiff has established all of the requirements of Fed. R. Civ. P. 23, the class should be certified.

### A.    Overview of the *Basic* Presumption of Reliance and "Price Impact"

The *Basic* fraud-on-the-market presumption "facilitates class certification by recognizing a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 463 (2013). The presumption "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,'" and that when an "investor buys or sells stock at the market price, his 'reliance on any public material

misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47). For the presumption to apply and establish predominance of issues related to reliance, a plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268.

Once a plaintiff establishes the presumption, defendants can rebut it with direct evidence showing that securities did not trade in an efficient market or, as defendants argue here, "that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Halliburton II*, 573 U.S. at 279-80.[9] A "defendant's burden of proving a lack of price impact is 'daunting,'" *West Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016), because it requires showing "that the alleged misstatements caused no price impact whatsoever." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 686-87 (D. Md. 2018). *See also Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 371, 393 (N.D. Ga. 2019) ("'[O]nce a plaintiff shows entitlement to a presumption of reliance, the defendant is burdened with the daunting task of proving that the

---

[9]    Whether defendants bear the burden of persuasion or production in rebutting the presumption of reliance is currently under review by the Supreme Court. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 2020 WL 7296815 (U.S. Dec. 11, 2020). The Third Circuit has not ruled on the issue in the context of a securities fraud class action, and courts in this District have differed as to a defendant's burden, relying on non-securities Circuit authority. *Compare City of Sterling Heights Gen. Emps' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *13 (D. N.J. Aug. 31, 2015) ("[T]he defendant bears the burden to prove a lack of price impact through direct evidence.") *with In re Celgene Corp. Sec. Litig.*, 2020 U.S. Dist. LEXIS 230548, at *24-*25 (D.N.J. Nov. 29, 2020) ("[A] defendant need only produce enough evidence to withstand a motion for summary judgment or judgment as a matter of law on the issue."). Both courts, however, required direct evidence and held that defendants failed to rebut the presumption. The correct standard is purely academic here because defendants' evidence fails under either standard.

publicly known statement had no price impact.'"). "[M]erely . . . introduc[ing] evidence raising a triable issue of fact as to whether there was a price impact" is insufficient rebuttal. *Sterling Heights*, 2015 WL 5097883, at *12. And "'pointing to other potential causes for a stock price change following a corrective disclosure,'" which defendants here do not even do, is "'not enough to rebut the *Basic* presumption.'" *West Palm Beach*, 2016 WL 4138613, at *14.

The trial court's review is also limited at the class certification stage to determining whether common issues of reliance will predominate under Rule 23(b). *Amgen*, 568 U.S.at 466 ("[T]he focus of Rule 23(b)(3) is on the predominance of common ***questions***.") (emphasis original). The Supreme Court has expressly cautioned courts not to extend price impact analyses into merits-based reliance inquiries such as truth-on-the-market, materiality and loss causation. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011); *Amgen*, 568 U.S. at 474. "[T]he district court must . . . make findings [on price impact] needed to decide class certification while resisting the temptation to draw even obvious inferences on topics that are forbidden at this stage: materiality and loss causation." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 611 (7th Cir. 2020).

### B.    Lead Plaintiff Has Established, and Defendants Fail to Rebut, the Fraud-on-the-Market Presumption of Reliance

#### 1.    Defendants Concede Market Efficiency

The touchstone of invoking the *Basic* presumption of reliance is establishing that the stock traded in an efficient market. *Basic*, 485 U.S. at 246. Plaintiffs' opening class certification papers made this showing (*see* ECF No. 69 at 26), and included an expert report demonstrating that the market for J&J stock was efficient during the Class Period.[10]    Defendants have presented no

---

[10]    *See* Report on Market Efficiency by Professor Steven P. Feinstein, PH.D., CFA, dated June 30, 2020, attached as Exhibit 1 to the Declaration of Robert R. Henssler Jr. in Support of Lead Plaintiff's Motion (ECF No. 69-2).

evidence and no arguments to suggest that the market was not efficient during the Class Period. Indeed, defendants and their expert, Kleidon, do not dispute Feinstein's conclusion that the market for J&J stock was efficient.  *See* Feinstein Rebuttal, ¶¶8-9, 17-18.

### 2. Defendants Fail to Prove a Complete Lack of Price Impact

Having conceded that J&J's stock traded in an efficient market and that the *Basic* presumption of reliance is applicable, defendants attempt to rebut the presumption of reliance for four of the six alleged corrective disclosures.  Opp. at 2-5, 23-43.  But under *Halliburton II*, in order to rebut the presumption of reliance, defendants bear the burden of "proving that the alleged misrepresentation(s) had ***no impact*** on the stock price" with direct evidence.  *Sterling Heights*, 2015 WL 5097883, at *5, *10 ("[T]he *Basic* presumption affirms that the investors relied on the alleged misrepresentations unless Defendant can prove an absence of price impact.") (citing *Halliburton II*, 573 U.S. at 278-79).  *Accord, Celgene*, 2020 U.S. Dist. LEXIS 230548, at *30 ("Defendants must produce evidence demonstrating that the purported misrepresentation or material omission had no price impact.").

As the court in *Sterling Heights* explained:

> A plaintiff is not required to prove price impact in order to rely on the *Basic* presumption.  *See Halliburton II*, 134 S. Ct. at 2414.  Instead, the plaintiff can establish entitlement to the presumption through evidence of publicity and market efficiency – "an indirect way of showing price impact." *Id.* at 2415.  Once those prerequisites are established, the defendant bears the burden to prove a lack of price impact through direct evidence.  *Id.* at 2415-16; *see also id.* at 2417 (Ginsburg, J., concurring) (emphasizing that "it is incumbent upon  the defendant to show the absence of price impact").

2015 WL 5097883, at *12.  *See also Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x. 51, 53 (3rd Cir. 2019) ("plaintiffs do not have the burden to prove price impact (or lack thereof)").[11]

---

[11]    *Emergent Biosolutions*, 322 F. Supp. 3d at 686-87 (defendant must show "that the alleged misstatements caused no price impact whatsoever," citing *Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485 (2d Cir. 2018) ("*Goldman I*").  And as set forth in briefing submitted

Defendants' price impact argument fails because they have conceded at least two of the alleged corrective disclosures impacted J&J's stock price, and Feinstein's event study and regression analysis proves that there was also a statistically significant stock price decline on each of the four challenged dates (December 14, 2018, July 13, 2018, January 31, 2018 and September 27, 2017). Defendants have no evidence disproving price impact and thus no basis to deny class certification.

### a. Defendants' Concession of Price Impact for Two Class Period Disclosures Precludes Any Rebuttal of the *Basic* Presumption

By not challenging the certification of claims based on the February 5, 2018 and February 7, 2018 disclosures, which were followed by statistically significant price declines, defendants concede that those disclosures impacted the price of J&J stock. Opp. at 4 n. 1; *see also* Feinstein Rebuttal, ¶¶33-37. Defendants' concession of price impact as to two class period disclosures precludes them from rebutting the presumption of reliance as to the entire class period, because they cannot establish "that there was 'no price impact whatsoever.'" *S. Co.*, 332 F.R.D. at 395. As the court in *S. Co.*, recognized, a defendant's concession that a stock price decline following at least one Class Period corrective disclosure was statistically significant,

> dooms Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage.

332 F.R.D. at 395.

Defendants conceded that they cannot show the complete absence of price impact, and consequently any further inquiry into predominance and reliance should be moot.

---

to the Supreme Court by the DOJ and the SEC, defendants must "disprove price impact to rebut the presumption of reliance." Brief for the United States as Amicus Curiae Supporting Neither Party, *Goldman Sachs*, 2021 WL 354273, at *32 (U.S. Feb, 2021).

- 13 -

**b.      Defendants Fail to Rebut Plaintiff's Evidence of Statistically Significant Price Declines Following the December 14, 2018, July 12, 2018, January 30, 2018 and September 27, 2017 Alleged Corrective Disclosures**

"A plaintiff is not required to prove price impact in order to rely on the *Basic* presumption." *Sterling Heights*, 2015 WL 5097883, *12 (citing *Halliburton II*, 573 U.S. at 278-79). However, plaintiffs may choose to "initially introduce direct evidence of price impact . . . as a means of responding to (or anticipating) a defendant's direct rebuttal evidence." *Allstate Corp.*, 966 F.3d at 609. In a case where defendants are hiding the true facts, such as this one, "'[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect.'" *Id*. at 613. *See also Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 265 (2d Cir. 2020) ("*Goldman II*") ("[I]f a court finds a disclosure caused a reduction in a defendant's share price, it can infer that the price was inflated by the amount of the reduction.");[12] *Waggoner v. Barclays PLC*, 875 F.3d 79, 104-05 (2nd Cir. 2017), *cert denied*, ___ U.S. ___, 138 S. Ct. 1702 (2018) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 256 (2nd Cir. 2016) (statements that "'maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price'").

Defendants' expert here agreed with plaintiffs' expert that J&J's stock dropped significantly (at the 95% level) following the alleged disclosures on January 30, 2018 and December 14, 2018,

---

[12]    On December 11, 2020, the Supreme Court granted *certiori* in *Goldman II* on other grounds. *See Goldman Sachs*, 2020 WL 7296815, at *1. The Supreme Court granted *certiori* on: (i) whether a defendant can show no price impact based on the generic nature of the alleged misstatements although that evidence is also relevant to materiality; and (ii) whether a defendant only has the burden of production or also has the burden of persuasion in rebutting the *Basic* presumption. The Supreme Court has scheduled oral argument for March 29, 2021.

and significantly (at the 90% level) following the alleged disclosure on July 12, 2018.  *See* Kleidon

Report, ¶55 (adopting Feinstein's event study results); Feinstein Rebuttal, ¶¶9, 15, 18-19.[13]  A

decline in share price following a corrective disclosure is exactly the type of evidence that

establishes (not refutes) price impact.  *See, e.g.*, *Celgene*, 2020 U.S. Dist. LEXIS 230548, at *26-*27

("[P]rice impact is shown if, when the truth is revealed, the artificial inflation in the stock price

(maintained as a result of a repeated misrepresentation) dissipated and the price of the stock fell.");

*S. Co.*, 332 F.R.D. at 393 (because "a statistically significant price decline following an alleged

corrective disclosure means one cannot rule out price impact, Professor Feinstein's model

demonstrates that defendants cannot prove an absence of price impact during the Class Period").[14]

In response to the evidence of statistically significant price declines following corrective

disclosures, defendants' expert did not perform any empirical testing or disaggregation analysis to

determine what caused J&J's stock price to drop on the corrective disclosure dates.  *See* Feinstein

Rebuttal, ¶¶12, 18.  Indeed, he failed to identify anything, other than the alleged corrective

---

[13]  "Kleidon Report" refers to the Report of Allan W. Kleidon, Ph.D., dated December 11, 2020, attached as Exhibit 25 to the Certification of Jack N. Frost filed in support of Defendants' Opposition.  Kleidon also does not dispute that the price decline on September 27, 2017 was statistically significant at the 95% level, but instead raises an intraday timing issue about this alleged disclosure.  As explained below, Kleidon's intraday timing argument does not demonstrate a complete absence of price impact for the September 27, 2017 alleged disclosure.  *Infra*, §III.D.2.c. And, as also explained below, defendants' argument that price impact in a securities fraud case requires a stock price decline at the 95% level has no basis in economics or the law.  *See infra* §III.D.2.a.

