**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **FRANK HALL,** *individually and on behalf of all others similarly situated,* | |
| Plaintiff, | Civil Action No. 18-1833 (ZNQ) (TJB) |
| v. | **OPINION** |
| **JOHNSON & JOHNSON,** ***et al***, | |
| Defendants. | |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23 filed by Plaintiff, (ECF No. 180), and two Motions to Supplement the Class Certification Record filed by Defendants. (ECF Nos. 189, 192.)

This class action concerns allegations of securities fraud. Lead Plaintiff San Diego County Employees Retirement Association's ("Plaintiff") asserts that Defendant Johnson & Johnson ("J&J" or the "Company"), and several of its key officers and/or employees, including Alex Gorsky ("Gorsky"), Carol Goodrich ("Goodrich"), Joan Casalvieri ("Casalvieri"), and Tara Glasgow ("Glasgow") (collectively with J&J, "Defendants") engaged in fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (Am. Compl., ECF No. 33.) Plaintiff alleges that Defendants fraudulently inflated the value of J&J's stock by issuing false and misleading statements as part of a long-running scheme to conceal the truth from investors that the Company's talc products were contaminated with asbestos, and that Plaintiff and other investors relied on these material misrepresentations and omissions to their detriment.

The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motions to Supplement the Class Certification Record related to the alleged corrective disclosures on December 14, 2018; February 5, 2018; and February 7, 2018 (ECF Nos. 189, 192) will be **GRANTED**. Plaintiff's Motion for Class Certification (ECF No. 180) will be **GRANTED**.

## I.   <u>BACKGROUND AND PROCEDURAL HISTORY</u>

As the parties are familiar with this matter, the Court does not provide a detailed factual recitation. Instead, the Court includes certain relevant facts from its prior Opinion dated December 27, 2019 ("Prior Opinion") and discusses any additional facts in the analysis section below.

### A.   **FACTUAL BACKGROUND**

J&J is a multinational company engaged in research and development, manufacturing, and sale of a broad range of healthcare products. (Am. Compl. ¶ 20.) J&J has three business segments: pharmaceutical, medical device, and consumer. (*Id.*) The products produced by the consumer segment include Baby Powder ("Baby Powder") and "Shower-to-Shower" ("Shower-to-Shower") (collectively, the "Talc Products"), which are both made from cosmetic talc. (*Id.* ¶¶ 48, 49.) Each of the individual defendants, on the other hand, is, or was, a senior J&J executive and, along with other personnel, allegedly helped perpetuate the Company's fraudulent scheme over its investors.

Put simply, Plaintiff alleges that Defendants concealed the truth about the asbestos in its Talc Products through a highly organized campaign of deceit and regulatory manipulation. According to Plaintiff, Baby Powder "stands out as a symbol of J&J's history and legacy" and has been described by the Company's executives as "an institution," "flagship product," and "sacred cow." (*Id.* ¶¶ 43, 47.) Plaintiff contends that the Talc Products "are contaminated with cancer-

causing asbestos." (*Id.* ¶ 1.) Cosmetic talc is a naturally occurring mineral that is mined from rock and then ground into powder form. (*Id.* ¶ 49.) Talc can be naturally contaminated with different types of asbestos, such as chrysotile, tremolite, actinolite, anthophyllite, amosite, and crocidolite minerals, that develop as bundles of long, thin fibers that are flexible and easily separable, rather than as solid rock. (*Id.* ¶ 50.) Tremolite, actinolite, and anthophyllite minerals can also develop naturally as larger rocks, i.e., "non-asbestiform." (*Id.* ¶ 50 n.6.) The parties dispute the health risks, if any, posed by those minerals in their non-asbestos form, however, they agree that asbestos fibers can cause fatal cancers. (*Id.* ¶ 50 n.6; *see* ECF No. 44-1, Memorandum of Law in Support of Defendants' Motion to Dismiss First Amended Class Action Complaint, at 5.)

According to Plaintiff, in the 1970s, concerns about the safety of talc-based products and the potential for asbestos contamination began to surface, and as a result, J&J allegedly initiated a concerted effort to convince the public that talc was safe. (*Id.* ¶ 51.) Similarly, after public health researchers in the 1980's started to consider a potential association between talc powder usage and ovarian cancer, the Company's alleged scheme turned to quelling those concerns. (*Id.* ¶ 74.) To that end, the Company allegedly "lied to the public, influenced regulators, and purposely avoided testing methods that could detect the trace amounts of asbestos that the Company knew were present," (*id.* ¶ 51), and sought to preclude health organizations such as the National Toxicology Program ("NTP") and the World Health Organization ("WHO") from listing talc as a carcinogen, *id.* ¶¶ 82–84, 100–02.

Plaintiff alleges that J&J went to extreme lengths to defend its products, including updating the Company's website to address the safety of the Talc Products, and seeking to conceal negative data from the FDA. (*Id.* ¶¶ 227, 288, 299.) Plaintiff alleges that while the Company was engaged

in its offensive tactics to conceal negative data regarding its talc from the public, J&J was repeatedly informed of, and internally discussed, the asbestos contamination in its Talc Products.

In 2013, J&J began facing lawsuits alleging a connection between ovarian cancer and talc, and that asbestos in its talc powder caused cancer.  (*Id.* ¶¶ 120, 179–86, 192–201, 204, 213–22.) Plaintiff alleges that, shortly thereafter, the Company began issuing numerous false and misleading statements—a continuation of its decade's long scheme—which form the basis of Plaintiff's instant claims.  Plaintiff further alleges that the various misstatements made during the Class Period were aimed at preserving the public trust and precluding the discovery of the Company's longstanding misinformation campaign.

Despite the Company's efforts, throughout 2017 and 2018, it is alleged that the truth regarding asbestos in the Talc Products was slowly disclosed, and the Company's stock price began to decline.  (*Id.* ¶¶ 184–237.)  On September 21, 2017, a law firm issued a press release (the "Bernstein Release"), entitled "Talcum Powder Lawsuit Plaintiffs Claim Unsealed Documents Show Johnson & Johnson Knew of Talc-Asbestos Danger in 1970s, Bernstein Liebhard LLP Reports."  (*Id.* ¶ 184.)  The press release indicated that plaintiffs in the ovarian cancer lawsuits were looking to add asbestos allegations to their ovarian cancer claims.  (*Id.*)  In response to the news, J&J's stock price declined from a close of $130.94 on September 26, 2017, to a close of $129.75 on September 27, 2017, and an event study allegedly "determined that [the decline] was statistically significant" and "cannot be attributed to market and sector factors, or to random volatility, but rather was caused by new company-specific information."  (*Id.* ¶ 185, 185 n.21.)