[14]  *See Emergent Biosolutions*, 322 F. Supp. 3d at 690 (where defense expert admitted that corrective disclosure "'had an adverse impact on the stock price,'" defendants failed to disprove price impact); *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *21 (S.D.N.Y. Jan. 26, 2021) (Feinstein's event study showing statistically significant stock price declines established that stock price was inflated for purposes of price maintenance; defendants failed to disprove price impact with a "correctiveness" argument); *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 673 (S.D. Fla. 2014) (where all parties agree that the publications containing the alleged corrective disclosure caused significant share price decline, proving an absence of price impact "exceedingly difficult").

disclosures, that could have caused any of the four stock price declines. *Id.* "***This failure is fatal to defendants' attempts to defeat class certification***." *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at *5 (N.D. Ill. Dec. 21, 2020) ("Courts have routinely required defendants to perform some sort of disaggregation analysis or event study to prove that the stock price decline was caused by some other factor.").[15] Courts in this District have held likewise. For example, in *Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331 (D.N.J. 2018), *aff'd sub nom. Vizirgianakis*, 775 F. App'x 51 (3d Cir. 2019), the court held that where a defense expert did not perform an independent event study or a price impact assessment, defendants failed to demonstrate the absence of price impact and "[p]laintiff's presumption of reliance stands unrebutted." And, in *Celgene*, 2020 U.S. Dist. LEXIS 230548, at *33, the court found a defense expert's opinion that a corrective disclosure was not new news failed to rebut the *Basic* presumption because the defendants provided no other evidence demonstrating prior market reaction.

Given defendants' failure to show any, let alone all, of the undisputed statistically significant stock price declines were caused by something other than the fraud-related corrective disclosures, defendants have failed to rebut the presumption of reliance.

---

[15] *See also In re Centurylink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 211-12 (D. Minn. 2020), (holding that the defendants failed to rebut the *Basic* presumption where their expert did not attempt to quantify the amount of the relevant stock drops caused by non-allegation-related factors); *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2020 WL 5757695, at *13 (D. Minn. Sept. 28, 2020) (holding that the defendants failed to rebut the *Basic* presumption where their expert "admitted that he has 'not offered the opinion about what caused the stock price decline' following the February 12 corrective disclosure"); *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *13-*14 (S.D. Fla. March 16, 2016) (where defense expert relied exclusively on market commentary in reasoning that a corrective disclosure had no price impact, and "applied no statistical or empirical methodology to undergird the conclusion," defendants failed to establish price impact related to the corrective disclosure).

C.    **Defendants' Truth-on-the-Market Defense Is Not Properly Considered at Class Certification, and Cannot Preclude Certification Under *Amgen***

    1.    **Defendants' Truth-on-the-Market Defense Is Not an Appropriate Certification Inquiry and Should Be Rejected**

Defendants attempt to rebut the *Basic* presumption of reliance with evidence purportedly showing that none of the information in four of the corrective disclosures was "new," and then arguing that it therefore must not have caused any stock price declines.  Opp. at 23-45; Kleidon Report, §VII.B.  Defendants' argument is a thinly disguised "truth-on-the-market" defense which is not properly considered or resolved at the class certification stage.  *Amgen*, 568 U.S. 455.  Truth-on-the-market is a question common to ***all*** claims based on the four disclosures which, if proven, "would end the case" for those claimants.  *Amgen*, 568 U.S. at 459-60.  As the Supreme Court held in *Amgen* and *Basic*, proof that "'news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements . . . ***is a matter for trial' (and presumably also for a summary-judgment motion*** under Federal Rule of Civil Procedure 56)."  *Id*. at 482, quoting *Basic*, 485 U.S. at 249 n.29.  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen*, 568 U.S. at 465-66.

This is why defendants inaccurately couch their truth-on-the-market defense as a price impact rebuttal to the presumption of reliance, arguing that if disclosures contain no new information, they cannot have impacted the stock price.  Opp. at 3, 22.  The Supreme Court rejected the same attempt to label truth-on-the-market as price impact in *Amgen*.  568 U.S. at 480-81.  In fact, the *Amgen* Court held that district courts may properly ***disregard*** the type of rebuttal evidence defendants offer here – previously available public documents which purportedly contained the same

information as a corrective disclosure because such evidence presents "no barrier to finding that common questions predominate." *Id.* at 480-81 (holding that district court did not err in disregarding defendant's evidence that corrective information was contained in earlier published document).[16]

Since *Amgen*, courts repeatedly have rejected efforts to defeat certification with truth-on-the-market defenses labeled "price impact." *See, e.g.*, *Allstate*, 2020 WL 7490280, at *7 ("[I]t appears to the court that [defendants' expert] report and defendants' briefing presents a truth-on-the-market defense, 'which *Amgen* held may not be decided on class certification.' . . . Defendants' briefing largely focuses on the fact that the identified statements could not have been corrective because the market already knew the truth. . . . And an argument that 'news of the [truth] credibly entered the market and dissipated the effects of the misstatement . . . is a matter for trial.' *Amgen*, 568 U.S. at 482."); *Celgene*, 2020 U.S. Dist. LEXIS 230548, at *33-*34 (defendants' argument that corrective disclosure was based on previously-published studies, and that the market had already reacted to such news, was insufficient to rebut *Basic* presumption); *Centurylink*, 337 F.R.D. at 211 (arguments about whether particular statements were actually disclosures and that the market already was aware of cramming allegations should be adjudicated at summary judgment or trial, citing *Amgen*, 568 U.S. at 4759).[17]

---

[16]   The defendants in *Amgen* argued that "the market was well aware of the truth regarding [their] alleged misrepresentations and omissions" based on publicly available documents that disclosed corrective information before an alleged misrepresentation, much like defendants argue here.  568 U.S. at 464, 480-81.  The Supreme Court agreed with the Circuit court's characterization of the defendants' "rebuttal evidence as an attempt to present a 'truth-on-the-market defense,' which . . . 'is a method of refuting an alleged misrepresentation's *materiality*,'" and referred to the matter as materiality in its analysis. *Id.* at 465, 481 (emphasis original).  Whether referred to as truth-on-the-market or materiality, courts following *Amgen* have held that such an inquiry is improper at the class certification stage and have rejected the same argument defendants present here.  *See* cases cited at §III.C.1, *infra*.

[17]   *See also In re Sandridge Energy, Inc. Sec. Litig.*, 2019 WL 4752268, at *8 (W.D. Okla. Sep. 30, 2019) ("defendants first argue that if such production data was publicly available, Lead Plaintiffs'

- 18 -

Notwithstanding defendants' suggestion to the contrary, *Halliburton II* did not modify *Amgen* and does not permit defendants to present truth-on-the-market evidence at the class certification stage.  Rather, *Halliburton II* held that a defendant "may seek to defeat **the Basic presumption** at [the certification] stage through direct as well as indirect **price impact** evidence." 573 U.S. at 283.  Defendants' argument and evidence contravene *Halliburton II* on both aspects of its holding.  First, they are not seeking to defeat the *Basic* presumption, but to adjudicate a merits defense.  Second, defendants are not offering **price impact** evidence, which "show[s] that the alleged misrepresentation **did not actually affect the stock's market price**."  *Id.* at 282.  Instead, they proffer a theory, unsupported by any direct evidence, that "the market price had already adjusted to the revelation of defendants' misstatements" before the corrective disclosure dates, which is not price impact evidence, but rather truth-on-the-market evidence.  *Goldman I*, 879 F.3d at 485-86; *see also* n.21, *supra*.

---

claims must fail because that data would have been reflected in the price of the SandRidge stock. . . . Lead Plaintiffs accurately argue that this amounts to Defendants raising a truth-on-the-market defense, which 'is inappropriate on a motion for class certification' and more properly a matter for summary judgment or trial"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *5 (S.D.N.Y. May 15, 2017) (defendants' argument that alleged corrective disclosures could not have impacted stock price because the truth had been revealed in three prior published articles "is essentially a 'truth-on-the market defense,' which is inappropriate on a motion for class certification") (citing *Amgen*); *Marcus v. J.C.Penney Co.*, 2016 WL 8604331, at *8 (E.D. Tex. Aug. 29, 2016) ("defendants' arguments about whether the disclosures were actually corrective amount to an improper attempt to assert a 'truth-on-the-market' defense [which] . . . is a 'method of refuting an alleged misrepresentation's materiality' which has no bearing on the predominance inquiry of class certification.  *Amgen*, 133 S. Ct. at 1203"); *Thorpe*, 2016 WL 4006661, at *14 (defendants' argument that information was previously disclosed was a truth-on-the-market defense which is "inextricably linked to the materiality of the statements and thus irrelevant at the class certification stage"); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 260-61 (N.D. Tex. 2015) ("*Halliburton II Remand*") (argument that disclosure information was "already known by the market" was "a veiled attempt to assert the 'truth-on-the-market' defense, which pertains to materiality and is not properly before the Court at this stage").