On January 30, 2018, testimony began in a New Jersey state court case (the "*Lanzo* Case" or "*Lanzo* trial") where the plaintiff, Stephen Lanzo, alleged that he developed mesothelioma as a result of exposure to J&J Baby Powder containing asbestos.  In that connection, a Law360 article

reported on product liability plaintiffs' opening statements in the *Lanzo* trial that "asserted that Johnson & Johnson [was] aware that talc contained asbestos in the 1970s," and referenced a 1975 report that allegedly stated asbestos was found in J&J talc.  (*Id.* ¶ 192.)  In response, J&J's stock dropped 3% from a close of $142.43 on January 30, 2018, to a close of $138.19 on January 31, 2018.  (*Id.* ¶ 193.)   An event study allegedly determined that the decline was statistically significant.  (*Id.*)

On February 5, 2018, Mesothelioma.net published an article anticipating use of "damaging internal company documents" during the *Lanzo* trial.  (*Id.* ¶ 194.)  Plaintiff alleges that following the publication of that article, the value of Company's stock declined over 5%, from a close of $137.68 on February 2, 2018, to a close of $130.39 on February 5, 2018, the following trading day, which an event study determined to be statistically significant.  (*Id.* ¶ 195.)

On July 12, 2018, a jury in a Missouri product liability lawsuit (the *Ingham* case), the first trial where plaintiffs alleged that their ovarian cancer was caused by asbestos in the Talc Products, rather than talc itself, issued a $4.69 billion verdict in favor of the plaintiffs.  (*Id.* ¶ 213.)  Following the jury verdict, the Company's stock price declined 1%, which an event study determined to be statistically significant.  (*Id.* ¶ 214.)  Market commenters and financial analysts also contributed the decline to the jury verdict.  (*Id.* ¶¶ 215–18.)

On December 14, 2018, Reuters published a highly detailed investigative report (the "Reuters article") entitled, "Powder Keg: Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder."  (*Id.* ¶ 223.)   The article purportedly provided new information regarding the Company's knowledge of asbestos contamination in the Talc Products, the Company's alleged offensive campaign to convince regulators that talc was not a carcinogen, the Company's unsuccessful efforts to remove asbestos from its talc, and its failure to use "essential"

testing methods.  (*Id*. ¶¶ 223–43.)  Furthermore, the article allegedly included never-before-seen internal J&J documents that detailed the Company's knowledge of asbestos in the Talc Products and documented J&J's longstanding fraudulent cover-up scheme.  (*Id*. ¶ 223.)

Following the publication of the Reuters article, J&J's stock price plummeted 10% from a closing price of $147.78 the prior day to a closing price of $133.  (*Id.* ¶ 233.)  An event study determined that the decline "was statistically significant."  (*Id.*)

### B.    PROCEDURAL HISTORY

On February 8, 2019, plaintiff Frank Hall filed a putative class action complaint on behalf of all investors that purchased J&J securities between February 22, 2013 and February 7, 2018, alleging violations of Section 10(b) of the Securities Act of 1934 and Rule 10(b)(5) (Count 1) by all Defendants, and violations of Section 20(a) of the 1934 Act by defendants J&J, Gorsky, and Caruso (Count 2).  (*See* ECF No. 1.)  On February 28, 2019, the Court appointed San Diego County Employees Retirement Association as Lead Plaintiff.  (*See* ECF No. 20.)  An Amended Complaint was filed on February 28, 2019.  (*See* ECF No. 33.)  The new pleadings added Sandra Peterson, Carol Goodrich, Joan Casalvieri, Michael Sneed, and Tara Glasgow as defendants, and also extended the Class Period through December 2018.  (*Id.*)

Subsequently, Defendants filed a motion to dismiss, arguing that Plaintiff had failed to state a claim under the applicable securities laws because: (1) the allegedly "new" information about the existence of asbestos in J&J's talc was immaterial; (2) alleged misrepresentations and omissions were either true or a non-actionable opinion; (3) Plaintiff had failed to allege a strong inference of scienter; 4) Plaintiff had not sufficiently alleged loss causation; and (5) Plaintiff's claims based on events occurring after February 7, 2018, (the end of the class period proposed in the initial Complaint) were not viable.

On December 27, 2019, this Court granted in part and denied in part Defendants' motion to dismiss the Amended Complaint.  (*See* ECF No. 49.)  Specifically, the Court found that Plaintiff's Section 10(b) and Rule 10b–5 claims are limited to those stemming from Defendants' statements regarding the safety of its talc products, the "asbestos-free" nature of its talc, and the Company's commitment to product safety, quality assurance, and research, and Plaintiff's claims based upon Defendants' alleged misstatements about the viability of the Product Liability lawsuits are dismissed.  (*Id.*)  Furthermore, because Plaintiff had not adequately alleged facts suggesting a strong inference of scienter as to defendants Caruso, Peterson, and Sneed, the Court dismissed those defendants from the lawsuit. (*Id.*)

On May 25, 2023, Plaintiff filed the instant Motion for Class Certification (*see* Pl.'s Mov. Br., ECF No. 180-1), which Defendants opposed.  (*See* Defs.' Opp., ECF No. 181.)  The parties also filed several sur-replies and supplemental submissions which the Court considers.

On May 26, 2023, Defendants filed two Motions to Supplement the Class Certification Record.  (ECF Nos. 189, 192.)  Plaintiff opposed both motions.  (ECF Nos. 190, 197.)

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 23 governs class actions.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  "[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."  *Id.* at 590 (citing Fed. R. Civ. P. 23(a)-(b)).  Plaintiff first bears the burden of showing that the proposed class satisfies the four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  These four prongs are often referred to as numerosity, commonality, typicality, and adequacy.  *See, e.g.*, *Erie Ins. Exch. v. Erie Indem. Co.*, 722 F.3d 154, 165 (3d Cir. 2013).

Plaintiff must also show that proposed class satisfies Rule 23(b)(1), (b)(2), or (b)(3).  *Marcus*, 687 F.3d at 590.  Here, Plaintiff argues that the putative class meets the requirements of Rule 23(b)(3).  Under Rule 23(b)(3), a plaintiff must show the following:

> [Q]uestions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Pursuant to Rule 23(c)(1)(A), a court "must determine by order whether to certify the action as a class action."  Fed. R. Civ. P. 23(c)(1)(A).  The decision to certify a class or classes is left to the discretion of the court.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008), *as amended* (Jan. 16, 2009).  "[T]he requirements set out in Rule 23 are not mere pleading rules."  *Marcus*, 687 F.3d at 591 (alteration in original) (quoting *Hydrogen Peroxide*, 552 F.3d at 316).  "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence."  *Id.*  "A party's assurance to the court that it intends or plans to meet the requirements is insufficient."  *Hydrogen Peroxide*, 552 F.3d at 318.