- 19 -

Defendants' reliance on *Goldman II*, 955 F.3d 254 is therefore unavailing. Opp. at 22. In *Goldman I*, the defendants (and their experts) presented an event study to show that the market learned the truth about Goldman's conflicts of interests on 34 pre-corrective disclosure occasions "without any accompanying decline in the price of Goldman stock." 879 F.3d at 481 n.5, 482, 485-86. The *Goldman I* defendants thereby attempted (unsuccessfully) "to show that their statements about Goldman's efforts to avoid conflicts of interest 'did not actually affect the stock's market price,'" which the Second Circuit distinguished from truth-on-the-market evidence like defendants here present. *Goldman I*, 879 F.3d at 485-86, quoting *Halliburton II*, 573 U.S. at 282.

Unlike in *Goldman II*, defendants (and their expert) here present no event study nor any empirical or statistical analysis showing that their misrepresentations ***did not*** affect J&J's stock price. Feinstein Rebuttal, ¶¶12, 18. Instead, defendants rely on a theory that the stock price ***could not*** have reacted to the corrective disclosures because they purportedly did not contain new information. Opp. at 3. This type of evidence, standing alone, cannot prove lack of price impact. *See, e.g.*, *Allstate*, 2020 WL 7490280, at *6 ("Given the lack of an independent event study or disaggregation analysis, defendants have failed to provide any support for their argument. Consequently, defendants have failed to persuade the court of a lack of price impact."); *Thorpe*, 2016 WL 4006661, at *13-*14 (same). *See also* cases at n.19, *supra*.[18]

For these reasons, defendants' argument that the disclosures on December 14, 2018, as well as those on September 27, 2017, January 30, 2018 and July 12, 2018 contained no "new" information is improperly presented at this stage, and should be rejected.

---

[18]    Unlike here, the defendants in *Goldman II* also tried to establish through expert evidence that the statistically significant stock price declines following alleged corrective disclosures were caused by news unrelated to the fraud. *See Goldman II*, 955 F.3d 254 at 271-72 (rejecting Goldman's experts' contention that the statistically significant stock price declines were unrelated to the fraud).

2.    **Defendants' Repeated Class Period Denials and False and Misleading Statements Preclude Them from Succeeding on a Truth-on-the-Market Defense**

Even if it were appropriate to consider a truth-on-the-market defense at this time, defendants' argument entirely ignores plaintiff's theory of the fraud. During the Class Period, defendants' persistent denials of public reports that J&J talc products contained asbestos and were unsafe are evidence that there was a fraud-on-the-market, and the presumption of reliance is appropriate. "Just as we require investors to act upon public information indicating fraud, so, too, do we allow them to rely upon corporate statements discounting the possibility of malfeasance." *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 350 (3d Cir. 2009).

As plaintiff alleges, and as this Court noted in its motion to dismiss opinion, defendants publicly denied wrongdoing and repeatedly assured investors that J&J's products were safe, did not contain asbestos and did not cause cancer. Opinion, 2019 WL 7207491, *28-*29; ¶¶180, 183, 191, 200, 204, 208, 210, 219, 220, 222. Indeed, these strident denials accompanied the alleged corrective disclosures defendants now challenge. Defendants' own Exhibit 2, which they submitted in support of their argument that the market had already incorporated negative information revealed by *Reuters*, contains multiple references to their own denials. *See, e.g.*, Opp., Ex. 2, Rows 3, 21-22, 27, 41. *See also* Feinstein Rebuttal, ¶67 (noting Kleidon's recognition that defendants disputed evidence at trials regarding asbestos in talc products). In addition, while defendants rely heavily on their own "disclosure" of trial exhibits in J&J's factsabouttalc.com website, the website itself was one of defendants' most elaborate and aggressive Class Period denials. ¶¶168, 321-323. At all relevant times, the website contained vehement denials that J&J talcum powder products contained asbestos and assured investors and consumers that the products were safe and did not cause cancer. *See, e.g.*, ¶¶168, 321.

"Where, as here, a purported 'disclosure' is accompanied by a corporate denial, it is no 'disclosure' at all, since such a denial is counteractive, misleading, and can cause investors to doubt the contents of the purported disclosure." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *16 (S.D.N.Y. July 10, 2019).

Even if the purported earlier disclosures publicized the same facts as the *Reuters* Report (they did not), defendants' denials would still stand in the way of their truth-on-the-market defense. In *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2018 WL 3854757, at *4 (S.D.N.Y. Aug. 14, 2018), *aff'd sub nom. Goldman II*, 955 F.3d 254 (2d Cir. 2020), the court held that the alleged corrective disclosure was "more reliable and credible" than previous reports, "especially in the presence of the denials and rebuttals." *See also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 182-84 (S.D.N.Y. 2008) (rejecting argument that "the *Basic* presumption [wa]s rebutted" because prior public reports "during the class period . . . publicized the existence of conflicts of interest" by Goldman analysts where, *inter alia*, "throughout the same time period, 'investors were also being fed reassuring statements by Goldman'" denying conflicts); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 490-92 (S.D.N.Y. 2011) (argument that "the market had knowledge of the potential conflicts" based on public articles "does not rebut the *Basic* presumption" as "the market was well aware of the potential for conflicts, but each time the rating agencies assured investors that the conflicts were either being managed or negligible").[19] Thus, even assuming prior disclosure of the relevant information contained in the alleged disclosures, defendants' denials and false assurances do and will preclude them from successfully defeating plaintiff's claims based on a truth-on-the-market defense.

---

[19] *Cf Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 402 n.16 (3d Cir. 2006) (finding that reassurances can dissipate investor's fears of malfeasance); *Hull V. Glob. Digit. Sols., Inc.*, 2017 WL 6493148, at *9 (D.N.J. Dec. 19, 2017) (false statements "may have had the effect of reassuring investors – despite the news articles").

- 22 -

And, as Feinstein explains, J&J's reassuring statements were credited by market professionals.  Feinstein Rebuttal, ¶¶53-62; *see also* ¶186 (October 11, 2017 analyst: J&J has "several large studies, as well as the FDA . . . on its side regarding the safety of talc."); ¶198 (February 5, 2018 analyst: J&J talc "products have been free of asbestos, based on decades of monitoring, testing and regulation dating back to the 1970s.").

Notably, at the motion to dismiss stage, the Court rejected defendants' argument that the market was fully aware of the alleged fraudulent scheme by February 8, 2018.  Opinion, 2019 WL 7207491, at*14.  As this Court held, defendants' "public denials of wrongdoing" and repeated assurances that J&J's "products were 'safe' and 'do not contain asbestos or cause mesothelioma'" raised "sufficient doubt as to whether the true extent of the Company's alleged fraudulent scheme was revealed" before December 14, 2018.  *Id.* at *29 (citing as examples ¶¶379-380, 382, 390). Defendants have not dispelled that doubt by doubling down on the purported prior disclosures while ignoring their own denials of the disclosed information.  And, as set forth at length above, class certification does not provide defendants with an opportunity to present a merits argument.  A jury should decide this issue.

### D. Defendants' Purported Evidence Fails to Prove a Complete Lack of Price Impact

Even if further analysis of defendants' truth-on-the-market argument were relevant or necessary to a price impact inquiry, the four disclosures that defendants address revealed new information as to the seriousness and extent of the alleged fraud which could not have been previously reflected in the stock price.  And because the *Reuters* Report that ends the Class Period revealed new information about defendants' fraudulent conduct, price impact is demonstrated for the entire Class Period.

1.    **Defendants Fail to Prove a Complete Absence of Price Impact for the December 14, 2018, *Reuters* Report**

The *Reuters* Report revealed new information concerning J&J's powder, talc and decades-long scheme to conceal the truth, exposing defendants' fraud.  ¶¶12, 223; *see also* Feinstein Rebuttal, ¶¶43-48.  As Feinstein explains, "[t]he *Reuters* Report contained new information that was corrective of the alleged misrepresentations and omissions."  *Id.*, ¶43.  Kleidon admitted that the *Reuters* Report revealed new information.  *Id.*, ¶46.  And, there is no dispute that the *Reuters* Report caused the statistically significant stock price decline.  *Id.*, ¶40.  In the *Reuters* Report, the highly respected news organization detailed its findings and analysis from its independent investigation:

> [F]rom at least 1971 to the early 2000s, the company's raw talc and finished powders sometimes tested positive for small amounts of asbestos, and [] company executives, mine managers, scientists, doctors and lawyers fretted over the problem and how to address it while failing to disclose it to regulators or the public.

¶223; Opp., Ex. 2 at Row 5.  *Reuters* also reported on J&J's "successful efforts to influence U.S. regulators' plans to limit asbestos in cosmetic talc products and scientific research on the health effects of talc."  *Id.*

Along with this new analysis, the *Reuters* Report contained new information that defendants do not contest.  *See* Feinstein Rebuttal, ¶48.  For example, the *Reuters* Report informed investors that J&J has **never** adopted a concentration method for preparing talc samples before asbestos testing. Opp., Ex. 2, Row 82.  This fact had been acknowledged by J&J itself through its responses "to dozens of questions from the reporter."  Opp. at 16.  Indeed, J&J's attorneys provided over 40 pages of "detailed factual responses" to *Reuters* ahead of publication.  Ex. 2 at 928.  And among those pages is *Reuters*' statement that "J&J never adopted the concentration method," followed by "J&J's response" which, through its silence, confirmed this fact.  Ex. 11 at 813-814.[20]

---

[20]   Contrary to defendants' assertion, *Reuters* did not source these facts concerning J&J never adopting concentration methods to any document from the 1970s or a single press article about

Investors and analysts were focused on *Reuters*' disclosures about J&J's asbestos testing. *See, e.g.*, Ex. 12 (December 14, 2018 email from investor to J&J executives asking about "lower limit of detectability of asbestos" in J&J's testing standard). And the revelations from *Reuters* surrounding J&J's asbestos testing were later echoed by Congressman Krishnamoorthi in his March 3, 2020 letter to the FDA, calling for a concentration method ("heavy liquid separation") for preparing talc samples and stating that "the need for more accurate testing is highlighted by Johnson & Johnson's brazen attempts to cover up the presence of asbestos in its consumer products." Ex. 10 at 1, 3-4.