The Third Circuit emphasizes that "'[a]ctual, not presumed[,] conformance' with Rule 23 requirements is essential." *Marcus*, 687 F.3d at 591 (alterations in original) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)). "To determine whether there is actual conformance with Rule 23, a district court must conduct a 'rigorous analysis' of the evidence and arguments put forth." *Id.* (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). This "rigorous analysis" requires a district court to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action." *Id.* (quoting *Hydrogen Peroxide*, 552 F.3d at 307, 316). Therefore, a district court "may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.'" *Hydrogen Peroxide*, 552 F.3d at 320 (quoting *Newton*, 259 F.3d at 167).

## III.   DISCUSSION

### A.   SCOPE OF THE MOTION FOR CLASS CERTIFICATION

At the outset, the Court must address the scope of Plaintiff's Motion for Class Certification, including whether to consider supplemental evidence related to the alleged corrective disclosures on February 5, 2018; February 7, 2018; and December 14, 2018.

#### 1.   First Motion to Supplement the Record

On May 26, 2023, Defendants filed a Motion to Supplement the Class Certification Record ("First Motion to Supplement"), which purportedly confirms that the December 14, 2018, Reuters article did not contain any new allegedly corrective information, and therefore, could not have impacted J&J's stock price. ("Defs.' First Motion to Supp. Mov. Br.", ECF No. 189.) Specifically, Defendants submit the Declaration of Mark Lanier (the "Lanier Declaration"). (*Id.*) Lanier was the lead trial lawyer for the twenty-two plaintiffs in the *Ingham* product liability case tried in St. Louis, Missouri in June and July 2018, and according to Defendants, the Reuters article "discussed

that case extensively, quoted Lanier, and attributed photos to him." (*Id.* at 1.)  Lanier certifies that he was a "primary source" for the Reuters article, that he provided the article's author "with information and documents regarding the talcum powder products and related litigation," and that "[e]verything that [he] provided to [the author] was publicly available" prior to the article's publication.  (*Id.* at 1–2.)   According to Defendants, the Lanier Declaration "powerfully corroborates Defendants' proof that the Reuters article contained no *new* allegedly corrective information," because "as the lead trial lawyer in *Ingham* and a 'primary source' of the article, Lanier is uniquely positioned to verify that 'all the information and documents referenced in the Reuters article' had been previously publicly available, and that the article merely rehashed the product liability plaintiffs' arguments." (*Id.* at 2.)

Because Plaintiff, in response, does not challenge the Court's ability to consider this supplemental evidence when deciding the Motion to Certify the Class,[1] the Court grants Defendants' First Motion to Supplement.  ("Pl.'s Opp. to First Motion to Supp.", ECF No. 190.) Plaintiff emphasizes only that if this "desperate" evidence is considered, Defendants' argument that the December 14, 2018, Reuters article contained no "new" corrective information, still falls short.  (*Id.* at 1.)  For example, Plaintiff highlights that Lanier acknowledges he does not have any "personal information" regarding "additional source interviews or documents" provided to Reuters in connection with the article, does not address the testimony of Professor Steven P. Feinstein, Ph.D., CFA, that the Reuters article revealed new and corrective information and caused the statistically significant price decline on December 14, 2018; does not address the admission by Defendants' own expert that the Reuters article revealed new information to the market; and fails

---

[1] The Court notes that while Plaintiff does challenge the timeliness of the Lanier Declaration in a footnote, the bulk of its argument is related to whether Lanier's testimony defeats certification with respect to the December 14, 2018 alleged corrective disclosure.

to dispute evidence of price impact provided by J&J's statistically significant stock price decline following the Reuters article's publication.  (*Id.* at 1, 8.)  In short, because Plaintiff has not provided any basis for the Court to ignore this new evidence, Defendants' First Motion to Supplement is granted.  That said, however, the Court will consider Plaintiff's substantive arguments challenging the Lanier Declaration when it evaluates the December 14, 2018, alleged corrective disclosure in connection with Plaintiff's Motion to Certify the Class.

### 2.    Second Motion to Supplement the Record

Defendants' opposition to Plaintiff's Motion for Class Certification did not challenge the certification of claims related to the alleged corrective disclosures on February 5, 2018, and February 7, 2018.  (Defs.' Opp. at 4.)  While Defendants' opposition made it clear that they disputed the merits of those claims and alleged corrective disclosures, they only challenged the certification of claims related to the four corrective disclosures added by Plaintiff when it amended the Complaint on February 28, 2019.  (*Id.*)  Those four corrective disclosures include those issued: September 27, 2017; January 30, 2018; July 12, 2018; and December 14, 2018.  On May 26, 2023, however, Defendants filed a Motion to Supplement the Class Certification Record ("Second Motion to Supplement").  ("Defs.' Second Motion to Supp. Mov. Br.", ECF No. 192.)  In this motion, Defendants ask the Court to consider "recently obtained evidence proving that Plaintiff's alleged corrective disclosures on February 5, 2018, and February 7, 2018, did not contain any new allegedly corrective information."  (*Id.* at 1.)

Specifically, Defendants submit the Declaration of Terri Oppenheimer (the "Oppenheimer Declaration") in connection with the February 5, 2018, alleged corrective disclosure and the Ted G. Meadows, Esq. Declaration (the "Meadows Declaration") in connection with the February 7, 2018, alleged corrective disclosure.  (*See* Ex. A to Second Motion to Supplement ("Oppenheimer Decl.") and Ex. B to Second Motion to Supplement ("Meadows Decl.").)  Oppenheimer was the

head writer of the Mesothelioma.net blog, and she wrote the February 5, 2018, blog post titled "Johnson & Johnson Mesothelioma Trial Likely to Expose Company Documents." (Oppenheimer Decl., ¶¶ 1, 4.) The Mesothelioma.net blog post is one of Plaintiff's alleged corrective disclosures, and it contends that the post publicly disclosed new information that revealed some or all of the "truth" that Defendants had allegedly concealed, and as a result impacted J&J's stock price. In her declaration, however, Oppenheimer certifies that the blog post "describe[d] the then-ongoing trial in *Lanzo v. Cyprus Amex Minerals Co. et al.*" against J&J, and that "the blog post was based entirely on public information gleaned from conducting internet searches." (*Id.* ¶¶ 4–5.) As for Meadows, he is a principal at the law firm of Beasley, Allen, Crow, Methvin, Portis, and Miles, P.C. ("Beasley Allen"), and has represented plaintiffs in product liability litigation against Johnson & Johnson Consumer Inc. and Johnson & Johnson regarding talcum powder products, including Johnson's Baby Powder. (Meadows Decl. ¶ 1.) On February 7, 2018, Beasley Allen published a press release about the talcum powder product liability litigation, which included quotes attributed to Meadows. The Beasley Allen press release serves as one of Plaintiff's alleged corrective disclosures, because it contends that the release disclosed new information about Defendant's purported fraud that impacted J&J's stock price. According to Meadows, however, "[n]one of the statements in the Beasley Allen press release reflected, or were based on, any documents or information that were not publicly available before the publication of the press release, whether from having been used in public trials, on J&J's own website, or in other public forms." (*Id.* at ¶ 3.)