The *Reuters* Report revealed many details that defendants fail to show were previously disclosed. *See* Ex. 13. These details included the following:

- Hammondsville, a mine containing various types of asbestos, was "the Vermont deposit that supplied Baby Powder talc for more than two decades" and was "the primary source of Baby Powder talc from 1966 until its shutdown in 1990." Opp., Ex. 2, Rows 76, 92. J&J itself informed *Reuters* that Hammondsville shut down in 1990. Ex. 11 at 815.

- A "court report" states that a lab "found asbestos in Shower to Shower talc from the 1990s." Opp., Ex. 2, Row 22; Ex. 11 at 789 ("We have no record of such a report and have not otherwise heard of one.").

- J&J did not obtain any patents on its asbestos removal methods, confirming that the Company did in fact decide to not "'let the whole world know.'" Opp., Ex. 2, Rows 55-56.

- J&J funded a 1970s talc miner study that took J&J's side on safety, with J&J executive Gavin Hildick-Smith "sen[ding] money to the Italian talc exporter-physician to hire a team of researchers." Opp., Ex. 2, Rows 107, 109, 111 (not listing any document showing that J&J paid for the study). J&J confirmed the payment through its responses to *Reuters*' questions. Ex. 11 at 826.

- Even if some tremolite found in J&J's talc is actually "'cleavage fragments' from non-asbestiform tremolite," "J&J's original records don't always make that

events "decades ago" (which could not speak to J&J's testing up to the present). Opp. at 16, 30, 40; Opp., Ex. 10.24. Nor does plaintiff claim that the *Reuters* Report was corrective merely because it cited to internal J&J documents. Opp. at 33.

4816-4886-2945.v1

distinction," and "[i]n terms of health risk, regulators since the early 1970s have treated small fiber-shaped particles of both forms the same."  Opp., Ex. 2, Row 32.

- "In the late 1950s, J&J discovered that talc from its chief source mine for the U.S. market in the Italian Alps contained tremolite," one of six minerals that can occur as asbestos.  Opp., Ex. 2, Row 29.

- In 1999, J&J successfully withheld evidence of asbestos contamination from Darlene Coker, a plaintiff suing J&J on allegations that J&J's powder had caused her mesothelioma.  Opp., Ex. 4 at 268-269, 281.  *Reuters* even provides a link to J&J's 1998 objections to interrogatories, which failed to disclose the letter J&J's lawyer "received only weeks earlier" from Blount "confirming that she had found asbestos in the company's Baby Powder."  Opp., Ex. 4 at 281; Ex. 14; Opp., Ex. 3.51.

The *Reuters* Report also provided new information from interviews and inquiries of relevant third parties, as well as J&J's own lawyer:

- J&J's lawyer told *Reuters* that even today J&J's X-ray scanning for asbestos testing can only "detect suspect minerals at levels as low as 0.1 percent."  "X-ray scanning is the primary method J&J has used for decades."  Opp., Ex. 2, Row 81.

- Arthur Langer, a mineralogist who had found asbestos in Johnson's Baby Powder, was visited by J&J lawyers in 2017 (during the Class Period), and told them "that he stood by all of his findings."  J&J has not called him as a witness in talc litigation.  Opp., Ex. 2, Row 45.

- Jerome Kretchmer, the former New York City environmental protection chief who had raised the issue of talc and asbestos in the early 1970s, told *Reuters* that when he "recently read that a jury had concluded that Baby Powder was contaminated with asbestos," he said to himself: "'How come it took so long?'"  Opp., Ex. 2, Rows 40, 45.

- FDA Commissioner Scott Gottlieb told *Reuters* that he "'recognize[s] the concern'" about talc and that "the agency's policing of cosmetics in general – fewer than 30 people regulating a 'vast' industry – was 'a place where we think we can be doing more.'"  Opp., Ex. 2, Row 95.  The FDA told *Reuters* that the agency was going to be looking at "'scientific test methods for assessment of asbestos'" and "'how we would develop standards for evaluating any potential risk.'"  Opp., Ex. 2, Row 95.  These facts revealed the false and misleading nature of many of defendants' statements.  *E.g.*, ¶288 (FDA "confirmed the purity of our talc"); ¶311 (FDA has "reviewed and analyzed the available data" and made conclusion on talc safety); ¶335 (FDA control data "clearly demonstrates the safety of talc"); ¶339 (J&J talc products "are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation").  *See also* ¶¶266, 303, 350.

- The lawyer for Darlene Coker told *Reuters* that the documents J&J withheld from Coker would have made a "'100% difference'" for his client. Opp., Ex. 2, Row 105.

- *Reuters* inquired with the American Cancer Society ("ACS") concerning asbestos in talc, and as a result, the ACS revised its website to say that cosmetic talc products in the United States "'should be free from detectable amounts of asbestos,'" rather than saying that cosmetic talcs are asbestos-free. Opp., Ex. 2, Rows 85-86.

The new information contained in the *Reuters* Report kicked off a flurry of reaction at the Company, as well as in Congress, and at the DOJ and the SEC. In sworn testimony, Gorsky detailed how the response team "worked collectively literally around the clock for the next several days" because "they are serious allegations" and J&J needed "a thorough understanding and an accurate response." Ex. 15 at 221:11, 13-16. This response team included lawyers, J&J's Chief Scientific Officer, and other top executives. Ex. 16 at 109. And J&J poured nearly $8 million into its media spend in a scramble to respond to the *Reuters* Report. Ex. 17; Ex. 18. Such actions would hardly be necessary if the *Reuters* Report was nothing but stale information.

In contemporaneous (internal) communications J&J executives acknowledged that the *Reuters* Report had a negative impact on the Company's stock price. On the same day the *Reuters* Report was released, a J&J Global Media Relations executive, Nicole Araujo, admitted that "because ***J&J's stock was impacted***, several trade outlets also published the news." Ex. 19; ("Broadcast coverage discussed the *Reuters* article and the significant effect it had on J&J's stock value . . . .") *id.* On December 15, 2018, Araujo described the reaction to the *Reuters* Report and admitted that "[c]overage focused on the ***financial impact of the article on J&J's stock value*** and the stock market overall." Ex. 20. On December 17, 2018, J&J's General Counsel admitted that the *Reuters* Report "resulted in a significant decrease in shareholder value." Ex. 21. And, on January 19, 2019, J&J received a private analysis it had requested from Goldman Sachs where the investment bank stated that "***the talc news resulted in an ~10% decline on December 14th***." Ex. 22. Similarly, in a January 31, 2019 internal memorandum to the J&J Executive Committee, J&J's investor relations

- 27 -

Vice President admitted that: "*On December 14th, an article published by Reuters on Talcum powder led to a 10% stock decline and a $40 billion market cap loss*." Ex. 23 at 977.

Furthermore, financial analysts explicitly recognized that the *Reuters* Report caused the December 14, 2018, share price decline. Feinstein Rebuttal, ¶63. And, market commentary noted that the *Reuters* Report's disclosed the seriousness of J&J's misconduct:

- "Reporting surfaced today alleging JNJ did not disclose to the FDA that asbestos had sometimes been found in its baby powder ingredients dating back to the 1970s. JNJ vehemently denies this, but either way, *we expect significant damage will unfold for JNJ's valuable brand name in consumer products and medical devices, which has been built over decades*. The Consumer and Medical Devices segments generate 39% of profits, and the brand name and accompanying consumer trust are critical for their success. We see today's news potentially impacting sales of everything from baby shampoo to prosthetic hips. Given these elevated risks, we no longer feel JNJ shares are attractive at recent prices." Ex. 24 at 1.

- "The *main concern from investors is whether JNJ could be faced with criminal charges down the road in light of allegations made in this morning's Reuters Report* ('Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder,' *Reuters*, 12/14/18)." Ex. 25 at 2.

- "The legal bills won't abate anytime soon . . . *[b]ut the hit to J&J's reputation may be the most difficult to fix*. In the 1980s, seven people died after taking Tylenol painkillers that had been laced with cyanide. The company's response to that tragedy – recalling 31 million bottles, taking out advertisements warning customers, and introducing tamper-proof packaging – became a staple business-school lesson in reputation-buffing. If the company really sat on troubling data relating to a product used on babies around the world, it might end up being taught as a counter-example." Ex. 26 at 1.

- "[T]he documented asbestos contamination of J&J talc that *Reuters* investigated had occurred over a lengthy period of time and involved counter-credo J&J decisions, making it difficult to imagine J&J was not aware of any issues at some point. *It also makes the effort at absolving itself unseemly. Some of J&J's messages in its recent campaign to combat the talc issue actually omit key details regarding findings on talc and, in certain instances, are undermined by other evidence, according to a Reuters review of the company's statements*." Ex. 27 at 10-11.[21]

---

[21] And, financial analysts also linked J&J's December 17, 2018, $5 billion share repurchase program to the price impact caused by the *Reuters* Report. As UBS Equities put it: "JNJ announced this afternoon that its board has authorized a $5B share repurchase program – adding a new flank to

And, in testimony in other cases, Gorsky has repeatedly admitted that the *Reuters* Report affected J&J's stock price and had a negative price impact. For example, Gorsky acknowledged that the *Reuters* Report caused a 10% share price decline, agreeing "[t]hat's what happened to the stock on the morning that the Reuters article came out." Ex. 29 at 73:9-19, 24-25 ("over a 24 hour period, Johnson & Johnson's stock dropped $50 billion") *id.* at 37:18-24, 74:3-4. Gorsky has also testified that the "effect" of the *Reuters* report on J&J's stock price was "approximately a ten percent drop that day." Ex. 16 at 115:14-21.

Further demonstrating the revelatory nature of the *Reuters* Report, J&J even changed its own messaging on asbestos: the Company's "'What we knew'" advertisement was changed from representing that Johnson's Baby Powder "'never'" contained asbestos to merely representing that Johnson's Baby Powder "'does not'" contain asbestos. Ex. 30 at 181:24-185:25. And J&J carefully tracked the "Reuters and Related Events Impact," finding that J&J's reputation and "perceived safety" had been negatively impacted. Ex. 31 at 3, 8.