Unlike with the First Motion to Supplement, however, Plaintiff disputes the Court's basis to consider this evidence. Plaintiff argues that "Defendants have not even attempted to show excusable neglect or good cause for supplementing the record with arguments that could have been

made and declarations that could have been obtained easily within the Court's ordered deadlines." ("Pl.'s Opp. to Second Motion to Supp.", ECF No. 197 at 3.)  According to Plaintiff, Defendants filed the Second Motion to Supplement over one year after the Scheduling Orders' deadlines for class certification, and therefore, Defendants must show good cause and excusable neglect under Rule 6(b)(1)(B). (*Id.* at 2.)  Plaintiff highlights that pursuant to the Magistrate Judge's scheduling orders in this case, Defendants' opposition to Plaintiff's Motion for Class Certification was originally served on December 11, 2020.  As such, Defendants were aware of the facts, arguments, and witnesses for nearly two years, and yet, they failed to supplement the record with the evidence from Oppenheimer and Meadows until December 22, 2021.  Indeed, Plaintiff emphasizes that even Defendants' opposition did not challenge the February 5 and February 7, 2018, alleged corrective disclosures.

Here, while the Court is sympathetic to Plaintiff's argument of timeliness, it also cannot overlook its ability to accept new evidence, nor can it disregard the potential relevancy of the Oppenheimer and Meadows Declarations.  First, it is generally accepted that new evidence relevant to class certification can be considered any time prior to final judgment.  Indeed, Rule 23(c)(1)(C) states that "[a]n order that grants or denies class certification may be altered or amended *before final judgment."* (Emphasis added).  As such, courts have recognized that this means new evidence relevant to class certification can—and should be—considered at any time before final judgment. *See Zenith Labs., Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976) (finding that "a district court is obliged to take cognizance of a changed factual situation and may alter an earlier [certification] order accordingly"); *Bayshore Ford Truck v. Ford Motor Co.*, Civ. No. 99–741, 2010 WL 415329, *7 (D.N.J. Jan. 29, 2010) ("[N]ew evidence . . . supports the need for a re-

examination of whether continued class treatment is proper.").[2]  Further, although Plaintiff argues that Defendants' motion is untimely, the Court fails to see how Plaintiff would be prejudiced by the Court's consideration of the Oppenheimer or Meadows Declarations.  In that connection, Plaintiff's opposition to the Second Motion to Supplement substantively challenges the evidence obtained from Oppenheimer and Meadows, arguing that even when considered, Defendants fail to show a complete lack of price impact.

Second, the Court notes that Plaintiff does not challenge the relevancy of the statements made by Oppenheimer or Meadows.  Rather, aside from challenging the timing of the application, Plaintiff simply argues that Defendants still fail to show a complete lack of price impact with respect to the February 5 and February 7 alleged corrective disclosures.  It is irrefutable that the Oppenheimer and Meadows Declarations speak to a critical question in the Court's class certification decision: whether the alleged corrective disclosures were based entirely on public information.  Recognizing the import of this question—and the potential impact of this new evidence—the Court concludes that it should consider the statements by Oppenheimer and Meadows in its class analysis.  Accordingly, the Court grants the Second Motion to Supplement.

## B.    RULE 23(a) REQUIREMENTS

Having identified the scope of the record, the Court turns to the requirements of class certification.  As set forth above, Rule 23(a) sets forth four prerequisites for class certification: (1) the class must be so numerous that joinder of all members is impractical ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims of the representative parties must be typical of the claims of the class ("typicality"); and (4) the

---

[2] The Court also notes the practical reality of this new evidence. As Defendants argue in reply, if a class including the February 2018 disclosures is certified without the Court having considered the Oppenheimer or Meadows Declarations, Defendants will simply move to decertify the class. Thus, in order to conserve time and judicial resources, it behooves the Court and the parties to consider this evidence now at this juncture.

representative parties must fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a).  As it relates to the six alleged corrective disclosures at issue, here, Defendants do not dispute that the requirements of numerosity, commonality, typicality, adequacy, and superiority under Rule 23(a) are all satisfied.  (*See generally* Defs.' Opp.)  Because Defendants raise no objections about whether the proposed class meets the Rule 23(a) requirements, the Court concludes that the proposed class meets those prerequisites.  Accordingly, the Court will focus its discussion on Plaintiff's ability to satisfy the Rule 23(b)(3) requirements.

### C.    RULE 23(b)(3) REQUIREMENTS

As discussed, Plaintiff seeks to certify its class pursuant to Rule 23(b)(3).  The requirements for Rule 23(b)(3) class certification are that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011) (citing Fed. R. Civ. P. 23(b)(3)).  These elements are commonly referred to as the "predominance" and "superiority" requirements.  *Id.*  The Third Circuit has also recognized that "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable."  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015).  Notably, however, Defendants do not challenge class certification with respect to superiority and ascertainability.  (*See generally* Defs.' Opp.)  Instead, Defendants argue simply that class certification in this case turns on the *Basic* presumption of reliance which exists under the predominance requirement.  (*Id.* at 21.)

The predominance requirement is "a 'far more demanding' standard than the commonality requirement of Rule 23(a)."  *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018) (quoting

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)).  It "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). "Predominance turns on the 'nature of the evidence' and whether 'proof of the essential elements of the cause of action requires individual treatment.'" *Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016) (quoting *Hydrogen Peroxide*, 552 F.3d at 311).

"At the class certification stage, the predominance requirement is met only if the district court is convinced that 'the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (quoting *Gonzalez*, 885 F.3d at 195 (internal quotation omitted)).  To assess this requirement, district courts "must look first to the elements of the plaintiffs' underlying claims and then, 'through the prism' of Rule 23, undertake a 'rigorous assessment of the available evidence and the method or methods by which [the] plaintiffs propose to use the evidence to prove' those elements." *Id.* at 128 (quoting *Marcus*, 687 F.3d at 600).