The revelations in the *Reuters* Report also led directly to governmental action and eventually the discontinuation of all J&J talcum powder in the U.S. and Canada. Indeed, the *Reuters* Report triggered inquiries and subpoenas from the DOJ and SEC, Congressional hearings, and a DOJ Grand Jury proceeding. Exs. 4, 9, 32; *see also* ¶¶13, 250-252. Less than a year after the *Reuters* Report, the FDA reported that Johnson's Baby Powder did contain asbestos. Ex. 7. The FDA also looked at long-overdue reforms for asbestos testing, while a Congressional committee pushed for the FDA to include in its formal recommendations a concentration method for asbestos testing and specifically referred to J&J's "brazen attempts to cover up the presence of asbestos." Ex. 10. On March 3, 2020,

the company's moves to counter investors' perceived risk from the talc litigation following last week's *Reuters* article." Ex. 28 at 1.

Representative Krishnamoorthi warned that legislation could be forthcoming if the concentration method was not included in the FDA recommendations. *Id.* Not coincidentally, within two months, J&J announced that it was discontinuing talc-based baby powder in the U.S. and Canada. Ex. 3.

Aware that the *Reuters* Report provided new information and new analysis concerning the fraudulent conduct, defendants attempt to limit the types of new information that can be a disclosure, arguing that the "internal J&J documents" linked in the *Reuters* Report were not new. Opp. at 23-32. But as the Court previously noted, "'[a] corrective disclosure need not take a particular form; it is the exposure of the falsity of the fraudulent representation that is the critical component.'" Opinion, 2019 WL 7207491, at *27 (quoting *Hull*, 2017 WL 6493148, at *14). In focusing solely on general "allegations" and the 56 documents linked by *Reuters*, defendants and their expert conspicuously ignore the facts and analysis identified above, which provided "new information as to the seriousness and extent of the Company's alleged fraud." Opinion, 2019 WL 7207491, at *27. *See also* Feinstein Rebuttal, ¶¶44-48.

### a. The *Reuters* Report Contained New Information, Not a Rehash of Allegations

Defendants point to product liability lawsuits, the initial complaint in this action, and attorney advertising to argue that *Reuters* simply "rehashed" "allegations that J&J knew of and covered up asbestos contamination," mischaracterizing the *Reuters* Report as merely being "about the litigation." Opp. at 23-25. But defendants fail to show that any of these sources contained the details first revealed by *Reuters*, identified above. Ex. 13. Nor can defendants credibly equate mere allegations with *Reuters*' analysis. As befitting a news organization of its history and reputation, *Reuters* conducted a lengthy, independent investigation to see if the allegations had any merit and reported definitively that J&J "knew for decades that asbestos lurked in its Baby Powder" and that "executives, mine managers, scientists, doctors and lawyers" at J&J failed to disclose it to regulators

- 30 -

or the public all while J&J conducted "successful efforts to influence" regulators and scientific research. Opp., Ex. 4 at 268-69. This analysis alone constitutes new information for investors, as defendants' own case law recognizes. *See Signet*, 2019 WL 3001084, at *17 (report was not "merely a journalist's negative opinion," but was an analysis of Signet's underlying business, which "qualifies as corrective"); *see also Marcus v. J.C. Penney Co. Inc.*, 2017 WL 907996, at *2 (E.D. Tex. Mar. 8, 2017) ("opinions" in an analyst report constitute new information). Defendants also point to prior news articles, but concede that the articles did not report as fact any asbestos contamination or concealment by J&J – they simply reported on what personal injury lawyers were claiming. *See* Opp. at 24 n.22 (citing articles about what a "jury [was] told"). The only article defendants insist did more than that is the January 16, 2018 *Fair Warning* article. Opp. at 24-25. But defendants misrepresent what *Fair Warning* actually says, just as they did in their Motion to Dismiss (*see* ECF 45 at 59).

*Fair Warning*'s conclusion after its analysis of certain documents was that they "don't settle the safety issue" and simply "raise[d] questions about J&J's candor" and mere "asbestos worries." Opp., Ex. 8.1 at 1-2. This is a far cry from *Reuters*' analysis and reporting. *See, e.g.*, Opp., Ex. 11.1 at 6 (interviewer to *Reuters* journalist: "your reporting has established that there was asbestos in these products and some of the reasons as to why"). Defendants' own case law recognizes that reporting of the sort contained in *Fair Warning* "merely rais[es] questions and speculation." *Signet*, 2019 WL 3001084, at *17; *see also Marcus*, 2017 WL 907996, at *2 (rejecting argument that previous reports had already disclosed the corrective information where those reports "were tempered with language" of "possibility" or "potential").

Defendants also fail to address, let alone establish, whether *Fair Warning* revealed any of the new information contained in the *Reuters* Report identified above. The *Fair Warning* article does

- 31 -

not discuss J&J's failure to ever adopt concentration methods and in fact commends J&J for "supplement[ing]" the industry test method "with additional tests."  Opp., Ex. 8.1 at 5.  Nor does *Fair Warning* say anything about J&J refraining from obtaining patents on asbestos removal procedures in order to keep the asbestos contamination a secret.  And *Fair Warning* did not provide details of interviews *Reuters* only later conducted.

> **b.    The *Reuters* Report Contained New Information, Not Just a Collection of Documents**

Defendants and their expert purportedly "traced every *document* linked or quoted" by *Reuters* and argue that all of the internal J&J documents uploaded by *Reuters* were previously publicly available and that the *Reuters* Report therefore could not have contained any new information.  Opp. at 26.  This argument fails for several reasons.

First, defendants do not, and cannot, cite any authority supporting their assumption that a corrective disclosure is somehow invalid or not corrective unless it releases specific never-before-seen internal company documents.  Notably, defendants prove this point by failing to challenge two alleged corrective disclosures that do not upload or link to any company document.  Opp. at 4 n.1.  And the Court did not uphold the alleged disclosures on the basis that documents were previously unavailable, but rather because the disclosures "provided new information as to the seriousness and extent of the Company's alleged fraud."  Opinion, 2019 WL 7207491, at*27.

Second, as discussed above, the *Reuters* Report clearly contained new information beyond what was sourced to the linked documents.  *See* Feinstein Rebuttal, ¶¶45-48.  *Reuters* also makes clear that the Report is the product of its review and analysis of sources other than the linked J&J documents.  *See, e.g.*, Opp., Ex. 11.1 at 3 ("many," not all or even "most" of the documents establishing J&J's knowledge of asbestos contamination were posted on *Reuters*.com); *id.* at 6 (author looked at "thousands of pages of documents"); Feinstein Rebuttal, ¶45.  And as illustrated

above, J&J provided over 40 pages of "detailed factual responses" to *Reuters* relating to the Report. Ex. 2 at 928. The fact that the *Reuters* Report contains numerous pieces of new information not sourced to internal documents is driven home by the multiple interviews *Reuters* conducted and reported on, in addition to the extensive Q&A with J&J. *See, e.g.*, Opp., Ex. 2, Rows 45, 81, 85-86, 95, 105.[22]

Third, the fact that some of the 56 linked documents were part of data dumps on asbestosandtalc.com and a J&J website, buried among thousands of irrelevant pages and devoid of any context, hardly compares to *Reuters*' careful analysis. Indeed, *Reuters* painstakingly annotated the various documents linked, explaining and providing necessary context. For example, the document identified in Opp., Ex. 2, Row 94 does not say on its face that the talc that tested positive was for Johnson's Baby Powder – *Reuters* explained that. Similarly, the document listed in Opp., Ex. 2, Row 83 (Opp., Ex. 3.44) – calling a concentration method of asbestos testing "'disturbing'" and calling into question "'purity claims'" – is explained by *Reuters* to have been authored by "J&J's longtime talc overseer," informing the market that this was in fact Company policy. Opp., Ex. 2, Row 83 (Opp., Ex. 3.44).

Fourth, while defendants assert that each of the 56 linked J&J documents were previously disclosed through public press articles, J&J's website, asbestosandtalc.com, or Courtroom Viewing Network ("CVN") broadcasts of trials (Opp. at 26-27), these arguments cannot establish truth-on-the-market.

---

[22] Defendants claim that the *Reuters* Reporter, Lisa Girion "confirmed that her story was 'based entirely on J&J's documents.'" Opp. at 26. But Girion never said that her entire story was based entirely on J&J's documents, let alone based entirely on the 56 linked documents. Opp., Ex. 11.1 at 2-3. Given the information detailed herein, and admitted to by defendants' expert, defendants' claim is nonsensical. Ex. 13; Feinstein Rebuttal, ¶¶44-48. Indeed, Girion's emphasis in an interview about reviewing J&J's own documents was in the context of responding to defendants' claim that the story was a false conspiracy theory. *Id.*

### (1)    Defendants' References to the Public Press Do Not Establish Truth-on-the-Market

Defendants admit that the majority of the 56 documents were never released in the public press prior to the *Reuters* Report.  *See* Opp., Ex. 1.  But even for the documents that defendants do claim were identified in prior press reports, there was no complete disclosure of the alleged truth. For example, the January 2017 *Fair Warning* article included seven pages from a May 14, 1974 document.  But the *Reuters* Report linked to the full 49 page document which included a data sheet of "asbestiform fiber counts" and an attachment on efforts at "asbestiform depression." *Compare* Opp., Ex. 8.9 (*Fair Warning* version) *with* Opp., Ex. 3.32 (*Reuters* version).  Similarly, some press articles that defendants argue contained "express discussions . . . of the specific" documents linked to by *Reuters* (Opp. at 4 n.2; Opp., Ex. 2), merely reported general assertions made by personal injury lawyers.  *See* Opp., Ex. 10.4 (reporting personal injury lawyer's assertions without "express[ly]" discussing Opp., Exs. 3.1 and 3.2); Opp., Ex. 10.25 (reporting personal injury lawyer's assertion about what J&J told the FDA in 1976 without "express[ly]" discussing March 15, 1976 letter to the FDA (Opp., Ex. 3.42)); Opp., Ex. 10.27 (reporting personal injury lawyer's question to the jury about J&J allegedly "trying to determine how much asbestos a baby could breathe" with no reference to the February 19, 1974 letter to J&J concerning dust exposure to infants (Opp., Ex. 3.28)).[23]

---

[23]    Defendants also claim that a draft J&J website revealed by *Reuters* was previously described in a local newspaper article.  Opp. at 28; Opp., Ex. 20.14.  But that article was primarily about J&J "altering [different] records," with only a few lines about the draft website.  The article incorrectly reported that the website language was changed from "have always been asbestos free" to "have been asbestos free," did not discuss anything about J&J admitting that talc studies actually "send mixed messages," and failed to even identify the document (*i.e.*, that it was a draft J&J website), or the custodian or date of the document. *See* Opp., Ex. 20.14; Opp., Ex. 3.55.  While a telling piece of evidence, the draft website is hardly "foundational to [p]laintiff's claims."  Opp. at 28.