In this instance, Plaintiff seeks class certification on its Section 10(b) and Rule 10b-5 claim. To establish its securities claims, Plaintiff must establish "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

At the class certification stage, the Court need not consider materiality and loss causation, but must consider reliance. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 473 (2013) (materiality); *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*, 563 U.S. 804, 812–13 (2011) (loss causation); *Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II)*, 573 U.S. 258, 267 (2014) (reliance). To establish reliance, a plaintiff may invoke the rebuttable presumption set forth in *Basic, Inc. v. Levinson*, that all investors rely on the integrity of the market price when deciding whether to buy or sell stock. 485 U.S. 224, 246–47 (1988). The *Basic* presumption of reliance is based on the "fraud-on-the-market" theory, which provides that where a company's stock trades on an efficient market, its stock price incorporates all material public information, including misrepresentations. *See id.* at 246–47. A plaintiff bears the burden to invoke the *Basic* presumption by showing: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. If the plaintiff meets that initial burden, the defendant may rebut the presumption by making "[a]ny showing that severs the link between the alleged misrepresentation and either the prices received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248.

Here, Defendants challenge only one prerequisite to class certification under Rule 23(b)(3): whether common questions of reliance predominate over questions affecting only individual class members. (Defs.' Opp. at 21.) In that connection, they contend that the certification of claims related to the corrective disclosures on September 27, 2017; January 30, 2018; February 5 and 7, 2018; July 12, 2018; and December 14, 2018, is inappropriate because those corrective disclosures contained no "new" information, *i.e.*, any of the allegedly corrective information was already

publicly available.  (*Id.* at 23–45.)  Accordingly, Defendants argue that the class period cannot begin before July 16, 2013, because the Court dismissed claims relating to each of the five alleged misstatements made prior to that date, and cannot extend past February 7, 2018, because individual questions of reliance predominate for alleged corrective disclosures on July 12, 2018, and December 14, 2018.  (*Id.* at 45–46.)

As to the start of the class period, Defendants submit that the alleged misstatements on February 22, 2013, April 25, 2013, and May 3, 2015, are "general value-oriented statements" that do not specifically address the Talc Products or make any specific claims about the Company's quality assurance process and procedures, and as such those statements were dismissed by the Court.  (*Id.* at 45) (citing MTD Opinion at 31.)  And the alleged misstatements on February 22, 2013, and May 3, 2013, which discuss the product liability cases, the Company's confidence in the products at issue, and the inability to predict the outcome of litigation, were also dismissed by this Court.  (*Id.*) (citing MTD Opinion at 31.)  As for the end date for the class period, Defendants contend that, as argued in further detail below, there was no price impact for the alleged corrective disclosures on July 12, 2018, and December 14, 2018, pursuant to Plaintiff's efficient market theory.  (*Id.* at 46.)  Thus, according to Defendants, Plaintiff's Motion to Certify Class should be denied in its entirety.  (*See generally* Defs' Second Motion to Supp. ¶ 15)

Plaintiff, on the other hand, argues that it has established, and Defendants have failed to rebut, the fraud-on-the-market presumption of reliance.  First, according to Plaintiff, Defendants' argument, at best, "present[s] a premature merits-based defense that cannot preclude certification, because it goes to whether entire claims should be dismissed, not whether individual reliance issues will predominate."  (Pl.'s Reply at 9.)  Second, Plaintiff argues that even considering the relevant evidence, Defendants have failed to prove a total absence of price impact.  (*Id.* at 23–46.)  In that

regard, Plaintiff submits that the four corrective disclosures challenged by Defendants revealed new information as to the seriousness and extent of the alleged fraud which could not have been previously reflected in the stock price.  (*Id.* at 23.)  Further, Plaintiff claims that because the Reuters article, which ends the Class Period, revealed new information about Defendants' fraudulent conduct, price impact is demonstrated for the entire Class Period.  (*Id.*)

### 1.   Truth-on-the-Market

First, as mentioned above, Plaintiff argues that Defendants' entire argument is a "thinly disguised 'truth-on-the-market' defense which is not properly considered or resolved at the class certification stage," and therefore, no obstacle exists to class certification.  "The 'truth of the market' defense recognizes that a statement or omission is materially misleading only if the allegedly undisclosed facts have not already entered the market."  *Winer Family Trust v. Queen*, Civ. No. 03-4318, 2004 WL 2203709, at *4 (ED. Pa. Sept. 27, 2004), *aff'd sub nom*, 503 F.3d 319 (3d Cir. 2007).  In other words, the truth on the market defense is where "the market was already aware of the truth regarding defendants' misrepresentations at the time the class members purchased their shares, meaning the market price had already adjusted to the revelation of defendants' misstatements, and class members could not have relied on those misstatements in choosing to buy stock."  *Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485 (2d Cir. 2018).  Plaintiff submits that courts have routinely held, however, that the truth-on-the-market defense is not appropriately resolved at the class certification stage.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481 (2013); *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 602 (7th Cir. 2020); *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, No. 15-3187, 2018 WL 1535156, at *4 (N.D. Ill. Mar. 29, 2018) ("Numerous courts have agreed that a 'truth on the market' defense cannot be used to rebut the presumption of reliance at the class-certification stage."); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, Civ. No. 15-1249, 2017 WL 2062985, at *5

(S.D.N.Y. May 15, 2017); *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 12-1737, 2015 WL 224631, at *7 (S.D. Cal. Jan. 15, 2015).

Although the Court agrees with the well-settled premise that an assessment of materiality is inappropriate for class certification, it still must consider Defendants' evidence to the extent that it demonstrates there was no price impact for the challenged corrective disclosures under Plaintiff's efficient market theory.  Indeed, as the Supreme Court acknowledged in *Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*, courts at class certification "must take into account *all* record evidence relevant to price impact, regardless of whether that evidence overlaps with materiality or any other merits issue."  141 S. Ct. 1951, 1961 (2021) (emphasis in original).  In that regard, the Supreme Court recognized that materiality and price impact are overlapping concepts, explaining that "evidence relevant to one will almost always be relevant to the other."  *Id.* at 1961 n 2.  That said, "a district court may not use the overlap to refuse to consider the evidence."  *Id.* (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 608 (7th Cir. 2020)).  Instead, the district court must use the evidence to decide the price impact issue "while resisting the temptation to draw what may be obvious inferences for the closely related issues that must be left for the merits, including materiality."  *Id.* (quoting *In re Allstate*, 966 F.3d at 609).