### (2)    J&J's Box.com Webpage Does Not Establish Truth-on-the-Market

Defendants also attempt to rely on J&J's November 29, 2018 data dump of "thousands of documents" to the following obscure web address: jjcloud.ent.box.com/s/2x692lcj24crvjunf0lnu590zw5g528e. Opp. at 14 n.12; Opp., Ex. 6. Notably, this took place just two weeks before the *Reuters* Report was published and when defendants knew what *Reuters* had found in its investigation and planned on reporting. Ex. 33. Moreover, defendants do not establish that the documents hosted at J&J's website were the same as those linked to by *Reuters*, or how the 56 documents linked by *Reuters* would be found in the thousands of documents dumped into the box.com site. *See* Opp., Ex. 7 (merely describing the downloading of documents and file data, without comparing to *Reuters*' documents). Even a cursory review of the site's documents shows that at least some documents uploaded by J&J prior to the *Reuters* Report were incomplete versions.[24]

### (3)    Asbestosandtalc.com Does Not Establish Truth-on-the-Market

Defendants' reliance on purported disclosure through the website of David Egilman, asbestosandtalc.com, to argue there was nothing new in the *Reuters* Report also fails. Again, defendants do not demonstrate or verify that the documents hosted there were the same as those linked to by *Reuters*. Defendants also provide almost no details as to how anyone would even know about the existence of that website prior to the publication of the *Reuters* Report. Indeed, while they

---

[24] For example, J&J's upload of the draft website copy admitting "we cannot say 'always'" asbestos-free had two pages missing – including the metadata revealing that the document was in defendant Goodrich's own custodial files and that the document was created on October 10, 2013. *Compare* Opp., Ex. 3.55 (version *Reuters* shared) *with* Ex. 34. Similarly, while defendants represent that a November 15, 1972 report was uploaded to J&J's website, the actual version hosted on J&J's website only contained the first page of the 16 page document linked by *Reuters*. *Compare* Ex. 35 *with* Ex. 36.

claim that links to the website have "appeared in Egilman's articles, at least one book, and the Federal Register," all but one of those are from 2020, over a year *after* the *Reuters* Report.  *See* Opp. at 13-14 n.10.  The sole exception is a link to a single J&J document buried in a 2018 "commentary" on a study concerning Colgate Palmolive products, not J&J's, with J&J only mentioned in a footnote.  Opp., Ex. 18.1.

### (4)    CVN Broadcasts of Trials Does Not Establish Truth-on-the-Market

The CVN broadcast of trials is also insufficient to show prior disclosure.  The website only shows what is being displayed to the jury during proceedings, which is often only a specific page (or part of a page) of the document.  *See, e.g.*, Opp. at 10 (image).  CVN does not post or display full copies of trial exhibits.  And defendants fail to provide copies of any particular trial exhibits, or identify how they were (if they were) broadcast on CVN, so they can be compared against the documents linked by *Reuters*.  As such, defendants have not established that the 56 documents linked to the *Reuters* Report were fully publicly disclosed before December 14, 2018.

### c.    Defendants Failure to Identify Any Non-Fraud Related Cause of the December 14, 2018 Stock Price Decline Means They Cannot Establish a Lack of Price Impact

Defendants do not, and cannot, deny that the *Reuters* Report impacted J&J's stock price.  *See* Opp. at 16.  Indeed, they admit that "the market reacted" to the Report.  Opp. at 36; Ex. 23 at 977 ("an article published by *Reuters* on Talcum powder led to a 10% stock decline").  And as one of plaintiff's investment managers testified, "the market reaction itself is a strong indication that there was some new information."  Ex. 37 at 57:24-58:1.  Defendants' own case law is in accord.  *Signet*, 2019 WL 3001084, at *17 ("one would not expect a company whose stock traded in an efficient market to find its share price cratering . . . upon the publication of stale, already-known information"); *See also Silverman v. Motorola, Inc*., 798 F. Supp. 2d 954, 983 (N.D. Ill. 2011) (at

- 36 -

summary judgment a "statistically significant decline" in share price after the alleged corrective disclosure "is evidence of new information" and "creates a genuine dispute").

Unable to refute the fact that the *Reuters* Report caused a statistically significant stock price decline, defendants speculate that the stock price reacted to the *Reuters* Report's purported "one-sided" nature, amounting to "free advertising" for plaintiffs' lawyers, and "increased uncertainty" concerning litigation exposure.  Opp. at 37.  Defendants' expert makes similar claims.  Kleidon Report, ¶¶210-213.  But defendants' own case law rejects such arguments, as does other authority. *See Signet*, 2019 WL 3001084, at *17 (rejecting argument that stock decline was result of "bad publicity" from *Washington Post* article rather than new information); *Waggoner*, 875 F.3d at 105 (rejecting argument that stock price decline was due to "potential regulatory action and fines" rather than the revelation of the concealed truth); *Aranaz*, 302 F.R.D. at 671-72 (rejecting argument that company's stock price was only impacted by "bad publicity and market overreaction" from article painting the defendant "as a villain," rather than revelation of new information).

Indeed, defendants' expert, Kleidon, failed to "perform any empirical testing or disaggregation analysis to determine what caused" the price drop, which "is fatal to defendants' attempts" to show a lack of price impact.  *Allstate*, 2020 WL 7490280, at *5; *see also Signet*, 2019 WL 3001084, at *17 (no showing of an absence of price impact where expert failed to "perform any event study or other empirical analysis to test" his "bad publicity" theory).  And, despite the fact that defendants have to establish that ***none*** of the price decline was fraud related, Kleidon did not offer any opinion on what part, if any, of the stock price decline was caused by the "one sided" nature of the *Reuters* Report or any "increased uncertainty."  Opp. at 37; Feinstein Rebuttal, ¶43, §V.B.4. Moreover, defendants ignore the fact that the litigation exposure, reputational risk and brand damage suffered by J&J as a result of the *Reuters* Report are inextricably intertwined with the disclosure of

defendants' fraud. *See Signet*, 2019 WL 3001084, at \*15 (defendants' fraud concealed the extent of credible allegations of sexual misconduct, including "the scope of the liability facing the company"); *cf. Waggoner*, 875 F.3d at 106 (rejecting challenge to plaintiffs' damages model because "the regulatory action and any ensuing fines were a part of the alleged harm the plaintiffs suffered").

Defendants' argument is also factually inaccurate and self-contradicting. Far from being "one-sided," *Reuters* actually provided extensive statements from J&J and its counsel, as well as statements from J&J's expert and talc supplier. *See* Opp., Ex. 2, Rows 21-22, 24-25, 27, 32, 49, 57, 75-76, 79, 85, 89, 93-94, 114. As for *Reuters* purportedly causing a stock price decline because it was "free advertising," defendants fail to square this theory with their own assertions that product liability lawyers already "heavily advertised the litigation" prior to the *Reuters* Report. Opp. at 7; Opp., Ex. 22 at 33.

Finally, defendants and their expert try to rely on analyst comments that the *Reuters* Report contained no new information. Opp. at 16. But none of the analysts said that the stock price decline on December 14, 2018 was caused by anything other than the *Reuters* Report. Feinstein Rebuttal, ¶63 n.85. And none of the analysts had previously reported on the documents or interviews discussed in the *Reuters* Report. *Id.*, ¶62. The fact that some analysts parroted the Company's defense is not evidence of a lack of price impact. *See, e.g.*, *Pearlstein*, 2021 WL 253453, at \*21 ("the presence or absence of analyst commentary" "is not a scientifically accepted method" of demonstrating absence of price impact). *See also* Exs. 38-42 (evidencing that J&J kept a guiding hand on what friendly "sell side" analysts were reporting).[25] Also, not surprisingly, defendants

---

[25] In fact, on the day the *Reuters* Report was published defendants had calls with at least 11 sell-side analysts and 15 by-side analysts. Ex. 38.

ignore the analysts and market commentators who recognized that the *Reuters* Report did reveal new information.  *See* ¶¶234-243; *see also* Feinstein Rebuttal, ¶¶63, 71-72.

> **2.    Because Defendants Fail to Demonstrate a Complete Absence of Price Impact on December 14, 2018, the Entire Class Period Should Be Certified**

As detailed above, the *Reuters* Report revealed new fraud-related information and caused a statistically significant stock price decline on December 14, 2018.  Defendants fail to offer any evidence that the decline was due to non-fraud-related factors.  As such, the Class Period appropriately ends on December 13, 2018.  And because the undisputed price decline following the *Reuters* Report compels certification of the full Class Period, defendants' arguments regarding certain of the disclosures during the Class Period are irrelevant.  Nevertheless, a review of the three additional alleged corrective disclosures that defendants challenge (July 12, 2018, January 30, 2018 and September 27, 2017) confirms that defendants have not proven zero price impact for these dates either.

> **a.    Defendants Fail to Show an Absence of Price Impact for the July 12, 2018 Corrective Disclosure**

Defendant argue that there "was no price impact" for the July 12, 2018 *Ingham* verdict for two reasons: (1) it purportedly "conveyed no new allegedly corrective information;" and (2) J&J's stock price decline was not statistically significant at the 95% level.  Opp. at 43-45.  But both arguments fail to show an absence of price impact.

First, defendants (and their expert) acknowledge, as they must, that the *Ingham* verdict was the first jury trial where the personally injured plaintiffs alleged that asbestos in J&J's talc, rather than the talc itself, caused their ovarian cancer.  Kleidon Report, ¶46.  Thus, on its face, the multi-billion dollar verdict constitutes new fraud-related information.