Here, Defendants are not arguing about the "truth" of the information or about how a reasonable investor would consider the total mix of available information.  Rather, Defendants contend that the allegedly corrective information was not new, and as such, it "did not actually affect the stock's market price" on the corrective disclosure dates.  Because Defendants' evidence about the prior public availability of allegedly corrective information is necessarily probative of

20

price impact, it must not be so quickly brushed aside.  The Court therefore rejects Plaintiff's argument related to Defendants' supposed "truth-on-the-market defense."[3]

### 2.   The Rebuttable Presumption of Reliance under *Basic*

A plaintiff may show reliance by invoking the *Basic* rebuttable presumption that all investors rely on the integrity of the market price when deciding whether to buy or sell stock.  485 U.S. 224, 246–47 (1988).  To determine whether the market for a security is efficient, courts in the Third Circuit look to the factors identified in *Cammer v. Bloom* and *Krogman v. Sterritt*.  711 F. Supp. 1264 (D.N.J. 1989); 202 F.R.D. 467 (N.D. Tex. 2001).  Plaintiff's expert comprehensively addressed and analyzed the *Cammer* and *Krogman* factors.  (Pl.'s Mov. Br. at 17.)  The expert opined that during the relevant period, J&J stock satisfied all of the *Cammer* and *Krogman* factors.  (*Id.* at 18.)  Notably, Defendants do not challenge market efficiency or whether Plaintiff is entitled to the presumption.  Further, the Court, having reviewed Plaintiff expert's analysis regarding the *Cammer* and *Krogman* factors, finds that Plaintiff has adequately shown that J&J stock traded in an efficient market and has therefore established a rebuttable presumption of reliance.

### 3.   Defendants' Burden to Rebut the Fraud-on-the-Market Presumption of Reliance

Defendants bear the burden of persuasion to rebut the presumption of reliance to prove a lack of price impact by a preponderance of the evidence.  *Goldman*, 141 S. Ct. at 1963.  At class certification, "[t]he district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact."  *Id.*  "In assessing price impact at class certification, 'court should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose

---

[3] The Court notes that Plaintiff appears to concede this argument as well. In a letter to the Court dated July 22, 2021, Plaintiff writes that it "agrees with defendants that *Goldman* clarified that the Court must consider all relevant evidence in assessing whether defendants have met their burden of proving a lack of price impact." (ECF No. 188).

of common sense.'"  *Id.* at 1960 (citing *In re Allstate Corp. Sec. Litig.*, 966 F.3d at 613).  Even if

the evidence also relates to a merits question, like materiality, courts must nevertheless consider

the evidence as it relates to price impact.  *See id.* at 1960–61; *see also Halliburton II*, 573 U.S. at

284.

Importantly, the Supreme Court clarified that a defendant bears the burden to rebut the

presumption by a preponderance of evidence, consistent with the Court's holdings in *Basic* and

*Halliburton II*: "The defendant must 'in fact' 'seve[r] the link' between a misrepresentation and

the price paid by plaintiff—and a defendant's mere production of *some* evidence relevant to price

impact would rarely accomplish that feat." *Goldman*, 141 S. Ct. at 1962 (emphasis in original).

Thus, "defendant's burden of persuasion will have bite only when the court finds the evidence in

equipoise—a situation that should rarely arise."  *Id.*

Here, Defendants seek to rebut the presumption for all six of the alleged corrective

disclosures by arguing that the disclosures contained no new information that was not already

publicly available.  Therefore, Defendants argue that (1) because the information was not new,

then the disclosures could not have impacted the stock price and (2) Plaintiff's position runs

contrary to the efficient market theory because "repetition of already public information cannot

impact the stock price because it was fully incorporated into the price when first released."  (Defs.'

Sur-Reply, ECF No. 184 at 4).

Courts have considered a defendant's burden to overcome the *Basic* presumption where

there are disclosures that allegedly contain no new information post-*Goldman.*  In *Allegheny*

*County Employees' Retirement System v. Energy Transfer LP*, the defendants argued that the

"corrective disclosures themselves weren't 'new' news such that they would have an impact on

the price in an efficient market."  623 F. Supp. 3d 470, 484 (E.D. Pa. 2022).  The court did not

accept the defendant's broad and sweeping argument that the *Basic* presumption is rebutted simply because information in the disclosures was already known.   Rather, the court reviewed the disclosures individually to determine the impact, if any at all, the public information had on the disclosures.   For example, the court agreed that an October 27, 2018 article republished all the information contained in an October 21, 2018, article.   *Id.* at 500–01.   Notably, both articles contained information about events that took place a month prior in September 2018.   *Id.* at 501. However, the court found that even though the October 27 article was essentially a reprint, it was nevertheless important because: (1) the story became more significant because it was deemed worthy of a reprint; (2) the reprint brought the story to a wider, national audience; and (3) the reprint heightened awareness to a particular issue, which increased the likelihood that investors would watch and monitor the issue more closely.   *Id.*   In short, the fact that the information was previously made public does not preclude the possibility that any later disclosure of that information could impact a stock's price.

In another post-*Goldman* case, *In re Qualcomm Inc. Securities Litigation*, a court agreed with the defendants' arguments that because "there was public information available . . . that mirrors the corrective disclosures makes it less likely that the corrective disclosures were actually curative."   2023 WL 2583306, at *13 (S.D. Ca. Mar. 20, 2023).   The court provided that the "corrective disclosures [that] only repeated already public information . . . makes it less likely that Defendants' alleged misrepresentations inflated Qualcomm's stock price on the front end and the information in the disclosures caused the price drop on the back end."   *Id.*   In addition to considering the already public information, the court also analyzed the specific versus generic nature of the statements as well as the quantitative impact of the disclosures.   *Id.* at *11–14.

Viewing the evidence together, the court ultimately concluded that the defendants rebutted the *Basic* presumption.

4. <u>Defendants' Ability to Rebut the Fraud-on-the-Market Presumption of Reliance</u>

Under the above legal standards, the Court considers whether Defendants have rebutted the presumption by proving lack of price impact as to the six alleged corrective disclosures.

*i. September 27, 2017 Alleged Corrective Disclosure*

First, Defendants contend that the *Basic* presumption is rebutted for the September 27, 2017, corrective disclosure. (Defs.' Opp. at 38.) Defendants argue that the Bernstein Release (1) did not disclose any new allegedly corrected information and (2) J&J's stock price declined before the Bernstein Release, not in response to it. (*Id.* at 39–41.)

Specifically, Defendants argue that the information in the Bernstein Release "was already publicly available and 'impounded in the market price' as of September 27, 2017" because it was published in two Bloomberg articles on September 15, 2017, and September 21, 2017. (*Id.* at 39.) According to Plaintiff, however, the Bernstein Release "signaled to J&J investors that plaintiffs in ovarian cancer lawsuits throughout the country were looking to add asbestos allegations to their ovarian cancer claims." (FAC ¶ 184.) Defendants respond that the two Bloomberg articles already covered the fact that "J&J was facing additional claims based on allegations of asbestos contamination" and that "ovarian cancer plaintiffs in other J&J cases had stated publicly in court filings that they were 'currently investigating the link between our clients' ovarian cancers and talcum powder containing asbestos fibers." (Defs' Sur-Reply at 19.) Though the two Bloomberg articles discuss J&J potentially facing claims relating to asbestos, it was the Bernstein Release that "disclosed that the thousands of ovarian cancer plaintiffs planned to include asbestos allegations

in their cases against J&J." (Pl.'s Reply at 46.) The Bernstein Release was more than a republication of already known information as it signaled a new development to J&J investors.