J&J executives acknowledged (internally) that the *Ingham* verdict had a price impact. For example, on July 15, 2018, Danielle Devine, J&J Director of Strategic Communications, emailed Gorsky about the global media coverage of J&J following the July 12, 2018, verdict: "[t]he narrative has continued to shift to ***focus on how the lawsuit may impact J&J stock*** and overall business performance ahead of earnings." Ex. 43. Likewise, market commentators confirmed that the price declined in response to the $4.69 billion verdict. ¶¶216-220, 222. Bloomberg reported that "Johnson & Johnson slipped as investors began to assess the long-term costs to the company of the legal saga surroundings it talc products" (Ex. 44), while *Fast Company* reported that "Johnson & Johnson [was] reeling from the decision; its stock is down nearly 3% in premarket trading" (Ex. 45). *Barrons* reported on July 13, 2018, that "Shares of Johnson & Johnson (JNJ) are falling on Friday, on news that the company's been ordered to pay a large fine related to claims that its baby powder caused cancer." Ex. 46.

And the form of the July 12, 2018 alleged corrective disclosure does not prove no price impact. As the Court noted in the motion to dismiss opinion:

> Defendants also contend that the articles about jury verdicts cannot constitute a corrective disclosure because "Plaintiffs cannot use a jury verdict as a conclusive disclosure of the 'truth.'" Def. Br. at 57-58 (collecting cases). However, none of the cases cited by defendant stand for the proposition that a jury verdict cannot, as a matter of law, constitute the disclosure of new information. The *Ingham* jury verdict was allegedly the first to award damages to a plaintiff linking ovarian cancer to asbestos in J&J's talc products, rather than to the talc, itself. AC ¶213. To the extent the jury verdict or documents publicly released during the lawsuit contained new information regarding an association between asbestos and ovarian cancer, and the existence of asbestos in the Company's Talc Products – revealing the alleged falsity of defendants' assertions to the contrary – the jury verdict may have been a corrective disclosure.

Opinion, 2019 WL 7207491, at *27 n.8. The same rationale holds true at this stage, and the argument should again be rejected. Indeed, in *Halliburton II Remand*, the court rejected defendants'

argument and held that a significant stock price decline following a jury verdict "show[s] price impact." 309 F.R.D. at 276-80.[26]

Second, that the price decline was not statistically significant at the 95% level does not establish an absence of price impact. As Feinstein explains, "the confidence level associated with the 13 July 2018 stock price decline is approximately 94.48%." Feinstein Rebuttal, ¶89. Thus, the results of Feinstein's event study analysis, which Kleidon recognizes are accurate, establishes with 94.48% certainty that J&J's stock price decline on July 13, 2018 was caused by J&J company-specific information and does not demonstrate an absence of price impact. *Id.* Courts routinely agree with the economic analysis provided by Feinstein and hold that defendants fail to show zero price impact by pointing to a decline that is significant at less than a 95% confidence level. *See Aeterna Zentaris*, 324 F.R.D. at 345 (price decline that was significant at the 84% confidence level did not demonstrate an absence of price impact); *In re Chi. Bridge & Iron Co N.V. Sec. Litig.*, 2020 WL 1329354, at *4 (S.D.N.Y. Mar. 23, 2020) ("No hard and fast rule dictates a cutoff of a 5% significance level to prove price impact in a securities fraud case, nor should one.").[27]

---

[26]   Defendants' argument about whether a jury verdict can constitute a corrective disclosure is a premature merits-based loss causation argument. *See Sterling Heights,* 2015 WL 5097883, at *11 (argument that a price decline was caused by non-corrective disclosures "is loss causation, and loss causation need not be proven at [the class certification] stage, . . . evidence of loss causation is irrelevant at th[is] stage"); *Centurylink*, 337 F.R.D. at 211 ("arguments about loss causation and that the market already was aware of cramming allegations, are common questions that can be adjudicated on a class-wide basis").

[27]   *See also West Palm Beach*, 2016 WL 4138613, at *14 ("it also does not 'necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact'"); *Pirnik v. Fiat Chrysler Autos. N.V.*, 327 F.R.D. 38, 46-47 (S.D.N.Y. 2018) (holding that plaintiff's expert's conclusion that a particular disclosure – determining price impact at a level below 95% – did not prove absence of price impact); *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 371 (S.D.N.Y. 2016), *aff'd in part and vacated in part*, 862 F.3d 250 (2d Cir. 2017) ("sid[ing] with [plaintiff's expert]" over defendant's expert that "not every event will move a market and that the impact of an event depends on various factors," and noting that "[t]he Supreme Court has rejected

Even if defendants' expert was correct that J&J's price decline on July 13, 2018 was not statistically significant (he is not), "the existence of non-statistically-significant stock price declines does ***not*** prove the absence of price impact." *S. Co.*, 332 F.R.D. at 393; *see also Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 444 (D. Ariz. 2019) ("The ***lack*** of statistically significant proof that a statement affected the stock price is not statistically significant proof of the opposite, *i.e.*, that it did ***not*** actually affect the stock price.") (emphasis in original); Feinstein Rebuttal, ¶¶25-26.  As the court in *Rooney* explained:

> Defendants suggest the lack of a statistically significant price adjustment following a corrective disclosure shows that whatever price adjustment has occurred must be due to "random chance" rather than a predicate misrepresentation.  But that is not how hypothesis testing works.  A statistically significant price adjustment following a corrective disclosure is evidence the original misrepresentation did, in fact, affect the stock price.  The converse, however, is not true – ***the absence of a statistically significant price adjustment does not show the stock price was unaffected by the misrepresentation***.

*Rooney v. EZCORP, Inc.*, 330 F.R.D. at 439, 450 (W.D. Tex. 2019).  Thus, even if defendants' expert's flawed analysis is accepted, a lack of statistical significance at the 95% level does not prove an absence of price impact on July 13, 2018.

As such, defendants fail to prove no price impact for the July 13, 2018 stock price decline.

### b.    Defendants Fail to Show an Absence of Price Impact for the January 30, 2018 Corrective Disclosure

Defendants argue that the Jan. 30 *Law360* article revealed no new information and thus could not have impacted the price of J&J stock.  Opp. at 42.  But, as discussed above in §III, this is a premature truth-on-the-market defense.  It also ignores the fact that J&J's stock price indisputably suffered a statistically significant decline following the release of the article.  Defendants' expert neither disputes that the January 31, 2018 decline was statistically significant, nor identifies ***any***

[defendant's expert's] absolutist view of market efficiency by making clear that 'market efficiency is a matter of degree'").

- 42 -

alternative information that could have caused that price decline. Ex. 47 at 214:5-11; Feinstein Rebuttal, ¶86. Defendants bear the burden of producing direct evidence of lack of price impact. *See Vizirgiankis*, 775 F. App'x at 53; *S. Co.*, 332 F.R.D. at 393 ("'Defendants must demonstrate that the corrective disclosures played ***no part*** in the decline in the [c]ompany's share price.'"). The statistically significant decline in J&J's stock price following the release of the article and absence of any alternative explanation for it preclude a finding of no price impact. Feinstein Rebuttal, ¶¶86-87.

The January 30, 2018 disclosures were clearly new to the market. The Jan. 30 *Law360* article reported on the opening statement in the *Lanzo* trial in which the plaintiff's attorney said that J&J and an Imerys predecessor had been aware that talc contained asbestos in the 1970s, citing a 1975 report in which the predecessor said it found asbestos in J&J baby powder. ¶192. The attorney also told the jury that J&J "got together other companies that were selling talc and they chose to call the asbestos something else – I guess on the theory that if you don't call it asbestos, then it can't cause asbestos-related diseases." *Id.*

Defendants argue that a January 16, 2018 *FairWarning* article disclosed the same information because it reported *Lanzo's* allegations that J&J's talc was known to contain asbestos since the 1970s and that J&J unsuccessfully tried to remove the asbestos. Opp. at 42. But, as noted above, the January 16 *FairWarning* article was replete with J&J's denials that its talc contained asbestos, and journalist commentary casting doubt on whether prior reports of asbestos in talc were reliable.[28] In fact, the January 16 *FairWarning* article emphasized J&J's continued claims that

---

[28]  *See, e.g.*, ¶189 ("the reports of contamination [in the 1970s] were somewhat exaggerated"); ¶188 (internal documents recognized "***potential*** asbestos content" and occasional "sub-trace quantities" of material that "***might*** be classified as asbestos fiber," and asbestos was "***potentially*** present in all talc ores in use at [that] time"); ¶189 (reporting that the documents in the article "don't settle the safety issue" concerning asbestos and talc).

4816-4886-2945.v1

asbestos had "never" been found in Johnson's Baby Powder.[29]  Moreover, the *Fair Warning* article made no mention of the same 1975 report that was later outlined in the Jan. 30 *Law360* article. Opp., Ex. 8-1.  Kleidon also fails to identify any information about the 1975 report in the *FairWarning* article.  Feinstein Rebuttal, ¶87 n.119.

Next, defendants point to the January 29, 2018 *Law.com* and *Law360* articles that "reported on the opening statements in the *Lanzo* trial" and were published just before the January 30, 2018 *Law360* article on talc went live.  Opp. at 42.  Like the January 16 article, the January 29 *Law360* article also makes no mention of the 1975 report.

Finally, defendants argue that the plaintiff's January 29, 2018 opening statement in the *Lanzo* trial was broadcast live on CVN, and mentioned the 1975 report referenced in the Jan. 30 *Law360* article.  *Id.*  Kleidon opines that a hypothetical investor who had a paid subscription to CVN would have thus been informed about the 1975 report, a day before the January 30 corrective disclosure. Kleidon Report, ¶105.  Even if this were the case, however, this broadcast stream alone cannot be realistically characterized as being "widely disseminated" to market participants.  Feinstein Rebuttal, ¶87 n.119.  Participant access via a "paid subscription" to a webcast streaming service is not the equivalent of being publicly available and in the public domain.

Thus, defendants have not proven a total absence of price impact for the January 31, 2018 stock price decline.