Defendants' second, and more compelling argument, is that J&J's stock price opened on September 27, 2017, at $131.00 and closed at $129.75—a decline of $1.25. (Defs.' Opp. at 41) (citing Ex. 25, Kleidon Report ¶¶ 96–99.) The Bernstein Release was issued at 11:46 a.m. EST, and according to J&J's intraday trading history, 97% of the day's decline—$1.21 of $1.25— occurred before that time. (*Id.*) According to Defendants' expert, an intraday event study confirmed that the $0.04 decline in J&J's stock price *after* the Bernstein Release was issued was "not statistically significant." (*Id.*)

"[C]ourts generally require a party's expert to testify based on an event study that meets the 95% confidence standard" that a disclosure had a negative impact on a stock price, *Halliburton II Remand*, 309 F.R.D. at 262, but courts have also found that stock prices have been impacted when the confidence level was below 95%. See *Allegheny*, 623 F. Supp. 3d at 487 ("[I]t should be noted that even a lack of statistical significance is not invariably fatal to a plaintiff's case. Event studies have an inherent rate of error, and where the statistical evidence does not disprove a null value to the requisite confidence level, numerous courts have recognized that as a matter of logic such absence of proof is not proof of absence."); *Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51, 53 (3d Cir. 2019) ("And even were plaintiffs' study attempting to demonstrate a price impact, the district court reasoned that its failure to do so is not necessarily proof of the opposite."). Thus, "courts routinely reject the argument that a non-statistically significant stock price decline proves an absence of price impact." *Allegheny*, 623 F. Supp. at 487 (quoting *Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370 (N.D. Ga. 2019)).

Here, even though the price decline was not at the traditionally "statistically significant" standard, when considering the price decline in conjunction with the information published in the Release and that Defendants have not identified another explanation for the price decline, the Court concludes that Defendants have not rebutted the presumption.

### ii. January 30, 2018 Alleged Corrective Disclosure

With respect to the Law360 article published on January 30, 2018, Defendants again contend that all of the allegedly corrective information was already publicly available. (Defs.' Opp., 41–43.) Plaintiff alleges that the January 30, 2018, Law360 article titled "No Asbestos in J&J Talc, NJ Jury Told In Mesothelioma Case," which reported on the first days of the *Lanzo* trial, was corrective because (1) it stated that plaintiffs in the product liability cases "have asserted that Johnson & Johnson . . . [was] aware that talc contained asbestos in the 1970s," and cited "a 1975 report in which the predecessor company allegedly said it found asbestos in the Johnson & Johnson powder" as evidence for this claim, and (2) the article described a statement by plaintiffs' attorney in *Lanzo* that "Johnson & Johnson 'got together with other companies that were selling talc and they chose to call the asbestos something else.'" (FAC ¶ 192.) But, according to Defendants, all of this was previously disclosed in several articles published before January 30, 2018. (Defs.' Opp at 41–43.) Defendants identify the following sources containing the information Plaintiff alleges is corrective: (1) a January 16, 2018, article included allegations that J&J knew that its talc powder contained asbestos; (2) two articles published on January 29, 2018, one day before the Law360 article, reported on the opening statements made in the *Lanzo* trial and referenced how J&J called "asbestos something else"; and (3) lawyers referenced the 1975 report in the *Lanzo* trial opening statements that took place on January 29, 2018. (*Id.* at 42–43.)

It is clear that there is an overlap of information published in the Law360 article and the two January 29 articles. However, one piece of information missing from the January 29 articles,

but referenced in the Law360 article, is the 1975 report.  (Pl.'s Reply at 44.)  The parties do not dispute that the 1975 report was discussed during the *Lanzo* trial opening arguments.  Instead, the parties dispute whether the statements made during the trial can be considered public or "widely disseminated."  (Defs' Opp. at 42; Pl.'s Reply at 44; Defs' Sur-Reply at 18.)  Notwithstanding the parties' dispute over the public nature of the statements, the Court nevertheless concludes that Defendants cannot show that the Law360 article had no impact to J&J stock price.  Even if the Court accepts Defendants' position that statements made during the *Lanzo* trial are public, it does not preclude a finding that an article analyzing the 1975 report a day after the trial could still affect the stock price.  Here the analysis turns on whether Defendants can "sever the link" between the statement and the stock price by a preponderance of the evidence and not how public or "widely disseminated" the information was.  Accordingly, an article published on January 30, 2018, discussing a report made public only a day before during the opening statements of a trial may still impact a stock's price.  The Court therefore finds that Defendants do not rebut the *Basic* presumption of reliance.

          iii.    *February 5, 2018 and February 7, 2018 Alleged Corrective Disclosures*

Next, as outlined above in connection with the Second Motion to Supplement, Defendants challenge the February 5 and February 7 alleged corrective disclosures.  Though Defendants did not initially challenge these two disclosures, (Defs' Opp. at 45 n. 35), Defendants now contend that the Oppenheimer and Meadows Declarations prove that the alleged corrective disclosures did not contain any new allegedly corrective information.  Again, Defendants attempt to rebut the presumption by arguing that there could be no price impact because there was nothing new in either disclosure.  (*See generally* Defs.' Second Motion to Supp. Mov. Br.; Defs.' Reply to Second Motion to Supp.)  However, as previously discussed, merely referencing information already made public does not itself preclude a finding that the disclosures cannot be certified.