---

[29]   ¶189 (article reported that J&J "has said its powders are perfectly safe, and could not have caused mesothelioma"); ¶191 ("[n]o asbestos was detected in any of the products or samples" tested by the FDA in 2009-2010, including J&J Baby Powder); ¶191 ("[r]eports of asbestos contamination have [']never been proven to be correct,' declared John Hopkins, a toxicologist and former J&J executive"); ¶191 ("J&J blasted the 'baseless theory' that its powders could be harmful. 'Johnson's Baby Powder has been around since 1894 and it does not contain asbestos or cause mesothelioma,' according to the company's statement").

c.    **Defendants Fail to Show an Absence of Price Impact for the September 27, 2017 Corrective Disclosure**

Defendants claim that the September 27, 2017 Bernstein Liebhard LLP press release "did not impact J&J's stock price for two reasons": (1) it purportedly did not reveal any new information; and (2) "J&J's stock price declined that day before the press release was issued."  Opp. at 39.  Both arguments fail to prove a complete absence of price impact.

Plaintiff alleges that the September 27, 2017 press release informed investors that plaintiffs in ovarian cancer lawsuits throughout the country were looking to add asbestos allegations to their ovarian cancer claims, with those plaintiffs taking notice of internal documents being "newly unsealed." ¶184.  Defendants do not point to any earlier disclosure that ovarian cancer victims, who had already filed thousands of lawsuits against J&J, were planning to include asbestos allegations in their cases.  Instead, defendants attempt to re-write plaintiff's allegations, arguing about particular "'newly unsealed documents'" cited in a September 21, 2017 *Bloomberg* article.  Opp. at 39.  While the *Bloomberg* article noted that the documents "add another dimension to the claims against J&J," it did not explain what that meant, nor did it signal to investors that ovarian cancer plaintiffs throughout the country were planning to add asbestos allegations to their cases.  The September 21, 2017 *Bloomberg* article also included numerous false denials including defendants' claim that "our talc products are, and always have been free of asbestos, based on decades of monitoring, testing and regulation." ¶183.

Defendants also point to a September 15, 2017 *Bloomberg* article that actually did the opposite of the Bernstein Liebhard LLP press release, as it distinguished ovarian cancer lawsuits from those alleging asbestos, talking about how the science "differentiates the asbestos-in-talc cases from the ovarian cancer suits" and how "[t]his differs from the talc/ovarian cancer litigation." Opp., Ex. 10.2 (describing *Herford* trial and other mesothelioma litigation).  And defendants point to a

- 45 -

*New Jersey Law Journal* article about the appointment of a special master, which briefly mentions plaintiffs merely "investigating" the link between their ovarian cancer and powder containing asbestos generally. Opp., Ex. 10.1. None of these disclosed that the thousands of ovarian cancer plaintiffs planned to include asbestos allegations in their cases against J&J.

Defendants also argue that there could not be price impact because J&J's stock price declined before the September 27, 2017 press release. Opp. at 41. But defendants and Kleidon fail to identify any other Company-specific news that could have caused the price decline, and Kleidon does not dispute that the press release is fraud-related. Feinstein Rebuttal, ¶¶78-81. There is no dispute that the stock price decline for the full day was statistically significant at the 95% level and defendants have failed to identify any non-fraud-related disclosure that could account for that price impact. *Id.* As such, defendants have failed to show that there was no price impact for the September 27, 2027 disclosure.

### E.    The Class Period Should Begin on February 22, 2013

Defendants' argument that the class period should begin on July 16, 2013 is directly contrary to this Court's ruling on defendants' motion to dismiss and should be rejected. Opp. at 45; Opinion, 2019 WL 7207491, at *16. The class period appropriately begins on February 22, 2013, the date of the first misstatement upheld by the Court. On February 22, 2013, J&J represented that it was "committed to ***investing in research and development*** with the aim of ***delivering high quality . . . products***." ¶253. The May 3, 2013 alleged misstatement was similar. ¶258 ("The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products."). This Court plainly upheld "statements regarding quality control and assurance in the Company's SEC filings," as well as other "public announcements that, although they did not specifically reference the Talc Products, suggested that the Company was taking

- 46 -

corrective action to address quality control issues with its products." Opinion, 2019 WL 7207491, at *16. The Court also specifically held the following:

> [I]n light of Plaintiff's allegations that the Company was knowingly hiding the existence of asbestos in its Talc Products, purposefully avoiding the use of testing methods which might reveal the existence of asbestos, and making misrepresentations to the FDA regarding asbestos testing and safety, **the Court cannot conclude that the Company's representations that it was focusing on research and development**, ensuring the quality of its outside materials, a**nd providing high quality products, were "so obviously unimportant to an investor that reasonable minds cannot differ on the questions of materiality**." *Shapiro*, 964 F.2d. at 280.

Opinion, 2019 WL 7207491, at *16. The February 22, 2013 and May 3, 2013 alleged misstatements track this language and were clearly among those meant "to preclude investors and the public from second-guessing the Company's approach to quality assurance and research." *Id.*

As such, the Class Period should begin on February 22, 2013.

**F.    The Class Period Should End on December 13, 2018**

Defendants argue that the Class Period should end on February 7, 2018. Opp. at 46. But as detailed above, defendants have failed to demonstrate a complete lack of price impact for the July 12, 2018 and December 14, 2018 disclosures. As such, the Class Period should end on December 13, 2018.

First, at the pleading stage, the Court rejected this same argument because there was "sufficient doubt as to whether the true extent of the Company's alleged fraudulent scheme was revealed prior to the publication of the Reuters article." Opinion, 2019 WL 7207491, at *29. As the Court noted, after February 7, 2018, defendants "continued to issue public denials of wrongdoing and repeatedly averred that [J&J's] products were 'safe' and 'do not contain asbestos or cause mesothelioma.'" *See, e.g.*, ¶¶379-380, 382, 390." Opinion, 2019 WL 7207491, at *29. *See also* ¶¶204, 208, 210, 219-220, 222. Defendants' own denials and contradictions of the February 7, 2018 disclosure continued to impact J&J's stock price positively and artificially, and supported "a

- 47 -

reasonable basis on which an individual purchaser or the market would rely." Opinion, 2019 WL7207491, at *29. In fact, the evidence now confirms that the market **did** rely, as reflected in analysts' reports parroting J&J's talking points, and in the massive stock price decline following the *Reuters* Report. *Supra* §§III.C.2-III.D1; Feinstein Rebuttal, ¶63.

Second, plaintiff has now demonstrated through Feinstein's statistical analysis (and additional evidence detailed herein) that the true extent of the alleged fraudulent scheme was not revealed prior to the publication of the *Reuters* Report. *Supra* §§III.D.1-2. As plaintiff demonstrates, the July and December 2018 disclosures contained new and fraud-related information. *Id.* Thus, the Court's prior rationale still applies, and any "doubts regarding the reasonableness of the reliance should be resolved in favor of extending the class period." Opinion, 2019 WL7207491, at *29, citing *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984), *rev'd on other grounds*, 843 F.2d 1537 (3d Cir. 1988).

Third, defendants' argument about when the Class Period should end is premised on their truth-on-the-market and loss causation defenses, which are inappropriate at this stage.

The Class Period should end on December 13, 2018.

## IV.    CONCLUSION

For the foregoing reasons, plaintiff's Motion should be granted; the Class should be certified for the Class Period February 22, 2013 through December 13, 2018; plaintiff should be appointed as class representative; and Robbins Geller Rudman & Dowd LLP should be appointed as class counsel.

DATED:  March 19, 2021                          Respectfully submitted,

                                                ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                                DARREN J. ROBBINS
                                                ARTHUR C. LEAHY
                                                TOR GRONBORG
                                                ROBERT R. HENSSLER JR.
                                                NATHAN R. LINDELL
                                                HILLARY B. STAKEM
                                                MATTHEW J. BALOTTA
                                                JOHN R. RIGBY


                                                     *s/ Robert R. Henssler Jr.*
                                                ROBERT R. HENSSLER JR.

                                                655 West Broadway, Suite 1900
                                                San Diego, CA  92101
                                                Telephone:  619/231-1058
                                                619/231-7423 (fax)
                                                darrenr@rgrdlaw.com
                                                artl@rgrdlaw.com
                                                torg@rgrdlaw.com
                                                bhenssler@rgrdlaw.com
                                                nlindell@rgrdlaw.com
                                                hstakem@rgrdlaw.com
                                                mbalotta@rgrdlaw.com
                                                jrigby@rgrdlawcom

                                                Lead Counsel for San Diego County Employees
                                                Retirement Association and Lead Counsel for the
                                                Class

CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com

Local Counsel

- 50 -

<u>CERTIFICATE OF SERVICE</u>

I, Robert R. Henssler Jr., hereby certify that on March 19, 2021, I caused the foregoing Lead

Plaintiff San Diego County Employees Retirement Association's Reply in Further Support of

Motion for Class Certification to be served by email on the following counsel, per the Court's

instruction:

<u>*Counsel for Plaintiff*</u>:

     James E. Cecchi (jcecchi@carellabyrne.com)
     **CARELLA, BYRNE, CECCHI, OLSTEIN,**
     **BRODY & AGNELLO, P.C.**
     5 Becker Farm Road
     Roseland, NJ 07068
     Telephone: (973) 994-1700

     Darren J. Robbins (darrenr@rgrdlaw.com)
     Arthur C. Leahy (artl@rgrdlaw.com)
     Robert R. Henssler Jr. (bhenssler@rgrdlaw.com)
     Nathan R. Lindell (nlindell@rgrdlaw.com)
     Hillary B. Stakem (hstakem@rgrdlaw.com)
     Matthew J. Balotta (mbalotta@rgrdlaw.com)
     Laura Andracchio (landracchio@rgrdlaw.com)
     **ROBBINS GELLER RUDMAN & DOWD LLP**
     655 West Broadway, Suite 1900
     San Diego, CA 92101
     Telephone: (619) 231-1058

<u>*Counsel for Defendants*</u>:

     Walter C. Carlson (wcarlson@sidley.com)
     Kristen R. Seeger (kseeger@sidley.com)
     John M. Skakun III (jskakun@sidley.com)
     Christopher Y. Lee (chris.lee@sidley.com)
     **SIDLEY AUSTIN LLP**
     One South Dearborn Street
     Chicago, IL 60603
     Telephone: (312) 853-7000

Robert M. Stern (rstern@orrick.com)
**ORRICK HERRINGTON & SUTCLIFF LLP**
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 339-1706

Dated:  March 19, 2021

*s/ Robert R. Henssler Jr.*
ROBERT R. HENSSLER JR.

ROBBINS GELLER RUDMAN
 & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

*Counsel for Lead Plaintiff*