Again, while the Court need not determine whether the disclosures are corrective at this stage, the Court must determine whether Defendants have met their burden to sever the link between the disclosures and the price impact.  The February 5 blog post and the February 7 press release did analyze and report on statements made during the *Lanzo* trial about forthcoming, damaging J&J documents.  However, the Court is not persuaded that the February 5 and February 7 disclosures merely "repackaged" information that was already public.  (Defs.' Reply to Second Motion to Supp. at 2.)  While the information in the blog post and the press release might make price impact slightly less likely, the following facts undermine Defendants position: (1) Plaintiff's expert opines that a statistically significant decline followed both disclosures, (Pl.'s Opp. to Second Motion to Supp. at 17, 22); (2) news media, financial analysts, and J&J employees' reaction to the disclosures "belies any argument that the disclosure was devoid of new information", (*id.* at 18–20); and (3) Defendants have not offered any other explanation for the stock price drop other than the disclosures, nor did Defendants' expert analyze the cause of the price drop, (*id.* at 14).  Accordingly, taking all of the evidence together, the Court finds that Defendants have not rebutted the *Basic* presumption.

iv.    *July 12, 2018 Alleged Corrective Disclosure*

As to the July 12, 2018, alleged corrective disclosure, Defendants submit that the *Ingham* verdict did not disclose any new allegedly corrective information, nor was J&J's stock price decline on July 13, 2018 statistically significant. (Defs' Opp. at 43–45.)  Defendants' position is that "the only new information [the verdict] conveyed was that the jury accepted the plaintiffs' theory of the case" because all information relating to the association between asbestos and ovarian cancer was already introduced during the course of the trial and reported on by various media outlets.  (*Id.* at 43.)  Plaintiff disagrees.  Plaintiff argues that the *Ingham* verdict was the first trial

containing allegations that the asbestos in talc caused ovarian cancer and therefore the "multi-billion dollar verdict constitutes new fraud-related information." (Pl.'s Reply at 39.)

The Court is not persuaded that the verdict had *no* impact at all on the stock price. Similar to the January 30, 2018 article discussed above, here, the parties do not dispute that there was considerable evidence demonstrated throughout the trial relating to asbestos in talc. However, agreeing that the final verdict relates to the information presented at trial does not preclude a finding that the announcement of the verdict itself would not affect J&J's stock price. Though the parties dispute whether the verdict constitutes a corrective disclosure, the Court declines to resolve that dispute on this motion for class certification. *See Halliburton II Remand*, 309 F.R.D. 251, 261–62 (N.D. Tex. 2015) ("This Court holds that *Amgen* and *Halliburton I* strongly suggest that the issue of whether disclosures are corrective is not a proper inquiry at the certification stage. *Basic* presupposes that a *misrepresentation* is reflected in the market price at the time of the transaction.") (emphasis in original).

Further, Defendants attempt to characterize the stock price movement on July 13, 2018 as "not statistically significant" fails for the same reasons explained above for the September 27 disclosure. (Defs' Opp. at 44.) Here, the evidence showed that the confidence level for the July 13, 2018 stock price was 94.48%, just shy of the generally accepted standard. That, alone, is not enough to rebut the *Basic* presumption. Looking at the evidence altogether, the Court does not agree that Defendants have rebutted the presumption.

     *v.*   *December 14, 2018 Alleged Corrective Disclosure*

Finally, the parties dispute the December 14, 2018, alleged corrective disclosure. The majority of the parties' briefing focuses on this specific disclosure, and the parties rigorously contest whether the information in the Reuters article is new. However, before the Court provides a general summary of the parties' arguments, the Court emphasizes that the burden is on

Defendants to establish a *lack* of price impact between the disclosure and a stock price decline. To satisfy this burden, Defendants must do more than produce evidence that is relevant to price impact; Defendants must "sever the link" between the disclosure and the stock price decline. *Goldman*, 141 S. Ct. at 1962–63.

Defendants contend that the market was well aware of the allegations that J&J knew of and covered up asbestos contamination "long before" they were published in the Reuters article. (Defs.' Opp. at 23.)  According to Defendants, the allegations made against J&J in the Reuters article formed the basis for the claims in several trials predating publication of the article, including "*Herford* (10/6/17–11/6/17), *Lanzo* (1/29/18–4/11/18), and *Ingham* (6/6/18/–7/12/18)." (*Id.* at 23–24.)  In addition, Defendants submit that the allegations found in the Reuters article were "reported widely and repeatedly in the press." (*Id.* at 24.)  And, to the extent that the Reuters article states that it is based on fifty-six "internal documents" produced by J&J in connection with product liability litigation, Defendants claim that they, and their expert, have "traced every document linked or quoted" in the article, and that "100% were publicly available" by September 2018. (*Id.* at 26–27.)  It is Defendants' position that because the article did not contain anything "new," the allegedly corrective information in the article cannot have impacted J&J's stock price. (*Id.* at 33–36.)

Unsurprisingly, Plaintiff disagrees and argues that the Reuters article contains several additional new pieces of information, and contains Reuters' "findings and analysis from its independent investigation." (Pl.'s Reply at 24–27.)  According to Plaintiff, it is the *analysis* in the article that constitutes new information, and Defendants cannot overcome their burden by tracing the documents linked in the article to documents that were already publicly available. (*Id.* at 32–33).  Plaintiff also asserts that the report "kicked off a flurry of reaction" at J&J, including a team

of lawyers and executives spending days working on a response and an $8 million increase to the J&J media budget to respond to the report.  (*Id.* at 27.)  Such actions, Plaintiff contends, "would hardly be necessary if the Reuters Report was nothing but stale information."  (*Id.*)

Having reviewed all of the evidence surrounding the December 14, 2018, disclosure, the Court concludes that Defendants have not rebutted the presumption.  It is not disputed that the Reuters article references previously disclosed documents.  (*See generally id.*)    As Plaintiff underscores, however, "the fact that some of the 56 linked documents" were found on a J&J website "hardly compares to Reuters' careful analysis.  Indeed, Reuters painstakingly annotated the various documents linked, explaining and providing necessary context."  (*Id.* at 33.) Defendants' various arguments as to why the disclosure does not contain any new information may make it less likely that the disclosure impacted the stock price, but the Court finds that it does not suffice to rebut the presumption of price impact by a preponderance of the evidence.

### D.    CLASS DEFINITION

Rule 23(c)(1)(B) requires that the class-certification order or incorporated opinion indicate "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis."  *Byrd*, 784 F.3d at 163 (citing *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187–88 (3d Cir. 2006)).  Therefore, the Court will certify a Rule 23(b)(3) class ("the Class"), defined as:

> All persons who purchased or otherwise acquired publicly traded J&J equity securities, as defined in 15 U.S.C. § 78c(11) and 17 C.F.R. § 240.3a11-1, between February 22, 2013 and December 13, 2018.

The following will be excluded from the class: defendants, present or former executive officers of defendants and members of their immediate families, present or former directors of

defendants and members of their immediate families, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded party.

Finally, SDCERA will be certified as Class Representative and Robbins Geller Rudman & Down LLP will be appointed as class counsel.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motions to Supplement the Class Certification Record related to the alleged corrective disclosures on December 14, 2018; February 5, 2018; and February 7, 2018 will be **GRANTED**.  Plaintiff's Motion for Class Certification will also be **GRANTED**.  An appropriate Order will follow.

Date: **December 28, 2023**

<u>s/ Zahid N. Quraishi</u>
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

32